# EXHIBIT B

S-4 1 a2225056zs-4.htm S-4

Use these links to rapidly review the document
TABLE OF CONTENTS
TABLE OF CONTENTS

Table of Contents

As filed with the Securities and Exchange Commission on June 16, 2015

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## Form S-4
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933

## Crestwood Equity Partners LP
(Exact name of registrant as specified in its charter)

| Delaware | 5960 | 43-1918951 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary standard industrial classification code number) | (I.R.S. Employer Identification Number) |

700 Louisiana Street, Suite 2550
Houston, Texas 77002
(832) 519-2200
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

Robert T. Halpin
700 Louisiana Street
Suite 2550
Houston, Texas 77002
(832) 519-2200
(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

| G. Michael O'Leary, Jr. | Gislar R. Donnenberg | David F. Taylor |
|---|---|---|
| Andrews Kurth LLP | Paul Hastings LLP | Locke Lord LLP |
| 600 Travis Street, Suite 4200 | 600 Travis Street, 58th Floor | 600 Travis Street, Suite 2800 |
| Houston, Texas 77002 | Houston, Texas 77002 | Houston, Texas 77002 |
| (713) 220-4200 | (713) 860-7300 | (713) 226-1200 |

Table of Contents

## THE MERGER

**Background of the Merger**

The senior management of CEQP and Midstream (the "Crestwood Entities" or "Crestwood") and the Equity GP Board and Midstream Board (together, the "Crestwood Boards") regularly review operational and strategic opportunities to improve the competitive positioning of the partnerships and maximize value for investors of CEQP and Midstream, respectively. In connection with these reviews, management and the directors from time to time evaluate potential transactions that would further Crestwood's strategic objectives.

As more fully described in the section entitled "Certain Relationships; Interests of Certain Persons in the Merger," CEQP and Midstream are under common control. Midstream is owned 100% by its limited partners and its non-economic general partner, Midstream GP. Midstream was formed by CEQP in September 2004 for the purpose of holding certain of CEQP's midstream investments. Midstream GP and 100% of Midstream's IDRs are owned by Midstream Holdings, a wholly owned subsidiary of CEQP. CEQP and CGS collectively own 7,159,438 of Midstream's outstanding common units.

Crestwood's senior management from time to time considers and pursues merger and acquisition opportunities designed to grow the combined business and create unitholder value. Since mid-2014, Crestwood's management, with the assistance of Citigroup Global Markets Inc. ("Citi"), Crestwood's financial advisor, has considered and discussed with the Crestwood Boards numerous opportunities intended to improve Crestwood's competitive positioning and enhance unitholder value, including third party mergers, a recapitalization of CEQP, a combination of the Crestwood Entities, and asset divestitures, including a "drop-down" of CEQP's natural gas liquids ("NGL") assets to Midstream ("NGL drop-down").

On August 14, 2014, at meetings of the Crestwood Boards held to explore the strategic direction of the Crestwood Entities, senior management and the directors reviewed various strategic alternatives under consideration. Robert Halpin, Senior Vice President and Chief Financial Officer of the Crestwood Entities, reviewed potential NGL drop-down structures and the benefits and challenges of each of the structures. William Moore, Senior Vice President, Strategy & Corporate Development of the Crestwood Entities, presented information regarding a potential strategic combination with a company that owns significant gathering, processing and fractionation assets in the western United States ("Project Sundance"). Mr. Moore also reviewed Kinder Morgan Inc.'s transaction to acquire all of the outstanding common units of Kinder Morgan Energy Partners, L.P. and El Paso Pipeline Partners, L.P., and discussed how a comparable CEQP—Midstream transaction could be structured and the potential accretive/dilutive impact of such a transaction.

In connection with the strategic board meetings, Crestwood's senior management selected two institutional investors to help evaluate Project Sundance, provide the capital support required by Crestwood for the transaction and become a co-sponsor of Crestwood with First Reserve. Historically, Crestwood's senior management has kept an active dialogue with multiple large-scale capital providers, including infrastructure funds and private equity funds, to continuously progress working relationships and avenues for equity capital support in addition to the public capital markets.

In September 2014, Crestwood's management had numerous discussions with the selected institutional investors, and the Crestwood Boards held multiple telephonic meetings relating to Project Sundance. With the support of the Crestwood Boards and the institutional investors, Crestwood submitted its final offer in Project Sundance. Crestwood was informed later that month that it was not selected as the winning bidder.

Following Crestwood's participation in Project Sundance and continuing through October 2014, Robert Phillips, Chairman, President and Chief Executive Officer of the Crestwood Entities and

44

Table of Contents

Messrs. Halpin and Moore identified and contacted a group of institutional investors to solicit interest in a significant equity investment and capital commitment to Crestwood. The institutional investors approached by Crestwood's management were targeted primarily based on (i) a firm's historical familiarity with and interest in the Crestwood platform, (ii) a firm's appetite for large-scale investments, (iii) a firm's stated desire to own and control an MLP platform and the firm's track record of executing on that strategy and (iv) a firm's existing portfolio of midstream assets that could potentially be contributed to a transaction. After numerous discussions with multiple candidates, Crestwood's senior management selected two institutional investors ("Sponsor A" and "Sponsor B," respectively, and together the "Potential Sponsors"), for advance negotiations and due diligence. Among other things, Messrs. Phillips, Halpin and Moore conducted management presentations for each Potential Sponsor in October and discussed potential structures in which the investors would commit capital to the Crestwood Entities to fund acquisitions and growth projects.

On November 13, 2014, at the regularly scheduled quarterly meeting of the Crestwood Boards in Houston, representatives of Citi reviewed various strategic alternatives potentially available to Crestwood, including: (i) an NGL drop-down; (ii) a simplification transaction whereby CEQP and Midstream would merge, resulting in a single publicly traded entity (a "Simplification Transaction"); (iii) a merger with another MLP involving a unit exchange; (iv) a sale of Crestwood to a large-cap MLP for cash consideration or an exchange of units; (v) a new private equity sponsor combined with an asset contribution; and (vi) an asset contribution from a strategic counterparty in exchange for CEQP equity interests. Citi outlined the benefits, challenges and actionability of each alternative.

In November 2014, Citi was contacted by a representative of an MLP merger candidate who expressed interest in a potential merger transaction ("Project Thunder").

In December 2014, Messrs. Phillips, Halpin and Moore met with Sponsor B after attending an MLP investor conference in New York. Sponsor B provided an update on their due diligence progress and discussed certain challenges associated with the proposed structure for their investment. Sponsor B expressed strong interest in pursuing other investment alternatives with Crestwood, including approaching First Reserve about taking CEQP private. Despite some continued inquiry, discussions between Sponsor B and First Reserve generally concluded and no formalized proposals were ever received from Sponsor B.

On January 22, 2015, the Crestwood Boards held a telephonic meeting to declare the fourth quarter distributions. During the meeting, Mr. Phillips provided an update on Project Thunder and a potential preferred equity investment at CEQP, each of which would have likely required a drop-down of CEQP's operating assets to Midstream. Thereafter, the Crestwood Boards authorized the CEQP Conflicts Committee and the Midstream Conflicts Committee, respectively, to retain counsel and financial advisors to begin review of a potential NGL drop-down.

On January 26, 2015, representatives of First Reserve and Messrs. Phillips, Halpin and Moore met with Sponsor A in Houston to discuss potential governance terms for an investment whereby Sponsor A would become a co-sponsor of Crestwood with First Reserve.

On January 27, 2015, the merger candidate in Project Thunder delivered a non-binding term sheet to Crestwood outlining the structure and general terms of a merger transaction.

On February 2, 2015, Sponsor A submitted a term sheet to First Reserve outlining the framework under which it would make a $250 million preferred equity investment in CEQP concurrent with an NGL drop-down, and would commit approximately $1.0 billion to Crestwood to fund acquisitions and investment opportunities. Following several clarification calls with Sponsor A, First Reserve and Crestwood's management made a counterproposal to Sponsor A on February 6, 2015.

On February 12, 2015, at the regularly scheduled quarterly meeting of the Crestwood Boards, senior management provided an update on the status of various strategic alternatives under

Table of Contents

consideration, including (i) Project Thunder, (ii) a CEQP restructuring with the introduction of a co-sponsor combined with an NGL drop-down, including management's conversations with Sponsor A, (iii) the Simplification Transaction, and (iv) the potential sale to third parties of certain assets and operations. Mr. Phillips noted that although senior management continues to search for a merger partner, the Project Thunder discussions were progressing slower than expected and senior management's focus had shifted to alternatives more within Crestwood's control, including an NGL drop-down.

Also on February 12, 2015, Sponsor A provided a revised term sheet to First Reserve and Crestwood's senior management.

On February 25, 2015, the Crestwood Boards held a telephonic meeting to review management's recommendations with respect to the NGL drop-down and, concurrently therewith, a potential equity investment at CEQP, where Sponsor A would become a co-sponsor with First Reserve. Senior management noted that in connection with the potential CEQP equity investment, management was evaluating a potential joint bid with Sponsor A to acquire certain midstream assets of an independent crude oil exploration and production company.

On March 4, 2015, Crestwood engaged Citi to provide to First Reserve and the Crestwood Entities financial advice and analysis concerning the Simplification Transaction.

On March 24, 2015, representatives from First Reserve and Sponsor A discussed governance issues relating to the co-sponsorship investment described in the term sheet received on February 12. As a part of those discussions, the two parties agreed the right framework had been developed for a partnership going forward, but without a sizable acquisition or investment opportunity as a catalyst, it would be difficult for Sponsor A to obtain equal governance rights with First Reserve and its existing capital investment in Crestwood. Both parties expressed a desire to continue to develop and pursue investment opportunities and, as opportunities materialized, to revisit co-sponsorship discussions.

On March 25, 2015, senior management of the Crestwood Entities, Citi and First Reserve held a strategic alternatives discussion during which time the participants reviewed the analysis, merits and considerations of an NGL drop-down as compared to the Simplification Transaction.

On April 2, 2015, CEQP GP, in its capacity as the general partner of CEQP, engaged Andrews Kurth LLP ("AK") as legal advisor to CEQP.

On April 7, 2015, Crestwood's senior management participated in a joint management presentation for Project Thunder.

On April 7, 2015, Mr. Phillips provided an update to the Crestwood Boards on the status of each strategic alternative under consideration. He noted that another mid-cap MLP had recently approached First Reserve and expressed interest in a potential combination with Crestwood ("Project Orion"), and a confidentiality agreement had been executed to facilitate further discussions and due diligence. Mr. Phillips further indicated that (i) senior management and Citi agreed that any realistic opportunities to create a so-called "Devon-Crosstex" merger (in which Crestwood would become the drop-down conduit for an oil and gas producer's midstream assets) had been exhausted, (ii) after more thorough analysis, an NGL drop-down was believed to be prohibitively dilutive to CEQP given its already low distribution coverage ratio and, consequently, the alternative was no longer considered viable by senior management, and (iii) senior management, First Reserve and Citi had increased their efforts around the Simplification Transaction. Mr. Phillips also explained that Crestwood's management would continue to develop and pursue Projects Thunder and Orion—recognizing that Crestwood management was not in control of those transactions and was dependent upon the counterparty's desire to progress those merger opportunities.

46

App000270

Table of Contents

On April 13, 2015, at the meetings of the Crestwood Boards, members of the boards again reviewed each strategic alternative then under consideration and discussed with Citi a comparison of the benefits and disadvantages of a potential NGL drop-down and a Simplification Transaction. The strategic alternatives reviewed by senior management and Citi at the meetings included (i) potential third-party mergers, including the status of Project Thunder and Project Orion as well as an overview of all merger-related activities dating back to February 2014, (ii) a "status quo" strategy, (iii) the Simplification Transaction, (iv) NGL drop-down (v) new sponsor or co-sponsor opportunities, and (vi) a sale of the Crestwood Entities. Mr. Halpin and Citi reviewed in greater detail the Simplification Transaction, its merits and considerations relative to other alternatives within Crestwood's control and an indicative timeline for execution. Representatives from AK then reviewed the Crestwood Boards' duties and responsibilities in evaluating all of the strategic alternatives, including the Simplification Transaction, described the approval process for an affiliated transaction and reviewed the relevant provisions of the Crestwood partnership agreements. Thereafter , the Crestwood Boards authorized the CEQP Conflicts Committee and the Midstream Conflicts Committee, respectively, to review the proposed Simplification Transaction.

On April 14, 2015, Midstream contacted representatives of Paul Hastings LLP ("Paul Hastings") to discuss its potential engagement by the Midstream Conflicts Committee regarding the Simplification Transaction.

On April 16, 2015, the Midstream Conflicts Committee confirmed the engagement of Paul Hastings as its legal counsel. Paul Hastings was selected by the Midstream Conflicts Committee because of its prior work for the Midstream Conflicts Committee and its knowledge and familiarity with Midstream and the industry in which it operates.

On April 16, 2015, Crestwood received a non-binding offer from an affiliated party ("Potential NGL Buyer") to acquire CEQP's NGL assets and certain NGL-related assets owned by Midstream (the "NGL Offer"). Crestwood's senior management reviewed the offer with First Reserve and agreed to discuss the offer with the Crestwood Boards at a meeting scheduled for April 17.

On April 16, 2015, Joel Lambert, Senior Vice President, General Counsel and Corporate Secretary of the Crestwood Entities, provided the Midstream Conflicts Committee and representatives of Paul Hastings with a high-level summary of the proposed structure, process and timing of the Simplification Transaction. The summary did not include a proposed exchange ratio.

On April 17, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives from Paul Hastings to discuss the committee's selection of a financial advisor to assist the committee in evaluating the proposed Simplification Transaction. After having discussed several candidates prior to and during the meeting, the Midstream Conflicts Committee contacted representatives from TPH to discuss the Midstream Conflicts Committee's potential engagement of TPH as financial advisor to the Midstream Conflicts Committee in connection with the proposed Simplification Transaction and asked TPH to disclose any material relationships it had with the parties to the proposed Simplification Transaction. TPH was selected by the Midstream Conflicts Committee because of its prior work for the Midstream Conflicts Committee and its knowledge and familiarity with Midstream, CEQP and the industry in which they operate. TPH was subsequently engaged as financial advisor to the Midstream Conflicts Committee pursuant to an engagement letter dated April 28, 2015.

On April 17, 2015, Randy Moeder, Chairman of the CEQP Conflicts Committee, on behalf of the CEQP Conflicts Committee, contacted representatives of Locke Lord LLP ("Locke Lord") to discuss engaging Locke Lord as legal counsel to the CEQP Conflicts Committee, given its knowledge and experience with respect to MLPs and public merger and acquisition transactions, the CEQP Conflicts Committee's prior experience with Locke Lord and Locke Lord's familiarity with CEQP. The CEQP Conflicts Committee subsequently executed an engagement letter with Locke Lord.

47

Table of Contents

On April 17, 2015, the CEQP Conflicts Committee discussed potential financial advisors that they identified with experience in similar transactions and decided to retain Evercore Group L.L.C. ("Evercore") as its independent financial advisor given Evercore's knowledge and experience with respect to MLPs, and the CEQP Conflicts Committee's prior experience with Evercore. The CEQP Conflicts Committee subsequently executed a formal engagement letter with Evercore on April 28, 2015.

On April 17, 2015, the Equity GP Board held a telephonic meeting where Mr. Phillips reviewed the history and background of the strategic alternatives discussed at the February 12, 2015 board meeting and provided a status update on the strategic alternatives still under consideration. Mr. Halpin then reviewed the costs and benefits of preserving the current structure and noted that substantial unitholder value creation under the current structure is limited. He also reviewed the financial analysis for the Simplification Transaction relative to the NGL drop-down. Thereafter, members of the Equity GP Board reviewed the proposed Simplification Transaction and approved a formal, non-binding merger proposal to the Midstream Board to acquire all of the outstanding publicly traded equity securities of Midstream at an exchange ratio of 2.60x. The proposal also contemplated that the existing Midstream preferred units would be converted into substantially equivalent preferred units to be issued by CEQP. Additionally, the Equity GP Board reviewed the material terms of the NGL Offer and agreed more analysis was needed in order to respond to the offer.

On April 17, 2015, in connection with Project Orion, John Black, Vice President of Finance of the Crestwood Entities, distributed Crestwood's financial model to Citi, which Citi subsequently distributed to the appropriate counterparties.

On April 19, 2015, via telephone conference, Mr. Moore discussed with representatives of TPH the scope and other terms of TPH's potential engagement by the Midstream Conflicts Committee.

On April 20, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the status of the Simplification Transaction, including the legal and financial due diligence process.

On the afternoon of April 20, 2015, the CEQP Conflicts Committee held a meeting with representatives from Evercore and Locke Lord in attendance. Mr. Moeder reviewed the proposed terms, benefits, and costs of the Simplification Transaction. The CEQP Conflicts Committee then discussed potential alternatives to the Simplification Transaction for CEQP. Representatives from Locke Lord reviewed the fiduciary duties of the CEQP Conflicts Committee and representatives from Evercore reviewed the anticipated timeline for the Simplification Transaction. The CEQP Conflicts Committee then discussed the upcoming management presentations that CEQP's management scheduled for the next few days.

On April 20, 2015, the Midstream Board held a telephonic meeting where Mr. Phillips reviewed the history and background of the strategic alternatives discussed at the February 12, 2015 board meeting and provided a status update on the strategic alternatives still under consideration. Mr. Halpin then discussed current investor sentiment, market risks and risks unique to Crestwood's portfolio emphasizing the need to chart a strategic path forward to address current challenges before reviewing the rationale for the Simplification Transaction. Additionally, the Midstream Board reviewed the material terms of the NGL Offer and agreed more analysis was needed in order to respond to the offer.

From April 20, 2015 through April 28, 2015, Mr. Moore and Rob Pacha exchanged emails negotiating Evercore's fee arrangement. On April 28, 2015, Mr. Moore and Mr. Pacha agreed upon Evercore's fee via telephone conference.

48

App000272

Table of Contents

On April 21, 2015, at the request of the Midstream Conflicts Committee, TPH sent management of the Crestwood Entities a list requesting certain financial and other information relating to CEQP and the Simplification Transaction.

On April 21, 2015, Mr. Halpin sent the financial model to the conflicts committees of each of Midstream and CEQP, and he sent simplification materials to GSO and Magnetar.

On April 22, 2015, members of Crestwood's management, including Messrs. Phillips, Halpin, Moore and Black, presented financial models, including a base case, an upside case and a downside case as well as pro forma financial models, with respect to the Crestwood Entities and the pro forma combined entity that would result from the Simplification Transaction to the members of each of the Midstream Conflicts Committee and the CEQP Conflicts Committee and representatives from Evercore, TPH, Locke Lord and Paul Hastings.

At the request of the Midstream Conflicts Committee, on April 23, 2015, via telephone conference, TPH, Messrs. Halpin, Moore, and Black and Vince Grisell, Vice President—Capital Markets and Risk at each Crestwood Entity, discussed the financial model related to the Simplification Transaction. On the same date, each Crestwood Board held meetings to determine and approve the first quarter distribution on each of CEQP's and Midstream's common units and to receive an update on the status of the proposed Simplification Transaction.

On April 24, 2015, TPH and Messrs. Halpin, Moore, Black and Grisell, telephonically participated in a diligence session related to CEQP's NGL business. On the same date, Mr. Black sent a revised financial model to the Midstream and CEQP Conflicts Committees to include a potential gathering and processing project in advanced negotiations in the upside case.

On April 24, 2015, representatives of Paul Hastings, AK and Simpson Thacher & Bartlett LLP, finance counsel to the Crestwood Entities, held a telephonic meeting at which they discussed the various Midstream and CEQP debt instruments and the impact of the proposed Simplification Transaction.

On April 27, 2015, the Midstream Conflicts Committee met to discuss the Simplification Transaction. Representatives of TPH and Paul Hastings were also present at that meeting. At the request of the Midstream Conflicts Committee, TPH reviewed and discussed its preliminary financial analysis with respect to Midstream, CEQP and the proposed Simplification Transaction with the Midstream Conflicts Committee.

On April 27, 2015, AK emailed an initial draft of the merger agreement to Locke Lord and Paul Hastings. The draft merger agreement provided for an exchange ratio of 2.60 CEQP common units per Midstream common unit and certain deal protection provisions, including a breakup fee payable to CEQP in the event the merger agreement was terminated under certain circumstances. The draft merger agreement also provided that certain Midstream unitholders would execute voting and support agreements.

On April 28, 2015, Paul Hastings provided to Philip D. Gettig, Chairman of the Midstream Conflicts Committee, a telephonic update of Delaware case law developments with respect to the conflicts committee process in MLP related party transactions.

On April 28, 2015, the Midstream Conflicts Committee held a telephonic meeting with representatives of TPH and Paul Hastings at which the Midstream Conflicts Committee approved a counterproposal providing for an exchange ratio of 3.00 CEQP common units per Midstream common unit instead of the exchange ratio of 2.60 initially proposed by CEQP.

On April 28, 2015, Mr. Gettig contacted the Chairman of the CEQP Conflicts Committee to communicate the Midstream Conflicts Committee's counterproposal, proposing an exchange ratio of

49

App000273

Table of Contents

3.00 CEQP common units to be issued for each Midstream common unit in the Simplification Transaction.

On April 29, 2015, members of Crestwood's management participated in two separate due diligence telephone conference calls with Potential NGL Buyer's representatives. On the first call, Messrs. Halpin and Black discussed with the Potential NGL Buyer's representatives the key terms in connection with the proposed purchase of NGL assets. On the second call, Citi and Messrs. Phillips, Halpin and Black discussed with the Potential NGL Buyer's representatives the NGL Offer and compared the merits of the offer to the Simplification Transaction.

On April 30, 2015, the CEQP Conflicts Committee held an extensive meeting at which representatives of Evercore and Locke Lord were present. Representatives of Locke Lord reviewed with the CEQP Conflicts Committee its fiduciary duties and obligations under Delaware law and the CEQP partnership agreement, including recent developments under Delaware law. Representatives of Evercore discussed their preliminary detailed financial analysis with respect to the Simplification Transaction, including a discussion regarding the proposed merger consideration exchange ratios, Midstream's and CEQP's respective businesses, assets and growth prospects. Representatives of Evercore also discussed the financial effects of alternative transaction structures for the Simplification Transaction and the yields at which units in the pro forma combined business could potentially trade following consummation of the Simplification Transaction.

Evercore's analysis included, among other things, a discussion of the preliminary standalone valuation for each of CEQP and Midstream, which Evercore measured using various methodologies, including a comparable partnership trading analysis, a selected comparable precedent transactions analysis, a discounted cash flow analysis and a discounted distribution analysis. Representatives of Evercore compared the standalone valuation estimates to the proposed exchange ratios.

Following Evercore's valuation discussion, the CEQP Conflicts Committee discussed Midstream's counter-proposal of 3.00 CEQP Common Units for each Midstream common unit and 3.00 CEQP preferred units for each Midstream preferred unit. After evaluating the various valuation methodologies described above and comparing the corresponding range of implied values per unit derived from such analyses, the CEQP Conflicts Committee authorized Mr. Moeder to contact the Chair of the Midstream Conflicts Committee to propose a decrease in the proposed exchange ratio and negotiate the proposed merger consideration. Representatives of Locke Lord also discussed with the CEQP Conflicts Committee certain legal issues and precedents related to the proposed merger agreement.

On May 1, 2015, via telephone conference, representatives from Magnetar and GSO and Messrs. Halpin, Moore and Black discussed business updates and the merits of the proposed Simplification Transaction.

On May 1, 2015, Mr. Moeder contacted the Chairman of the Midstream Conflicts Committee to propose a revised exchange ratio of 2.65 CEQP common units per Midstream common unit.

On May 1, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the 2.65 exchange ratio counterproposal from the CEQP Conflicts Committee. At the request of the Midstream Conflicts Committee, TPH reviewed and discussed its supplemental preliminary financial analysis with respect to Midstream, CEQP and the proposed Simplification Transaction with the Midstream Conflicts Committee. Paul Hastings also provided a brief overview of the issues identified in the initial draft of the merger agreement, noting that Midstream should have maximum flexibility to entertain an alternative transaction and should not be subject to any termination fee unless CEQP was also subject to a termination fee in the event it terminated the merger agreement in accordance with certain provisions of the merger agreement. The Midstream Conflicts Committee determined that it appeared the two proposed exchange ratios were too far apart, but that a conversation among the chairmen of the respective conflicts committees, with the assistance of their respective financial advisors, might advance discussions between the parties.

50

Table of Contents

Accordingly, later in the day on May 1, 2015, the Chairman of each of the Midstream and CEQP Conflicts Committees, with assistance of their respective financial advisors, conducted a brief telephone conference to discuss the rationale for their current positions with respect to the proposed exchange ratios.

Also on May 1, 2015, representatives of Paul Hastings reviewed with the Midstream Conflicts Committee their markup of the merger agreement and then emailed Locke Lord comments to the draft merger agreement that had initially been distributed by AK. Such comments, among other items, provided that CEQP would be subject to the same (and in certain cases more strenuous) restrictions on its operations between signing and closing, provided Midstream with greater flexibility to entertain alternate proposals and eliminated the termination fee concept, instead replacing it with a repayment of expenses.

At 4:00 p.m. on May 1, 2015, the Chairman of the CEQP Conflicts Committee contacted the Chairman of the Midstream Conflicts Committee to inform him that the CEQP Conflicts Committee believed that the respective proposals of the committees were too far apart for further negotiations to be worthwhile.

Later on May 1, 2015, Mr. Gettig relayed the conversation with his counterpart to Mr. Lumpkins and representatives of TPH and Paul Hastings. The members of the Midstream Conflicts Committee then instructed Paul Hastings to communicate the impasse in negotiations to Crestwood's counsel.

On May 2, 2015, Paul Hastings conducted a brief call with AK and Locke Lord to update AK as to the current status of discussions and negotiations between the Midstream Conflicts Committee and the CEQP Conflicts Committee and the impasse that had been reached.

On May 3, 2015, the Midstream Conflicts Committee, Paul Hastings, TPH, Messrs. Phillips, Halpin, Lambert, and Moore, AK and Citi discussed the status of negotiations surrounding the merger agreement and the Simplification Transaction.

On the same date, a separate meeting of the CEQP Conflicts Committee was held via telephone conference, and the CEQP Conflicts Committee, Locke Lord, Evercore, Messrs. Phillips, Halpin, Lambert, and Moore and Citi discussed the status of negotiations surrounding the merger agreement and the Simplification Transaction.

On May 4, 2015 at 8:30 a.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings. The Midstream Conflicts Committee, with the assistance of TPH and Paul Hastings, reviewed and discussed the supplemental financial and other information provided to the Midstream Conflicts Committee, TPH and Paul Hastings at the May 3, 2015 meeting with management of the Crestwood Entities. Paul Hastings then reviewed with the members of the committee the duties of the Midstream Conflicts Committee and the standard of good faith set forth in Midstream's partnership agreement for the Midstream Conflicts Committee's review of related party transactions. Thereafter, the Midstream Conflicts Committee, with the assistance of representatives of TPH, reviewed and discussed certain financial metrics and determined to respond to the CEQP Conflicts Committee with the proposal of a 2.80x exchange ratio.

On May 4, 2015, Mr. Gettig informed the Chairman of the CEQP Conflicts Committee of the Midstream Conflicts Committee's response. Following the receipt of the counter-offer, the CEQP Conflicts Committee met with representatives from Evercore and Locke Lord to discuss the counter-offer and open items. The CEQP Conflicts Committee extensively discussed these items and proposed revisions to the merger agreement with its advisors. During the meeting, and based upon additional financial analyses provided by Evercore, the CEQP Conflicts Committee determined to counter the Midstream Conflicts Committee offer with a proposal to offer 2.75 CEQP common units for each Midstream common unit and 2.75 CEQP preferred units for each Midstream preferred unit. Shortly thereafter, the CEQP Conflicts Committee responded with a counterproposal of a 2.75x exchange ratio

51

Table of Contents

provided that the Midstream Conflicts Committee would agree to the termination fee as initially proposed in the merger agreement.

On May 4, 2015 at 12:15 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the CEQP Conflicts Committee's response of a 2.75x exchange ratio and that the Midstream Conflicts Committee agree to the original termination fee proposal in the merger agreement. Paul Hastings discussed the precedents for termination fees with the Midstream Conflicts Committee and noted that the merger agreement contained a provision permitting CEQP to walk away from the deal. After discussion, the Midstream Conflicts Committee determined that it would prefer no termination fee. The Midstream Conflicts Committee also determined that a 2.75x exchange ratio, with the appropriate resolution regarding the termination fee, was potentially acceptable to the Midstream Conflicts Committee.

On May 4, 2015, Paul Hastings and Locke Lord had further discussion regarding the merger agreement and Locke Lord, on behalf of the CEQP Conflicts Committee, accepted the Midstream Conflicts Committee's proposal for no termination fee, with only expenses being payable in certain circumstances. Shortly after that discussion, on May 4, 2015, Locke Lord emailed a revised draft of the merger agreement to Paul Hastings, which included no termination fee. After reviewing such revisions, Paul Hastings and AK discussed that AK would incorporate the agreed changes into a revised draft of the merger agreement.

On May 4, 2015 at 3:00 p.m., the Crestwood Boards held a joint telephonic meeting at which the status of the Simplification Transaction was discussed. Citi reviewed the status of Project Thunder and Project Orion and noted that no actionable proposals had been presented by either counterparty. Mr. Moore provided an update on the CEQP restructuring strategy and potential joint bid to acquire certain midstream assets of an independent crude oil exploration and production company. He noted that the acquisition opportunity was likely no longer viable and no new proposals had been received from the potential co-sponsor with respect to an equity investment at CEQP. Mr. Phillips reviewed the terms of the NGL Offer and indicated that substantial work still needed to be completed to fully analyze and respond to the NGL Offer. The Crestwood Boards determined that the NGL Offer should not delay the Simplification Transaction, and Crestwood would continue to evaluate strategic alternatives (including the NGL Offer) while proceeding with the Simplification Transaction.

On May 4, 2015 at 4:00 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the Midstream Board meeting held earlier in the day, including the fact that a potential sale of CEQP's NGL business prior to closing of the transactions contemplated by the merger agreement would result in a significantly different transaction for Midstream. Paul Hastings confirmed that such a sale would not be permitted under the merger agreement as currently drafted if the merger agreement was executed.

On May 4, 2015 at 4:30 p.m., at the request of the Midstream Conflicts Committee, Mr. Lambert and AK confirmed in a telephone conference with Paul Hastings that CEQP had no current intent to sell CEQP's NGL business and AK confirmed that any such sale would require an amendment to the merger agreement as well as the written consent of the Midstream Conflicts Committee if such sale occurred after the merger agreement was executed.

Early on May 5, 2015, AK emailed a revised draft of the merger agreement to Paul Hastings and Locke Lord. In response, Paul Hastings provided some additional comments to the interim operating covenants that had previously been agreed to by the CEQP Conflicts Committee and Midstream Conflicts Committee. AK incorporated such additional interim operating covenants into a revised draft circulated to the parties later that same day.

On May 5, 2015 at 9:00 a.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the Midstream Conflicts Committee

52

App000276

Table of Contents

discussed the Midstream preferred unit exchange ratio, in particular that the parties understood that the relative distributions with respect to the preferred units should not change.

On the afternoon of May 5, 2015, the CEQP Conflicts Committee held a meeting, at which representatives of Evercore and Locke Lord were present, to discuss and, if appropriate, approve the transaction documents, including the merger agreement and the support agreement. Representatives of Locke Lord reviewed the efforts made by the CEQP Conflicts Committee regarding the Simplification Transaction, including the substantive work and the processes followed. Locke Lord then discussed the duties of the CEQP Conflicts Committee with respect to the Simplification Transaction and reviewed the "Special Approval" standard under CEQP's partnership agreement. Locke Lord then reviewed the material terms and provisions of the merger agreement and answered the questions of the CEQP Conflicts Committee.

Following this extensive discussion, representatives of Evercore delivered to the CEQP Conflicts Committee an oral opinion, confirmed by delivery of a written opinion dated May 5, 2015, to the effect that, as of May 5, 2015, and based upon and subject to the various assumptions, qualifications and limitations set forth in Evercore's opinion, the exchange ratio of 2.75 CEQP common units for each Midstream common unit to be issued in the merger was fair, from a financial point of view, to the holders of CEQP common units (other than Equity GP and its affiliates, officers and directors). The CEQP Conflicts Committee then unanimously (i) determined that the merger agreement and the transactions contemplated thereby were in the best interest of CEQP and the holders of CEQP common units (other than Equity GP and its affiliates, officers and directors), (ii) approved the merger agreement and the transactions contemplated thereby, including the merger, which constituted "Special Approval" under the CEQP partnership agreement, and (iii) recommended to the Equity GP Board the approval of the merger agreement and the consummation of the transactions contemplated thereby, including the merger.

On May 5, 2015, representatives of TPH and Paul Hastings received confirmation from management of the Crestwood Entities that the preferred unit conversion ratio would remain effectively the same under the terms of the new CEQP preferred units.

On May 5, 2015 at 2:00 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings. At the request of the Midstream Conflicts Committee, representatives of TPH reviewed and discussed TPH's financial analyses with respect to Midstream, CEQP and the proposed merger. Thereafter, at the request of the Midstream Conflicts Committee, TPH rendered its oral opinion to the Midstream Conflicts Committee (which was subsequently confirmed in writing by delivery of TPH's written opinion addressed to the Midstream Conflicts Committee dated as of the same date) as to, as of May 5, 2015, the fairness, from a financial point of view, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. Following discussion of the terms and conditions of the merger agreement, including the elimination of the termination fee, and the financial analyses and opinion of TPH, the Midstream Conflicts Committee determined in good faith that the merger was fair and reasonable and in the best interest of Midstream and the Midstream unaffiliated unitholders. The Midstream Conflicts Committee unanimously approved and determined to recommend the Simplification Transaction and the merger agreement to the Midstream Board.

On May 5, 2015 at 3:00 p.m. the Midstream Board convened a duly called and held telephonic meeting, during which, upon recommendation of the Midstream Conflicts Committee the Midstream Board approved the Simplification Transaction, merger agreement and the documents and transactions related thereto.

On May 5, 2015 at 4:00 p.m. the Equity GP Board convened a duly called and held telephonic meeting, during which, upon recommendation of the CEQP Conflicts Committee the Equity GP Board

53

App000277

Table of Contents

approved the Simplification Transaction, the merger agreement and the documents and transactions related thereto.

On May 5, 2015, the parties finalized and executed the merger agreement.

On May 6, 2015, CEQP and Midstream issued earnings releases and a joint press release announcing the merger agreement and the proposed merger.

**Recommendation of the Midstream Board and the Midstream Conflicts Committee's Reasons for the Merger**

After careful consideration, the Midstream Conflicts Committee, by a unanimous vote of its members, at a meeting held on May 5, 2015, determined that the merger agreement and the transactions contemplated thereby are advisable and in the best interests of Midstream and the Midstream unaffiliated unitholders and recommended to the Midstream Board the execution, delivery and performance of the merger agreement and the transactions contemplated thereby. In evaluating the merger, the Midstream Conflicts Committee consulted with Midstream's senior management and the Midstream Conflicts Committee's legal and financial advisors and, in reaching its decision, the Midstream Conflicts Committee considered a number of factors that the Midstream Conflicts Committee believed supported its decision, including the following material factors:

- Midstream had a favorable exchange ratio relative to the trading price of the Midstream common units the day before the merger was announced;

- the Midstream Conflicts Committee's assessment of current and projected commodity prices, and the direct and indirect risks resulting therefrom, the changes in the capital markets, borrowing and liquidity issues and the sustainability of future distributions, and certain related adverse effects on Midstream;

- the potential alternatives available to Midstream, including the possibility of remaining a stand-alone entity, and the assessment of the Midstream Conflicts Committee that the merger was likely to enhance value for Midstream unitholders;

- the elimination of Midstream's IDRs, which is expected to result in a cost of capital improvement to better finance growth and stabilize the combined entity's long-term distribution outlook;

- the increased scale and simplified entity structure of the combined company should permit it to compete more effectively and facilitate future development projects, exploration and acquisitions through increased cash flow, lower cost of capital, better access to debt and equity markets and elimination of potential conflicts of interest and appeal to a wider investor base;

- the potential ability to achieve substantial G&A and fixed charge reductions, including the elimination of dual public company costs and elimination of IDR distributions;

- the merger is expected to result in long-term cash flow accretion, in part due to the elimination of Midstream's IDRs;

- the fact that the merger is subject to the approval of the Midstream unitholders, who will be free to approve or reject the merger, but is not subject to a vote of the CEQP common unitholders;

- the financial analyses reviewed and discussed with the Midstream Conflicts Committee by representatives of TPH as well as the oral opinion of TPH rendered to the Midstream Conflicts Committee on May 5, 2015, (which was subsequently confirmed in writing by delivery of TPH's written opinion addressed to the Midstream Conflicts Committee dated the same date) as to, as of May 5, 2015, the fairness, from a financial point of view, to the Unaffiliated Unitholders of

54

Table of Contents

the Common Merger Consideration to be received by such Unaffiliated Unitholders in the merger pursuant to the merger agreement; and

- the fact that the merger agreement does not preclude Midstream from engaging in negotiations with, and providing information to, a third party that makes an unsolicited written acquisition proposal, if the Midstream Conflicts Committee determines in good faith that such proposal is likely to result in a superior proposal (as defined under "The Merger Agreement—Acquisition Proposals; Change in Recommendation"), and the fact that the merger agreement permits Midstream to terminate the merger agreement to enter into such a transaction after reimbursing CEQP's expenses up to $10 million.

The Midstream Conflicts Committee also considered, and balanced against the potential benefits, various risks and other potentially negative factors concerning the merger agreement, including the following:

- the merger agreement provides for a fixed exchange ratio and thus the exchange ratio will not change based on changes in the trading prices of Midstream or CEQP common units or changes in the business performance or financial results of Midstream or CEQP. Accordingly, if the value of CEQP's business declines relative to the value of Midstream's business prior to completion of the merger, the Midstream unitholders' percentage ownership in the combined company may exceed CEQP's relative contribution to the combined company;

- the merger agreement restricts Midstream's ability to solicit possibly superior transactions and the required reimbursement by Midstream of CEQP's expenses up to $10 million in the event of termination of the arrangement agreement under specified circumstances;

- based on the exchange ratio, the merger would be dilutive to the Midstream unitholders on a short-term basis;

- substantial costs will be incurred by Midstream in connection with the transaction, including financial arrangement fees, financial advisory fees and legal and other advisor fees, as well as the costs of integrating the businesses of Midstream and CEQP;

- the risk that management focus, employee attention and resources for other strategic opportunities, as well as employee attention to operational matters, could be diverted for an extended period of time while the parties work to complete the merger and integration process and any litigation that may occur in connection with the proposed transactions;

- the fact that the merger agreement permits CEQP to terminate the merger agreement at any time prior to obtaining the Midstream unitholder approval, in the event that the Equity GP Board determines to abandon the transactions contemplated in the merger agreement, subject only to CEQP reimbursing Midstream's reimbursing CEQP's expenses up to $10 million;

- the possibility that the merger might not be consummated despite the parties' efforts or that the closing of the merger may be unduly delayed, and that the announcement of the transaction, coupled with any failure to consummate the transaction, could have a negative effect on Midstream's relationships with third parties, as well as a negative effect on Midstream's operating results and trading price;

- the risks inherent in CEQP's business and operations, including those identified in CEQP's SEC filings; and

- risks of the type and nature described under "Risk Factors."

The Midstream Conflicts Committee concluded that the potentially negative factors associated with the proposed merger were outweighed by the potential benefits that it expected the Midstream unaffiliated unitholders would achieve as a result of the merger. Accordingly, the Midstream Conflicts

55

App000279

Table of Contents

Committee determined that the merger agreement and the transactions contemplated thereby, including the merger, are in the best interests of Midstream and the Midstream unaffiliated unitholders, and recommended to the Midstream Board the execution, delivery and performance of the merger agreement and the transactions contemplated thereby. **The Midstream Board unanimously approved the merger agreement and the transactions contemplated thereby and recommends that the Midstream unitholders vote FOR the merger proposal**.

The foregoing discussion of the information and factors considered by the Midstream Conflicts Committee includes all of the material factors considered by the Midstream Conflicts Committee, but it is not intended to be exhaustive and may not include all of the factors considered by the Midstream Conflicts Committee. In view of the wide variety of factors considered in connection with its evaluation of the merger and the complexity of these matters, the Midstream Conflicts Committee did not find it useful and did not attempt to quantify or assign any relative or specific weights to the various factors in its determination to recommend the approval of the merger agreement and the transactions contemplated thereby, including the merger. In addition, individual members of the Midstream Conflicts Committee may have given weights to different factors.

This explanation of the Midstream Conflicts Committee's reasons for the merger and other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors described under "Information Regarding Forward-Looking Statements."

**Opinion of the Midstream Conflicts Committee's Financial Advisor**

The Midstream Conflicts Committee retained TPH as its exclusive financial advisor with respect to the provision of an opinion to the Midstream Conflicts Committee as to the fairness from a financial point of view to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. At the request of the Midstream Conflicts Committee at a meeting of the Midstream Conflicts Committee held on May 5, 2015, TPH rendered its oral opinion to the Midstream Conflicts Committee that, as of May 5, 2015, based upon and subject to the assumptions, qualifications, limitations and other matters considered by TPH in connection with the preparation of its opinion, the Common Merger Consideration to be received by the Unaffiliated Common Unitholders in the merger pursuant to the merger agreement was fair, from a financial point of view, to the Unaffiliated Common Unitholders. TPH subsequently confirmed its oral opinion in writing dated May 5, 2015 to the Midstream Conflicts Committee.

The opinion speaks only as of the date it was delivered and not as of the time the merger will be completed or any other date. The opinion does not reflect changes that may occur or may have occurred after May 5, 2015, which could alter the facts and circumstances on which TPH's opinion was based.

**TPH's opinion was directed to the Midstream Conflicts Committee (in its capacity as such), and only addressed the fairness from a financial point of view, as of the date of the opinion, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by the Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. TPH's opinion did not address any other term or aspect of the merger agreement or the Transaction. The full text of the TPH written opinion, dated May 5, 2015, which describes the assumptions made, procedures followed, matters considered, and qualifications and limitations of the review undertaken by TPH in rendering its opinion, is attached as Annex B to this proxy statement/prospectus. The summary of TPH's opinion set forth in this proxy statement/prospectus is qualified in its entirety by reference to the full text of the opinion. However, neither TPH's written opinion nor the summary of its opinion and the related analyses set forth in this proxy statement/prospectus are intended to be, and they do not constitute, a recommendation as to how the Midstream Conflicts Committee or the board of directors of**

56

Table of Contents

**Midstream GP, Midstream GP, any holder of securities in Midstream or any other person should act or vote with respect to any matter relating to the merger, the Transaction or any other matter.**

TPH's opinion to the Midstream Conflicts Committee was among several factors taken into consideration by the Midstream Conflicts Committee in making its recommendation to the board of directors of Midstream GP regarding the merger.

In connection with rendering its opinion and performing its related financial analyses, TPH reviewed, among other things:

(i)   a draft, dated May 4, 2015, of the merger agreement and a draft, received by TPH on May 5, 2015, of the CEQP Partnership Agreement Amendment;

(ii)   annual reports to unitholders and Annual Reports on Form 10-K of Midstream and CEQP for each of the years ended 2012, 2013 and 2014;

(iii)   certain interim reports to unitholders and Quarterly Reports on Form 10-Q of Midstream and CEQP;

(iv)   certain other communications from Midstream and CEQP to their respective unitholders;

(v)   certain internal financial information and forecasts for Midstream and CEQP prepared and adjusted by the management of Midstream and CEQP, including with respect to the future financial performance of Midstream on a stand-alone basis (the "Midstream Forecasts"), CEQP on a stand-alone basis (the "CEQP Forecasts") and CEQP after giving effect to the Transaction, including certain estimates of cost savings and other synergies ("Synergies") projected by the management of Midstream and CEQP to result from the Transaction (the "Pro Forma Forecasts"); and

(vi)   certain publicly available research analyst reports with respect to the future financial performance of Midstream and CEQP, which TPH discussed with the senior management of Midstream and CEQP.

TPH also held discussions with members of the senior management of Midstream and CEQP regarding their assessment of the strategic rationale for, and the potential benefits of, the Transaction and the past and current business operations, financial condition and future prospects of Midstream and CEQP. In addition, TPH reviewed the reported price and trading activity for Midstream common units and CEQP common units, compared certain financial and stock market information for Midstream and CEQP with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations that TPH deemed relevant, compared the relative contributions of Midstream and CEQP to certain pro forma financial statistics for CEQP after giving effect to the Transaction, and reviewed such other documents, performed such other studies and analyses, and considered such other factors, as TPH considered appropriate. TPH understood that (i) the management of Midstream were employees of Crestwood Operations LLC, a wholly-owned subsidiary of CEQP, (ii) certain members of Midstream's management have responsibilities for managing both Midstream and CEQP and (iii) the Midstream Forecasts, the CEQP Forecasts, the Synergies and the Pro Forma Forecasts were developed by or under the supervision of the senior management of Midstream and CEQP.

The Midstream Conflicts Committee advised TPH, and for purposes of its analyses and opinion TPH assumed, that each outstanding Midstream preferred unit would, as a result of the merger, be converted into the Preferred Merger Consideration and that the units in CEQP comprising the Preferred Merger Consideration would constitute "Substantially Equivalent Units" as defined in Midstream's partnership agreement.

57

App000281

Table of Contents

For purposes of its opinion, TPH assumed and relied upon, without assuming any responsibility for independent verification, the accuracy and completeness of all of the financial, accounting, legal, tax, regulatory and other information provided to, discussed with or reviewed by or for TPH, or publicly available. In that regard, TPH assumed with the Midstream Conflicts Committee's consent that the Midstream Forecasts and the CEQP Forecasts had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Midstream and CEQP with respect to the future financial performance of Midstream and CEQP on a standalone basis and that the Pro Forma Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Midstream and CEQP with respect to the future financial performance of the combined company after giving effect to the Transaction. TPH expressed no view or opinion with respect to the Midstream Forecasts, the CEQP Forecasts, the Synergies, the Pro Forma Forecasts or the assumptions on which they were based, and TPH assumed, at the Midstream Conflicts Committee's direction, that the Midstream Forecasts, the CEQP Forecasts, the Synergies and the Pro Forma Forecasts provided a reasonable basis upon which to evaluate Midstream, CEQP and the proposed Transaction. TPH relied upon and assumed, without independent verification, that (a) the representations and warranties of all parties to the merger agreement and all other related documents and instruments referred to therein were true and correct, (b) each party to the merger agreement and such other related documents and instruments would fully and timely perform all of the covenants and agreements required to be performed by such party, (c) all conditions to the consummation of the Transaction would be satisfied without waiver thereof, and (d) the Transaction would be consummated in a timely manner in accordance with the terms described in the merger agreement and such other related documents and instruments, without any amendments or modifications thereto. TPH also assumed, with the consent of the Midstream Conflicts Committee, that, for U.S. federal income tax purposes, no gain or loss would be recognized by Unaffiliated Common Unitholders as a result of the receipt of CEQP common units in the merger (other than any income or gain resulting from any actual or constructive distribution of cash and cash received in lieu of fractional CEQP common units pursuant to the merger agreement). TPH also assumed that all governmental, regulatory or other consents or approvals necessary for the consummation of the Transaction would be obtained without any effect on Midstream, CEQP, or the expected benefits of the Transaction. In addition, TPH relied upon and assumed, without independent verification, that the final forms of any draft documents identified above would not differ in any respect from the drafts of said documents.

TPH was not requested to, and did not, solicit indications of interest from third parties with respect to a potential alternative transaction involving Midstream. TPH also assumed that there had been no material changes in the business, operations, financial condition and prospects of Midstream or CEQP since the respective dates of the most recent financial statements and other information provided to TPH. In addition, TPH did not make an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or off-balance-sheet assets and liabilities) of Midstream, CEQP or any of their respective affiliates and TPH was not furnished with any such evaluation or appraisal.

The estimates contained in TPH's analyses and the results from any particular analysis are not necessarily indicative of future results, which may be significantly more or less favorable than suggested by such analyses. In addition, analyses relating to the value of businesses or assets neither purport to be appraisals nor do they necessarily reflect the prices at which businesses or assets may actually be sold. Accordingly, TPH's analyses and estimates are inherently subject to substantial uncertainty.

In arriving at its opinion, TPH did not attribute any particular weight to any particular analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of each analysis and factor. Several analytical methodologies were employed by TPH in its analyses, and no one single method of analysis should be regarded as determinative of the overall conclusion reached

58

App000282

Table of Contents

by TPH. Each analytical technique has inherent strengths and weaknesses, and the nature of the available information may further affect the significance of particular techniques. Accordingly, TPH believes that its analyses must be considered as a whole and that selecting portions of its analyses and of the factors considered by it, without considering all analyses and factors in their entirety, could create a misleading or incomplete view of the evaluation process underlying its opinion. The conclusion reached by TPH, therefore, is based on the application of TPH's experience and judgment to all analyses and factors considered by TPH, taken as a whole.

TPH's opinion did not address any accounting, legal, tax or regulatory matters. In addition, its opinion did not address the underlying business decision of the Midstream Conflicts Committee, the board of directors of Midstream GP, Midstream GP or any other party to engage in the Transaction, or the relative merits of the Transaction as compared to any other alternative transaction that might have been available to Midstream, CEQP or any other party. TPH's opinion addressed only the fairness from a financial point of view, as of the date thereof, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. TPH did not express any view on, and its opinion did not address, any other term or aspect of the merger agreement or the Transaction, including, without limitation, the fairness of the Preferred Merger Consideration to the holders of Midstream preferred units, the fairness of the Common Merger Consideration relative to the Preferred Merger Consideration, the allocation of the aggregate consideration to be received by holders of Midstream preferred units and Midstream common units among the holders of Midstream preferred units and Midstream common units or groups thereof, the fairness of the Transaction to, or any consideration received in connection therewith by, creditors or other constituencies of Midstream or CEQP; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Midstream or CEQP, or any class of such persons, in connection with the Transaction, whether relative to the Common Merger Consideration, the Preferred Merger Consideration or otherwise. TPH did not express any opinion as to the price at which CEQP common units will trade when issued in the merger or as to the prices at which the Midstream common units, Midstream preferred units, CEQP common units or CEQP preferred units may be purchased or sold at any time. TPH's opinion was necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to TPH as of, the date of its opinion. TPH assumed no obligation to update, revise or reaffirm its opinion and expressly disclaimed any responsibility to do so whether based on circumstances, developments or events occurring after the date of its opinion or otherwise. TPH's opinion and related analyses were provided for the information and assistance of the Midstream Conflicts Committee (in its capacity as such) in connection with its consideration of the merger and such opinion and analyses do not constitute a recommendation as to how the Midstream Conflicts Committee, the board of directors of Midstream GP, Midstream GP, any holder of securities in Midstream or any other person should act or vote with respect to any matter relating to the Transaction or any other matter. The issuance of TPH's opinion was approved by TPH's fairness opinion committee.

The following is a summary of the material financial analyses performed by TPH in connection with the preparation of its opinion and reviewed with the Midstream Conflicts Committee on May 5, 2015. Unless the context indicates otherwise, enterprise values and equity values used in the selected companies analysis described below were calculated using the closing price of the Midstream common units and the equity securities of the selected companies listed below as of May 4, 2015, and transaction values for the selected transactions analysis described below were calculated on an enterprise value basis based on the value of the equity consideration and other public information available at the time of the relevant transaction's announcement. The analyses summarized below include information presented in tabular format. In order to fully understand the financial analyses performed, the tables must be considered together with the textual summary of the analyses.

59

App000283

Table of Contents

For purposes of its analyses, TPH reviewed a number of financial metrics including:

Enterprise Value—generally the value as of a specified date of the relevant company's outstanding equity securities (taking into account its options and other outstanding convertible securities) plus the value as of such date of its net debt (the value of its outstanding indebtedness, preferred stock and capital lease obligations less the amount of cash on its balance sheet).

EBITDA—generally the amount of the relevant company's earnings before interest, taxes, depreciation and amortization for a specified time period.

Distributable Cash Flow—generally EBITDA minus interest expense and maintenance capital expenditures, as adjusted for special items for a specified time period. LP Distributable Cash Flow is generally the Distributable Cash Flow available for distribution to holders of limited partnership units for a specified time period.

In addition, for purposes of certain of TPH's analyses, with the Midstream Conflicts Committee's consent, TPH treated future distributions on the Midstream preferred units that may be payable-in-kind as paid in cash.

No company or transaction used in the analyses of companies or transactions summarized below is identical or directly comparable to Midstream, CEQP or the Transaction. As a consequence mathematical derivations (such as the high, low, mean and median) of financial data are not by themselves meaningful, and these analyses must take into account differences in the financial and operating characteristics of the selected publicly traded companies and differences in the structure and timing of the selected transactions and other factors that would affect the public trading value and acquisition value of the companies considered.

**Forecasts**

The Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts each included a base case prepared by Midstream and CEQP management, as well as an upside case and a downside case, resulting from adjustments by Midstream and CEQP management to the applicable base case. In addition, the Pro Forma Forecasts included the Synergies.

**Contribution Analysis**

TPH reviewed the contributions of Midstream and CEQP of certain financial metrics to the combined company resulting from the Transaction based on the Midstream Forecasts and the CEQP Forecast and certain publicly available financial information for Midstream and CEQP. The financial metrics reviewed included (i) equity value as of May 4, 2015; (ii) distributable cash flow for the year 2014; and (iii) estimated distributable cash flow for the years 2015, 2016, 2017, 2018 and 2019, using the base, downside and upside cases for Midstream included in the Midstream Forecasts and the base case for CEQP included in the CEQP Forecasts. The contribution analysis did not give effect to the Synergies. The contribution analysis indicated a range of implied exchange ratios in the merger of 1.432x to 4.179x, as set forth in the table below, as compared to the exchange ratio of 2.750x provided for in the merger. For purposes of the contribution analyses, TPH excluded the general partner and

60

App000284

Table of Contents

incentive distribution rights of Midstream held by CEQP, the common units of Midstream held by CEQP and the Midstream preferred units from its analysis of Midstream.

|  | Implied Exchange Ratio |
|---|---|
| Market Value | 2.398x |
|  |  |
| 2014A Distributable Cash Flow | 4.179x |
|  |  |
| Base |  |
| 2015E LP Distributable Cash Flow | 3.607x |
| 2016E LP Distributable Cash Flow | 3.642x |
| 2017E LP Distributable Cash Flow | 3.023x |
| 2018E LP Distributable Cash Flow | 2.384x |
| 2019E LP Distributable Cash Flow | 2.079x |
|  |  |
| Levered Discounted Cash Flow | 1.679x - 1.853x |
| Discounted Distribution Analysis | 2.434x - 2.726x |
|  |  |
| Downside |  |
| 2015E LP Distributable Cash Flow | 3.372x |
| 2016E LP Distributable Cash Flow | 3.019x |
| 2017E LP Distributable Cash Flow | 3.043x |
| 2018E LP Distributable Cash Flow | 3.143x |
| 2019E LP Distributable Cash Flow | 2.887x |
|  |  |
| Levered Discounted Cash Flow | 2.223x - 2.465x |
| Discounted Distribution Analysis | 2.812x - 3.323x |
|  |  |
| Upside |  |
| 2015E LP Distributable Cash Flow | 3.580x |
| 2016E LP Distributable Cash Flow | 3.260x |
| 2017E LP Distributable Cash Flow | 2.854x |
| 2018E LP Distributable Cash Flow | 2.064x |
| 2019E LP Distributable Cash Flow | 1.755x |
|  |  |
| Levered Discounted Cash Flow | 1.432x - 1.578x |
| Discounted Distribution Analysis | 2.132x - 2.380x |

*Discounted Cash Flow Analysis*

TPH calculated implied value reference ranges of Midstream and CEQP common units on a standalone basis by discounting projected levered distributable cash flows to holders of Midstream and CEQP common units. TPH applied equity discount rates ranging from 11.0% to 13.0% and terminal value multiples ranging from 9.0x to 12.0x to the projected levered LP distributable cash flow for Midstream based on the Midstream Forecasts, which resulted in implied value reference ranges per Midstream common unit of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case. TPH applied discount rates ranging from 12.0% to 14.0% and terminal value multiples ranging from 14.0x to 16.0x to the projected levered distributable cash flow for CEQP based on the CEQP Forecasts, which resulted in implied value reference ranges per CEQP common unit of $6.49 to $7.64 based on the downside case, $10.55 to $12.54 based on the base case, and $12.18 to $14.50 based on the upside case.

61

Table of Contents

*Discounted Distribution Analysis*

TPH calculated implied value reference ranges of Midstream and CEQP common units on a standalone basis by discounting projected distributed cash flows to holders of Midstream and CEQP common units. TPH applied equity discount rates ranging from 11.0% to 13.0% and terminal yields ranging from 7.00% to 10.5% to the projected LP distributed cash flow for Midstream based on the Midstream Forecasts, which resulted in implied value reference ranges per Midstream common unit of $15.20 to $21.63 based on the downside case, $18.05 to $26.02 based on the base case, and $17.81 to $25.67 based on the upside case. TPH applied discount rates ranging from 12.0% to 14.0% and terminal yields ranging from 7.00% to 9.00% to the projected distributed cash flow for CEQP based on the CEQP Forecasts, which resulted in implied value reference ranges per CEQP common unit of $5.41 to $6.87 based on the downside case, $7.40 to $9.55 based on the base case, and $8.34 to $10.79 based on the upside case.

*Selected Companies Analysis*

For purposes of the discounted cash flow and distribution analyses, TPH reviewed and compared certain financial, operating and stock market information for selected companies deemed similar to CEQP or Midstream on a standalone basis in one or more respects, using estimates of financial performance for the selected companies based on publicly available research analyst consensus estimates for the selected companies.

The information reviewed and compared included: estimated distribution yield for the year 2015, or "2015E yield"; unit price as a multiple of estimated LP distributable cash flow per unit for the years 2015 and 2016, or "2015E LP DCF/unit" and "2016E LP DCF/unit," for Midstream and the selected master limited partnerships; equity value as a multiple of estimated distributable cash flow for the years 2015 and 2016, or "2015E DCF" and "2016E DCF," for CEQP and the selected general partners of master limited partnerships; and enterprise value as a multiple of estimated EBITDA for the years 2015 and 2016, or "2015E EBITDA" and "2016E EBITDA."

*Midstream*

The selected companies for Midstream were: Enable Midstream Partners, Targa Resources Partners LP, DCP Midstream Partners LP, American Midstream Partners, LP, Midcoast Energy

62

App000286

Table of Contents

Partners, Martin Midstream Partners LP and Southcross Energy Partners LP. The resulting high, low, mean and median data for such companies and the corresponding data for Midstream were:

| | Distribution Yield | Price/ LP DCF/Unit | | Enterprise Value/ EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 9.0% | 11.0x | 9.9x | 13.5x | 11.8x |
| Median | 8.7% | 11.2x | 10.6x | 12.8x | 11.2x |
| Low | 7.4% | 8.3x | 8.2x | 11.2x | 8.4x |
| High | 10.8% | 13.5x | 11.0x | 16.7x | 16.3x |
| Midstream (based on publicly available consensus analyst estimates) | 10.5% | 9.3x | 8.5x | 13.3x | 12.2x |
| Midstream (based on Midstream Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 10.5% | 10.9x | 11.7x | 13.8x | 13.9x |
| Base | 10.5% | 10.2x | 9.8x | 13.0x | 12.1x |
| Upside | 10.5% | 10.2x | 10.1x | 12.9x | 11.1x |

*CEQP*

The selected companies for CEQP were: Energy Transfer Equity, L.P., Western Gas Equity Partners, LP, Targa Resources Corp., EnLink Midstream LLC, Plains GP Holdings LP, The Williams Companies, Inc., Alliance Holdings GP, L.P., ONEOK, Inc. and NuStar GP Holdings, LLC. The resulting high, low, mean and median data and corresponding data for CEQP were:

| | Yield | Equity Value/ DCF | | Enterprise Value/ EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 4.2% | 31.1x | 30.2x | 31.2x | 27.2x |
| Median | 3.4% | 28.7x | 24.5x | 33.2x | 28.3x |
| Low | 2.3% | 13.5x | 12.3x | 13.4x | 12.3x |
| High | 7.5% | 62.9x | 72.4x | 62.7x | 58.3x |
| CEQP (based on publicly available consensus analyst estimates) | 8.1% | 15.0x | 13.8x | 16.0x | 14.9x |
| CEQP (based on CEQP Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 8.1% | 16.5x | 15.9x | 16.5x | 15.7x |
| Base | 8.1% | 16.5x | 16.0x | 16.5x | 15.8x |
| Upside | 8.1% | 16.4x | 14.8x | 16.4x | 14.9x |

*Selected Transactions Analysis*

For purposes of the discounted cash flow analysis, TPH reviewed the financial terms of certain recent business combinations involving target companies that TPH deemed similar to Midstream in one

63

App000287

Table of Contents

or more respects. The information reviewed and compared included enterprise value as a multiple of estimated EBITDA for the next twelve months "NTM" or next fiscal year "FY1" following announcement, based on publicly available research analyst estimates for those targets.

The selected transactions and resulting high, low, mean and median data were:

| Acquiror | Seller(s)/Target(s) |
|---|---|
| Tesoro Logistics LP* | QEP Midstream Partners |
| EQT Midstream Partners LP* | EQT Corporation |
| Energy Transfer Partners* | Regency Energy Partners LP |
| Western Gas Partners LP | Nuevo Midstream LLC |
| Williams Partners LP* | Access Midstream Partners |
| Tesoro Logistics | QEP Field Services Company |
| Targa Resources | Atlas Pipeline Partners LP |
| EQT Midstream Partners LP* | EQT Corporation |
| Regency Energy Partners LP | Eagle Rock Energy Partners, L.P. |
| Devon | Crosstex Energy LP |
| Regency Energy Partners LP | PVR Partners LP |
| Crestwood Holdings LLC | Inergy LP |
| Atlas Pipeline Partners LP | TEAK Midstream LLC |
| Kinder Morgan Energy Partners LP* | Kinder Morgan Inc. |
| Regency Energy Partners LP* | Southern Union Gathering Company |
| Kinder Morgan Energy Partners LP | Copano Energy LLC |
| Access Midstream Partners LP* | Chesapeake Energy Corporation |
| Penn Virginia Resource Partners LP | Chief Oil & Gas LLC |
| MarkWest Energy Partners LP* | The Energy & Minerals Group |
| Enterprise Products Partners* | Duncan Energy Partners LP |

\*      Related Party Transaction

|  | Enterprise Value/ FY1/NTM EBITDA |
|---|---|
| Related Party Transactions | |
| Median | 11.2x |
| Mean | 11.5x |
| Other Selected Transactions | |
| Median | 12.8x |
| Mean | 12.9x |
| All Transactions | |
| Median | 12.2x |
| Mean | 12.2x |
| Low | 7.8x |
| High | 15.7x |

**Give/Gets—Discounted Cash Flow and Distribution Analyses**

    TPH calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected levered distributable cash flows to holders of CEQP common units based on the Pro Forma Forecasts. TPH applied discount rates ranging from 11.0% to 13.0% and terminal value multiples ranging from 9.0x to 12.0x to the projected levered distributable cash flow for CEQP based on the Pro Forma Forecasts and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP

Table of Contents

pro forma for the Transaction resulted in implied value reference ranges per CEQP common unit of $14.11 to $18.54 based on the downside case, $19.20 to $25.35 based on the base case, and $20.39 to $26.98 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case.

TPH also calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected unlevered free cash flows based on the Pro Forma Forecasts. TPH applied discount rates ranging from 8.0% to 10.0% and terminal value EBITDA multiples ranging from 11.0x to 13.0x to the projected unlevered free cash flows for CEQP based on the Pro Forma Forecasts, deducted net debt, minority interests and preferred equity to calculate pro forma CEQP implied value reference ranges per unit and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP pro forma for the Transaction resulted in adjusted implied value reference ranges per CEQP common unit of $14.95 to $21.04 based on the downside case, $20.19 to $27.63 based on the base case, and $23.47 to $32.49 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case.

TPH also calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected distributed cash flows to holders of CEQP common units based on the Pro Forma Forecasts. TPH applied discount rates ranging from 11.0% to 13.0% and terminal yields ranging from 7.00% to 10.5% to the projected distributed cash flow for CEQP based on the Pro Forma Forecasts and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP pro forma for the Transaction resulted in adjusted implied value reference ranges per CEQP common unit of $14.65 to $20.95 based on the downside case, $19.25 to $28.00 based on the base case, and $20.42 to $29.79 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $15.20 to $21.63 based on the downside case, $18.05 to $26.02 based on the base case, and $17.81 to $25.67 based on the upside case.

For purposes of the discounted cash flow and distribution analyses, TPH reviewed and compared certain financial, operating and stock market information for selected companies deemed similar to CEQP pro forma for the Transaction in one or more respects, using estimates of financial performance for the selected companies based on publicly available research analyst consensus estimates for those companies.

The information reviewed and compared included: estimated yield for the year 2015, or "2015E yield"; unit price as a multiple of estimated distributable cash flow per unit for the years 2015 and 2016, or "2015E DCF/unit" and "2016E DCF/unit"; and enterprise value as a multiple of EBITDA for the years 2015 and 2016, or "2015E EBITDA" and "2016E EBITDA."

The selected companies were: Summit Midstream Partners LP, EnLink Midstream Partners, MarkWest Energy Partners LP, Enable Midstream Partners, Targa Resources Partners LP, DCP Midstream Partners LP, American Midstream Partners, LP, Midcoast Energy Partners, Martin Midstream Partners LP and Southcross Energy Partners LP. The resulting high, low, mean and median

65

App000289

Table of Contents

data and corresponding data for Midstream on a standalone basis and CEQP on a pro forma basis were:

| | Distribution Yield | Price/ DCF/Unit | | Enterprise Value EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 8.2% | 12.5x | 11.0x | 14.5x | 12.1x |
| Median | 7.9% | 11.8x | 10.8x | 13.3x | 11.5x |
| Low | 5.5% | 8.3x | 8.2x | 11.2x | 8.4x |
| High | 10.8% | 18.3x | 16.1x | 19.5x | 16.3x |
| | | | | | |
| Midstream (standalone, based on publicly available consensus analyst estimates) | 10.5% | 9.3x | 8.5x | 13.3x | 12.2x |
| | | | | | |
| Midstream (standalone, based on Midstream Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 10.5% | 10.9x | 11.7x | 13.8x | 13.9x |
| Base | 10.5% | 10.2x | 9.8x | 13.0x | 12.1x |
| Upside | 10.5% | 10.2x | 10.1x | 12.9x | 11.1x |
| | | | | | |
| CEQP (pro forma, based on the Pro Forma Forecasts) | | | | | |
| Downside | 8.1% | 14.7x | 15.7x | 14.6x | 14.6x |
| Base | 8.1% | 13.5x | 12.5x | 13.9x | 12.9x |
| Upside | 8.1% | 13.3x | 12.5x | 13.7x | 11.9x |

*General*

TPH and its affiliates, as part of their investment banking business, are regularly engaged in performing financial analyses with respect to businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and other transactions as well as for estate, corporate and other purposes.

TPH and its affiliates also engage in securities trading and brokerage, private equity and investment management activities, equity research and other financial services, and in the ordinary course of these activities, TPH and its affiliates may from time to time acquire, hold or sell, for their own accounts and for the accounts of their customers, (i) equity, debt and other securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of Midstream, CEQP, First Reserve Management, L.P. (including private equity and investment funds affiliated or associated therewith and the portfolio companies thereof "First Reserve"), which substantially owns and controls CEQP's general partner, their respective affiliates or any of the other parties that may be involved in the Transaction and (ii) any currency or commodity that may be involved in the Transaction and the other matters contemplated by the merger agreement.

In addition, TPH and its affiliates and certain of its employees, including members of the team performing services in connection with the Transaction, as well as certain private equity or other investment funds associated or affiliated with TPH in which they may have financial interests, may from time to time acquire, hold or make direct or indirect investments in or otherwise finance a wide variety

66

App000290

Table of Contents

of companies, including Midstream, CEQP, First Reserve, other actual or potential transaction participants and their respective affiliates and may have committed to invest in private equity or other investment funds managed or advised by First Reserve, and in portfolio companies of such funds, and may have co-invested with First Reserve or certain of its affiliates, and may do so in the future.

The Midstream Conflicts Committee selected TPH to provide financial advice in connection with its evaluation of the merger because of TPH's experience, reputation and familiarity with the midstream sector of the energy industry and because its investment banking professionals have substantial experience in transactions similar to the merger.

TPH and certain of its affiliates have in the past provided and may currently be providing investment banking, financial advisory and other financial services to Midstream, First Reserve and/or certain of their affiliates for which TPH and its affiliates have received, and may receive, compensation, including during the past two years, providing certain advisory services to First Reserve related to exploration and production activity in selected basins in which Midstream operates in January 2015, serving as financial advisor to the Midstream Conflicts Committee in connection with Midstream's acquisition of a majority interest in Tres Palacios Holdings LLC in 2014 and serving as financial advisor to the Conflicts Committee of the board of directors of Midstream GP of Directors of the general partner of Inergy Midstream, L.P. ("Inergy") in connection with Inergy's merger with Midstream in 2013. TPH and certain of its affiliates may provide investment banking, financial advisory and other financial services to Midstream, CEQP, First Reserve, other participants in the Transaction or certain of their respective affiliates or security holders in the future, for which TPH and its affiliates may receive compensation.

The description set forth above constitutes a summary of the analyses employed and factors considered by TPH in rendering its opinion to the Midstream Conflicts Committee. The preparation of a fairness opinion is a complex, analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and is not necessarily susceptible to partial analysis or summary description.

Pursuant to the terms of the engagement of TPH, TPH will receive a fee of $2,250,000 for its services, of which $1,250,000 became payable upon the rendering of the opinion and $1,000,000 is contingent upon the consummation of the merger. In addition, Midstream has agreed to reimburse certain of TPH's expenses and indemnify TPH and certain related parties against certain liabilities arising out of its engagement.

## Unaudited Financial Projections

CEQP and Midstream do not as a matter of course make public projections as to future sales, earnings or other results. However, in connection with the proposed merger, the management of CEQP and Midstream prepared and provided the Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts to the CEQP and Midstream Conflicts Committees. These forecasts were prepared solely for the purposes of the merger, and were provided to the Midstream and CEQP Conflicts Committee in connection with their evaluation of the merger. They were also provided to TPH, which was authorized by the Midstream Conflicts Committee to use and rely upon such projections for purposes of its analyses and opinion, and to Evercore and Citi who were authorized by the CEQP Conflicts Committee to use and rely upon such projections.

67

App000291

Table of Contents

*CEQP and Midstream each caution you that uncertainties are inherent in projections of any kind. None of CEQP or Midstream or any of their affiliates, officers, directors, managers, advisors or other representatives has made or makes any representation or can give any assurance to any CEQP or Midstream unitholder regarding the ultimate performance of CEQP or Midstream compared to the summarized information set forth below or that any projected results will be achieved.*

The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of CEQP's and Midstream's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of such management's knowledge and belief, the expected course of action and the expected future financial performance of CEQP and Midstream. However, this information is not fact.

Neither Crestwood's independent auditors, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, this prospective financial information. The reports of the independent registered public accounting firms incorporated by reference into this proxy statement/prospectus relate to the historical financial information of CEQP and Midstream. Such reports do not extend to the unaudited financial projections and should not be read to do so.

The Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts included the information set forth in the following table:

| ($ millions) | 2015(1) | | | | Projections | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | 2016 | | 2017 | | 2018 | | 2019 |
| **EBITDA** | | | | | | | | | |
| Midstream | $ | 507 | $ | 537 | $ | 620 | $ | 718 | $ | 794 |
| CEQP | $ | 59 | $ | 62 | $ | 74 | $ | 78 | $ | 82 |
| Pro Forma CEQP(2) | $ | 571 | $ | 604 | $ | 699 | $ | 801 | $ | 880 |
| | | | | | | | | | |
| **Distributable Cash Flow** | | | | | | | | | |
| Midstream(3) | $ | 348 | $ | 375 | $ | 413 | $ | 467 | $ | 538 |
| CEQP | $ | 77 | $ | 91 | $ | 119 | $ | 150 | $ | 188 |
| Pro Forma CEQP(3)(4) | $ | 391 | $ | 422 | $ | 470 | $ | 527 | $ | 602 |
| | | | | | | | | | |
| **Distributable Cash Flow Per LP Unit** | | | | | | | | | |
| Midstream(2) | $ | 1.65 | $ | 1.74 | $ | 1.84 | $ | 1.98 | $ | 2.17 |
| CEQP | $ | 0.41 | $ | 0.48 | $ | 0.64 | $ | 0.80 | $ | 1.01 |
| Pro Forma CEQP(3)(4) | $ | 0.57 | $ | 0.62 | $ | 0.69 | $ | 0.77 | $ | 0.88 |
| | | | | | | | | | |
| **Distributions Per LP Unit** | | | | | | | | | |
| Midstream | $ | 1.64 | $ | 1.70 | $ | 1.79 | $ | 1.92 | $ | 2.10 |
| CEQP | $ | 0.55 | $ | 0.55 | $ | 0.64 | $ | 0.80 | $ | 1.01 |
| Pro Forma CEQP | $ | 0.55 | $ | 0.59 | $ | 0.65 | $ | 0.73 | $ | 0.84 |
| | | | | | | | | | |
| **Growth Capital Expenditures** | | | | | | | | | |
| Midstream(5) | $ | 141 | $ | 212 | $ | 291 | $ | 176 | $ | 80 |
| CEQP | $ | 7 | $ | 5 | $ | 5 | $ | 5 | $ | 5 |
| Pro Forma CEQP(5) | $ | 148 | $ | 217 | $ | 296 | $ | 181 | $ | 85 |

Notes:

(1)      Assumes 1/1/2015 effective date.

Table of Contents

(2)     Pro forma CEQP EBITDA assumes $5 million of public company synergies.

(3)     Represents adjusted distributable cash flow available to common unitholders. Includes deduct for cash distributions payable to GE (Crestwood Niobara preferred units) and Midstream's Class A Preferred Units (noting that cash distributions are payable on the Class A Preffered Units commencing in 2017).

(4)     Does not include CEQP DCF attributable to the cash received for the 7.2 million LP units and GP / IDR interest that CEQP owns in Midstream.

(5)     Excludes $40 million earn-out payment paid to Antero in February 2015.

### General

While the unaudited financial projections summarized above were prepared in good faith and based on information available at the time of preparation, no assurance can be made regarding future events. The estimates and assumptions underlying the unaudited financial projections involve judgments with respect to, among other things, future economic, competitive, regulatory and financial market conditions and future business decisions that may not be realized and that are inherently subject to significant business, economic, competitive and regulatory uncertainties and contingencies, including, among others, risks and uncertainties described under "Risk Factors" and "Cautionary Statements Regarding Forward-Looking Statements," all of which are difficult to predict and many of which are beyond the control of Crestwood, and many of which are beyond the control of the combined partnership. There can be no assurance that the underlying assumptions will prove to be accurate or that the projected results will be realized and actual results will likely differ, and may differ materially, from those reflected in the unaudited financial projections, whether or not the transactions are completed. As a result, the unaudited financial projections cannot be considered a reliable predictor of future operating results.

While presented with numerical specificity, the unaudited financial projections reflect numerous estimates and assumptions made by CEQP's and Midstream's management with respect to industry performance and competition, general business, economic, market and financial conditions and matters specific to CEQP's and Midstream's business, all of which are difficult to predict and many of which are beyond CEQP's and Midstream's control. In developing the projections, management of CEQP and Midstream made numerous material assumptions with respect to CEQP and Midstream for the period from 2015 to 2019, including:

- the cash flow from existing assets and business activities;

- organic growth opportunities and projected volume growth and the amounts and timing of related costs and potential economic returns;

- the amount of maintenance and growth capital expenditures;

- outstanding debt during applicable periods, and the availability and cost of capital; and

- other general business, market and financial assumptions.

By including in this proxy statement/prospectus a summary of certain of the unaudited financial projections, neither CEQP or Midstream nor any of its representatives has made or makes any representation to any person regarding the ultimate performance of CEQP or Midstream compared to the information contained in the financial projections. The unaudited financial projections cover multiple years and such information by its nature becomes less predictive with each succeeding year. Neither CEQP or Midstream nor, following completion of the merger, the combined partnership undertakes any obligation, except as required by law, to update or otherwise revise the unaudited financial projections contained in this proxy statement/prospectus to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events or to reflect changes in general

69

---

Table of Contents

economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be in error.

The summaries of the unaudited financial projections are not included in this proxy statement/prospectus in order to induce any Midstream unitholder to vote in favor of the proposal to approve the merger agreement or any of the other proposals to be voted on at the special meeting of Midstream unitholders.

***Neither CEQP nor Midstream intends to update or otherwise revise the above projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even if any or all of the assumptions underlying such projections are no longer appropriate.***

**No Dissenters' or Appraisal Rights**

Neither Midstream common unitholders nor Midstream preferred unitholders have dissenters' or appraisal rights under Midstream's partnership agreement, the merger agreement or applicable Delaware law.

**Antitrust and Regulatory Matters**

Due to rules applicable to partnerships and the common control of Midstream and CEQP, no filing is required under the HSR Act and the rules promulgated thereunder by the FTC. However, at any time before or after completion of the merger, the DOJ, the FTC, or any state request additional information or could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the completion of the merger, to rescind the merger or to seek divestiture of particular assets of CEQP or Midstream. Private parties also may seek to take legal action under the antitrust laws under certain circumstances. In addition, non-U.S. governmental and regulatory authorities may seek to take action under applicable antitrust laws. A challenge to the merger on antitrust grounds may be made and, if such a challenge is made, it is possible that CEQP and Midstream will not prevail.

**Listing of Common Units to be Issued in the Merger; Delisting and Deregistration of Midstream Common Units**

CEQP expects to obtain approval to list on the NYSE the CEQP common units to be issued pursuant to the merger agreement, which approval is a condition to closing the merger. Upon completion of the merger, Midstream common units currently listed on the NYSE will cease to be listed on the NYSE and will be subsequently deregistered under the Exchange Act.

**Accounting Treatment of the Merger**

The proposed merger will be accounted for in accordance with Financial Accounting Standards Board Accounting Standards Codification 810, *Consolidations—Overall—Changes in Parent's Ownership Interest in a Subsidiary*. Because CEQP controls Midstream both before and after the merger and related transactions, the changes in CEQP's ownership interest in Midstream will be accounted for as an equity transaction and no gain or loss will be recognized in CEQP's consolidated statements of operations resulting from the merger. The proposed merger represents CEQP's acquisition of the noncontrolling interests in Midstream.

**Pending Litigation**

On May 20, 2015, Lawrence G. Farber, a purported unitholder of Midstream, filed a complaint in the Southern District of the United States, Houston Division, as a putative class action on behalf of the Midstream unitholders, captioned Lawrence G. Farber, individually and on behalf of all others similarly

70

App000294

# EXHIBIT C

App000295

S-4/A 1 a2225473zs-4a.htm S-4/A

Use these links to rapidly review the document
TABLE OF CONTENTS
TABLE OF CONTENTS

Table of Contents

As filed with the Securities and Exchange Commission on July 24, 2015

Registration No. 333-205004

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Amendment No. 1 to
## Form S-4
### REGISTRATION STATEMENT
### UNDER
### THE SECURITIES ACT OF 1933

## Crestwood Equity Partners LP
### (Exact name of registrant as specified in its charter)

| **Delaware** | **5960** | **43-1918951** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary standard industrial classification code number) | (I.R.S. Employer Identification Number) |

**700 Louisiana Street, Suite 2550**
**Houston, Texas 77002**
**(832) 519-2200**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Robert T. Halpin**
**700 Louisiana Street**
**Suite 2550**
**Houston, Texas 77002**
**(832) 519-2200**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

Copies to:

| **G. Michael O'Leary, Jr.** | **Gislar R. Donnenberg** | **David F. Taylor** |
|---|---|---|
| **Andrews Kurth LLP** | **Paul Hastings LLP** | **Locke Lord LLP** |
| **600 Travis Street, Suite 4200** | **600 Travis Street, 58th Floor** | **600 Travis Street, Suite 2800** |
| **Houston, Texas 77002** | **Houston, Texas 77002** | **Houston, Texas 77002** |
| **(713) 220-4200** | **(713) 860-7300** | **(713) 226-1200** |

Table of Contents

## THE MERGER

**Background of the Merger**

The senior management of CEQP and Midstream (the "Crestwood Entities" or "Crestwood") and the Equity GP Board and Midstream Board (together, the "Crestwood Boards") regularly review operational and strategic opportunities to improve the competitive positioning of the partnerships and maximize value for investors of CEQP and Midstream, respectively. In connection with these reviews, management and the directors from time to time evaluate potential transactions that would further Crestwood's strategic objectives.

As more fully described in the section entitled "Certain Relationships; Interests of Certain Persons in the Merger," CEQP and Midstream are under common control. Midstream is owned 100% by its limited partners and its non-economic general partner, Midstream GP. Midstream was formed by CEQP in September 2004 for the purpose of holding certain of CEQP's midstream investments. Midstream GP and 100% of Midstream's IDRs are owned by Midstream Holdings, a wholly owned subsidiary of CEQP. CEQP and CGS collectively own 7,159,438 of Midstream's outstanding common units.

Crestwood's senior management from time to time considers and pursues merger and acquisition opportunities designed to grow the combined business and create unitholder value. Since mid-2014, Crestwood's management, with the assistance of Citigroup Global Markets Inc. ("Citi"), Crestwood's financial advisor, has considered and discussed with the Crestwood Boards numerous opportunities intended to improve Crestwood's competitive positioning and enhance unitholder value, including third party mergers, a recapitalization of CEQP, a combination of the Crestwood Entities, and asset divestitures, including a "drop-down" of CEQP's natural gas liquids ("NGL") assets to Midstream ("NGL drop-down").

On August 14, 2014, at meetings of the Crestwood Boards held to explore the strategic direction of the Crestwood Entities, senior management and the directors reviewed various strategic alternatives under consideration. Robert Halpin, Senior Vice President and Chief Financial Officer of the Crestwood Entities, reviewed potential NGL drop-down structures and the benefits and challenges of each of the structures. William Moore, Senior Vice President, Strategy & Corporate Development of the Crestwood Entities, presented information regarding a potential strategic combination with a company that owns significant gathering, processing and fractionation assets in the western United States ("Project Sundance"). Mr. Moore also reviewed Kinder Morgan Inc.'s transaction to acquire all of the outstanding common units of Kinder Morgan Energy Partners, L.P. and El Paso Pipeline Partners, L.P., and discussed how a comparable CEQP—Midstream transaction could be structured and the potential accretive/dilutive impact of such a transaction.

In connection with the strategic board meetings, Crestwood's senior management selected two institutional investors to help evaluate Project Sundance, provide the capital support required by Crestwood for the transaction and become a co-sponsor of Crestwood with First Reserve. Historically, Crestwood's senior management has kept an active dialogue with multiple large-scale capital providers, including infrastructure funds and private equity funds, to continuously progress working relationships and avenues for equity capital support in addition to the public capital markets.

In September 2014, Crestwood's management had numerous discussions with the selected institutional investors, and the Crestwood Boards held multiple telephonic meetings relating to Project Sundance. With the support of the Crestwood Boards and the institutional investors, Crestwood submitted its final offer in Project Sundance. Crestwood was informed later that month that it was not selected as the winning bidder.

Following Crestwood's participation in Project Sundance and continuing through October 2014, Robert Phillips, Chairman, President and Chief Executive Officer of the Crestwood Entities and Messrs. Halpin and Moore identified and contacted a group of institutional investors to solicit interest in a significant equity investment and capital commitment to Crestwood. The institutional investors

44

Table of Contents

approached by Crestwood's management were targeted primarily based on (i) a firm's historical familiarity with and interest in the Crestwood platform, (ii) a firm's appetite for large-scale investments, (iii) a firm's stated desire to own and control an MLP platform and the firm's track record of executing on that strategy and (iv) a firm's existing portfolio of midstream assets that could potentially be contributed to a transaction. After numerous discussions with multiple candidates, Crestwood's senior management selected two institutional investors ("Sponsor A" and "Sponsor B," respectively, and together the "Potential Sponsors"), for advance negotiations and due diligence. Among other things, Messrs. Phillips, Halpin and Moore conducted management presentations for each Potential Sponsor in October and discussed potential structures in which the investors would commit capital to the Crestwood Entities to fund acquisitions and growth projects.

On November 13, 2014, at the regularly scheduled quarterly meeting of the Crestwood Boards in Houston, representatives of Citi reviewed various strategic alternatives potentially available to Crestwood, including: (i) an NGL drop-down; (ii) a simplification transaction whereby CEQP and Midstream would merge, resulting in a single publicly traded entity (a "Simplification Transaction"); (iii) a merger with another MLP involving a unit exchange; (iv) a sale of Crestwood to a large-cap MLP for cash consideration or an exchange of units; (v) a new private equity sponsor combined with an asset contribution; and (vi) an asset contribution from a strategic counterparty in exchange for CEQP equity interests. Citi outlined the benefits, challenges and actionability of each alternative.

In November 2014, Citi was contacted by a representative of an MLP merger candidate who expressed interest in a potential merger transaction ("Project Thunder").

In December 2014, Messrs. Phillips, Halpin and Moore met with Sponsor B after attending an MLP investor conference in New York. Sponsor B provided an update on their due diligence progress and discussed certain challenges associated with the proposed structure for their investment. Sponsor B expressed strong interest in pursuing other investment alternatives with Crestwood, including approaching First Reserve about taking CEQP private. Despite some continued inquiry, discussions between Sponsor B and First Reserve generally concluded and no formalized proposals were ever received from Sponsor B.

On January 22, 2015, the Crestwood Boards held a telephonic meeting to declare the fourth quarter distributions. During the meeting, Mr. Phillips provided an update on Project Thunder and a potential preferred equity investment at CEQP, each of which would have likely required a drop-down of CEQP's operating assets to Midstream. Thereafter, the Crestwood Boards authorized the CEQP Conflicts Committee and the Midstream Conflicts Committee, respectively, to retain counsel and financial advisors to begin review of a potential NGL drop-down.

On January 26, 2015, representatives of First Reserve and Messrs. Phillips, Halpin and Moore met with Sponsor A in Houston to discuss potential governance terms for an investment whereby Sponsor A would become a co-sponsor of Crestwood with First Reserve.

On January 27, 2015, the merger candidate in Project Thunder delivered a non-binding term sheet to Crestwood outlining the structure and general terms of a merger transaction.

On February 2, 2015, Sponsor A submitted a term sheet to First Reserve outlining the framework under which it would make a $250 million preferred equity investment in CEQP concurrent with an NGL drop-down, and would commit approximately $1.0 billion to Crestwood to fund acquisitions and investment opportunities. Following several clarification calls with Sponsor A, First Reserve and Crestwood's management made a counterproposal to Sponsor A on February 6, 2015.

On February 12, 2015, at the regularly scheduled quarterly meeting of the Crestwood Boards, senior management provided an update on the status of various strategic alternatives under consideration, including (i) Project Thunder, (ii) a CEQP restructuring with the introduction of a co-sponsor combined with an NGL drop-down, including management's conversations with Sponsor A, (iii) the Simplification Transaction, and (iv) the potential sale to third parties of certain assets and operations. Mr. Phillips noted that although senior management continues to search for a merger

45

Table of Contents

partner, the Project Thunder discussions were progressing slower than expected and senior management's focus had shifted to alternatives more within Crestwood's control, including an NGL drop-down.

Also on February 12, 2015, Sponsor A provided a revised term sheet to First Reserve and Crestwood's senior management.

On February 25, 2015, the Crestwood Boards held a telephonic meeting to review management's recommendations with respect to the NGL drop-down and, concurrently therewith, a potential equity investment at CEQP, where Sponsor A would become a co-sponsor with First Reserve. Senior management noted that in connection with the potential CEQP equity investment, management was evaluating a potential joint bid with Sponsor A to acquire certain midstream assets of an independent crude oil exploration and production company.

On March 4, 2015, Crestwood engaged Citi to provide to First Reserve and the Crestwood Entities financial advice and analysis concerning the Simplification Transaction. Given the size and complexity of the Simplification Transaction, Crestwood and First Reserve determined that it would be prudent to hire Citi in order to provide additional financial analysis and capital markets perspective for the Simplification Transaction.

On March 24, 2015, representatives from First Reserve and Sponsor A discussed governance issues relating to the co-sponsorship investment described in the term sheet received on February 12. As a part of those discussions, the two parties agreed the right framework had been developed for a partnership going forward, but without a sizable acquisition or investment opportunity as a catalyst, it would be difficult for Sponsor A to obtain equal governance rights with First Reserve and its existing capital investment in Crestwood. Both parties expressed a desire to continue to develop and pursue investment opportunities and, as opportunities materialized, to revisit co-sponsorship discussions.

On March 25, 2015, senior management of the Crestwood Entities, Citi and First Reserve held a strategic alternatives discussion during which time the participants reviewed the analysis, merits and considerations of an NGL drop-down as compared to the Simplification Transaction.

On April 2, 2015, CEQP GP, in its capacity as the general partner of CEQP, engaged Andrews Kurth LLP ("AK") as legal advisor to CEQP.

On April 7, 2015, Crestwood's senior management participated in a joint management presentation for Project Thunder.

On April 7, 2015, Mr. Phillips provided an update to the Crestwood Boards on the status of each strategic alternative under consideration. He noted that another mid-cap MLP had recently approached First Reserve and expressed interest in a potential combination with Crestwood ("Project Orion"), and a confidentiality agreement had been executed to facilitate further discussions and due diligence. Mr. Phillips further indicated that (i) senior management and Citi agreed that any realistic opportunities to create a so-called "Devon-Crosstex" merger (in which Crestwood would become the drop-down conduit for an oil and gas producer's midstream assets) had been exhausted, (ii) after more thorough analysis, an NGL drop-down was believed to be prohibitively dilutive to CEQP given its already low distribution coverage ratio and, consequently, the alternative was no longer considered viable by senior management, and (iii) senior management, First Reserve and Citi had increased their efforts around the Simplification Transaction. Mr. Phillips also explained that Crestwood's management would continue to develop and pursue Projects Thunder and Orion—recognizing that Crestwood management was not in control of those transactions and was dependent upon the counterparty's desire to progress those merger opportunities.

On April 13, 2015, at the meetings of the Crestwood Boards, members of the boards again reviewed each strategic alternative then under consideration and discussed with Citi a comparison of the benefits and disadvantages of a potential NGL drop-down and a Simplification Transaction. The strategic alternatives reviewed by senior management and Citi at the meetings included (i) potential third-party mergers, including the status of Project Thunder and Project Orion as well as an overview

46

App000299

Table of Contents

of all merger-related activities dating back to February 2014, (ii) a "status quo" strategy, (iii) the Simplification Transaction, (iv) NGL drop-down (v) new sponsor or co-sponsor opportunities, and (vi) a sale of the Crestwood Entities. Mr. Halpin and Citi reviewed in greater detail the Simplification Transaction, its merits and considerations relative to other alternatives within Crestwood's control and an indicative timeline for execution. The merits of the Simplification Transaction discussed by Citi and Mr. Halpin included that (a) the resulting simplified corporate structure would eliminate potential conflicts of interest issues and create an attractive platform to a broader group of consolidation candidates, (b) elimination of the IDRs would drive cost of capital improvement to better finance the combined company's growth, (c) substantial general and administrative expense ("G&A") and fixed charge reductions would further benefit the combined company's results from operations and its ability to grow its business, and (d) execution of the Simplification Transaction would be largely within Crestwood's control. Representatives from AK then reviewed the Crestwood Boards' duties and responsibilities in evaluating all of the strategic alternatives, including the Simplification Transaction, described the approval process for an affiliated transaction and reviewed the relevant provisions of the Crestwood partnership agreements. Thereafter, the Crestwood Boards authorized the CEQP Conflicts Committee and the Midstream Conflicts Committee, respectively, to review the proposed Simplification Transaction.

On April 14, 2015, Midstream contacted representatives of Paul Hastings LLP ("Paul Hastings") to discuss its potential engagement by the Midstream Conflicts Committee regarding the Simplification Transaction.

On April 16, 2015, the Midstream Conflicts Committee confirmed the engagement of Paul Hastings as its legal counsel. Paul Hastings was selected by the Midstream Conflicts Committee because of its prior work for the Midstream Conflicts Committee and its knowledge and familiarity with Midstream and the industry in which it operates.

On April 16, 2015, Crestwood received a non-binding offer from an affiliated party ("Potential NGL Buyer") to acquire CEQP's NGL assets and certain NGL-related assets owned by Midstream (the "NGL Offer"). Crestwood's senior management reviewed the offer with First Reserve and agreed to discuss the offer with the Crestwood Boards at a meeting scheduled for April 17.

On April 16, 2015, Joel Lambert, Senior Vice President, General Counsel and Corporate Secretary of the Crestwood Entities, provided the Midstream Conflicts Committee and representatives of Paul Hastings with a high-level summary of the proposed structure, process and timing of the Simplification Transaction. The summary did not include a proposed exchange ratio.

On April 17, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives from Paul Hastings to discuss the committee's selection of a financial advisor to assist the committee in evaluating the proposed Simplification Transaction. After having discussed several candidates prior to and during the meeting, the Midstream Conflicts Committee contacted representatives from TPH to discuss the Midstream Conflicts Committee's potential engagement of TPH as financial advisor to the Midstream Conflicts Committee in connection with the proposed Simplification Transaction and asked TPH to disclose any material relationships it had with the parties to the proposed Simplification Transaction. TPH was selected by the Midstream Conflicts Committee because of its prior work for the Midstream Conflicts Committee and its knowledge and familiarity with Midstream, CEQP and the industry in which they operate. TPH was subsequently engaged as financial advisor to the Midstream Conflicts Committee pursuant to an engagement letter dated April 28, 2015.

On April 17, 2015, Randy Moeder, Chairman of the CEQP Conflicts Committee, on behalf of the CEQP Conflicts Committee, contacted representatives of Locke Lord LLP ("Locke Lord") to discuss engaging Locke Lord as legal counsel to the CEQP Conflicts Committee, given its knowledge and experience with respect to MLPs and public merger and acquisition transactions, the CEQP Conflicts Committee's prior experience with Locke Lord and Locke Lord's familiarity with CEQP. The CEQP Conflicts Committee subsequently executed an engagement letter with Locke Lord.

47

Table of Contents

On April 17, 2015, the CEQP Conflicts Committee discussed potential financial advisors that they identified with experience in similar transactions and decided to retain Evercore Group L.L.C. ("Evercore") as its independent financial advisor given Evercore's knowledge and experience with respect to MLPs, and the CEQP Conflicts Committee's prior experience with Evercore. The CEQP Conflicts Committee subsequently executed a formal engagement letter with Evercore on April 28, 2015.

On April 17, 2015, the Equity GP Board held a telephonic meeting where Mr. Phillips reviewed the history and background of the strategic alternatives discussed at the February 12, 2015 board meeting and provided a status update on the strategic alternatives still under consideration. Mr. Halpin then reviewed the costs and benefits of preserving the current structure and noted that substantial unitholder value creation under the current structure is limited. He also reviewed the financial analysis for the Simplification Transaction relative to the NGL drop-down. Thereafter, members of the Equity GP Board reviewed the proposed Simplification Transaction and approved a formal, non-binding merger proposal to the Midstream Board to acquire all of the outstanding publicly traded equity securities of Midstream at an exchange ratio of 2.60x. The proposal also contemplated that the existing Midstream preferred units would be converted into substantially equivalent preferred units to be issued by CEQP. Additionally, the Equity GP Board reviewed the material terms of the NGL Offer and agreed more analysis was needed in order to respond to the offer.

On April 17, 2015, in connection with Project Orion, John Black, Vice President of Finance of the Crestwood Entities, distributed Crestwood's financial model to Citi, which Citi subsequently distributed to the appropriate counterparties.

On April 19, 2015, via telephone conference, Mr. Moore discussed with representatives of TPH the scope and other terms of TPH's potential engagement by the Midstream Conflicts Committee.

On April 20, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the status of the Simplification Transaction, including the legal and financial due diligence process.

On the afternoon of April 20, 2015, the CEQP Conflicts Committee held a meeting with representatives from Evercore and Locke Lord in attendance. Mr. Moeder reviewed the proposed terms, benefits, and costs of the Simplification Transaction. The CEQP Conflicts Committee then discussed potential alternatives to the Simplification Transaction for CEQP. Representatives from Locke Lord reviewed the fiduciary duties of the CEQP Conflicts Committee and representatives from Evercore reviewed the anticipated timeline for the Simplification Transaction. The CEQP Conflicts Committee then discussed the upcoming management presentations that CEQP's management scheduled for the next few days.

On April 20, 2015, the Midstream Board held a telephonic meeting where Mr. Phillips reviewed the history and background of the strategic alternatives discussed at the February 12, 2015 board meeting and provided a status update on the strategic alternatives still under consideration. Mr. Halpin then discussed current investor sentiment, market risks and risks unique to Crestwood's portfolio emphasizing the need to chart a strategic path forward to address current challenges before reviewing the rationale for the Simplification Transaction, Additionally, the Midstream Board reviewed the material terms of the NGL Offer and agreed more analysis was needed in order to respond to the offer.

From April 20, 2015 through April 28, 2015, Mr. Moore and Rob Pacha exchanged emails negotiating Evercore's fee arrangement. On April 28, 2015, Mr. Moore and Mr. Pacha agreed upon Evercore's fee via telephone conference.

On April 21, 2015, at the request of the Midstream Conflicts Committee, TPH sent management of the Crestwood Entities a list requesting certain financial and other information relating to CEQP and the Simplification Transaction.

48

Table of Contents

On April 21, 2015, Mr. Halpin sent the financial model to the conflicts committees of each of Midstream and CEQP, and he sent simplification materials to GSO and Magnetar.

On April 22, 2015, members of Crestwood's management, including Messrs. Phillips, Halpin, Moore and Black, presented financial models, including a base case, an upside case and a downside case as well as pro forma financial models, with respect to the Crestwood Entities and the pro forma combined entity that would result from the Simplification Transaction to the members of each of the Midstream Conflicts Committee and the CEQP Conflicts Committee and representatives from Evercore, TPH, Locke Lord and Paul Hastings.

At the request of the Midstream Conflicts Committee, on April 23, 2015, via telephone conference, TPH, Messrs. Halpin, Moore, and Black and Vince Grisell, Vice President—Capital Markets and Risk at each Crestwood Entity, discussed the financial model related to the Simplification Transaction. On the same date, each Crestwood Board held meetings to determine and approve the first quarter distribution on each of CEQP's and Midstream's common units and to receive an update on the status of the proposed Simplification Transaction.

On April 24, 2015, TPH and Messrs. Halpin, Moore, Black and Grisell, telephonically participated in a diligence session related to CEQP's NGL business. On the same date, Mr. Black sent a revised financial model to the Midstream and CEQP Conflicts Committees to include a potential gathering and processing project in advanced negotiations in the upside case.

On April 24, 2015, representatives of Paul Hastings, AK and Simpson Thacher & Bartlett LLP, finance counsel to the Crestwood Entities, held a telephonic meeting at which they discussed the various Midstream and CEQP debt instruments and the impact of the proposed Simplification Transaction.

On April 27, 2015, the Midstream Conflicts Committee met to discuss the Simplification Transaction. Representatives of TPH and Paul Hastings were also present at that meeting. At the request of the Midstream Conflicts Committee, TPH reviewed and discussed its preliminary financial analysis with respect to Midstream, CEQP and the proposed Simplification Transaction with the Midstream Conflicts Committee.

On April 27, 2015, AK emailed an initial draft of the merger agreement to Locke Lord and Paul Hastings. The draft merger agreement provided for an exchange ratio of 2.60 CEQP common units per Midstream common unit and certain deal protection provisions, including a breakup fee payable to CEQP in the event the merger agreement was terminated under certain circumstances. The draft merger agreement also provided that certain Midstream unitholders would execute voting and support agreements.

On April 28, 2015, Paul Hastings provided to Philip D. Gettig, Chairman of the Midstream Conflicts Committee, a telephonic update of Delaware case law developments with respect to the conflicts committee process in MLP related party transactions.

On April 28, 2015, the Midstream Conflicts Committee held a telephonic meeting with representatives of TPH and Paul Hastings at which the Midstream Conflicts Committee approved a counterproposal providing for an exchange ratio of 3.00 CEQP common units per Midstream common unit instead of the exchange ratio of 2.60 initially proposed by CEQP.

On April 28, 2015, Mr. Gettig contacted the Chairman of the CEQP Conflicts Committee to communicate the Midstream Conflicts Committee's counterproposal, proposing an exchange ratio of 3.00 CEQP common units to be issued for each Midstream common unit in the Simplification Transaction.

On April 29, 2015, members of Crestwood's management participated in two separate due diligence telephone conference calls with Potential NGL Buyer's representatives. On the first call, Messrs. Halpin and Black discussed with the Potential NGL Buyer's representatives the key terms in connection with the proposed purchase of NGL assets. On the second call, Citi and Messrs. Phillips,

49

App000302

Table of Contents

Halpin and Black discussed with the Potential NGL Buyer's representatives the NGL Offer and compared the merits of the offer to the Simplification Transaction and explained that Crestwood's management believes that the NGL Offer does not provide a favorable alternative path to the Simplification Transaction for the following reasons: (i) execution risk and potential timing delays of the NGL transaction could jeopardize the Simplification Transaction; (ii) the need for more time for management to fully assess the strategic value proposition of the NGL assets portfolio in connection with Crestwood's broader midstream business; and (iii) the dilutive nature of the NGL Offer further limits Crestwood's visibility to growth.

On April 30, 2015, the CEQP Conflicts Committee held an extensive meeting at which representatives of Evercore and Locke Lord were present. Representatives of Locke Lord reviewed with the CEQP Conflicts Committee its fiduciary duties and obligations under Delaware law and the CEQP partnership agreement, including recent developments under Delaware law. Representatives of Evercore discussed their preliminary detailed financial analysis with respect to the Simplification Transaction, including a discussion regarding the proposed merger consideration exchange ratios, Midstream's and CEQP's respective businesses, assets and growth prospects. Representatives of Evercore also discussed the financial effects of alternative transaction structures for the Simplification Transaction and the yields at which units in the pro forma combined business could potentially trade following consummation of the Simplification Transaction.

Evercore's analysis included, among other things, a discussion of the preliminary standalone valuation for each of CEQP and Midstream, which Evercore measured using various methodologies, including a comparable partnership trading analysis, a selected comparable precedent transactions analysis, a discounted cash flow analysis and a discounted distribution analysis. Representatives of Evercore compared the standalone valuation estimates to the proposed exchange ratios.

Following Evercore's valuation discussion, the CEQP Conflicts Committee discussed Midstream's counter-proposal of 3.00 CEQP Common Units for each Midstream common unit and 3.00 CEQP preferred units for each Midstream preferred unit. After evaluating the various valuation methodologies described above and comparing the corresponding range of implied values per unit derived from such analyses, the CEQP Conflicts Committee authorized Mr. Moeder to contact the Chair of the Midstream Conflicts Committee to propose a decrease in the proposed exchange ratio and negotiate the proposed merger consideration. Representatives of Locke Lord also discussed with the CEQP Conflicts Committee certain legal issues and precedents related to the proposed merger agreement.

On May 1, 2015, via telephone conference, representatives from Magnetar and GSO and Messrs. Halpin, Moore and Black discussed business updates and the merits of the proposed Simplification Transaction.

On May 1, 2015, Mr. Moeder contacted the Chairman of the Midstream Conflicts Committee to propose a revised exchange ratio of 2.65 CEQP common units per Midstream common unit.

On May 1, 2015, the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the 2.65 exchange ratio counterproposal from the CEQP Conflicts Committee. At the request of the Midstream Conflicts Committee, TPH reviewed and discussed its supplemental preliminary financial analysis with respect to Midstream, CEQP and the proposed Simplification Transaction with the Midstream Conflicts Committee. Paul Hastings also provided a brief overview of the issues identified in the initial draft of the merger agreement, noting that Midstream should have maximum flexibility to entertain an alternative transaction and should not be subject to any termination fee unless CEQP was also subject to a termination fee in the event it terminated the merger agreement in accordance with certain provisions of the merger agreement. The Midstream Conflicts Committee determined that it appeared the two proposed exchange ratios were too far apart, but that a conversation among the chairmen of the respective conflicts committees, with the assistance of their respective financial advisors, might advance discussions between the parties.

50

Table of Contents

Accordingly, later in the day on May 1, 2015, the Chairman of each of the Midstream and CEQP Conflicts Committees, with assistance of their respective financial advisors, conducted a brief telephone conference to discuss the rationale for their current positions with respect to the proposed exchange ratios.

Also on May 1, 2015, representatives of Paul Hastings reviewed with the Midstream Conflicts Committee their markup of the merger agreement and then emailed Locke Lord comments to the draft merger agreement that had initially been distributed by AK. Such comments, among other items, provided that CEQP would be subject to the same (and in certain cases more strenuous) restrictions on its operations between signing and closing, provided Midstream with greater flexibility to entertain alternate proposals and eliminated the termination fee concept, instead replacing it with a repayment of expenses.

At 4:00 p.m. on May 1, 2015, the Chairman of the CEQP Conflicts Committee contacted the Chairman of the Midstream Conflicts Committee to inform him that the CEQP Conflicts Committee believed that the respective proposals of the committees were too far apart for further negotiations to be worthwhile.

Later on May 1, 2015, Mr. Gettig relayed the conversation with his counterpart to Mr. Lumpkins and representatives of TPH and Paul Hastings. The members of the Midstream Conflicts Committee then instructed Paul Hastings to communicate the impasse in negotiations to Crestwood's counsel.

On May 2, 2015, Paul Hastings conducted a brief call with AK and Locke Lord to update AK as to the current status of discussions and negotiations between the Midstream Conflicts Committee and the CEQP Conflicts Committee and the impasse that had been reached.

On May 3, 2015, the Midstream Conflicts Committee, Paul Hastings, TPH, Messrs. Phillips, Halpin, Lambert, and Moore, AK and Citi discussed the status of negotiations surrounding the merger agreement and the Simplification Transaction, the reasons therefor as well as financial information previously provided.

On the same date, a separate meeting of the CEQP Conflicts Committee was held via telephone conference, and the CEQP Conflicts Committee, Locke Lord, Evercore, Messrs. Phillips, Halpin, Lambert, and Moore and Citi discussed the status of negotiations surrounding the merger agreement and the Simplification Transaction.

On May 4, 2015 at 8:30 a.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings. The Midstream Conflicts Committee, with the assistance of TPH and Paul Hastings, discussed the comprehensive overview of the reasons for the Simplification Transaction provided by management of the Crestwood Entities during the May 3, 2015 meeting, as well as the discussion with management of the Crestwood Entities during such meeting of the financial information previously provided to the Midstream Conflicts Committee. Paul Hastings then reviewed with the members of the committee the duties of the Midstream Conflicts Committee and the standard of good faith set forth in Midstream's partnership agreement for the Midstream Conflicts Committee's review of related party transactions. Thereafter, the Midstream Conflicts Committee, with the assistance of representatives of TPH, reviewed and discussed certain financial metrics and determined to respond to the CEQP Conflicts Committee with the proposal of a 2.80x exchange ratio.

On May 4, 2015, Mr. Gettig informed the Chairman of the CEQP Conflicts Committee of the Midstream Conflicts Committee's response. Following the receipt of the counter-offer, the CEQP Conflicts Committee met with representatives from Evercore and Locke Lord to discuss the counter-offer and open items. The CEQP Conflicts Committee extensively discussed these items and proposed revisions to the merger agreement with its advisors. During the meeting, and based upon additional financial analyses provided by Evercore, the CEQP Conflicts Committee determined to counter the

51

App000304

Table of Contents

Midstream Conflicts Committee offer with a proposal to offer 2.75 CEQP common units for each Midstream common unit and 2.75 CEQP preferred units for each Midstream preferred unit. Shortly thereafter, the CEQP Conflicts Committee responded with a counterproposal of a 2.75x exchange ratio provided that the Midstream Conflicts Committee would agree to the termination fee as initially proposed in the merger agreement.

On May 4, 2015 at 12:15 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the CEQP Conflicts Committee's response of a 2.75x exchange ratio and that the Midstream Conflicts Committee agree to the original termination fee proposal in the merger agreement. Paul Hastings discussed the precedents for termination fees with the Midstream Conflicts Committee and noted that the merger agreement contained a provision permitting CEQP to walk away from the deal. After discussion, the Midstream Conflicts Committee determined that it would prefer no termination fee. The Midstream Conflicts Committee also determined that a 2.75x exchange ratio, with the appropriate resolution regarding the termination fee, was potentially acceptable to the Midstream Conflicts Committee.

On May 4, 2015, Paul Hastings and Locke Lord had further discussion regarding the merger agreement and Locke Lord, on behalf of the CEQP Conflicts Committee, accepted the Midstream Conflicts Committee's proposal for no termination fee, with only expenses being payable in certain circumstances. Shortly after that discussion, on May 4, 2015, Locke Lord emailed a revised draft of the merger agreement to Paul Hastings, which included no termination fee. After reviewing such revisions, Paul Hastings and AK discussed that AK would incorporate the agreed changes into a revised draft of the merger agreement.

On May 4, 2015 at 3:00 p.m., the Crestwood Boards held a joint telephonic meeting at which the status of the Simplification Transaction was discussed. Citi reviewed the status of Project Thunder and Project Orion and noted that no actionable proposals had been presented by either counterparty. Mr. Moore provided an update on the CEQP restructuring strategy and potential joint bid to acquire certain midstream assets of an independent crude oil exploration and production company. He noted that the acquisition opportunity was likely no longer viable and no new proposals had been received from the potential co-sponsor with respect to an equity investment at CEQP. Mr. Phillips reviewed the terms of the NGL Offer and indicated that substantial work still needed to be completed to fully analyze and respond to the NGL Offer. The Crestwood Boards determined that the NGL Offer should not delay the Simplification Transaction, and Crestwood would continue to evaluate strategic alternatives (including the NGL Offer) while proceeding with the Simplification Transaction.

On May 4, 2015 at 4:00 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the committee discussed the Midstream Board meeting held earlier in the day, including the fact that a potential sale of CEQP's NGL business prior to closing of the transactions contemplated by the merger agreement would result in a significantly different transaction for Midstream. Paul Hastings confirmed that such a sale would not be permitted under the merger agreement as currently drafted if the merger agreement was executed.

On May 4, 2015 at 4:30 p.m., at the request of the Midstream Conflicts Committee, Mr. Lambert and AK confirmed in a telephone conference with Paul Hastings that CEQP had no current intent to sell CEQP's NGL business and AK confirmed that any such sale would require an amendment to the merger agreement as well as the written consent of the Midstream Conflicts Committee if such sale occurred after the merger agreement was executed.

Early on May 5, 2015, AK emailed a revised draft of the merger agreement to Paul Hastings and Locke Lord. In response, Paul Hastings provided some additional comments to the interim operating covenants that had previously been agreed to by the CEQP Conflicts Committee and Midstream Conflicts Committee. AK incorporated such additional interim operating covenants into a revised draft circulated to the parties later that same day.

52

Table of Contents

On May 5, 2015 at 9:00 a.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings at which the Midstream Conflicts Committee discussed the Midstream preferred unit exchange ratio, in particular that the parties understood that the relative distributions with respect to the preferred units should not change.

On the afternoon of May 5, 2015, the CEQP Conflicts Committee held a meeting, at which representatives of Evercore and Locke Lord were present, to discuss and, if appropriate, approve the transaction documents, including the merger agreement and the support agreement. Representatives of Locke Lord reviewed the efforts made by the CEQP Conflicts Committee regarding the Simplification Transaction, including the substantive work and the processes followed. Locke Lord then discussed the duties of the CEQP Conflicts Committee with respect to the Simplification Transaction and reviewed the "Special Approval" standard under CEQP's partnership agreement. Locke Lord then reviewed the material terms and provisions of the merger agreement and answered the questions of the CEQP Conflicts Committee.

Following this extensive discussion, representatives of Evercore delivered to the CEQP Conflicts Committee an oral opinion, confirmed by delivery of a written opinion dated May 5, 2015, to the effect that, as of May 5, 2015, and based upon and subject to the various assumptions, qualifications and limitations set forth in Evercore's opinion, the exchange ratio of 2.75 CEQP common units for each Midstream common unit to be issued in the merger was fair, from a financial point of view, to the holders of CEQP common units (other than Equity GP and its affiliates, officers and directors). The CEQP Conflicts Committee then unanimously (i) determined that the merger agreement and the transactions contemplated thereby were in the best interest of CEQP and the holders of CEQP common units (other than Equity GP and its affiliates, officers and directors), (ii) approved the merger agreement and the transactions contemplated thereby, including the merger, which constituted "Special Approval" under the CEQP partnership agreement, and (iii) recommended to the Equity GP Board the approval of the merger agreement and the consummation of the transactions contemplated thereby, including the merger.

On May 5, 2015, representatives of TPH and Paul Hastings received confirmation from management of the Crestwood Entities that the preferred unit conversion ratio would remain effectively the same under the terms of the new CEQP preferred units.

On May 5, 2015 at 2:00 p.m., the Midstream Conflicts Committee held a telephonic meeting that included representatives of TPH and Paul Hastings. At the request of the Midstream Conflicts Committee, representatives of TPH reviewed and discussed TPH's financial analyses with respect to Midstream, CEQP and the proposed merger. Thereafter, at the request of the Midstream Conflicts Committee, TPH rendered its oral opinion to the Midstream Conflicts Committee (which was subsequently confirmed in writing by delivery of TPH's written opinion addressed to the Midstream Conflicts Committee dated as of the same date) as to, as of May 5, 2015, the fairness, from a financial point of view, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. Following discussion of the terms and conditions of the merger agreement, including the elimination of the termination fee, and the financial analyses and opinion of TPH, the Midstream Conflicts Committee determined in good faith that the merger was fair and reasonable and in the best interest of Midstream and the Midstream unaffiliated unitholders. The Midstream Conflicts Committee unanimously approved and determined to recommend the Simplification Transaction and the merger agreement to the Midstream Board.

On May 5, 2015 at 3:00 p.m. the Midstream Board convened a duly called and held telephonic meeting, during which, upon recommendation of the Midstream Conflicts Committee the Midstream Board approved the Simplification Transaction, merger agreement and the documents and transactions related thereto.

53

App000306

Table of Contents

On May 5, 2015 at 4:00 p.m. the Equity GP Board convened a duly called and held telephonic meeting, during which, upon recommendation of the CEQP Conflicts Committee the Equity GP Board approved the Simplification Transaction, the merger agreement and the documents and transactions related thereto.

On May 5, 2015, the parties finalized and executed the merger agreement.

On May 6, 2015, CEQP and Midstream issued earnings releases and a joint press release announcing the merger agreement and the proposed merger.

**Recommendation of the Midstream Board and the Midstream Conflicts Committee's Reasons for the Merger**

After careful consideration, the Midstream Conflicts Committee, by a unanimous vote of its members, at a meeting held on May 5, 2015, determined that the merger agreement and the transactions contemplated thereby are advisable and in the best interests of Midstream and the Midstream unaffiliated unitholders and recommended to the Midstream Board the execution, delivery and performance of the merger agreement and the transactions contemplated thereby. In evaluating the merger, the Midstream Conflicts Committee consulted with Midstream's senior management and the Midstream Conflicts Committee's legal and financial advisors and, in reaching its decision, the Midstream Conflicts Committee considered a number of factors that the Midstream Conflicts Committee believed supported its decision, including the following material factors:

- Midstream had a favorable exchange ratio relative to the trading price of the Midstream common units the day before the merger was announced;

- the Midstream Conflicts Committee's assessment of current and projected commodity prices, and the direct and indirect risks resulting therefrom, the changes in the capital markets, borrowing and liquidity issues and the sustainability of future distributions, and certain related adverse effects on Midstream;

- the potential alternatives available to Midstream, including the possibility of remaining a stand-alone entity, and the assessment of the Midstream Conflicts Committee that the merger was likely to enhance value for Midstream unitholders;

- the elimination of Midstream's IDRs, which is expected to result in a cost of capital improvement to better finance growth and stabilize the combined entity's long-term distribution outlook;

- the increased scale and simplified entity structure of the combined company should permit it to compete more effectively and facilitate future development projects, exploration and acquisitions through increased cash flow, lower cost of capital, better access to debt and equity markets and elimination of potential conflicts of interest and appeal to a wider investor base;

- the potential ability to achieve substantial G&A and fixed charge reductions, including the elimination of dual public company costs and elimination of IDR distributions;

- the merger is expected to result in long-term cash flow accretion, in part due to the elimination of Midstream's IDRs;

- the fact that the merger is subject to the approval of the Midstream unitholders, who will be free to approve or reject the merger, but is not subject to a vote of the CEQP common unitholders;

- the financial analyses reviewed and discussed with the Midstream Conflicts Committee by representatives of TPH as well as the oral opinion of TPH rendered to the Midstream Conflicts Committee on May 5, 2015, (which was subsequently confirmed in writing by delivery of TPH's

App000307

Table of Contents

written opinion addressed to the Midstream Conflicts Committee dated the same date) as to, as of May 5, 2015, the fairness, from a financial point of view, to the Unaffiliated Unitholders of the Common Merger Consideration to be received by such Unaffiliated Unitholders in the merger pursuant to the merger agreement; and

- the fact that the merger agreement does not preclude Midstream from engaging in negotiations with, and providing information to, a third party that makes an unsolicited written acquisition proposal, if the Midstream Conflicts Committee determines in good faith that such proposal is likely to result in a superior proposal (as defined under "The Merger Agreement—Acquisition Proposals; Change in Recommendation"), and the fact that the merger agreement permits Midstream to terminate the merger agreement to enter into such a transaction after reimbursing CEQP's expenses up to $10 million.

The Midstream Conflicts Committee also considered, and balanced against the potential benefits, various risks and other potentially negative factors concerning the merger agreement, including the following:

- the merger agreement provides for a fixed exchange ratio and thus the exchange ratio will not change based on changes in the trading prices of Midstream or CEQP common units or changes in the business performance or financial results of Midstream or CEQP. Accordingly, if the value of CEQP's business declines relative to the value of Midstream's business prior to completion of the merger, the Midstream unitholders' percentage ownership in the combined company may exceed CEQP's relative contribution to the combined company;

- the merger agreement restricts Midstream's ability to solicit possibly superior transactions and the required reimbursement by Midstream of CEQP's expenses up to $10 million in the event of termination of the arrangement agreement under specified circumstances;

- based on the exchange ratio, the merger would be dilutive to the Midstream unitholders on a short-term basis;

- substantial costs will be incurred by Midstream in connection with the transaction, including financial arrangement fees, financial advisory fees and legal and other advisor fees, as well as the costs of integrating the businesses of Midstream and CEQP;

- the risk that management focus, employee attention and resources for other strategic opportunities, as well as employee attention to operational matters, could be diverted for an extended period of time while the parties work to complete the merger and integration process and any litigation that may occur in connection with the proposed transactions;

- the fact that the merger agreement permits CEQP to terminate the merger agreement at any time prior to obtaining the Midstream unitholder approval, in the event that the Equity GP Board determines to abandon the transactions contemplated in the merger agreement, subject only to CEQP reimbursing Midstream's reimbursing CEQP's expenses up to $10 million;

- the possibility that the merger might not be consummated despite the parties' efforts or that the closing of the merger may be unduly delayed, and that the announcement of the transaction, coupled with any failure to consummate the transaction, could have a negative effect on Midstream's relationships with third parties, as well as a negative effect on Midstream's operating results and trading price;

- the risks inherent in CEQP's business and operations, including those identified in CEQP's SEC filings; and

- risks of the type and nature described under "Risk Factors."

55

Table of Contents

The Midstream Conflicts Committee concluded that the potentially negative factors associated with the proposed merger were outweighed by the potential benefits that it expected the Midstream unaffiliated unitholders would achieve as a result of the merger. Accordingly, the Midstream Conflicts Committee determined that the merger agreement and the transactions contemplated thereby, including the merger, are in the best interests of Midstream and the Midstream unaffiliated unitholders, and recommended to the Midstream Board the execution, delivery and performance of the merger agreement and the transactions contemplated thereby. **The Midstream Board unanimously approved the merger agreement and the transactions contemplated thereby and recommends that the Midstream unitholders vote FOR the merger proposal.**

The foregoing discussion of the information and factors considered by the Midstream Conflicts Committee includes all of the material factors considered by the Midstream Conflicts Committee, but it is not intended to be exhaustive and may not include all of the factors considered by the Midstream Conflicts Committee. In view of the wide variety of factors considered in connection with its evaluation of the merger and the complexity of these matters, the Midstream Conflicts Committee did not find it useful and did not attempt to quantify or assign any relative or specific weights to the various factors in its determination to recommend the approval of the merger agreement and the transactions contemplated thereby, including the merger. In addition, individual members of the Midstream Conflicts Committee may have given weights to different factors.

This explanation of the Midstream Conflicts Committee's reasons for the merger and other information presented in this section is forward-looking in nature and, therefore, should be read in light of the factors described under "Information Regarding Forward-Looking Statements."

### Opinion of the Midstream Conflicts Committee's Financial Advisor

The Midstream Conflicts Committee retained TPH as its exclusive financial advisor with respect to the provision of an opinion to the Midstream Conflicts Committee as to the fairness from a financial point of view to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. At the request of the Midstream Conflicts Committee at a meeting of the Midstream Conflicts Committee held on May 5, 2015, TPH rendered its oral opinion to the Midstream Conflicts Committee that, as of May 5, 2015, based upon and subject to the assumptions, qualifications, limitations and other matters considered by TPH in connection with the preparation of its opinion, the Common Merger Consideration to be received by the Unaffiliated Common Unitholders in the merger pursuant to the merger agreement was fair, from a financial point of view, to the Unaffiliated Common Unitholders. TPH subsequently confirmed its oral opinion in writing dated May 5, 2015 to the Midstream Conflicts Committee.

The opinion speaks only as of the date it was delivered and not as of the time the merger will be completed or any other date. The opinion does not reflect changes that may occur or may have occurred after May 5, 2015, which could alter the facts and circumstances on which TPH's opinion was based.

**TPH's opinion was directed to the Midstream Conflicts Committee (in its capacity as such), and only addressed the fairness from a financial point of view, as of the date of the opinion, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by the Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. TPH's opinion did not address any other term or aspect of the merger agreement or the Transaction. The full text of the TPH written opinion, dated May 5, 2015, which describes the assumptions made, procedures followed, matters considered, and qualifications and limitations of the review undertaken by TPH in rendering its opinion, is attached as Annex B to this proxy statement/prospectus. The summary of TPH's opinion set forth in this proxy statement/prospectus is qualified in its entirety by reference to the full text of**

56

App000309

Table of Contents

**the opinion. However, neither TPH's written opinion nor the summary of its opinion and the related analyses set forth in this proxy statement/prospectus are intended to be, and they do not constitute, a recommendation as to how the Midstream Conflicts Committee or the board of directors of Midstream GP, Midstream GP, any holder of securities in Midstream or any other person should act or vote with respect to any matter relating to the merger, the Transaction or any other matter.**

TPH's opinion to the Midstream Conflicts Committee was among several factors taken into consideration by the Midstream Conflicts Committee in making its recommendation to the board of directors of Midstream GP regarding the merger.

In connection with rendering its opinion and performing its related financial analyses, TPH reviewed, among other things:

(i)     a draft, dated May 4, 2015, of the merger agreement and a draft, received by TPH on May 5, 2015, of the CEQP Partnership Agreement Amendment;

(ii)    annual reports to unitholders and Annual Reports on Form 10-K of Midstream and CEQP for each of the years ended 2012, 2013 and 2014;

(iii)   certain interim reports to unitholders and Quarterly Reports on Form 10-Q of Midstream and CEQP;

(iv)    certain other communications from Midstream and CEQP to their respective unitholders;

(v)     certain internal financial information and forecasts for Midstream and CEQP prepared and adjusted by the management of Midstream and CEQP, including with respect to the future financial performance of Midstream on a stand-alone basis (the "Midstream Forecasts"), CEQP on a stand-alone basis (the "CEQP Forecasts") and CEQP after giving effect to the Transaction, including certain estimates of cost savings and other synergies ("Synergies") projected by the management of Midstream and CEQP to result from the Transaction (the "Pro Forma Forecasts"); and

(vi)    certain publicly available research analyst reports with respect to the future financial performance of Midstream and CEQP, which TPH discussed with the senior management of Midstream and CEQP.

TPH also held discussions with members of the senior management of Midstream and CEQP regarding their assessment of the strategic rationale for, and the potential benefits of, the Transaction and the past and current business operations, financial condition and future prospects of Midstream and CEQP. In addition, TPH reviewed the reported price and trading activity for Midstream common units and CEQP common units, compared certain financial and stock market information for Midstream and CEQP with similar information for certain other companies the securities of which are publicly traded, reviewed the financial terms of certain recent business combinations that TPH deemed relevant, compared the relative contributions of Midstream and CEQP to certain pro forma financial statistics for CEQP after giving effect to the Transaction, and reviewed such other documents, performed such other studies and analyses, and considered such other factors, as TPH considered appropriate. TPH understood that (i) the management of Midstream were employees of Crestwood Operations LLC, a wholly-owned subsidiary of CEQP, (ii) certain members of Midstream's management have responsibilities for managing both Midstream and CEQP and (iii) the Midstream Forecasts, the CEQP Forecasts, the Synergies and the Pro Forma Forecasts were developed by or under the supervision of the senior management of Midstream and CEQP.

The Midstream Conflicts Committee advised TPH, and for purposes of its analyses and opinion TPH assumed, that each outstanding Midstream preferred unit would, as a result of the merger, be converted into the Preferred Merger Consideration and that the units in CEQP comprising the

57

App000310

Table of Contents

Preferred Merger Consideration would constitute "Substantially Equivalent Units" as defined in Midstream's partnership agreement.

For purposes of its opinion, TPH assumed and relied upon, without assuming any responsibility for independent verification, the accuracy and completeness of all of the financial, accounting, legal, tax, regulatory and other information provided to, discussed with or reviewed by or for TPH, or publicly available. In that regard, TPH assumed with the Midstream Conflicts Committee's consent that the Midstream Forecasts and the CEQP Forecasts had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Midstream and CEQP with respect to the future financial performance of Midstream and CEQP on a standalone basis and that the Pro Forma Forecasts were reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Midstream and CEQP with respect to the future financial performance of the combined company after giving effect to the Transaction. TPH expressed no view or opinion with respect to the Midstream Forecasts, the CEQP Forecasts, the Synergies, the Pro Forma Forecasts or the assumptions on which they were based, and TPH assumed, at the Midstream Conflicts Committee's direction, that the Midstream Forecasts, the CEQP Forecasts, the Synergies and the Pro Forma Forecasts provided a reasonable basis upon which to evaluate Midstream, CEQP and the proposed Transaction. TPH relied upon and assumed, without independent verification, that (a) the representations and warranties of all parties to the merger agreement and all other related documents and instruments referred to therein were true and correct, (b) each party to the merger agreement and such other related documents and instruments would fully and timely perform all of the covenants and agreements required to be performed by such party, (c) all conditions to the consummation of the Transaction would be satisfied without waiver thereof, and (d) the Transaction would be consummated in a timely manner in accordance with the terms described in the merger agreement and such other related documents and instruments, without any amendments or modifications thereto. TPH also assumed, with the consent of the Midstream Conflicts Committee that, for U.S. federal income tax purposes, no gain or loss would be recognized by Unaffiliated Common Unitholders as a result of the receipt of CEQP common units in the merger (other than any income or gain resulting from any actual or constructive distribution of cash and cash received in lieu of fractional CEQP common units pursuant to the merger agreement). TPH also assumed that all governmental, regulatory or other consents or approvals necessary for the consummation of the Transaction would be obtained without any effect on Midstream, CEQP, or the expected benefits of the Transaction. In addition, TPH relied upon and assumed, without independent verification, that the final forms of any draft documents identified above would not differ in any respect from the drafts of said documents.

TPH was not requested to, and did not, solicit indications of interest from third parties with respect to a potential alternative transaction involving Midstream. TPH also assumed that there had been no material changes in the business, operations, financial condition and prospects of Midstream or CEQP since the respective dates of the most recent financial statements and other information provided to TPH. In addition, TPH did not make an independent evaluation or appraisal of the assets and liabilities (including any contingent, derivative or off-balance-sheet assets and liabilities) of Midstream, CEQP or any of their respective affiliates and TPH was not furnished with any such evaluation or appraisal.

The estimates contained in TPH's analyses and the results from any particular analysis are not necessarily indicative of future results, which may be significantly more or less favorable than suggested by such analyses. In addition, analyses relating to the value of businesses or assets neither purport to be appraisals nor do they necessarily reflect the prices at which businesses or assets may actually be sold. Accordingly, TPH's analyses and estimates are inherently subject to substantial uncertainty.

In arriving at its opinion, TPH did not attribute any particular weight to any particular analysis or factor considered by it, but rather made qualitative judgments as to the significance and relevance of

58

App000311

Table of Contents

each analysis and factor. Several analytical methodologies were employed by TPH in its analyses, and no one single method of analysis should be regarded as determinative of the overall conclusion reached by TPH. Each analytical technique has inherent strengths and weaknesses, and the nature of the available information may further affect the significance of particular techniques. Accordingly, TPH believes that its analyses must be considered as a whole and that selecting portions of its analyses and of the factors considered by it, without considering all analyses and factors in their entirety, could create a misleading or incomplete view of the evaluation process underlying its opinion. The conclusion reached by TPH, therefore, is based on the application of TPH's experience and judgment to all analyses and factors considered by TPH, taken as a whole.

TPH's opinion did not address any accounting, legal, tax or regulatory matters. In addition, its opinion did not address the underlying business decision of the Midstream Conflicts Committee, the board of directors of Midstream GP, Midstream GP or any other party to engage in the Transaction, or the relative merits of the Transaction as compared to any other alternative transaction that might have been available to Midstream, CEQP or any other party. TPH's opinion addressed only the fairness from a financial point of view, as of the date thereof, to the Unaffiliated Common Unitholders of the Common Merger Consideration to be received by such Unaffiliated Common Unitholders in the merger pursuant to the merger agreement. TPH did not express any view on, and its opinion did not address, any other term or aspect of the merger agreement or the Transaction, including, without limitation, the fairness of the Preferred Merger Consideration to the holders of Midstream preferred units, the fairness of the Common Merger Consideration relative to the Preferred Merger Consideration, the allocation of the aggregate consideration to be received by holders of Midstream preferred units and Midstream common units among the holders of Midstream preferred units and Midstream common units or groups thereof, the fairness of the Transaction to, or any consideration received in connection therewith by, creditors or other constituencies of Midstream or CEQP; nor as to the fairness of the amount or nature of any compensation to be paid or payable to any of the officers, directors or employees of Midstream or CEQP, or any class of such persons, in connection with the Transaction, whether relative to the Common Merger Consideration, the Preferred Merger Consideration or otherwise. TPH did not express any opinion as to the price at which CEQP common units will trade when issued in the merger or as to the prices at which the Midstream common units, Midstream preferred units, CEQP common units or CEQP preferred units may be purchased or sold at any time. TPH's opinion was necessarily based on economic, monetary, market and other conditions as in effect on, and the information made available to TPH as of, the date of its opinion. TPH assumed no obligation to update, revise or reaffirm its opinion and expressly disclaimed any responsibility to do so whether based on circumstances, developments or events occurring after the date of its opinion or otherwise. TPH's opinion and related analyses were provided for the information and assistance of the Midstream Conflicts Committee (in its capacity as such) in connection with its consideration of the merger and such opinion and analyses do not constitute a recommendation as to how the Midstream Conflicts Committee, the board of directors of Midstream GP, Midstream GP, any holder of securities in Midstream or any other person should act or vote with respect to any matter relating to the Transaction or any other matter. The issuance of TPH's opinion was approved by TPH's fairness opinion committee.

The following is a summary of the material financial analyses performed by TPH in connection with the preparation of its opinion and reviewed with the Midstream Conflicts Committee on May 5, 2015. Unless the context indicates otherwise, enterprise values and equity values used in the selected companies analysis described below were calculated using the closing price of the Midstream common units and the equity securities of the selected companies listed below as of May 4, 2015, and transaction values for the selected transactions analysis described below were calculated on an enterprise value basis based on the value of the equity consideration and other public information available at the time of the relevant transaction's announcement. The analyses summarized below

59

App000312

Table of Contents

include information presented in tabular format. In order to fully understand the financial analyses performed, the tables must be considered together with the textual summary of the analyses.

For purposes of its analyses, TPH reviewed a number of financial metrics including:

Enterprise Value—generally the value as of a specified date of the relevant company's outstanding equity securities (taking into account its options and other outstanding convertible securities) plus the value as of such date of its net debt (the value of its outstanding indebtedness, preferred stock and capital lease obligations less the amount of cash on its balance sheet).

EBITDA—generally the amount of the relevant company's earnings before interest, taxes, depreciation and amortization for a specified time period.

Distributable Cash Flow—generally EBITDA minus interest expense and maintenance capital expenditures, as adjusted for special items for a specified time period. LP Distributable Cash Flow is generally the Distributable Cash Flow available for distribution to holders of limited partnership units for a specified time period.

In addition, for purposes of certain of TPH's analyses, with the Midstream Conflicts Committee's consent, TPH treated future distributions on the Midstream preferred units that may be payable-in-kind as paid in cash.

No company or transaction used in the analyses of companies or transactions summarized below is identical or directly comparable to Midstream, CEQP or the Transaction. As a consequence mathematical derivations (such as the high, low, mean and median) of financial data are not by themselves meaningful, and these analyses must take into account differences in the financial and operating characteristics of the selected publicly traded companies and differences in the structure and timing of the selected transactions and other factors that would affect the public trading value and acquisition value of the companies considered.

**Forecasts**

The Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts each included a base case prepared by Midstream and CEQP management, as well as an upside case and a downside case, resulting from adjustments by Midstream and CEQP management to the applicable base case. In addition, the Pro Forma Forecasts included the Synergies.

**Contribution Analysis**

TPH reviewed the contributions of Midstream and CEQP of certain financial metrics to the combined company resulting from the Transaction based on the Midstream Forecasts and the CEQP Forecast and certain publicly available financial information for Midstream and CEQP. The financial metrics reviewed included (i) equity value as of May 4, 2015; (ii) distributable cash flow for the year 2014; and (iii) estimated distributable cash flow for the years 2015, 2016, 2017, 2018 and 2019, using the base, downside and upside cases for Midstream included in the Midstream Forecasts and the base case for CEQP included in the CEQP Forecasts. The contribution analysis did not give effect to the Synergies. The contribution analysis indicated a range of implied exchange ratios in the merger of 1.432x to 4.179x, as set forth in the table below, as compared to the exchange ratio of 2.750x provided for in the merger. For purposes of the contribution analyses, TPH excluded the general partner and

60

App000313

Table of Contents

incentive distribution rights of Midstream held by CEQP, the common units of Midstream held by CEQP and the Midstream preferred units from its analysis of Midstream.

|  | Implied Exchange Ratio |
|---|---|
| Market Value | 2.398x |
|  |  |
| 2014A Distributable Cash Flow | 4.179x |
|  |  |
| Base |  |
| 2015E LP Distributable Cash Flow | 3.607x |
| 2016E LP Distributable Cash Flow | 3.642x |
| 2017E LP Distributable Cash Flow | 3.023x |
| 2018E LP Distributable Cash Flow | 2.384x |
| 2019E LP Distributable Cash Flow | 2.079x |
|  |  |
| Levered Discounted Cash Flow | 1.679x - 1.853x |
| Discounted Distribution Analysis | 2.434x - 2.726x |
|  |  |
| Downside |  |
| 2015E LP Distributable Cash Flow | 3.372x |
| 2016E LP Distributable Cash Flow | 3.019x |
| 2017E LP Distributable Cash Flow | 3.043x |
| 2018E LP Distributable Cash Flow | 3.143x |
| 2019E LP Distributable Cash Flow | 2.887x |
|  |  |
| Levered Discounted Cash Flow | 2.223x - 2.465x |
| Discounted Distribution Analysis | 2.812x - 3.323x |
|  |  |
| Upside |  |
| 2015E LP Distributable Cash Flow | 3.580x |
| 2016E LP Distributable Cash Flow | 3.260x |
| 2017E LP Distributable Cash Flow | 2.854x |
| 2018E LP Distributable Cash Flow | 2.064x |
| 2019E LP Distributable Cash Flow | 1.755x |
|  |  |
| Levered Discounted Cash Flow | 1.432x - 1.578x |
| Discounted Distribution Analysis | 2.132x - 2.380x |

*Discounted Cash Flow Analysis*

     TPH calculated implied value reference ranges of Midstream and CEQP common units on a standalone basis by discounting projected levered distributable cash flows to holders of Midstream and CEQP common units. TPH applied equity discount rates ranging from 11.0% to 13.0% and terminal value multiples ranging from 9.0x to 12.0x to the projected levered LP distributable cash flow for Midstream based on the Midstream Forecasts, which resulted in implied value reference ranges per Midstream common unit of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case. TPH applied discount rates ranging from 12.0% to 14.0% and terminal value multiples ranging from 14.0x to 16.0x to the projected levered distributable cash flow for CEQP based on the CEQP Forecasts, which resulted in implied value reference ranges per CEQP common unit of $6.49 to $7.64 based on the downside case, $10.55 to $12.54 based on the base case, and $12.18 to $14.50 based on the upside case.

61

App000314

Table of Contents

*Discounted Distribution Analysis*

TPH calculated implied value reference ranges of Midstream and CEQP common units on a standalone basis by discounting projected distributed cash flows to holders of Midstream and CEQP common units. TPH applied equity discount rates ranging from 11.0% to 13.0% and terminal yields ranging from 7.00% to 10.5% to the projected LP distributed cash flow for Midstream based on the Midstream Forecasts, which resulted in implied value reference ranges per Midstream common unit of $15.20 to $21.63 based on the downside case, $18.05 to $26.02 based on the base case, and $17.81 to $25.67 based on the upside case. TPH applied discount rates ranging from 12.0% to 14.0% and terminal yields ranging from 7.00% to 9.00% to the projected distributed cash flow for CEQP based on the CEQP Forecasts, which resulted in implied value reference ranges per CEQP common unit of $5.41 to $6.87 based on the downside case, $7.40 to $9.55 based on the base case, and $8.34 to $10.79 based on the upside case.

*Selected Companies Analysis*

For purposes of the discounted cash flow and distribution analyses, TPH reviewed and compared certain financial, operating and stock market information for selected companies deemed similar to CEQP or Midstream on a standalone basis in one or more respects, using estimates of financial performance for the selected companies based on publicly available research analyst consensus estimates for the selected companies.

The information reviewed and compared included: estimated distribution yield for the year 2015, or "2015E yield"; unit price as a multiple of estimated LP distributable cash flow per unit for the years 2015 and 2016, or "2015E LP DCF/unit" and "2016E LP DCF/unit," for Midstream and the selected master limited partnerships; equity value as a multiple of estimated distributable cash flow for the years 2015 and 2016, or "2015E DCF" and "2016E DCF," for CEQP and the selected general partners of master limited partnerships; and enterprise value as a multiple of estimated EBITDA for the years 2015 and 2016, or "2015E EBITDA" and "2016E EBITDA."

*Midstream*

The selected companies for Midstream were: Enable Midstream Partners, Targa Resources Partners LP, DCP Midstream Partners LP, American Midstream Partners, LP, Midcoast Energy

62

---

App000315

Table of Contents

Partners, Martin Midstream Partners LP and Southcross Energy Partners LP. The resulting high, low, mean and median data for such companies and the corresponding data for Midstream were:

| | Distribution Yield | Price/ LP DCF/Unit | | Enterprise Value/ EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 9.0% | 11.0x | 9.9x | 13.5x | 11.8x |
| Median | 8.7% | 11.2x | 10.6x | 12.8x | 11.2x |
| Low | 7.4% | 8.3x | 8.2x | 11.2x | 8.4x |
| High | 10.8% | 13.5x | 11.0x | 16.7x | 16.3x |
| Midstream (based on publicly available consensus analyst estimates) | 10.5% | 9.3x | 8.5x | 13.3x | 12.2x |
| Midstream (based on Midstream Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 10.5% | 10.9x | 11.7x | 13.8x | 13.9x |
| Base | 10.5% | 10.2x | 9.8x | 13.0x | 12.1x |
| Upside | 10.5% | 10.2x | 10.1x | 12.9x | 11.1x |

*CEQP*

The selected companies for CEQP were: Energy Transfer Equity, L.P., Western Gas Equity Partners, LP, Targa Resources Corp., EnLink Midstream LLC, Plains GP Holdings LP, The Williams Companies, Inc., Alliance Holdings GP, L.P., ONEOK, Inc. and NuStar GP Holdings, LLC. The resulting high, low, mean and median data and corresponding data for CEQP were:

| | Yield | Equity Value/ DCF | | Enterprise Value/ EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 4.2% | 31.1x | 30.2x | 31.2x | 27.2x |
| Median | 3.4% | 28.7x | 24.5x | 33.2x | 28.3x |
| Low | 2.3% | 13.5x | 12.3x | 13.4x | 12.3x |
| High | 7.5% | 62.9x | 72.4x | 62.7x | 58.3x |
| CEQP (based on publicly available consensus analyst estimates) | 8.1% | 15.0x | 13.8x | 16.0x | 14.9x |
| CEQP (based on CEQP Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 8.1% | 16.5x | 15.9x | 16.5x | 15.7x |
| Base | 8.1% | 16.5x | 16.0x | 16.5x | 15.8x |
| Upside | 8.1% | 16.4x | 14.8x | 16.4x | 14.9x |

*Selected Transactions Analysis*

For purposes of the discounted cash flow analysis, TPH reviewed the financial terms of certain recent business combinations involving target companies that TPH deemed similar to Midstream in one

63

Table of Contents

or more respects. The information reviewed and compared included enterprise value as a multiple of estimated EBITDA for the next twelve months "NTM" or next fiscal year "FY1" following announcement, based on publicly available research analyst estimates for those targets.

The selected transactions and resulting high, low, mean and median data were:

| Acquiror | Seller(s)/Target(s) |
|---|---|
| Tesoro Logistics LP* | QEP Midstream Partners |
| EQT Midstream Partners LP* | EQT Corporation |
| Energy Transfer Partners* | Regency Energy Partners LP |
| Western Gas Partners LP | Nuevo Midstream LLC |
| Williams Partners LP* | Access Midstream Partners |
| Tesoro Logistics | QEP Field Services Company |
| Targa Resources | Atlas Pipeline Partners LP |
| EQT Midstream Partners LP* | EQT Corporation |
| Regency Energy Partners LP | Eagle Rock Energy Partners, L.P. |
| Devon | Crosstex Energy LP |
| Regency Energy Partners LP | PVR Partners LP |
| Crestwood Holdings LLC | Inergy LP |
| Atlas Pipeline Partners LP | TEAK Midstream LLC |
| Kinder Morgan Energy Partners LP* | Kinder Morgan Inc. |
| Regency Energy Partners LP* | Southern Union Gathering Company |
| Kinder Morgan Energy Partners LP | Copano Energy LLC |
| Access Midstream Partners LP* | Chesapeake Energy Corporation |
| Penn Virginia Resource Partners LP | Chief Oil & Gas LLC |
| MarkWest Energy Partners LP* | The Energy & Minerals Group |
| Enterprise Products Partners* | Duncan Energy Partners LP |

\*    Related Party Transaction

| | Enterprise Value/<br>FY1/NTM EBITDA |
|---|---|
| Related Party Transactions | |
| Median | 11.2x |
| Mean | 11.5x |
| Other Selected Transactions | |
| Median | 12.8x |
| Mean | 12.9x |
| All Transactions | |
| Median | 12.2x |
| Mean | 12.2x |
| Low | 7.8x |
| High | 15.7x |

**Give/Gets—Discounted Cash Flow and Distribution Analyses**

TPH calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected levered distributable cash flows to holders of CEQP common units based on the Pro Forma Forecasts. TPH applied discount rates ranging from 11.0% to 13.0% and terminal value multiples ranging from 9.0x to 12.0x to the projected levered distributable cash flow for CEQP based on the Pro Forma Forecasts and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP

64

App000317

Table of Contents

pro forma for the Transaction resulted in implied value reference ranges per CEQP common unit of $14.11 to $18.54 based on the downside case, $19.20 to $25.35 based on the base case, and $20.39 to $26.98 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case.

TPH also calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected unlevered free cash flows based on the Pro Forma Forecasts. TPH applied discount rates ranging from 8.0% to 10.0% and terminal value EBITDA multiples ranging from 11.0x to 13.0x to the projected unlevered free cash flows for CEQP based on the Pro Forma Forecasts, deducted net debt, minority interests and preferred equity to calculate pro forma CEQP implied value reference ranges per unit and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP pro forma for the Transaction resulted in adjusted implied value reference ranges per CEQP common unit of $14.95 to $21.04 based on the downside case, $20.19 to $27.63 based on the base case, and $23.47 to $32.49 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $14.42 to $18.84 based on the downside case, $17.72 to $23.24 based on the base case, and $17.44 to $22.88 based on the upside case.

TPH also calculated implied value reference ranges of CEQP common units pro forma for the Transaction by discounting projected distributed cash flows to holders of CEQP common units based on the Pro Forma Forecasts. TPH applied discount rates ranging from 11.0% to 13.0% and terminal yields ranging from 7.00% to 10.5% to the projected distributed cash flow for CEQP based on the Pro Forma Forecasts and adjusted the resulting per unit value reference ranges by the exchange ratio provided for in the merger of 2.750x. The discounted cash flow analysis for CEQP pro forma for the Transaction resulted in adjusted implied value reference ranges per CEQP common unit of $14.65 to $20.95 based on the downside case, $19.25 to $28.00 based on the base case, and $20.42 to $29.79 based on the upside case, as compared to the implied value reference ranges for Midstream common units indicated by the discounted cash flow analysis with respect thereto of $15.20 to $21.63 based on the downside case, $18.05 to $26.02 based on the base case, and $17.81 to $25.67 based on the upside case.

For purposes of the discounted cash flow and distribution analyses, TPH reviewed and compared certain financial, operating and stock market information for selected companies deemed similar to CEQP pro forma for the Transaction in one or more respects, using estimates of financial performance for the selected companies based on publicly available research analyst consensus estimates for those companies.

The information reviewed and compared included: estimated yield for the year 2015, or "2015E yield"; unit price as a multiple of estimated distributable cash flow per unit for the years 2015 and 2016, or "2015E DCF/unit" and "2016E DCF/unit"; and enterprise value as a multiple of EBITDA for the years 2015 and 2016, or "2015E EBITDA" and "2016E EBITDA."

The selected companies were: Summit Midstream Partners LP, EnLink Midstream Partners, MarkWest Energy Partners LP, Enable Midstream Partners, Targa Resources Partners LP, DCP Midstream Partners LP, American Midstream Partners, LP, Midcoast Energy Partners, Martin Midstream Partners LP and Southcross Energy Partners LP. The resulting high, low, mean and median

65

App000318

Table of Contents

data and corresponding data for Midstream on a standalone basis and CEQP on a pro forma basis were:

| | Distribution Yield | Price/ DCF/Unit | | Enterprise Value EBITDA | |
|---|---|---|---|---|---|
| | 2015E | 2015E | 2016E | 2015E | 2016E |
| Mean | 8.2% | 12.5x | 11.0x | 14.5x | 12.1x |
| Median | 7.9% | 11.8x | 10.8x | 13.3x | 11.5x |
| Low | 5.5% | 8.3x | 8.2x | 11.2x | 8.4x |
| High | 10.8% | 18.3x | 16.1x | 19.5x | 16.3x |
| Midstream (standalone, based on publicly available consensus analyst estimates) | 10.5% | 9.3x | 8.5x | 13.3x | 12.2x |
| Midstream (standalone, based on Midstream Forecasts and Upside and Downside Cases) | | | | | |
| Downside | 10.5% | 10.9x | 11.7x | 13.8x | 13.9x |
| Base | 10.5% | 10.2x | 9.8x | 13.0x | 12.1x |
| Upside | 10.5% | 10.2x | 10.1x | 12.9x | 11.1x |
| CEQP (pro forma, based on the Pro Forma Forecasts) | | | | | |
| Downside | 8.1% | 14.7x | 15.7x | 14.6x | 14.6x |
| Base | 8.1% | 13.5x | 12.5x | 13.9x | 12.9x |
| Upside | 8.1% | 13.3x | 12.5x | 13.7x | 11.9x |

*General*

    TPH and its affiliates, as part of their investment banking business, are regularly engaged in performing financial analyses with respect to businesses and their securities in connection with mergers and acquisitions, negotiated underwritings, competitive biddings, secondary distributions of listed and unlisted securities, private placements and other transactions as well as for estate, corporate and other purposes.

    TPH and its affiliates also engage in securities trading and brokerage, private equity and investment management activities, equity research and other financial services, and in the ordinary course of these activities, TPH and its affiliates may from time to time acquire, hold or sell, for their own accounts and for the accounts of their customers, (i) equity, debt and other securities (or related derivative securities) and financial instruments (including bank loans and other obligations) of Midstream, CEQP, First Reserve Management, L.P. (including private equity and investment funds affiliated or associated therewith and the portfolio companies thereof "First Reserve"), which substantially owns and controls CEQP's general partner, their respective affiliates or any of the other parties that may be involved in the Transaction and (ii) any currency or commodity that may be involved in the Transaction and the other matters contemplated by the merger agreement.

    In addition, TPH and its affiliates and certain of its employees, including members of the team performing services in connection with the Transaction, as well as certain private equity or other investment funds associated or affiliated with TPH in which they may have financial interests, may from time to time acquire, hold or make direct or indirect investments in or otherwise finance a wide variety

66

Table of Contents

of companies, including Midstream, CEQP, First Reserve, other actual or potential transaction participants and their respective affiliates and may have committed to invest in private equity or other investment funds managed or advised by First Reserve, and in portfolio companies of such funds, and may have co-invested with First Reserve or certain of its affiliates, and may do so in the future.

The Midstream Conflicts Committee selected TPH to provide financial advice in connection with its evaluation of the merger because of TPH's experience, reputation and familiarity with the midstream sector of the energy industry and because its investment banking professionals have substantial experience in transactions similar to the merger.

TPH and certain of its affiliates have in the past provided and may currently be providing investment banking, financial advisory and other financial services to Midstream, First Reserve and/or certain of their affiliates for which TPH and its affiliates have received, and may receive, compensation, including during the past two years, providing certain advisory services to First Reserve related to exploration and production activity in selected basins in which Midstream operates in January 2015, serving as financial advisor to the Midstream Conflicts Committee in connection with Midstream's acquisition of a majority interest in Tres Palacios Holdings LLC in 2014 and serving as financial advisor to the Conflicts Committee of the board of directors of Midstream GP of Directors of the general partner of Inergy Midstream, L.P. ("Inergy") in connection with Inergy's merger with Midstream in 2013. TPH and certain of its affiliates may provide investment banking, financial advisory and other financial services to Midstream, CEQP, First Reserve, other participants in the Transaction or certain of their respective affiliates or security holders in the future, for which TPH and its affiliates may receive compensation.

The description set forth above constitutes a summary of the analyses employed and factors considered by TPH in rendering its opinion to the Midstream Conflicts Committee. The preparation of a fairness opinion is a complex, analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to the particular circumstances and is not necessarily susceptible to partial analysis or summary description.

Pursuant to the terms of the engagement of TPH, TPH will receive a fee of $2,250,000 for its services, of which $1,250,000 became payable upon the rendering of the opinion and $1,000,000 is contingent upon the consummation of the merger. In addition, Midstream has agreed to reimburse certain of TPH's expenses and indemnify TPH and certain related parties against certain liabilities arising out of its engagement.

**Unaudited Financial Projections**

CEQP and Midstream do not as a matter of course make public projections as to future sales, earnings or other results. However, in connection with the proposed merger, the management of CEQP and Midstream prepared and provided the Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts to the CEQP and Midstream Conflicts Committees. These forecasts were prepared solely for the purposes of the merger, and were provided to the Midstream and CEQP Conflicts Committee in connection with their evaluation of the merger. They were also provided to TPH, which was authorized by the Midstream Conflicts Committee to use and rely upon such projections for purposes of its analyses and opinion, and to Evercore and Citi who were authorized by the CEQP Conflicts Committee to use and rely upon such projections.

67

Table of Contents

*CEQP and Midstream each caution you that uncertainties are inherent in projections of any kind. None of CEQP or Midstream or any of their affiliates, officers, directors, managers, advisors or other representatives has made or makes any representation or can give any assurance to any CEQP or Midstream unitholder regarding the ultimate performance of CEQP or Midstream compared to the summarized information set forth below or that any projected results will be achieved.*

The accompanying prospective financial information was not prepared with a view toward public disclosure or with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of CEQP's and Midstream's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of such management's knowledge and belief, the expected course of action and the expected future financial performance of CEQP and Midstream. However, this information is not fact.

Neither Crestwood's independent auditors, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and assume no responsibility for, and disclaim any association with, this prospective financial information. The reports of the independent registered public accounting firms incorporated by reference into this proxy statement/prospectus relate to the historical financial information of CEQP and Midstream. Such reports do not extend to the unaudited financial projections and should not be read to do so.

The Midstream Forecasts, the CEQP Forecasts and the Pro Forma Forecasts included the information set forth in the following table:

| ($ millions) | | 2015(1) | | | | Projections | | | | | |
| | | | | 2016 | | 2017 | | 2018 | | 2019 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **EBITDA** | | | | | | | | | | | |
| Midstream | $ | 507 | $ | 537 | $ | 620 | $ | 718 | $ | 794 | |
| CEQP | $ | 59 | $ | 62 | $ | 74 | $ | 78 | $ | 82 | |
| Pro Forma CEQP(2) | $ | 571 | $ | 604 | $ | 699 | $ | 801 | $ | 880 | |
| | | | | | | | | | | | |
| **Distributable Cash Flow** | | | | | | | | | | | |
| Midstream(3) | $ | 348 | $ | 375 | $ | 413 | $ | 467 | $ | 538 | |
| CEQP | $ | 77 | $ | 91 | $ | 119 | $ | 150 | $ | 188 | |
| Pro Forma CEQP(3)(4) | $ | 391 | $ | 422 | $ | 470 | $ | 527 | $ | 602 | |
| | | | | | | | | | | | |
| **Distributable Cash Flow Per LP Unit** | | | | | | | | | | | |
| Midstream(2) | $ | 1.65 | $ | 1.74 | $ | 1.84 | $ | 1.98 | $ | 2.17 | |
| CEQP | $ | 0.41 | $ | 0.48 | $ | 0.64 | $ | 0.80 | $ | 1.01 | |
| Pro Forma CEQP(3)(4) | $ | 0.57 | $ | 0.62 | $ | 0.69 | $ | 0.77 | $ | 0.88 | |
| | | | | | | | | | | | |
| **Distributions Per LP Unit** | | | | | | | | | | | |
| Midstream | $ | 1.64 | $ | 1.70 | $ | 1.79 | $ | 1.92 | $ | 2.10 | |
| CEQP | $ | 0.55 | $ | 0.55 | $ | 0.64 | $ | 0.80 | $ | 1.01 | |
| Pro Forma CEQP | $ | 0.55 | $ | 0.59 | $ | 0.65 | $ | 0.73 | $ | 0.84 | |
| | | | | | | | | | | | |
| **Growth Capital Expenditures** | | | | | | | | | | | |
| Midstream(5) | $ | 141 | $ | 212 | $ | 291 | $ | 176 | $ | 80 | |
| CEQP | $ | 7 | $ | 5 | $ | 5 | $ | 5 | $ | 5 | |
| Pro Forma CEQP(5) | $ | 148 | $ | 217 | $ | 296 | $ | 181 | $ | 85 | |

Notes:

(1)      Assumes 1/1/2015 effective date.

Table of Contents

(2)   Pro forma CEQP EBITDA assumes $5 million of public company synergies.

(3)   Represents adjusted distributable cash flow available to common unitholders. Includes deduct for cash distributions payable to GE (Crestwood Niobara preferred units) and Midstream's Class A Preferred Units (noting that cash distributions are payable on the Class A Preffered Units commencing in 2017).

(4)   Does not include CEQP DCF attributable to the cash received for the 7.2 million LP units and GP / IDR interest that CEQP owns in Midstream.

(5)   Excludes $40 million earn-out payment paid to Antero in February 2015.

*General*

    While the unaudited financial projections summarized above were prepared in good faith and based on information available at the time of preparation, no assurance can be made regarding future events. The estimates and assumptions underlying the unaudited financial projections involve judgments with respect to, among other things, future economic, competitive, regulatory and financial market conditions and future business decisions that may not be realized and that are inherently subject to significant business, economic, competitive and regulatory uncertainties and contingencies, including, among others, risks and uncertainties described under "Risk Factors" and "Cautionary Statements Regarding Forward-Looking Statements," all of which are difficult to predict and many of which are beyond the control of Crestwood, and many of which will be beyond the control of the combined partnership. There can be no assurance that the underlying assumptions will prove to be accurate or that the projected results will be realized and actual results will likely differ, and may differ materially, from those reflected in the unaudited financial projections, whether or not the transactions are completed. As a result, the unaudited financial projections cannot be considered a reliable predictor of future operating results.

    While presented with numerical specificity, the unaudited financial projections reflect numerous estimates and assumptions made by CEQP's and Midstream's management with respect to industry performance and competition, general business, economic, market and financial conditions and matters specific to CEQP's and Midstream's business, all of which are difficult to predict and many of which are beyond CEQP's and Midstream's control. In developing the projections, management of CEQP and Midstream made numerous material assumptions with respect to CEQP and Midstream for the period from 2015 to 2019, including:

- the cash flow from existing assets and business activities;

- organic growth opportunities and projected volume growth and the amounts and timing of related costs and potential economic returns;

- the amount of maintenance and growth capital expenditures;

- outstanding debt during applicable periods, and the availability and cost of capital; and

- other general business, market and financial assumptions.

    By including in this proxy statement/prospectus a summary of certain of the unaudited financial projections, neither CEQP or Midstream nor any of its representatives has made or makes any representation to any person regarding the ultimate performance of CEQP or Midstream compared to the information contained in the financial projections. The unaudited financial projections cover multiple years and such information by its nature becomes less predictive with each succeeding year. Neither CEQP or Midstream nor, following completion of the merger, the combined partnership undertakes any obligation, except as required by law, to update or otherwise revise the unaudited financial projections contained in this proxy statement/prospectus to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events or to reflect changes in general

69

Table of Contents

economic or industry conditions, even in the event that any or all of the underlying assumptions are shown to be in error.

The summaries of the unaudited financial projections are not included in this proxy statement/prospectus in order to induce any Midstream unitholder to vote in favor of the proposal to approve the merger agreement or any of the other proposals to be voted on at the special meeting of Midstream unitholders.

*Neither CEQP nor Midstream intends to update or otherwise revise the above projections to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even if any or all of the assumptions underlying such projections are no longer appropriate.*

**No Dissenters' or Appraisal Rights**

Neither Midstream common unitholders nor Midstream preferred unitholders have dissenters' or appraisal rights under Midstream's partnership agreement, the merger agreement or applicable Delaware law.

**Antitrust and Regulatory Matters**

Due to rules applicable to partnerships and the common control of Midstream and CEQP, no filing is required under the HSR Act and the rules promulgated thereunder by the FTC. However, at any time before or after completion of the merger, the DOJ, the FTC, or any state request additional information or could take such action under the antitrust laws as it deems necessary or desirable in the public interest, including seeking to enjoin the completion of the merger, to rescind the merger or to seek divestiture of particular assets of CEQP or Midstream. Private parties also may seek to take legal action under the antitrust laws under certain circumstances. In addition, non-U.S. governmental and regulatory authorities may seek to take action under applicable antitrust laws. A challenge to the merger on antitrust grounds may be made and, if such a challenge is made, it is possible that CEQP and Midstream will not prevail.

**Listing of Common Units to be Issued in the Merger; Delisting and Deregistration of Midstream Common Units**

CEQP expects to obtain approval to list on the NYSE the CEQP common units to be issued pursuant to the merger agreement, which approval is a condition to closing the merger. Upon completion of the merger, Midstream common units currently listed on the NYSE will cease to be listed on the NYSE and will be subsequently deregistered under the Exchange Act.

**Accounting Treatment of the Merger**

The proposed merger will be accounted for in accordance with Financial Accounting Standards Board Accounting Standards Codification 810, *Consolidations—Overall—Changes in Parent's Ownership Interest in a Subsidiary.* Because CEQP controls Midstream both before and after the merger and related transactions, the changes in CEQP's ownership interest in Midstream will be accounted for as an equity transaction and no gain or loss will be recognized in CEQP's consolidated statements of operations resulting from the merger. The proposed merger represents CEQP's acquisition of the noncontrolling interests in Midstream.

**Pending Litigation**

On May 20, 2015, Lawrence G. Farber, a purported unitholder of Midstream, filed a complaint in the Southern District of the United States, Houston Division, as a putative class action on behalf of the Midstream unitholders, captioned Lawrence G. Farber, individually and on behalf of all others similarly

70

# EXHIBIT D

App000324

10-K 1 ceqp-10k2014.htm 10-K
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
For the fiscal year ended December 31, 2014

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

COMMISSION FILE NUMBER: 001-34664

# Crestwood Equity Partners LP
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **43-1918951** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **700 Louisiana Street, Suite 2550 Houston, Texas** | **77002** |
| (Address of principal executive offices) | (Zip code) |

**(832) 519-2200**
(Registrant's telephone number, including area code)

---

### SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Units representing limited partnership interests | The New York Stock Exchange |

### SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: None

Indicate by check mark if registrant is a well-known seasoned issuer, as defined by Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.
   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Table of Contents

- the rates we charge for storage and transportation services and the amount of services our customers purchase from us, which will be affected by, among other things, the overall balance between the supply of and demand for commodities, governmental regulation of our rates and services, and our ability to obtain permits for growth projects;
- force majeure events that damage our or third-party pipelines, facilities, related equipment and surrounding properties;
- prevailing economic and market conditions;
- governmental regulation, including changes in governmental regulation in our industry;
- changes in tax laws;
- the level of competition from other midstream companies;
- the level of our operating and maintenance and general administrative costs;
- the level of capital expenditures we make;
- our ability to make borrowings under our revolving credit facility; and
- the cost of acquisitions.

In addition, the actual amount of cash we will have available for distribution will depend on other factors, some of which are beyond our control, including: the level and timing of capital expenditures we make; the cost of acquisitions; our debt service requirements and other liabilities; fluctuations in our working capital needs; our ability to borrow funds and access capital markets; restrictions contained in our debt agreements; and the amount of cash reserves established by our general partner.

***Our partnership agreement requires that we distribute all of our available cash, which could limit our ability to grow and make acquisitions.***

We expect that we will distribute all of our available cash to our common unitholders and will rely primarily upon external financing sources, including commercial bank borrowings and the issuance of debt and equity securities, to fund our acquisitions and expansion capital expenditures. As a result, to the extent we are unable to finance growth externally, our cash distribution policy will significantly impair our ability to grow.

In addition, because we distribute all of our available cash, our growth may not be as fast as that of businesses that reinvest their available cash to expand ongoing operations. To the extent we issue additional units in connection with any acquisitions or expansion capital expenditures, the payment of distributions on those additional units may increase the risk that we will be unable to maintain or increase our per unit distribution level. There are no limitations in our partnership agreement on our ability to issue additional units, including units ranking senior to the common units. The incurrence of additional commercial borrowings or other debt to finance our growth strategy would result in increased interest expense, which, in turn, may impact the available cash that we have to distribute to our common unitholders.

***We may issue additional units without common unitholder approval, which would dilute existing common unitholder ownership interests.***

Our partnership agreement does not limit the number of additional limited partner interests we may issue at any time without the approval of our existing common unitholders. The issuance of additional common units or other equity interests of equal or senior rank will have the following effects:

- our existing common unitholders' proportionate ownership interest in us will decrease;
- the amount of cash available for distribution on each common unit may decrease;
- the ratio of taxable income to distributions may increase;
- the relative voting strength of each previously outstanding common unit may be diminished; and
- the market price of the common units may decline.

***Holders of our common units have limited voting rights and are not entitled to elect our general partner or its directors, which could reduce the price at which our common units will trade.***

Unlike the holders of common stock in a corporation, our common unitholders have only limited voting rights on matters affecting our business and, therefore, limited ability to influence management's decisions regarding our business. Our common unitholders will have no right on an annual or ongoing basis to elect our general partner or its board of directors. The board of directors of our general partner, including the independent directors, is chosen entirely by Crestwood Holdings, as a result of it owning our general partner, and not by our common unitholders. Unlike publicly traded corporations, we will not conduct

annual meetings of our common unitholders to elect directors or conduct other matters routinely conducted at annual meetings of stockholders of corporations. As a result of these limitations, the price at which the common units will trade could be diminished because of the absence or reduction of a takeover premium in the trading price.

36

---

App000327

 Positive

As of: August 11, 2015 4:37 PM EDT

# *Brown v. Brewer*

United States District Court for the Central District of California

June 17, 2010, Decided; June 17, 2010, Filed

Case No. CV 06-3731-GHK (SHx)

**Reporter**

2010 U.S. Dist. LEXIS 60863; 2010 WL 2472182

Jim Brown v. Brett Brewer, et al.

**Prior History:** *Brown v. Brewer, 2009 U.S. Dist. LEXIS 47535 (C.D. Cal., May 29, 2009)*

**Counsel:** **[\*1]** Attorneys Present for Plaintiffs: None.

Attorneys Present for Defendants: None.

**Judges:** The Honorable GEORGE H. KING, UNITED STATES DISTRICT JUDGE.

**Opinion by:** GEORGE H. KING

# Opinion

**CIVIL MINUTES - GENERAL**

**Proceedings: (In Chambers) Order re: Cross-Motions for Summary Judgment;** [213, 218, 244, 251, and 261]

This shareholder class action arises out of News Corporation's ("News Corp.") 2005 acquisition of Intermix

Media, Inc. ("Intermix"), formerly known as eUniverse Inc. (Brewer Decl. P 3), a company which owned, among other internet businesses, the social networking website MySpace. Plaintiff Jim Brown ("Plaintiff"), individually and on behalf of all members of the certified class of former Intermix shareholders, [1] claims that Defendants Brett Brewer ("Brewer"), Daniel Mosher ("Mosher"), Lawrence Moreau ("Moreau"), David Carlick ("Carlick"), Andrew Sheehan ("Sheehan"), Richard Rosenblatt ("Rosenblatt"), James Quandt ("Quandt"), and William Woodward ("Woodward") (collectively, "Defendants"), the eight Intermix directors at the time of the company's sale, breached their fiduciary duties under state law and violated *Section 14(a)* of the Securities and Exchange Act of 1934 and SEC *Rule 14a-9* (Counts IV and II, respectively). **[\*2]** [2] (Consolidated Second Amended Complaint ["CSAC"] PP 168-74, 179-87; Brewer Decl. P 5). The only other remaining claim is Count III for "control person" liability under *Section 20(a)* of the 1934 Act against Defendants involved in the 2005 acquisition of Intermix. (CSAC PP 175-78). This matter is before us on the Parties' Cross-Motions for Summary Judgment. We have considered the papers filed and all of the admissible evidence, and deem this matter appropriate for resolution

---

[1] In our June 22, 2009 Order, we certified the following class: "All holders of Intermix Media, Inc. ('Intermix' or the 'Company') common stock, from July 18, 2005 through the consummation of the sale of Intermix to News Corporation ('News Corp') at the price of $ 12.00 per share on September 30, 2005 (the 'Acquisition'), who were harmed by defendants' improper conduct at issue in the litigation. Excluded from the Class are defendants and any person, firm, trust, corporation or other entity related to or affiliated with any defendant." (Dkt. No. 197).

[2] In **[\*3]** our July 14, 2008 Order on the Motion to Dismiss, we dismissed with prejudice Defendants Montgomery & Co. LLC ("Montgomery"), and Thomas Weisel Partners Group, Inc. and Thomas Weisel Partners LLC ("TWP"), the investment banks which advised the Intermix board during the 2005 transaction and completed fairness analyses on the $ 12 per share price offered by News Corp. in the consummated merger transaction. (Dkt. No. 110, at 4-5). In that same Order, we also dismissed with prejudice Count I for violation of Section 14(a) of the 1934 Act and SEC Rule 14a-9, which was stated against the 2003 Individual Defendants, which included Brewer, Mosher, Moreau, Jeffrey Scott Edell, Bradley Ward, Carlick, Sheehan, and Lipp, and VantagePoint. (Id. at 1-3). Accordingly, Count III for "control person" liability was dismissed as to Edell and Ward, as it was premised on the only other claim against them, the dismissed Count I. (Id. at 7-8). The Parties stipulated to dismiss certain Defendants. (Dkt. Nos. 190, 204). On June 10, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendants VantagePoint Venture Partners, VP Alpha Holdings IV L.L.C., VantagePoint Venture Partners IV **[\*4]** (Q) L.P., VantagePoint Venture Partners IV L.P., and VantagePoint Venture Partners IV Principals Fund L.P. (Dkt. No. 194). On August 28, 2009, pursuant to the Parties' stipulation, we dismissed without prejudice Defendant Christopher Lipp, Intermix's General Counsel. (Dkt. No. 205).

2010 U.S. Dist. LEXIS 60863, *2

without oral argument. *L.R. 7-15*. As the Parties are familiar with the facts in this case, we will repeat them only as necessary. Accordingly, we rule as follows.

### I. Motion for Summary Judgment Standard

Summary judgment should be granted ″if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.″ *FED. R. CIV. P. 56(c)(2)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. ″As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.″ *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. On a motion for summary judgment, our ″function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.″ *Id. at 249*.

The moving party bears the initial responsibility to point to the  **[*5]** absence of evidence of any genuine issue of material fact. *Celotex Corp., 477 U.S. at 323*. ″When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.″ *Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006)* (citation and quotation marks omitted). By contrast, where the non-moving party ″bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to ′make a showing sufficient to establish the existence of an element essential to [its] case.′″ *Nebraska v. Wyoming, 507 U.S. 584, 590, 113 S. Ct. 1689, 123 L. Ed. 2d 317 (1993)* (quoting *Celotex Corp., 477 U.S. at 322*) (alteration in original). ″[T]he moving party can meet its burden by pointing out the absence of evidence from the non-moving party,″ and it ″need not disprove the other party's case.″ *Miller, 454 F.3d at 987* (citation omitted). Accordingly, ″[t]he nonmoving party must come forward with specific facts showing there is a genuine  **[*6]** issue for trial.″ *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (internal quotation marks and citations omitted). However, ″[i]f the

opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.″ *FED. R. CIV. P. 56(e)(2)*; *see also Celotex Corp., 477 U.S. at 322* (″[T]he plain language of *Rule 56(c)* mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.″). The ″opposing party may not rely merely on allegations or denials in its own pleading[.]″ *FED. R. CIV. P. 56(e)(2)*. ″The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.″ *Anderson, 477 U.S. at 255*; *see also In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008)* (″The court must view all the evidence in the light most favorable to the moving party.″) (citations omitted).

″Only admissible evidence may be considered in deciding a motion for summary judgment.″ *Miller, 454 F.3d at 988*. Under *Federal Rule of Civil Procedure 56(e)(1)*,  **[*7]** ″[a] supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated.″ *See also Block v. City of Los Angeles, 253 F.3d 410, 418-19 (9th Cir. 2001)*. Conclusory and speculative affidavits that fail to set forth specific facts are insufficient to raise a genuine issue of material fact. *Thornhill Publ'g Co., Inc. v. Gen. Tel. & Elecs. Corp., 594 F.2d 730, 738 (9th Cir. 1979)*. Absent a proper exception, hearsay statements are inadmissible. *See Japan Telecom, Inc. v. Japan Telecom Am., Inc., 287 F.3d 866, 875 n.1 (9th Cir. 2002)*. Furthermore, neither an unverified complaint nor unsworn statements made in the parties' briefs can be considered as evidence at this stage. *See Moran v. Selig, 447 F.3d 748, 759 & n.16 (9th Cir. 2006)* (noting that unverified complaint cannot be considered as evidence on motion for summary judgment); *British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978)* (″[L]egal memoranda . . . are not evidence[.]″).

### II. Count IV: Breach of Fiduciary Duty Claim

#### A. Delaware Law on Corporate Fiduciary Duties Generally

Delaware law governs Plaintiff's  **[*8]** state law claim of breach of fiduciary duty. Under Delaware law, all directors and officers of a corporation owe their shareholders fiduciary duties of loyalty and care. *Gantler v. Stephens, 965 A.2d 695, 708-09 (Del. 2009)*. [3]

#### 1. Duty of Care

---

[3]   Under Delaware law, the business judgment rule creates ″a presumption that in making a business decision, the directors of a corporation act on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.″

2010 U.S. Dist. LEXIS 60863, *8

"Director liability for breaching the duty of care 'is predicated upon concepts of gross negligence.'" _Binks v. DSL.net, Inc., C.A. No. 2823-VCN, 2010 Del. Ch. LEXIS 98, 2010 WL 1713629, at *8 (Del. Ch. Apr. 29, 2010)_ (quoting _McMullin v. Beran, 765 A.2d 910, 921 (Del. 2000))_. The Delaware General Corporation Law permits a corporation to include a provision in its charter "eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director." _DEL. CODE ANN. tit. 8, § 102(b)(7)_. While such an exculpatory provision may eliminate any liability for breaches of the duty of care, it "shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve **[*10]** intentional misconduct or a knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit." _Id._ Intermix's charter exculpates Defendants from any duty of care claims. (J.A., Ex. 38, Certificate of Incorporation). Accordingly, Defendants assert this provision as their fifth affirmative defense: "The breach of fiduciary duty claim is barred, in whole or in part, by the exculpatory provision contained in Intermix's Certificate of Incorporation." (Dkt. No. 11, Aug. 4, 2008). In light of this provision, we conclude that the director Defendants cannot be liable for any purported breach of fiduciary duty based solely on their duty of care. Plaintiff does not argue otherwise.

Defendants also move for summary judgment on the question of whether Brewer and Rosenblatt, who doubled as officers for Intermix, may be held liable for any breaches of the duty of care, since _Section 102(b)(7)_ only permits exculpation of duty of care claims for directors. It is undisputed that both Brewer and Rosenblatt served as directors and officers of Intermix, Brewer as President and Rosenblatt as CEO. (Brewer Decl. P 1; Rosenblatt Decl. P 1). The law is **[*11]** clear that where it is impossible to separate actions taken in fulfillment of a defendant's directorial duties from actions taken in fulfillment of that defendant's duties as a corporate officer, then any duty of care claim stated against that individual is exculpated. In _Arnold v. Society for Savings Bancorp, Inc., 650 A.2d 1270 (Del. 1994)_, the

Delaware Supreme Court held that since the plaintiff "failed to highlight any specific actions [the defendant] undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to _Section 102(b)(7)_[,]" any duty of care claim was precluded under the exculpatory clause. _Id. at 1288_ (citing R. Franklin Balotti & Jesse A. Finkelstein, Delaware Law of Corp. & Business Org. § 4.19, at 4-335 (Supp. 1992) (where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of _Section 102(b)(7)_)). Plaintiffs have not identified any actions taken by Rosenblatt or Brewer solely in their capacity as officers. Accordingly, to the extent any claim for breach of the duty of care is embodied in Count IV, we **GRANT** summary judgment on that **[*12]** specific basis as to all director defendants, including Brewer and Rosenblatt who also served as officers.

## 2. Duty of Loyalty

To hold a director liable for breach of the duty of loyalty, the plaintiff must establish that "a majority of the Director Defendants either [1] stood on both sides of the merger or were dominated and controlled by someone who did; or [2] failed to act in good faith, i.e., where a fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." _In re NYMEX S'holder Litig., C.A. Nos. 3621-VCN, 3835-VCN, 2009 Del. Ch. LEXIS 176, 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009)_ (internal citations and quotation marks omitted); _Lyondell Chem. Co. v. Ryan, 970 A.2d 235, 239-40 (Del. 2009)_ ("_Lyondell_") ("Because the trial court determined that the board was independent and was not motivated by self-interest or ill will, the sole issue is whether the directors are entitled to summary judgment on the claim that they breached their duty of loyalty by failing to act in good faith.").

With respect to the first basis for demonstrating breach of the duty of loyalty, Delaware law provides that "[w]hen directors . . . are on both sides of a **[*13]** transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain." _Weinberger_

_Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)._ "A plaintiff challenging a board decision bears the burden to rebut the rule's presumption by providing evidence that the directors breached their fiduciary duties." _Goodwin v. Live Entm't, Inc.,_ No. Civ. A. 15765, 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *24 (Del. Ch. Jan. 22, 1999) (citing _Cede & Co. v. Technicolor, Inc.,_ 634 A.2d 345, 361 (Del. 1993), _modified by,_ 636 A.2d 956 (Del. 1994) ("_Cede II_"); _Citron v. Fairchild Camera and Instrument Corp.,_ 569 A.2d 53, 64 (Del. 1989)). "In order to overcome that presumption, a plaintiff must prove an act of bad faith by a preponderance of the evidence." _In re Walt Disney Co. Derivative Litig.,_ 907 A.2d 693 (Del. Ch. 2005). "If **[*9]** the plaintiff fails to rebut the presumption, the business judgment rule protects the decision made." _Goodwin,_ 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *4 (citation omitted). "If the rule is rebutted, the burden shifts to the defendants . . . to prove that the transaction was entirely fair to the plaintiff shareholder." _Id._ (citation omitted).

2010 U.S. Dist. LEXIS 60863, *13

*v. UOP, Inc., 457 A.2d 701, 710 (Del. 1983)*. "Classic examples [of this type of breach] are when a director appears on both sides of a transaction or receives a personal benefit not received by the shareholders, generally." *Oliver v. Boston Univ., No. Civ. A. 16570-NC, 2006 Del. Ch. LEXIS 75, 2006 WL 1064169, at *18 (Del. Ch. Apr. 14, 2006)* (citing *Cede II, 634 A.2d at 362* (citing *Nixon v. Blackwell, 626 A.2d 1366, 1375 (Del. 1993)))* (internal quotation marks and alterations omitted). "If corporate fiduciaries stand on both sides of a challenged transaction, an instance where the directors' loyalty has been called into question, the burden shifts to the fiduciaries to demonstrate the 'entire fairness' of the transaction." *Id.* (citations omitted). A showing of "entire fairness" requires proof that the transaction is "the product of both fair dealing *and* fair price." *Cede II, 634 A.2d at 361* (emphasis in original and citations omitted).

With respect to the second basis for demonstrating breach of the duty of loyalty, Delaware courts have noted that "the requirement to act  [*14] in good faith is a subsidiary element, i.e., a condition, of the fundamental duty of loyalty." *Stone v. Ritter, 911 A.2d 362, 369-70 (Del. 2006)* (citation, alteration, and internal quotation marks omitted) ("[T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith."). In *Stone,* the Delaware Supreme Court explained that "although good faith may be described colloquially as part of a 'triad' of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty." *Id. at 370.*

The Delaware Supreme Court has explained what constitutes bad faith by way of a spectrum of directorial conduct. "At one end of the spectrum, [there is] a category of acts involving non-exculpable, so-called 'subjective bad faith,' that is, fiduciary conduct motivated by an actual intent to do harm." *Ryan v. Lyondell Chem. Co., C.A. No. 3176-VCN, 2008 Del. Ch. LEXIS 125, 2008 WL 4174038, at *3 (Del. Ch. Aug. 29, 2008)* ("*Ryan*") (quoting *In re Walt Disney Co. Derivative Litig., 906 A.2d 27, 64 (Del. 2006)*  [*15] ("*Disney*")) (internal quotation marks omitted). "The second category of conduct, which is at the opposite end of the spectrum, involves lack of due care--that is, fiduciary action taken solely by reason of gross negligence and without any malevolent intent." *Disney, 906 A.2d at 64.* The court observed that "grossly negligent conduct, without more, does not and cannot constitute a breach of the fiduciary duty to act in good faith." *Id. at 65.* The third category identified by the Delaware Supreme Court is the

one at issue in this case: "intentional dereliction of duty or a conscious disregard for one's responsibilities." *Id. at 66.* "Such misconduct, according to the Court, is 'properly treated as a non-exculpable, non-indemnifiable violation of the fiduciary duty to act in good faith.'" *Ryan, 2008 Del. Ch. LEXIS 125, 2008 WL 4174038, at *3* (quoting *Disney, 906 A.2d at 66*).

Accordingly, "the distinction between gross negligence and non-exculpable 'bad faith' (i.e., that elusive something 'more') has important consequences in Delaware's jurisprudence and corporate statutory scheme because, for example, director conduct amounting *only* to a violation of the duty of care, but otherwise taken in good faith, is exculpable  [*16] under *8 Del. C. § 102(b)(7)* or indemnifiable under *8 Del. C. § 145.*" *Id.* (citing *Disney, 906 A.2d at 64-65*).

### B. Scope of Plaintiff's Claim of Breach of the Duty of Loyalty

Inasmuch as the director defendants are exculpated from potential breaches of their duty of care, the success of Count IV necessarily depends on "whether any arguable shortcomings on the part of the . . . directors also implicate their duty of loyalty, a breach of which is not exculpated." *Lyondell, 970 A.2d at 239.* To that end, in order to rule on Defendants' motion for summary judgment, we must ascertain whether there are any genuine issues of material fact with respect to whether the directors breached their duty of loyalty, not merely their duty of care. In keeping with the Parties' Joint Brief, we address the two bases for breach of the duty of loyalty in the reverse order: first, Plaintiff's assertion of bad faith conduct by Defendants, and second, Plaintiff's allegation of a self-interested transaction not shown to be entirely fair.

### 1. Bad Faith in *Revlon* Auction Context

The obligation to act in good faith, which is a necessary component of satisfying the duty of loyalty, requires directors to act for the purpose  [*17] of advancing corporate well-being. Therefore, any "intentional dereliction of duty, a conscious disregard for one's responsibilities[,]" constitutes bad faith, or the failure to act in good faith. *Disney, 906 A.2d at 66*; *Stone, 911 A.2d at 370* ("Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith."). In this case, Plaintiff and the shareholder class which he represents argue Defendants consciously disregarded their responsibilities in selling

2010 U.S. Dist. LEXIS 60863, *17

Intermix to News Corp. for $ 12 per share, when, so they contend, a likely topping bid from Viacom was imminent.

The seminal case of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986)*, regulates directorial conduct during a sale or change of control of a publicly held corporation. Revlon holds that directors satisfy their fiduciary duties when their conduct is geared towards "the maximization of the company's value at a sale for the stockholders' benefit." *Id. at 182*. *Revlon* is triggered in the following three scenarios: "(1) when a corporation [*18] initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control." *Arnold v. Soc'y for Sav. Bancorp., Inc., 650 A.2d 1270, 1289-90 (Del. 1994)* (internal citations and quotation marks omitted). More recently, the Delaware Supreme Court has stated that *Revlon* duties attach "when a company embarks on a transaction--on its own initiative or in response to an unsolicited offer--that will result in a change of control." *Lyondell, 970 A.2d at 242*. When the company's "break-up" became "inevitable," in *Revlon*, "[t]he directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *506 A.2d at 182*. In addition to its principal holding that shareholder wealth maximization must be the directors' foremost objective, the court also noted that "favoritism for a white knight to the total exclusion [*19] of a hostile bidder" was impermissible if divorced from the objective of shareholder value maximization. *Id. at 184*. "[W]hen bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their [fiduciary] duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity." *Id.*

The Delaware Supreme Court has clarified that "*Revlon* did not create any new fiduciary duties[,]" but rather "simply held that the 'board must perform its fiduciary duties in the service of a specific objective: maximizing the sale price of the enterprise.'" *Lyondell, 970 A.2d at 239* (quoting *Malpiede v. Townson, 780 A.2d 1075, 1083 (Del. 2001)*). Additionally, Delaware case law has time and again reaffirmed the anti-favoritism principle, *i.e.* that directors may not tilt the

playing field in favor of one bidder or otherwise skew the auction unless this conduct is designed to maximize shareholder wealth. In *Barkan v. Amsted Industries, 567 A.2d 1279 (Del. 1989)*, the court warned that "the board must act in a neutral manner to encourage the highest [*20] possible price for shareholders." *Id. at 1286*. To be sure, "there is no single blueprint that a board must follow to fulfill its duties," and "there are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties." *Id.; Lyondell, 970 A.2d at 243*. Nevertheless, "[w]hen multiple bidders are competing for control, this concern for fairness forbids directors from using defensive mechanisms to thwart an auction or to favor one bidder over another." *Id. at 1286-87* (citation omitted). More recently, in *In re Toys "R" Us, Inc., Shareholder Litigation, 877 A.2d 975 (Del. Ch. 2005)*, the Delaware Chancery Court stated that "a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar" is a violation of a director's fiduciary obligations. *Id. at 1000-01*.

To support his claim that Defendants acted in bad faith, Plaintiff cites *Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261 (Del. 1988)*. In that case, Macmillan, Inc.'s Chairman and Chief Executive Officer ("CEO") and its President and Chief Operating Officer ("COO") orchestrated a leveraged buyout of their [*21] own company, resulting in a lock-up agreement "between Macmillan and Kohlberg Kravis Roberts & Co. ('KKR'), an investment firm specializing in leveraged buyouts." *Id. at 1264-65*. These directors, "as participants in the leveraged buyout, had a significant self-interest in ensuring the success of a KKR bid." *Id. at 1279*. Indeed, "Macmillan senior management would receive up to 20% ownership in the newly formed company." *Id. at 1273*. So strong was the pull of that promised 20 percent ownership stake that even before KKR had communicated a bid price, these self-interested actors indicated that they would "endorse" the acquisition to the full board of directors. *Id.* To steer the process in the desired direction, they "clandestinely and impermissibly skewed" the auction in KKR's favor by, among other things, tipping KKR off as to the amount of a competing bid and then concealing this tip from the board of directors. *Id. at 1279-81*. On appeal, the Delaware Supreme Court held that "discriminatory treatment of a bidder, *without any rational benefit to the shareholders,* was unwarranted." *Id. at 1282* (emphasis added). [4] The court found that "KKR repeatedly received significant material advantages [*22] to the exclusion and detriment of [the competing bidder] to

---

[4] Favoritism and deal protection devices, such as a termination fee, are permissible so long as they are strategically designed to maximize the price paid to shareholders. *Macmillan, 559 A.2d at 1287* ("[T]he board's primary objective, and essential purpose, must

stymie, rather than enhance, the bidding process." *Id. at 1281.* Moreover, the court concluded that "[t]he board was torpid, if not supine, in its efforts to establish a truly independent auction . . . ." *Id. at 1280.* The court added: "By placing the entire process in the hands of [the chairman], through his own chosen financial advisors, with little or no board oversight, the board materially contributed to the unprincipled conduct of those upon whom it looked with a blind eye." *Id.*

Defendants contend that *Macmillan* is distinguishable because the directors in that case were on both sides of the transaction and therefore engaged in self-dealing. However, Defendants have pointed us to no authority for the proposition that *Macmillan* is only applicable when a court reviews self-interested transactions for fairness and may not support a finding of bad faith conduct in the *Revlon* auction context.

We recognize that *Wayne County Employees' Retirement System v. Corti, Civil Action No. 3534-CC, 2009 Del. Ch. LEXIS 126, 2009 WL 2219260 (Del. Ch. July 24, 2009)*, distinguishes *Macmillan* from the single-bidder merger reviewed in that case on the absence of any conflicted insiders seeking to transfer control of a company to themselves. *2009 Del. Ch. LEXIS 126, [WL] at *12-13* ("There is much less cause for concern where managers will continue their employment with the combined post-transaction entity, **[*24]** than when the conflicted managers are bidders in an auction for control of the company, and are thereby seeking to transfer control of the company to themselves personally."). But that discussion has no bearing on the prohibition on favoring a particular bidder in a multiple-bidder context, which this case arguably presents. [5] Defendants suggest that the directors may tilt the playing field in favor of a particular bidder, without regard to shareholder wealth maximization, so long as they are not on both sides of a transaction. We reject this argument.

Simply because *Macmillan* examined "disparate treatment" through the lens of disloyalty premised on a self-interested transaction does not mean field-tilting is permissible in other contexts. See *Emerson Radio Corp. v. Int'l Jensen Inc., Civ. A. Nos. 15130, 14992, 1996 Del. Ch. LEXIS 100, 1996 WL 483086, at *11-12 (Del. Ch. Aug. 20, 1996)* (describing *Macmillan* as requiring fiduciaries to "treat all bidders equally and fairly in carrying out their *Revlon* duties" and identifying self-interested nature of merger transaction as an "addition[al]" or "alternative" theory for breach of duty of loyalty); *Roberts v. Gen. Instrument Corp., CIV. A. No. 11639, 1990 Del. Ch. LEXIS 138, 1990 WL 118356, at *8 (Del. Ch. Aug. 13, 1990)* **[*25]** (citing *Macmillan, 559 A.2d at 1287-88*) ("In each instance where the board is not predominantly self-interested or under the control or dominating influence of a person with a conflicting interest, the principal judicial inquiries relate to whether the board was adequately informed and acting in good faith. This court has been pointedly instructed, however, that 'where issues of corporate control are at stake' action of even a disinterested board must meet an enhanced test before they will qualify for the deference that courts ordinarily accord to good faith business judgments.").

Whatever a director's particular motivation, evidence that he skewed an auction in favor of a particular bidder can support a finding of an "intentional dereliction of duty," *Disney, 906 A.2d at 66, i.e.* a violation of the obligation to act in good faith. See *Nagy v. Bistricer, 770 A.2d 43, 48, n.2 (Del. Ch. 2000)* (observing that the duty of good faith may serve **[*26]** as a "constant reminder . . . that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest"). [6]

---

remain the enhancement of the bidding process for the benefit of the stockholders."). *Macmillan* set forth a test which tolerates only *value-enhancing* preferential treatment:

> In the face of disparate treatment, the trial court must first examine whether the directors properly perceived that shareholder interests were enhanced. In any event, the board's action must be reasonable in relation **[*23]** to the advantage sought to be achieved, or, conversely, to the threat which a particular bid allegedly poses to stockholder interests.

*559 A.2d at 1288; In re J.P. Stevens & Co., Inc. S'holders Litig., 542 A.2d 770, 782 (Del. Ch. 1988)* ("The board may tilt the playing field if, but only if, it is in the shareholders' interest to do so.").

[5]  Although Viacom did not actually submit a bid, we conclude that there are triable issues of fact as to whether Viacom was at least a serious potential bidder which was discouraged from actually submitting a bid by Defendants' alleged bad faith conduct.

[6]  The Delaware courts have explained that favoritism, untethered to any strategy to drive up bid prices, is a breach of the fiduciary duties which *Revlon* focused through the lens of shareholder wealth maximization:

Defendants' principal argument is that recent Delaware Supreme Court case law creates a much more stringent standard for claims of breaches of the obligation to act in good faith. To this end, they cite language in the Delaware Supreme Court's decision in *Lyondell*. In that case, Lyondell's board of directors approved the sale of their company to Basell AF, a privately held Luxembourg company, after negotiating several increases in the per share bid price up from $ 40 to $ 48, and a set of less stringent deal protection devices, including a "fiduciary out" clause in the standard no-shop provision and a reduced termination fee. *970 A.2d at 237-39*. The court found no bad faith and therefore no breach of the duty of loyalty. *Id. at 242-44*. The Supreme Court rested its decision on the following facts:

> The Lyondell directors met several times **[*28]** to consider Basell's premium offer. They were generally aware of the value of their company and they knew the chemical company market. The directors solicited and followed the advice of their financial and legal advisors. They attempted to negotiate a higher offer even though all the evidence indicates that Basell had offered a "blowout" price. Finally, they approved the merger agreement, because "it was simply too good not to pass along [to the stockholders] for their consideration." We assume, as we must on summary judgment, that the Lyondell directors did absolutely nothing to prepare for Basell's offer, and that they did not even consider conducting a market check before agreeing to the merger. Even so, this record clearly establishes that the Lyondell directors did not breach their duty of loyalty by failing to act in good faith.

*Id. at 244*.

Contrary to Defendants' argument, *Lyondell* did not work any transformation in Delaware law on the duty of loyalty. Nothing in this case altered the standard definition of bad faith; indeed, the court reaffirmed that "bad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious

**[*29]** disregard for his duties.'" *Id. at 243* (quoting *Disney, 906 A.2d at 67*). The court continued: "there is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties." *Id.* Despite all the references to the "conscious disregard" standard, Defendants nevertheless cherry-pick certain language to argue that a more stringent standard applies, including the following lines: (1) "Only if they knowingly and completely failed to undertake their responsibilities would they breach their duty of loyalty"; and (2) "[T]he inquiry should have been whether those directors *utterly failed* to obtain the best sale price." *Id. at 243-44* (emphasis added); (Joint Br. 5-7, 16). Defendants' citation of this language is out of context and misleading. A comprehensive review of the *Lyondell* opinion reveals that the court intended that language to be synonymous and coterminous with the "conscious disregard" standard. The court did not suggest that the "utter failure" standard would supplant the definition of bad faith set forth in *Disney*. Nor did it suggest any unprecedented diminishment of *Revlon* duties, as suggested by the minimalist standard **[*30]** Defendants advance. If such a radical departure were intended, we think the court would have taken the pains to say as much. Divorced from the surrounding text, the "utter failure" language could be said to require that directors simply do anything in the auction process, no matter how feckless, ineffectual, or at odds with the goal of maximizing shareholder wealth.

The "utter failure" language derives from the *Stone* and *In re Caremark* decisions, which the court cited. *911 A.2d 362 (Del. 2006)*; *698 A.2d 959, 971 (Del. Ch. 1996)*. Both of those decisions concerned claims that directors failed to engage in the necessary oversight to ensure compliance with laws such as the federal Bank Secrecy Act in *Stone*. That vital factual context helps explain why *In re Caremark* defined bad faith as follows: "Generally where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation, . . . only a sustained or systematic failure of the board to exercise oversight--such as an utter failure to

---

Critically, in the wake of *Revlon*, Delaware courts have made clear that the enhanced judicial review *Revlon* requires is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made *in good faith*. For example, the Supreme Court has held that the duty to take reasonable steps to secure the highest immediately available price does not invariably require a board to conduct an auction process or even a targeted market canvass in the first instance, emphasizing that there is "no single blue-print" for fulfilling the duty to maximize value. Nor does a board's decision to sell a company prevent it from offering bidders deal protections, **[*27]** so long as its decision to do so was reasonably directed to the objective of getting the highest price, *and not by a selfish or idiosyncratic desire by the board to tilt the playing field towards a particular bidder for reasons unrelated to the stockholders' ability to get top dollar.*

*Toys "R" Us*, 877 A.2d at 1000-01 (emphasis added; citations omitted).

2010 U.S. Dist. LEXIS 60863, *30

attempt to assure a reasonable information and reporting system exists--will establish the lack of good faith that is a necessary condition [*31] to liability." *698 A.2d at 971* ("Such a test of liability--lack of good faith as evidenced by sustained or systematic failure of a director to exercise reasonable oversight--is quite high."). Nevertheless, the Delaware Supreme Court explained in *Stone* and reaffirmed in *Lyondell* that: "the *Caremark* standard is fully consistent with the *Disney* definition of bad faith." *Lyondell, 970 A.2d at 240* (citing *Stone, 911 A.2d at 370*). We cannot second-guess that determination as Defendants wish.

Instead of placing "utter failure" between "subjective bad faith" (i.e. "actual intent to do harm") and "conscious disregard" on the *Disney* "bad faith" spectrum, *Lyondell* equated the "utter failure" and "conscious disregard" standards. *970 A.2d at 240*. This reasoning was fully in keeping with the Supreme Court's prior decision in *Stone*, where it noted that the duty of loyalty could be breached by two specific kinds of conduct rising to the level of bad faith: "(a) the directors *utterly failed* to implement any reporting or information system or controls; or (b) having implemented such a system or controls, *consciously failed to monitor or oversee* its operations thus disabling themselves from being informed [*32] of risks or problems requiring their attention." *911 A.2d 370*. Crucially, though bad faith could be demonstrated with either of these alternatives, the court emphasized, citing *Disney, 906 A.2d at 67*, that these were coterminous legal standards:

> In either case, imposition of liability requires a showing that the directors knew that they were not discharging their fiduciary obligations. *Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities,* they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*911 A.2d at 370* (emphasis added). Delaware courts generally seem to read *Lyondell* in this way. *See, e.g., Robotti & Co., LLC v. Liddell, C.A. No. 3128-VCN, 2010 Del. Ch. LEXIS 4, 2010 WL 157474, at *11 (Del. Ch. Jan. 14, 2010)* (characterizing *Lyondell* as holding that "[b]ad faith, and thus a breach of the duty of loyalty, can arise only when a fiduciary consciously disregards his or her responsibilities"). [7]

In addition, we do not read *Lyondell* as diminishing the prohibition on tilting the playing field in favor of a

particular bidder for any reason other than maximizing shareholder wealth. The lack of an actual or even potential second bidder was a key undisputed fact on which that court relied, noting: "[The directors] had reason to believe that no other bidders would emerge, given the price Basell had offered and the limited universe of companies that might be interested in acquiring Lyondell's unique assets. . . . Finally, no other acquiror [*sic*] expressed interest during the four months between the merger announcement and the stockholder vote." *970 A.2d at 241*. Other cases have distinguished between single-bidder and multiple-bidder contexts as well. *See, e.g., Barkan, 567 A.2d at 1286-87; Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 466 n.14 (D. Del. 2004)* ("In [Macmillan], the claim was that [*34] the directors approved the use of a lock-up that stopped rival bidders from winning the auction for the company so that fellow directors could purchase the company through a leveraged buy-out. Here, however, *there were no other bidders for Star,* the Company was on the verge of bankruptcy, and the Gotel financing was, by the Plaintiff's own admission, the only financing option presented to the Board.") (emphasis added and citations omitted). Since *Lyondell* only reviewed a merger with a lone bidder, even if we were to read its "utter failure" language as more lenient on Defendants, it is of severely diminished relevance in the multiple-bidder scenario we arguably confront here.

In short, *Revlon* and *Macmillan* are not displaced in any way by *Stone* or *Lyondell*. Accordingly, we must ask whether there is a genuine issue of material fact as to whether Defendants consciously disregarded their duties, i.e. "fail[ed] to act in the face of a known duty to act." *Stone, 911 A.2d at 370*. There is nothing in the case law to warrant granting judgment as a matter of law for Defendants, simply because they engaged in some bargaining.

Having considered all of the admissible evidence before us and viewing [*35] it in the light most favorable to Plaintiff as we must under *Rule 56*, we conclude that there are genuine, triable issues of material fact sufficient to defeat Defendants' Motion for Summary Judgment on this *Revlon* claim. These issues fall into three categories: (1) whether Intermix CEO Rosenblatt impermissibly tilted the playing field in favor of News Corp.; (2) whether the remaining board members consciously disregarded their duties; and (3) whether the purported risk of a direct bid for MySpace,

---

[7]   "A failure to act in good faith may be shown . . . where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary [*33] acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.,* 907 A.2d at 755.

2010 U.S. Dist. LEXIS 60863, *35

which would have frozen the MySpace Option, precludes a finding that Defendants consciously disregard their duties.

a. **Rosenblatt**

Plaintiff proffers evidence tending to show that during the crucial week leading up to the July 18, 2005 merger, Rosenblatt evaded Viacom's advances, even though Viacom's representatives were communicating that a competing bid was imminent. Plaintiff raises at least two interrelated triable issues: (1) whether Rosenblatt was self-interested in the merger transaction; [8] and (2) whether he impermissibly steered the auction in News Corp.'s favor.

As to Rosenblatt's purported self-interest, there is evidence of Rosenblatt's motivation for the alleged bidder favoritism, namely his anticipation of future employment with News Corp. In one particularly revealing email sent on July 15, Rosenblatt excitedly endorses News Corp.'s Ross Levinsohn's vision: "So, we create the Fox Internet group, all our units (myspace, alena, grab) fall under it, plus all new acquisitions, and you are CEO Fox Internet and I am Fox Internet grand Puba!!!!" (J.A., Ex. 184). Rosenblatt continues: "I would like to discuss my specific role and structure whenever you are ready. It is no rush unless Peter and Rupert want me to sign an employment agreement by Sunday [July 17, 2005] . . . ." (Id.). In an earlier email in that same chain, Rosenblatt wrote: "[I] am burning some real equity with every major media company by getting [the deal] done. . . . u [sic] [*37] have no idea the pain I will suffer on Monday. U [sic] better have a good job for me cause I ain't [sic] gonna work in this town again. . . ." (Id.). On July 13, Rosenblatt wrote: "tell Thom Murdoch and I cut the deal in 30 mins [sic] and I got 100% of what we wanted. Deal closing by Monday." (Id., Ex. 154). This evidence at least raises the inference that Rosenblatt had a strong interest in seeing a merger transaction with News Corp. completed and had made up his mind that Intermix would be sold to News Corp. as of July 13.

Moreover, Plaintiff points to several key pieces of documentary evidence and witness testimony which tend to support his contention that (1) Rosenblatt, in representing the Intermix board through the Transaction Committee ("TC"), (2) Sheehan, who also sat on the TC, and (3) their agents, deliberately dodged, if not frustrated, an arguably imminent bid from Viacom:

> *First,* on July 6, Montgomery responded to an email announcing "Viacom coming in hard" by telling Rosenblatt: "You need to dance with [Viacom] . . . slow them down. I know you can do it." (Id., Ex. 117).

> *Second,* TWP, specifically Robert Kitts ("Kitts"), was aware that Epstein was trying to reach them to talk [*38] about a potential Viacom bid. (Kitts Tr. at 125:4-7, 126:4-13). Epstein noted on July 16 that Kitts never called him back as promised. (J.A., Ex. 191 ("We exchanged subsequent emails and he indicated he would call me, but he never did.")).

> *Third,* on July 15, Mosher wrote Rosenblatt following one of Rosenblatt's updates to the full board, saying "Viacom sounds like a pipedream." (Id., Ex. 182).

> *Fourth,* on July 15, Judy McGrath of MTV [9] wrote Rosenblatt to inform him that Viacom was "coming with a bid early next week." (Id., Ex. 183). She added: "We really want to be with you on this, and hope to get in the ring for it . . . ." (Id.). Rosenblatt replied evasively, failing to correct her mistaken impression that the auction would still be ongoing after Monday: "I am on a call but thanks so much for the email . . . . I will call you back soon . . . ." (Id.). Rosenblatt could not recall precisely whether he had returned her call: "I may have tried. I think, actually, I do think I tried and I couldn't get a hold of her." (Rosenblatt Tr. at 108:21-24).

> *Fifth,* Viacom's CEO Thomas Freston ("Freston"), who reiterated Viacom's interest in purchasing Intermix to Rosenblatt, has testified that he [*39] was only told that the process with the competing bidder was "moving quickly." (Freston Tr. at 17:12-20, 19:8-11, 22:4-14). [10]

---

[8]   Although analytically we are reviewing the evidence on the bad faith prong of the duty of loyalty component of the breach [*36] of fiduciary duty claim at this juncture, we consider Rosenblatt's alleged self-interest to the extent that it bears on whether Plaintiff has raised a triable issue of material fact as to whether Rosenblatt acted in conscious disregard of his duties by impermissibly tilting the field in favor of News Corp.

[9]   Viacom owns MTV Networks.

[10]   The Parties initially sought to file Freston's deposition transcript under seal because it contained information subject to the governing protective order. On November 13, 2009, the Parties filed a joint stipulation to withdraw their application to file under seal unredacted versions of the Joint Brief, the Joint Statement of Uncontroverted Facts, and Volumes 2-3 and 5-9 of the Joint Evidentiary Appendix, as well as several full deposition transcripts, including Freston's testimony. (Dkt. No. 234). In that document, the Parties stated that: "WHEREAS the Parties have contacted all non-parties that produced documents and/or gave deposition testimony which was the subject

2010 U.S. Dist. LEXIS 60863, *39

He testified that he could not "recall if [Rosenblatt] said that they were going to do a deal by Sunday." (*Id.* at 22:21-24). When asked whether Rosenblatt had communicated that a deal would be completed by Sunday, he stated that he did not believe so. (Freston Tr. at 19:8-11). Kitts of TWP also confirmed that he failed to give Viacom any hard deadline by which to submit a bid. (Kitts Tr. at 88:21-89:16, 90:11-22, 136:11-14). [11]

*Sixth*, on July 17, Jason Hirschhorn emailed Chris DeWolfe, MySpace's CEO, to document his difficulties in staying in the auction process: "chris, quick concerns . . . Intermix management did not show up on Friday as promised during our time there . . . Intermix legal cancels their time with our legal today at the last minute . . . Heard you guys got called off the ad sales call abruptly . . . In short, I have had a team of 20+ people here working for 72 hours straight on a significant bid, is there anything I need to know?" (J.A., Ex. 200).

*Seventh*, on July 17, Van Toffler of MTV also emailed Rosenblatt directly to complain politely about [*40] the perceived run-around: "They are in the office working round [*sic*] the clock so we can put forth a number to you this week. They mentioned a couple of calls were cancelled at the end of the day Friday, and seemed a bit concerned. Is there anything I can do to help the process for both of us as this is clearly on the fast track?" (*Id.,* Ex. 202). Again, Rosenblatt replied in such a way that a reasonable jury could infer an intent to evade an arguably imminent competing bid: "We like you and your guys a ton also. Chris called back or will your GC today. Have a great weekend[.]" (*Id.*). [12]

*Eighth*, on July 17, Kitts of TWP, pursuant to the Intermix board's instructions, informed Viacom that it would be "in their best interest" to make a bid that evening. [13] (Kitts Tr. at 69:13-70:14, 88:21-89:16). Kitts admitted that he did not give Viacom a hard and fast deadline (*see id.* at 88:21-89:16, 90:11-22; Epstein Tr. at 53:21-55:5), but that he "relied upon the message [he] delivered as code that [Epstein] should get a bid in this evening." (Kitts Tr. at 90:20-22). Furthermore, Kitts admitted in the deposition that he had been instructed to ask for a bid on a timetable that he knew was infeasible. [*41] (*Id.* at 144:1-145:7). Kitts testified that he was aware of an upcoming Viacom board meeting, "at which [a potential bid] was going to be discussed." (*Id.* at 69:13-70:14). The Viacom board was not scheduled to meet until the evening of Tuesday July 19, 2005. (Rosenblatt Decl. P 42; Brewer Decl. P 29).

On the other hand, Defendants present the following evidence of events leading up to the July 18th merger, which they argue demonstrates the board members' good faith. News Corp. initially signaled that it would be willing to purchase Intermix in the $ 8-10 per share price range. (Rosenblatt Decl. P 18). During the Tuesday July 12, 2005 meeting between Rosenblatt, Rupert Murdoch, and Peter Chernin, [14] News Corp. indicated that it would pay $ 12 per share, as long as the MySpace Option was exercised and a merger agreement [*44] was executed by no later than Sunday, July 17, 2005. (*Id.* P 24 (describing the "handshake deal")). At the 2 p.m. meeting on July 15, the Intermix board of directors rejected News Corp.'s proposal to enter exclusive

---

of the application to file under seal, and obtained their permission for the documents to be publicly filed, and therefore withdraw the Application to File Under Seal[.]" (*Id.* at 3). Our November [*42] 17, 2009 Order regarding the joint stipulation was not clear as to whether the deposition transcripts were also being filed in the public record. (Dkt. No. 236). We now clarify that all of the deposition transcripts labeled "Confidential Pursuant to Protective Order" and submitted to the Court along with the Cross-Motions for Summary Judgment **SHALL** also be filed in the public record pursuant to the Parties' joint stipulation.

[11]   Rosenblatt, on the other hand, has testified that he actually told Freston that a deal would "likely be over by Sunday," or (stated with more certainty) that the deal was "going to be done by Sunday." (Rosenblatt Tr. at 64:5-22, 65:22-25, 92:5-8). For purposes of summary judgment, this conflicting evidence further supports the existence of a triable issue of fact as to Viacom's relative awareness of the impending consummation of the merger with News Corp. Moreover, Jason Hirschhorn ("Hirschhorn"), Viacom's top manager for Internet business, wrote in an internal email on Saturday July 16 that News Corp. "will deliver [its bid] anywhere from today-monday." (J.A., Ex. 192). Freston also states that Rosenblatt told him "a specific deal was imminent." (Freston Tr. [*43] at 29:11-16). Though the actual meaning of that statement is obscure as to whether a deal or a bid would have been imminent (particularly given Freston's other testimony), this ambiguity likewise buttresses our conclusion that there are genuine issues for trial.

[12]   A reasonable jury could infer from this email that Rosenblatt intended to evade an arguably imminent competing bid, and that the "[h]ave a great weekend" line at the end of the email was dismissive, given the fact that the email was sent at nearly 6 p.m. on a Sunday night.

[13]   We do not read the deposition to suggest that these were his actual words; Kitts was merely paraphrasing what he recalls saying to Viacom.

[14]   Rupert Murdoch is the Chairman and CEO of News Corp. Peter Chernin was the then-President and COO of News Corp.

2010 U.S. Dist. LEXIS 60863, *44

negotiations as premature. (*Id.* PP 29-30). At the 8 p.m. meeting on July 15, the Intermix board rejected the non-binding term sheet including a variety of deal protection provisions as "too strong a deterrent to other potential bidders." (*Id.* P 33; J.A., Ex. 14). At the 8 p.m. meeting on July 16, TWP advised the board that it would be reasonable to approve a merger with News Corp. rather than waiting for Viacom to present an offer. (Brewer Decl. P 27; Rosenblatt Decl. P 37). At the 7:30 p.m. TC meeting on July 17, the committee directed TWP to contact Viacom and/or its representative, Morgan Stanley, to ascertain whether Viacom would be making an offer before the opening of the market the next morning. (Rosenblatt Decl. P 41; Sheehan Decl. P 36; J.A., Ex. 18). At the 10 p.m. Intermix board meeting on July 17, TWP advised that Viacom was not prepared to make any offer until its board met on Tuesday July 19 and approved a bid. (Rosenblatt Decl. P 42; J.A., Ex. 19). At the **[*45]** 3:45 a.m. board meeting on July 18, both Montgomery and TWP presented their valuation analyses, explaining that $ 12 per share was a fair price for Intermix, and the Board voted to approve the merger. (Rosenblatt Decl. P 44). On July 18, Intermix entered into a merger agreement with News Corp.'s Fox Interactive Media. (Rosenblatt Decl. P 45; J.A., Ex. 4, at 319). Defendants contend, and the record reflects, that throughout this process the board met repeatedly, authorized ongoing discussions with both competing bidders, and consulted legal and financial advisers. (J.A., Exs. 8-12, 14-19).

Viewing the evidence as a whole and in the light most favorable to Plaintiff, we conclude that there are at least triable issues of fact as to whether Rosenblatt acted in good faith, whether he impermissibly skewed the auction in favor of News Corp. for a purpose other than maximizing shareholder value, knowing that a Viacom bid was likely and imminent, and whether this arguably disparate treatment of Viacom and News Corp. had any effect on Viacom's appreciation of the arguable need to make **[*46]** an offer by the evening of July 17, 2005.

**b. The Other Directors**

**i. Sheehan**

In addition to Rosenblatt, there are also triable issues of fact as to whether Sheehan consciously disregarded his fiduciary duties. On Friday July 15, Stuart Epstein ("Epstein"), the Morgan Stanley investment banker representing Viacom, tried to reach Sheehan but was unsuccessful. (Sheehan Tr. at 83:12-18; J.A. Ex. 175). Sheehan instructed his secretary as follows: "Do not tell [Epstein] anything about what I am doing or where I am[.]" (J.A., Ex. 175). In reply to his

email, Sheehan's secretary informed him that she told Epstein that he was "unavailable." (*Id.*). A reasonable jury could conclude that this email chain evinces Sheehan's intent to avoid Viacom's representatives.

**ii. The Other Six Directors**

In *Gesoff v. IIC Industries, Inc., 902 A.2d 1130 (Del. Ch. 2006)*, the court stated that bad faith may be found where directors have "acted with conscious disregard *or made decisions with knowledge that they lacked material information.*" *Id. at 1165* (emphasis added). Few Delaware cases attempt to define precisely what conduct reaches the level of actionable bad faith, but there is at least agreement that "adopting **[*47]** a 'we don't care about the risks' attitude concerning a material corporate decision" constitutes bad faith. *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 289 (Del. Ch. 2003)* (finding bad faith claim properly alleged where factual allegations, if true, implied that "the defendant directors *knew* that they were making material decisions without adequate information and without adequate deliberation, and that they simply did not care if the decisions caused the corporation and its stockholders to suffer injury or loss") (emphasis in original).

Having reviewed the record in full, we conclude that there is sufficient admissible evidence to create a triable question of fact as to whether the rest of the board, as in *Macmillan,* "plac[ed] the entire process in the hands of" Rosenblatt and to a lesser extent Sheehan and thereby "materially contributed to the [allegedly] unprincipled conduct of those upon whom it looked with a blind eye." *559 A.2d at 1281*.

On February 9, 2005, the Intermix board of directors formed a Transaction Committee comprised of Rosenblatt, Sheehan, and Quandt. (Rosenblatt Decl. P 6). From that point until July 18, 2005 when the merger was announced, it is undisputed **[*48]** that the Board received most of its information about the negotiations from its self-interested CEO, Rosenblatt. Indeed, it is undisputed that Rosenblatt was the only board member who had some first-hand information as to the circumstances of Viacom's efforts to put in a bid. (*See, e.g.,* Joint Statement of Uncontroverted Facts P347 ("Rosenblatt was the only person from the Intermix Board who negotiated with Viacom.")). Crucially, one of the board members testified that Rosenblatt had led him to believe "[t]hat Viacom was less urgent about the deal and hadn't taken the time or done the same level of work as Fox Network" and that Viacom was a "pipedream." (J.A., Ex. 182; Mosher Tr. at 25:24-26:1). This phrase is admittedly not indicative of *conscious* wrongdoing. However, there is a triable question as to whether the other board members

consciously abdicated their responsibilities as corporate fiduciaries in allegedly swallowing Rosenblatt's version of events and utterly failing to assess the situation for themselves.

More generally, a reasonable fact-finder could conclude that the other board members acted in bad faith by making "decisions with knowledge that they lacked material information." [*49] *Gesoff, 902 A.2d at 1165*. With respect to their knowledge of the relative likelihood of a Viacom bid, Mosher stated that he could not recall if he or any other board member had "asked any questions regarding Viacom or its status." (Mosher Tr. at 26:14-21). Additionally, he could not recall whether he had "any knowledge of whether anyone from management was providing equal information to Viacom and Fox News Corp about the time line" for submitting a bid for Intermix. (*Id.* at 43:17-21).

With respect to their knowledge of bidder favoritism, though Mosher testified that he could not recall the board ever instructing Rosenblatt to favor one bidder over another, he also could not definitively represent that the board had *not* so instructed Rosenblatt. (*Id.* at 41:10-21). Other board members besides Rosenblatt have also testified that they were unaware that any due diligence meetings with Viacom had been cancelled. (Brewer Tr. at 119:11-15; Sheehan Tr. at 98:1-20). Furthermore, Brewer testified that he was simply unaware that Viacom was conducting due diligence over the July 16-17, 2005 weekend. (Brewer Tr. at 26:5-24).

With respect to their knowledge of the fairness of the merger price, Rosenblatt [*50] did not inform Brewer that he was requesting $ 12 per share from News Corp. until the day of the "handshake deal" with Rupert Murdoch; it is unclear when the rest of the board learned this information. (*Id.* at 122:2-9). He also did not explain how that requested price was derived. (*Id.* at 122:10-14). Brewer testified that the board did not ask, and Mosher could not recall whether any board member sought an explanation. (*Id.;* Mosher Tr. at 53:6-9). Moreover, Brewer testified that the board as a whole never conducted any independent analysis to determine what "an appropriate price per share" would be. (Brewer Tr. at 122:15-18; *see also* Mosher Tr. at 49:24-50:4 (testifying that he himself did not perform any independent analysis)). Additionally, Mosher confirmed that the board had not "directed the management team to go get the specific valuation work done prior to the acquisition." (Mosher Tr. at 52:4-18). Finally, Brewer has testified that he could not even recall whether any of the directors had asked "any questions about [Montgomery and TWP's] fairness presentations." (Brewer Tr. at 104:2-10). Though Brewer's failure to recall what everyone had specifically asked back

in 2005 would [*51] be understandable, a reasonable jury might draw a negative inference from his representation that he could not recall any discussion as to the investment banks' analyses.

Construing all of the above testimony in the light most favorable to Plaintiff as we must on Defendants' motion for summary judgment, we conclude that it is at least triable as to whether the remaining six board members consciously disregarded their duties and acted in bad faith. There is evidence in the record suggesting that no one on the board asked any questions about the requested per share price, the treatment of the competing bidders, the fairness valuations, or the relative likelihood of a Viacom bid. A reasonable jury could infer that this evidence demonstrates the other six directors consciously abdicated their roles as corporate fiduciaries required by law to do their utmost to maximize shareholder wealth. Of course, we remain mindful that even gross negligence, premised on "simple inattention or failure to be informed of all facts material to the decision[,]" violates only the duty of care and is not actionable as bad faith. *Disney, 906 A.2d at 66*. Nevertheless, we think a reasonable jury could find that [*52] the other six directors exceeded the bounds of negligent conduct, willfully proceeded to their decisions knowing they lacked material information, *Gesoff, 902 A.2d at 1165*, and thereby consciously disregarded their fiduciary duties. *Disney, 906 A.2d at 66* ("Cases have arisen where corporate directors have no conflicting self-interest in a decision, yet engage in misconduct that is more culpable than simple inattention or failure to be informed of all facts material to the decision. To protect the interests of the corporation and its shareholders, fiduciary conduct of this kind, which does not involve disloyalty (as traditionally defined) but is qualitatively more culpable than gross negligence, should be proscribed.").

### c. The MySpace Option

The MySpace, Inc. Stockholders Agreement ("MSA") (J.A., Ex. 2), executed on February 11, 2005, was the culmination of negotiations between MySpace, Inc., MySpace Ventures, LLC, Redpoint Ventures I, L.P., Redpoint Associates I, LLC, Redpoint Ventures II, L.P., Redpoint Associates II, LLC, Redpoint Technology Partners Q-1, L.P., and/or Redpoint Technology Partners A-1, L.P. (collectively, "the Redpoint Entities"). (Brewer Decl. P 6; Rosenblatt Decl. [*53] P 7). Under the agreement, the Redpoint Entities purchased a 47 percent minority interest in Intermix, and at the same time, the 53 percent majority stockholders acquired an option ("the MySpace Option") to buy back that minority interest if a third party made a "bona fide . . . offer" for 50 percent or more of Intermix's shares:

2010 U.S. Dist. LEXIS 60863, *53

So long as Intermix (together with its Affiliates) directly or indirectly holds at least 1,000,000 shares of Common Stock . . . , in the event Intermix receives a bona fide third-party offer with respect to a Change of Control of Intermix . . . within the twelve (12) month-period commencing on the date hereof . . . , then, following receipt of such offer (and provided discussions relating to such offer are then-ongoing), Intermix shall have the right to purchase . . . up to 100% of Common Stock and Common Stock Equivalents of the Corporation held by the other Stockholders, whether now owned or hereafter acquired . . . .

(J.A., Ex. 2 § 7.1.1; Brewer Decl. PP 6-7; Rosenblatt PP 7-8). Section 7.1.5 of the MSA precluded the majority from exercising the MySpace Option if a third party made a direct bid for MySpace of over $ 125 million: "Intermix may not exercise [*54] the Purchase Option if (a) the Corporation [MySpace, Inc.] has previously received a bona fide third party offer to purchase the Corporation's capital stock or assets for a purchase price greater than $ 125.0 million and discussions regarding such acquisition between the Corporation and such third party are ongoing . . . ." (J.A., Ex. 2 § 7.1.5). The two provisions are mutually exclusive: (1) a bid for 50 percent or more of Intermix's shares precludes any subsequent direct bid for MySpace (while discussions for the Intermix control share are ongoing); and (2) any direct bid for MySpace precludes any subsequent bid for 50 percent or more of Intermix's shares (while discussions for the acquisition of MySpace are ongoing).

Defendants contend their conduct was not in bad faith in light of the risk of a direct third-party bid for MySpace, which would have precluded the 53 percent Intermix majority interest from exercising the MySpace Option under the MSA to purchase the minority 47 percent interest. Accordingly, we must consider whether the purported risk of a direct bid for MySpace, which would have frozen the MySpace Option, dictates a conclusion that Defendants did not consciously disregard [*55] their duties as a matter of law.

Defendants claim that the risk of such a freezing bid was real and that any delay in consummating the merger with News Corp. threatened the loss of an opportunity to capture the value of Intermix's crown jewel, MySpace, for their shareholders. (Joint Br. 11-15). At the July 15th board meeting at 2 p.m., the directors discussed the status of conversations with News Corp. and Viacom and considered the possibility that if either company "viewed itself as unlikely to prevail in acquiring [Intermix], it might submit an offer to acquire only MySpace in order to potentially

suspend, at least temporarily, [Intermix's] ability to exercise the MySpace option, thereby potentially jeopardizing economically attractive transactions involving the Company including the potential News Corp. transaction then under consideration." (Rosenblatt Decl. P 31; J.A., Ex. 12). Rosenblatt and the other directors have declared that they "believed that the deadline provided by News Corp. by which to execute the Merger Agreement was firm and that News Corp. was prepared to walk away if the deal was not consummated by the opening of the stock market on July 18, 2005." (Rosenblatt Decl. [*56] P 46).

To substantiate their purported concern over a potential freeze-out bid, Defendants suggest that a "bona fide third-party offer" can only mean a fully executed agreement, as in the written merger agreement executed on July 18, 2005. (Joint Br. 93-97). We reject Defendants' assertion that this proposed construction of "bona fide third-party offer" is compelled as a matter of law. Under Sections 7.1.1 and 7.1.5 of the MSA, a subsequent bid for MySpace or the Intermix control share, respectively, will only be precluded if discussions regarding the "bona fide third-party offer" are "ongoing." This language in the agreement suggests that the term "bona fide offer" does not contemplate the final execution of an agreement, at which point discussions would no longer be "ongoing."

Even though we reject Defendants' construction of the phrase "bona fide third-party offer" in the MSA, we also reject Plaintiff's request that we rule as a matter of law on the purely legal question of what constitutes a "bona fide third-party offer" under Sections 7.1.1 and 7.1.5 of the MSA. In our view, Plaintiff's request misses the point. We are not here to construe the terms of the MSA, as such. Rather, [*57] the question is whether there is a triable issue that Defendants, reasonably fearing being frozen out of the MySpace Option, tilted the field in News Corp.'s favor for the permissible purpose of maximizing shareholder wealth, or whether Defendants had no such reasonable fear, but merely used the MySpace Option as a rationalization for a selfish or idiosyncratic desire to favor News Corp. unrelated to securing top dollar for the shareholders. We think the evidence fairly presents such triable issues as to Defendants' purported conscious disregard of their duties. In any event, our *post hoc* legal determination cannot dictate the result of the question of the propriety of Defendants' conduct that indisputably occurred without the benefit of our construction of the MSA.

Accordingly, we hereby **DENY** Plaintiff's Motion for Summary Judgment on this question of contractual interpretation.

2010 U.S. Dist. LEXIS 60863, *57

In light of all the reasons set forth above, we hereby **DENY** Defendants' Motion for Summary Judgment on the fiduciary duty claim with respect to Plaintiff's bad faith theory in the *Revlon* auction context.

## 2. Self-Interested Transaction

In the alternative, Defendants move for summary judgment on the second theory [*58] supporting the breach of fiduciary duty claim, arguing that five of the eight Defendants (a majority) were not self-interested or controlled by someone who was. The Delaware Supreme Court summarized the governing law in *Cinerama, Inc. v. Technicolor, Inc.*:

> A board of which a majority of directors is interested is not a "neutral decision-making body." *See, e.g., Paramount Communications, Inc. v. QVC Network, Inc., Del.Supr., 637 A.2d 34, 42 n. 9 (1994)* ("[w]here actual self-interest is present and affects a majority of the directors approving a transaction, a court will apply [the entire fairness test]"); *Aronson v. Lewis, Del.Supr., 473 A.2d 805, 812 (1984).* A majority of disinterested directors is not "independent" if that majority was dominated by an interested director. *See Heineman v. Datapoint Corp., Del.Supr., 611 A.2d 950, 955 (1992).* Similarly, the manipulation of the disinterested majority by an interested director vitiates the majority's ability to act as a neutral decision-making body. *See Mills Acquisition Co. v. Macmillan, Inc., Del.Supr., 559 A.2d 1261, 1281 (1989).*

*663 A.2d 1156, 1170 n.25 (Del. 1995).* Accordingly, Plaintiff must make two showings. "First, the plaintiff [*59] must proffer evidence showing that those members of the board had a material self-interest in the challenged transaction[,]" and this must be "evidence of a substantial self-interest suggesting disloyalty, such as evidence of entrenchment motives, vote selling, or fraud." *Goodwin, 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *25* (citing *Cede II, 634 A.2d at 362-63*; *Cinerama, 663 A.2d at 1169*). "Second, the plaintiff must show that those materially self-interested members either: a) constituted a majority of the board; b) controlled and dominated the board as a whole; or c) i) failed to disclose their interests in the transaction to the board; ii) and a reasonable board member would have regarded the existence of their material interests as a significant fact in the evaluation of the proposed transaction." *Id.* (citing *Cinerama, 663 A.2d at 1168*).

There were eight directors on the Intermix board at the time of the merger: Rosenblatt, Sheehan, Mosher, Quandt, Brewer,

Carlick, Moreau, and Woodward. Rosenblatt was conflicted due to his interest in becoming the head of Fox Interactive Media. He aimed to "receiv[e] a personal benefit from a transaction not received by the shareholders generally." *Cede II, 634 A.2d at 362*; [*60] *McGowan, 2002 Del. Ch. LEXIS 3, 2002 WL 77712, at *2* (deeming contracts for post-merger employment in acquiring entity a "disabling conflict of interest"); *Goodwin, 1999 Del. Ch. LEXIS 5, 1999 WL 64265, at *25* (finding "a triable issue of fact regarding whether [directors'] expectations constituted a material interest in the merger not shared by the stockholders" but granting summary judgment on lack of evidence that any material interest infected deliberative process); *Oliver, 2006 Del. Ch. LEXIS 75, 2006 WL 1064169, at *19* ("[A]s a consequence of their personal interest in the negotiation of the Accord Agreement, in light of its potential impact on their rights under their employment agreements, they also were self-interested."). Rosenblatt did not simply seek to retain his current position, but sought to secure a coveted position at the top of a division at News Corp. Accordingly, read in conjunction with other admissible evidence we have cited previously, this self-interested motivation is suggestive of disloyalty.

Defendants argue that Rosenblatt's interests were coterminous with the shareholders' interests because every additional dollar increase in the price paid per share would yield roughly an additional $ 2 million for Rosenblatt, a significant [*61] shareholder in Intermix. (Rosenblatt P 51; Joint Statement of Uncontroverted Facts D89). This argument, however, misses the point that Rosenblatt arguably stood to gain more money and prestige by becoming the "grand Puba" of Fox Interactive Media. If Chris DeWolfe, the former CEO of MySpace, stood to make a $ 30 million salary over two years if retained by the merged entity (the Parties appear to agree on this point) (*see* Joint Br. 37 n.42, 41-42), a reasonable jury could infer that Rosenblatt, as head of Fox Interactive Media, would have been offered an even higher salary. As such, a per share price of well above $ 20 would be needed to offset Rosenblatt's conflicting interest in a $ 30 million (or higher) salary. (*Id.* at 41-42). Defendants only reiterate that Rosenblatt stood to gain a greater benefit from each incremental increase in the per share price.

It is undisputed that no director instructed any other director on how to vote or was influenced by how other board members voted. (Joint Statement of Uncontro verted Facts D95-96; Brewer Decl. P 36; Carlick Decl. P 38; Mosher Decl. P 34; Moreau Decl. P 36; Quandt Decl. P 42; Rosenblatt Decl. P49; Sheehan Decl. P 44; Woodward Decl. [*62] P 34). The real question is whether each board

2010 U.S. Dist. LEXIS 60863, *62

member acted independently and free of any manipulation by the interested members, principally Rosenblatt, *i.e.* whether "[e]ach Board Member exercised his independent judgment and consideration in deciding how to vote." (Joint Statement of Uncontroverted Facts D97). In virtually identical declarations, the directors claim they were not so manipulated. (Brewer Decl. P 36; Carlick Decl. P 38; Mosher Decl. P 34; Moreau Decl. P 36; Quandt Decl. P 42; Rosenblatt Decl. P 49; Sheehan Decl. P 44; Woodward Decl. P 34). On the other hand, Plaintiff argues that Rosenblatt deliberately misled the other board members regarding the viability of the Viacom bid, steering them into approving the merger without waiting even a couple more days to see if Viacom would top News Corp.'s offer. (Joint Br. 26-27). Plaintiff cites an email Mosher sent to Rosenblatt after one of the July 15th meetings, stating: "We need to honor our commitment to Fox and get this done. Viacom sounds like a pipedream. Fox sounds dead serious and not screwing around." (J.A., Ex. 182). When asked about this email during his deposition, Mosher testified that Rosenblatt's periodic updates  [*63] to the board had led him to believe "[t]hat Viacom was less urgent about the deal and hadn't taken the time or done the same level of work as Fox Network." (Mosher Tr. at 25:24-26:1, 26:5-13). He also noted that: "The discussion around Viacom that the management team had led indicated that Viacom did not seem as willing to come to the table with an offer for the company." (*Id.* at 25:1-4). This evidence is sufficient to raise an inference that Rosenblatt's presentation to the board may have been misleading as to Viacom's seriousness. According to Mosher's description of the board meetings, "from the management team estimation standpoint [*sic*], they were not inclined to make an offer for the company on the time line that we were looking at." (*Id.* at 25:18-21). Viewing the evidence as a whole in the light most favorable to Plaintiff, including the contrary evidence that Viacom was indeed very seriously interested in bidding on Intermix, [15] there are at least triable issues of fact as to whether Mosher was manipulated by a self-interested director, Rosenblatt.

Moreover, based on Mosher's description of the content of Rosenblatt's presentations to the board, the issue of manipulation is triable with respect to all of the other board members. Accordingly, as a reasonable jury could potentially conclude that a majority of the directors was interested or manipulated by someone who was, we hereby **DENY** Defendants' Motion for Summary Judgment on this second basis for Plaintiff's claim of breach of the duty of loyalty.

## III. Count II: Violation of Section 14(a) of the Securities and Exchange Act of 1934 and SEC Rule 14a-9

On August 25, 2005, Intermix issued a proxy statement ("Proxy") concerning the News Corp. merger. (Rosenblatt Decl. P 53). On September 30, 2005, a majority of Intermix shareholders voted to adopt the Merger Agreement. (*Id.* P 55). Plaintiff alleges that there were five material omissions in the Proxy. (J.A., Ex. 4). To succeed on "a claim under *§ 14(a)* and *Rule 14a-9*, a plaintiff must establish  [*65] that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *New York City Employees' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010)* (citation and internal quotation marks omitted); *15 U.S.C. § 78j(b)*; *17 C.F.R. § 240.14a-9(a)* ("No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.").

### A. Alleged Material Omissions

### 1. MySpace's Then-Current Revenue and Profits

Defendants first argue that  [*66] Plaintiff failed to identify the alleged material omission of MySpace's then-current revenue and profits as a basis for this Section 14(a) claim in its responses to their interrogatories, thereby waiving this ground for his Section 14(a) claim. (Joint Br. 45 n.49). We disagree. First, the CSAC clearly alleges that Defendants omitted "the current revenues and profits being generated by MySpace." (CSAC PP 130-33). Second, our July 14, 2008 Order clearly identified this purported material omission as one of the five surviving bases for the Section 14(a) claim. (Dkt. No. 110, at 5). Third, whether Plaintiff actually identified this alleged material omission in his Revised Objections and Responses to Defendant VP Alpha Holdings IV, L.L.C.'s First Set of Interrogatories is unclear. (J.A., Ex.

---

[15]   Van Toffler of MTV emailed Rosenblatt on July 17 to note that his people were "in the office working around the clock so [Viacom  [*64] could] put forth a number to [him that] week." (J.A., Ex. 202). On the same day, Jason Hirschhorn of Viacom informed Chris DeWolfe that he has "had a team of 20+ people . . . working for 72 hours straight on a significant bid[.]" (*Id.,* Ex. 200).

28). Most of the response to Interrogatory No. 1 focused on the conspicuous absence of internal projections for MySpace's prospective growth, not the company's then-current revenue and profits. (*Id.* at 513-15). Plaintiff did not use the phrase "current revenue and profits," but rather, stated the following:

[S]hareholders . . . *were never made aware of MySpace's true value* or its true growth potential, **[*67]** and had no way of comparing the information that was publicly available to management's projections and growth assumptions. *Thus, even though certain metrics that were used to track MySpace's growth were available from some hard to find public sources (and were not made available by the Company directly to its shareholders), shareholders and other members of the investing public could not compare this data to the Company's internal data* to determine if the Investment Banks' fairness opinions accurately reflected the explosive growth of MySpace.

(*Id.* at 515 (emphasis added)). Although somewhat opaque, we think the highlighted text above can fairly be read to embrace internal data on MySpace's then-current financial position. Fourth, during the Parties' *Local Rule 7-3* meet and confer, according to Defendants, Plaintiff did not identify this alleged omission. (Joint Br. 45 n.49). Sheehan and Carlick's counsel has also declared that Plaintiff was asked at the meeting whether they were pursuing "any other misstatements or omissions," but he does not declare that Plaintiff's counsel answered the question in the negative, thereby waiving this basis. (J.A., Ex. 30, Knaster Decl. PP 8-9). Fifth, **[*68]** Plaintiff's counsel also circulated a letter outlining the issues discussed at the meet and confer, which did not list this purported material omission. (J.A., Ex. 35). However, since this document purports to be an outline of the summary judgment arguments Defendants identified, we decline to conclude that this document contemplated a waiver of the "current revenue and profits" omission, which was so clearly identified in the CSAC (if not so clearly in the interrogatory responses). Accordingly, as this argument was not waived, and Defendants have not made any threshold showing entitling them to summary judgment on this basis, we **DENY** the Motion for Summary Judgment as to this alleged material omission under Count II.

## 2. Intermix Management's 2005-2009 Financial Projections

Plaintiff also alleges that Defendants failed to disclose Intermix management's internal financial projections, and that this information was material. The Supreme Court set forth the materiality standard for Section 14(a) claims in *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important **[*69]** in deciding how to vote." *Id. at 449.* The Court added that "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*

While federal courts generally agree that financial projections, "forward-looking statements," "puffing," or other soft financial information need not be disclosed, this case is distinguishable. *See, e.g., Walker v. Action Indus., Inc., 802 F.2d 703, 707-08 (4th Cir. 1986); Flynn v. Bass Bros. Enters., Inc., 744 F.2d 978, 985 (3d Cir. 1984)* (noting SEC policy favoring nondisclosure of financial projections due to their unreliability and potential to mislead voting stockholders). In this case, the Proxy disclosed Montgomery and TWP's fairness analyses but did not disclose the underlying 2005-2009 Intermix management projections used in formulating those opinions. In *Zemel Family Trust v. Philips International Realty Corp., No. 00 CIV. 7438 MGC, 2000 U.S. Dist. LEXIS 17320, 2000 WL 1772608 (S.D.N.Y. Nov. 30, 2000)*, the court honed in on this distinction:

A company has no duty to include "speculative financial predictions" in a proxy. However, if **[*70]** a Proxy discloses valuation information, it must be complete and accurate. Both the proxy and the [financial valuation] opinion address the value of the Third Avenue property and so [the defendant] has a duty to fully and accurately disclose information related to the valuation.

*2000 U.S. Dist. LEXIS 17320, [WL] at *6.*

Here, the "total mix" of information before the shareholders did not include any of the projected growth rates. *See SEC v. Mozilo, No. CV 09-3994-JFW, 2009 U.S. Dist. LEXIS 104689, 2009 WL 3807124, at *10 (C.D. Cal. Nov. 3, 2009)* ("[T]he 'total mix' of information only includes information that is 'readily' or 'reasonably' available to an investor."); *Koppel v. 4987 Corp., 167 F.3d 125, 132 (2d Cir. 1999)* (same). A reasonable shareholder would have wanted to independently evaluate management's internal financial projections to see if the company was being fairly valued. "[T]here is a substantial likelihood that a reasonable shareholder would consider it important" in making his decision. *TSC Indus., Inc., 426 U.S. at 449.* As we previously noted in our July 14, 2008 Order, the Ninth Circuit has

2010 U.S. Dist. LEXIS 60863, *70

observed that: "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest. Surely, [*71] the average investor's interest would be piqued by a company's internal projections . . . ." *United States v. Smith, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998).* Delaware courts concur. In a case that also considered a discounted cash flow ("DCF") analysis in a proxy statement, the same technique utilized by Montgomery and TWP, the court held that the underlying projections informing a DCF analysis completed for a fairness opinion were clearly material. *See In re Netsmart Techs. S'holders Litig., 924 A.2d 171, 203 (Del. Ch. 2007)* ("[P]rojections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or . . . market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects."). [16] Here, we conclude that there is at least a triable issue as to the materiality of the omission of Intermix's internal financial projections.

Accordingly, Defendants' Motion for Summary Judgment [*72] is **DENIED** as to this alleged material omission.

### 3. Outstanding Derivative Lawsuits

Plaintiff also argues that Defendants failed to disclose one pending derivative lawsuit, *LeBoyer v. Greenspan, et al.,* No. CV 03-5603-GHK (JTLx), and the fact that shareholder derivative standing would be extinguished as to both *LeBoyer* and *Greenspan v. Salzman,* the two derivative lawsuits pending at the time the Proxy was issued. The Proxy merely stated: "Following the effective time of the merger, Fox Interactive Media will use commercially reasonable efforts to take such actions as are within its control so as to obtain the dismissal of Greenspan v. Salzman, et al., LASC No. BC328558; provided that it will not be required to make any payments to any of the plaintiffs (or their counsel) in such litigation to do so." (J.A., Ex. 4, at 332).

Defendants concede that they did not disclose the existence of the pending *LeBoyer* action. (Joint Br. 56 n.67). However, Defendants maintain that this lawsuit had been disclosed in Intermix's prior public filings (*see* J.A., Exs. 47 (Form 10-Q), 3 (Form 10-K)), which they argue were incorporated by reference in the Proxy. A document "may be incorporated into proxy materials [*73] by reference, at the least, in circumstances where 'no reasonable shareholder can be misled.'" *Federated Bond Fund v. ShopKo Stores, Inc., No. 05 CV 9923(RO), 2006 U.S. Dist. LEXIS 85220, 2006 WL 3378696, at *2 (S.D.N.Y. Nov. 17, 2006)* (quoting *Kramer v. Time Warner Inc., 937 F.2d 767, 777 (2d Cir. 1991)).* We do not think this is a case where "no reasonable shareholder can be misled." *Id.* Moreover, "[c]orporate documents that have not been distributed to the shareholders entitled to vote on the proposal should rarely be considered part of the total mix of information reasonably available to those shareholders." *United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1199-1200 (2d Cir. 1993)* (rejecting notion that public reports and 10-K Report submitted to SEC were part of "total mix"). Accordingly, whether the undisclosed derivative lawsuit constituted material information which was not part of the "total mix" of information is at the very least a triable question.

With respect to the disclosed *Greenspan v. Salzman* action, Defendants argue they had no obligation to further announce the extinguishment of derivative standing. In Delaware, with only two exceptions not applicable here, a cash-out merger [*74] extinguishes the standing of shareholder plaintiffs to maintain a derivative suit. *Feldman v. Cutaia, 951 A.2d 727, 731 (Del. 2008)* (citing *Lewis v. Anderson, 477 A.2d 1040, 1049 (Del. 1984)).* This is so because a plaintiff must be a stockholder at the time of the alleged wrongdoing and throughout the litigation. *Lewis, 477 A.2d at 1046.* The failure to disclose the potential extinguishment of a derivative lawsuit is material. *See Lichtenberg v. Besicorp Group Inc., 43 F. Supp. 2d 376, 387 (S.D.N.Y. 1999).* In *Lichtenberg,* the court noted that the proxy stated that the shareholder plaintiffs "may" not be able to maintain their derivative suits following the merger. *Id.* The court found the word "may" to be "affirmatively misleading," because it "implie[d] a possibility that the plaintiffs will be able to continue the actions as shareholder derivative suits," when that was in fact foreclosed as a matter of New York law. *Id.* Here too, the disclosure above is arguably misleading as well, as it did not affirmatively disclose that the *Greenspan v. Salzman* plaintiffs' derivative standing would be extinguished under Delaware law. (J.A., Ex. 4, at 332). Instead, it only stated that Fox Interactive [*75] Media would seek the dismissal of the action and would do so only if it was not required to pay the plaintiffs or their counsel. (*Id.*). Accordingly, it is at least triable whether the above language was misleading as to the extinguishment of derivative standing, which was material information.

Accordingly, we also hereby **DENY** Defendants' Motion for Summary Judgment as to this alleged material omission.

---

[16] Even though this decision concerned a state law duty of disclosure claim, the materiality standard is the same as set forth in *TSC Industries. In re Netsmart Techs., 924 A.2d at 199-200.*

2010 U.S. Dist. LEXIS 60863, *75

**4. Alleged Material Omissions Concerning Viacom and the MySpace Option**

Plaintiff has also argued that the directors made two other material omissions concerning: (1) Viacom's ability to make an offer for Intermix or its ability to conduct due diligence; and (2) the likelihood of a direct bid for MySpace, which would freeze the MySpace Option. This subpart of the Section 14(a) claim essentially seeks to penalize Defendants for their failure to disclose that Viacom was allegedly stonewalled or otherwise prevented from making a bid during the auction. It also seeks to hold Defendants liable for purportedly exaggerating the threat of a direct bid for Intermix's crown jewel, MySpace.

However, these purported material omissions are nothing more than the building blocks of Plaintiff's fiduciary [*76] duty claim. Mandating the disclosure of the above allegations would compel Defendants to essentially accuse themselves of breaching their fiduciary duties. In *Koppel v. 4987 Corp.*, the court dismissed Rule 14a-9 claims based on its conclusion that "these allegations constitute no more than state law breach of fiduciary duty claims under a thin coat of federal paint." *167 F.3d at 133*. The court explained:

> We have long recognized that no general cause of action lies under *§ 14(a)* to remedy a simple breach of fiduciary duty. *See Field v. Trump, 850 F.2d 938, 947 (2d Cir. 1988)* (quoting *Maldonado v. Flynn, 597 F.2d 789, 796 (2d Cir. 1979)*), *cert. denied, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989)*; *cf. Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977)* (refusing to construe *§ 10(b)* to prohibit "instances of corporate mismanagement . . . in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary"). Although the Supreme Court has explained that explicit, conclusory statements concerning the wisdom of a proposed action are actionable, *see generally Virginia Bankshares, 501 U.S. 1083, 111 S.Ct. 2749, 115 L. Ed. 2d 929*, there is [*77] no § 14(a) violation for merely failing to inform shareholders that a proposed action is not subjectively the most beneficial to an entity's shareholders: "Subjection to liability for misleading others does not raise a duty of self-accusation; [rather] it enforces a duty to refrain from misleading." *Id. at 1098 n. 7, 111 S.Ct. 2749*. The securities laws do not "effectively require [an issuer] to accuse [it]sel[f] of breach of fiduciary duty." *Id.*

*Id. at 133-34*. The D.C. Circuit has arrived at the same conclusion: "Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty." *Kas v. Fin. Gen. Bankshares, Inc., 796 F.2d 508, 513, 254 U.S. App. D.C. 217 (D.C. Cir. 1986)* (citations omitted).

In this case, the Proxy unambiguously disclosed Rosenblatt's self-interested motivations, anticipated future employment with News Corp., and the immediate vesting of all his unvested options. (J.A., Ex. 4, at 272, 310, 312). The Proxy also disclosed that Viacom ("Company D") conducted [*78] due diligence and remained interested in making a bid for Intermix, but was "not then in a position to make a proposal [prior to] a [Viacom] board meeting later that week . . . ." (*Id.* at 287, 289). Plaintiff claims this disclosure was misleadingly incomplete, because it did not mention Rosenblatt's alleged evasion of Viacom executives and the alleged deliberate hampering of Viacom's due diligence efforts. (CSAC PP 147-48). Plaintiff claims that these omissions "left shareholders with the false impression that Viacom was given a full and fair opportunity to bid for the Company." (*Id.* P 148). Plaintiff also claims that Defendants misrepresented Viacom and News Corp.'s ability to block a competing bid by freezing the MySpace Option. (CSAC PP 149-51 (citing J.A., Ex. 4, at 284, 288)). As there is no duty of self-accusation, these proffered material omissions cannot support a Section 14(a) claim. Indeed, the allegedly omitted details are not necessarily *facts*, but rather factual *allegations*, and unless and until judgment is granted in Plaintiff's favor, their omission from the Proxy simply could not have been material. In *Brown v. Perrette, No. CIV.A 13531, 1999 Del. Ch. LEXIS 92, 1999 WL 342340 (Del. Ch. May 14, 1999)*, [*79] the court explained this distinction:

> Although a flawed bidding process would be a material fact, [the plaintiff] must prevail on the substantive claim, that the process was flawed, before the alleged flaw becomes material. Once [the plaintiff] prevails on her *Revlon* claim, the alleged disclosure claim becomes superfluous because the defendants' breach of duty becomes the wrong for which an appropriate remedy must be crafted.

2010 U.S. Dist. LEXIS 60863, *79

*1999 Del. Ch. LEXIS 92, [WL] at \*10-11* [17]; *see also Stroud v. Grace, 606 A.2d 75, 84 n.1 (Del. 1992)* ("We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.") (citation omitted).

Accordingly, since "self-flagellation" **[\*80]** omissions are not material, we hereby **GRANT** Defendants' Motion for Summary Judgment as to the purported material omissions concerning Viacom and the MySpace Option. [18]

### B. Negligence

In *Desaigoudar v. Meyercord, 223 F.3d 1020 (9th Cir. 2000)*, the Ninth Circuit stated that a "Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability . . . ." *Id. at 1022* (citation omitted). To succeed on a Section 14(a)/Rule 14a-9 claim, a plaintiff need only establish that the defendant was negligent in drafting and reviewing the proxy statement. *Gerstle v. Gamble-Skogmo, Inc., 478 F.2d 1281, 1300-01 (2d Cir. 1973)* (holding that negligence suffices for claim based on misleading proxy statement and that plaintiffs "are not required to establish any evil motive or even reckless disregard of the facts"). This holding was reaffirmed in the oft-cited case of *Wilson v. Great American Industries, Inc., 855 F.2d 987 (2d Cir. 1988)*: "Liability can be imposed for negligently **[\*81]** drafting a proxy statement." *Id. at 995* (citing *Gerstle, 478 F.2d at 1301 n.20*). "As a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact is sufficient to satisfy the *Gerstle* negligence standard." *Id.* Accordingly, a director may be found negligent under *Section 14(a)* for a failure to notice material omissions upon reading a proxy statement. *See, e.g., Parsons v. Jefferson-Pilot Corp., 789 F. Supp. 697, 703 (M.D.N.C. 1992)* ("Mr. Eagle [a senior in-house lawyer] is not the only negligent party in this action. Each of the directors who reviewed the proxy statement is equally as negligent for failing to notice the use of the word 'restricted' ten times in the document.").

Here, each of the Defendants has declared that he was "involved in the process of preparing, reviewing, and disseminating the Proxy Statement to Intermix shareholders." (Sheehan Decl. P 53 (internal citation omitted); Carlick Decl. P 46; Brewer Decl. P 39; Mosher Decl. P 37; Moreau Decl. P 39; Quandt Decl. P 45; Rosenblatt Decl. P 53; Woodward Decl. P 37). Construing this sworn statement in the light most favorable to **[\*82]** Plaintiff, we read it to mean each director personally reviewed the Proxy before it was disseminated to the Intermix shareholders. Since we have denied summary judgment with respect to three of the proffered material omissions in the Proxy, and Defendants have admitted to participating in "the process of preparing, reviewing, and disseminating" that Proxy, we must also **DENY** summary judgment with respect to the element of negligence. If Plaintiff can persuade a jury as to both materiality and Defendants' participation in the preparation and/or review of the Proxy at trial, then a finding of negligence will flow from those findings.

### C. Damages

### 1. Benefit-of-the-Bargain Damages

This theory of damages is wholly inapposite to this case. A request for "benefit-of-the-bargain damages" seeks the "value that was represented as coming to" the shareholder under a particular transaction, such as a merger. *In re Real Estate Assocs. Ltd. P'ship Litig., 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002)*. "[B]enefit-of-the-bargain damages are available in the limited instance where a misrepresentation is made in the proxy solicitations as to the consideration to be forthcoming upon an intended merger." *Id.* **[\*83]** (citation omitted). As the Ninth Circuit has stated, "[t]he benefit-of-the-bargain measure of damages allows a plaintiff to recover 'the difference between what the plaintiff *expected* he would receive . . . and the amount [the plaintiff] *actually received* . . . .' *DCD Programs, Ltd. v. Leighton, 90 F.3d 1442, 1449 (9th Cir. 1996)* (quoting *Cunha v. Ward Foods, Inc., 804 F.2d 1418, 1426 (9th Cir. 1986)* (emphasis in original)). Here, the Proxy made no misrepresentation as to the per share price offered to and ultimately received by the class members. The Proxy stated the class members would receive $ 12 cash for each common share, and it is undisputed that they received $ 12 cash for each common share. (J.A., Ex. 4, at 319; Joint Statement of Uncontroverted Facts D128). Accordingly, this damages theory is not viable. We **GRANT** summary judgment with respect to this damages theory.

---

[17]   Even though *Brown* analyzes the relationship between a state law fiduciary duty claim and a state law duty of disclosure claim, brought on the same grounds, the principles articulated are equally applicable to a Section 14(a) claim premised on the same allegations supporting a breach of fiduciary duty claim.

[18]   Notwithstanding our ruling, nothing in the above discussion precludes Plaintiff from introducing evidence of these omissions in the course of his breach of fiduciary duty claim.

## 2. Out-of-Pocket Losses

### a. Legal Framework

"'Out-of-pocket' losses are the standard measure of damages for *Rule 10b-5* and Section 14(a) claims." *In re DaimlerChrysler AG Sec. Litig., 294 F. Supp. 2d 616, 626 (D. Del. 2003)* (citing *Tse v. Ventana Med. Sys., Inc., 123 F. Supp. 2d 213, 222 (D. Del. 2000)* ("*Tse II*")). [**84**] Out-of-pocket losses constitute "the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct." *Tse II, 123 F. Supp. 2d at 222* (quoting *Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128, 155, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972))* (quotation marks omitted). The Ninth Circuit concurs: "The out-of-pocket rule fixes recoverable damages as 'the difference between the purchase price and the value of the stock at the date of purchase.'" *Wool v. Tandem Computers Inc., 818 F.2d 1433, 1437 (9th Cir. 1987)*, *impliedly overruled in part on other grounds by Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1577-78 (9th Cir. 1990)* (en banc) (citation omitted). "The guiding philosophy of the out-of-pocket theory of damages . . . is to award not what the plaintiff might have gained, but what he has lost by being deceived into the purchase." *Id. at 1437 n.2* (citation and internal quotation marks omitted). Since this theory of damages is premised on an intrinsic valuation of the company as it existed at the time of the merger, Plaintiff has produced expert witness testimony consisting of two different financial valuations of Intermix/MySpace. [**85**] Defendants have moved to exclude that testimony as inadmissible.

### b. Defendants' Motion to Exclude; Plaintiff's Motions to Strike

Defendants move to exclude Plaintiff's proffered expert testimony by Dr. G. William Kennedy as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. Plaintiff has moved to strike both this Motion to Exclude and Defendants' Motion for Summary Judgment, arguing that this *Daubert* challenge was not included in the joint brief on the Cross-Motions for Summary Judgment and therefore violates our Order Re: Summary Judgment Motions. (Dkt. No. 123, Oct. 30, 2008). We reject this argument. First, Defendants included virtually the same arguments attacking Dr. Kennedy's testimony in the Joint Brief. (Mot. 77-80). Second, the Motion to Exclude is a challenge to the admissibility of evidence crucial to one of Plaintiffs' damages theories. As we may only consider *admissible* evidence in ruling on the Parties' Cross-Motions, nothing in

the Order Re: Summary Judgment Motions precludes a party from filing a separate motion to exclude certain evidence from the Court's consideration. Third, it is common for litigants to move for the exclusion of [**86**] certain evidence at the summary judgment stage. *See, e.g., In re Hanford Nuclear Reservation Litig., 292 F.3d 1124, 1131 (9th Cir. 2002)* ("Defendants linked their summary judgment motion to dozens of in limine motions challenging the admissibility of plaintiffs' expert witnesses, commonly known as '*Daubert* motions.'") (citation omitted); *O'Hanlon v. Matrixx Initiatives, No. CV 04-10391-AHM (JTLx), 2007 U.S. Dist. LEXIS 65655, 2007 WL 2446496, at *1, 4 (C.D. Cal. Jan. 3, 2007)* (considering motions *in limine* concurrently with motion for summary judgment). Accordingly, we hereby **DENY** Plaintiff's Motions to Strike the Motion to Exclude and the Motion for Summary Judgment.

We now consider the merits of the Motion to Exclude. Defendants attack the reliability of Dr. Kennedy's application of his chosen methodologies for estimating the value of MySpace: (1) discounted cash flow ("DCF") analysis; and (2) comparable public company analysis. *Federal Rule of Evidence 702* states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify [**87**] thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert,* the Supreme Court construed *Rule 702* to require district courts to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *509 U.S. at 597*. The Court noted that "[p]ertinent evidence based on scientifically valid principles will satisfy those demands" but cautioned that "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.; id. at 595*. To assist courts in assessing whether the proffered testimony is scientifically valid, the Supreme Court set forth a non-exhaustive list of factors, including: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1316*

2010 U.S. Dist. LEXIS 60863, *87

*(9th Cir. 1995)* [**88**] (″*Daubert II*″) (citing *Daubert, 509 U.S. at 593-94*).

The ″gatekeeping obligation″ *Daubert* requires us to fulfill ″applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (quoting *Fed. R. Evid. 702*). ″Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case.″ *United States v. Simmons, 470 F.3d 1115, 1123 (5th Cir. 2006)* (citing *Kumho, 526 U.S. at 153*) (internal citations and quotation marks omitted). Courts have stated that ″[i]n such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations.″ *Id.* Though perhaps not to the same degree as psychology or social psychology, financial valuation is not an exact scientific methodology. Estimations, predictions, and inferences based on professional [**89**] judgment and experience are key ingredients in any valuation. In a variety of contexts, the circuit courts have noted that economic valuation is less than an exact science.″ *See, e.g.,* *In re Arnold & Baker Farms, 85 F.3d 1415, 1421 (9th Cir. 1996)* (″Experience has taught us that determining the value of real property at any given time is not an exact science. Because each parcel of real property is unique, the precise value of land is difficult, if not impossible, to determine until it is actually sold.″); *Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 830, 835 (7th Cir. 1985)* (noting that ″[t]he process of valuation is inexact″ and that DCF analyses ″are highly sensitive to assumptions about the firm's costs and rate of growth, and about the discount rate″).

With respect to the DCF analysis, the principal difference from Montgomery and TWP's DCF fairness analyses is Dr. Kennedy's MySpace growth rate projections for 2007-2008 and 2008-2009. (Baron Decl., Ex. 3, Expert Report of Dr. G. William Kennedy [″Kennedy Report″], May 20, 2009). Intermix management projected the following revenue growth rates for the company: 107 percent for 2005-2006; 67 percent for 2006-2007; 20 percent [**90**] for 2007-2008; and 15 percent for 2008-2009. (J.A., Ex. 242). Montgomery used these projections for its analysis without any modification. (Baron Decl., Ex. 3, at 39). TWP's projections differed slightly from management's projections: 107 percent for 2005-2006; 67 percent for 2006-2007; 21 percent for 2007-2008; and 10 percent for 2008-2009. (*Id.*). Kennedy

adopted management's growth rate projections for 2005-2006 and 2006-2007, derived a deceleration rate of 62.06 percent from those figures, and then used that same deceleration rate to calculate different revenue growth rates for 2007-2008 and 2008-2009, 41.36 percent and 25.67 percent, respectively. (*Id.* at 39-40). Based on these new figures, Kennedy calculated new Earnings Before Interest, Taxes, Depreciation and Amortization (″EBITDA″) figures for 2008 and 2009 for MySpace. (*Id.* at 40). Finally, ″[u]sing a discount rate of 19% and a terminal EBITDA multiple of 18[,]″ Dr. Kennedy calculated ″a value of $ 962.4 million after subtracting the $ 69 million option exercise price from the present value of MySpace's Cash Flows.″ (*Id.*). The 19 percent discount rate was chosen based on the discount rates used in the Montgomery and TWP fairness [**91**] opinions, which ranged from 17 percent up to 25 percent. (*Id.* at 41).

Defendants make several arguments against the reliability of this procedure. They argue first that Dr. Kennedy has insufficiently justified his use of a uniform deceleration rate from 2005 to 2009 and the 18x terminal multiple. (Mot. 9-13). Defendants claim that Dr. Kennedy has offered no coherent reason for his rejection of management's projections for 2007-2008 and 2008-2009. (*Id.* at 11). They note that he has merely declared that Montgomery and TWP's projections ″were unreasonably low and not consistent with the very rapid rates of growth currently observed at the time of the Proxy and expected in the social networking sector at the time." (*Id.* at 11 (quoting Moriarty Decl., Ex. 7, Kennedy Supplemental Decl. P 6) (emphasis omitted)). Yet, Defendants neglect to mention that Dr. Kennedy explained his use of higher growth rates for 2007-2008 and 2008-2009 by noting that ″MySpace revenues consistently outperformed Intermix management's own projections in each of the first four months of 2005.″ (Baron Decl., Ex. 3, Kennedy Report, at 35). This is at least one reasoned basis for his adjustments to what he viewed as demonstrably [**92**] ″conservative″ forecasts. (*Id.*). After all, the entire endeavor is forecasting, not hard science. Projections themselves cannot be tested for accuracy; they ″represent hopes rather than the results of scientific analysis.″ *Zenith Elecs. Corp. v. WH-TV Broad. Corp., 395 F.3d 416, 420 (7th Cir. 2005)*; *see also In re Orchards Village Invs., LLC, No. 09-30893-rldll, 2010 Bankr. LEXIS 48, 2010 WL 143706, at *11 (Bankr. D. Or. Jan. 8, 2010)* (″[P]rojecting future financial results from the operations of a business is not an exact science.″).

Additionally, Defendants argue that: ″Kennedy provides no theoretical or empirical justification for applying this incredibly aggressive 18x terminal multiple, except his statement that it is based on forward EBITDA multiples observed in comparable publicly traded guideline

2010 U.S. Dist. LEXIS 60863, *92

companies" referenced in the comparable public company analysis below. (Mot. 12-13 (quoting Moriarty Decl., Ex. 1, Kennedy Report, at 15) (quotation marks omitted)). They assert that Dr. Kennedy only relied on "the most profitable of the 14 comparable companies relied upon by" Montgomery and TWP, including Google and Yahoo!, and could not summon a single company that had grown at the rate projected with **[*93]** his revenue growth rates and terminal value. (Id. at 13 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 25; id., Ex. 6, Kennedy Tr. at 123:4-24)).

While these two challenges may be objections to Kennedy's *conclusions* on his DCF analysis, they do not render his methodology unreliable. Rather, the deviation from management's projections, the use of an arguably aggressive terminal multiple, and the alleged selection of the most profitable guideline companies are proper subjects for cross-examination. Defendants do not take issue with the widely accepted DCF methodology; [19] nor do they attack any input that is identical to those used in the Montgomery and TWP projections (for instance, the 2005-2006 and 2006-2007 projections or the discount rate which fell within the same range in the investment banks' fairness analyses). Even in light of Dr. Kennedy's less than fully reasoned explanations for his choices, given the inherent element of judgment in these financial valuation analyses, we cannot say that he failed to identify any "reliable principles and methods" or to apply those "principles and methods reliably to the facts of [this] case." <u>FED. R. EVID. 702</u>. "A court may admit somewhat **[*94]** questionable testimony if it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" <u>S.M. v. J.K., 262 F.3d 914, 921 (9th Cir. 2001)</u> (quoting <u>Kumho, 526 U.S. at 153</u>).

Defendants also argue that there is a fundamental flaw in Dr. Kennedy's DCF analysis, since it allegedly yields an average growth rate into perpetuity above that of the U.S. economy as a whole (12.74 percent versus a historical average of 6.5 percent). (Mot. 13-16; Cornell Decl. in Supp. of Mot. to Exclude P 5). Arguing that this outcome violates a key tenet of financial valuation, Defendants cite to Professor Aswath Damodaran's treatise, which states: "The fact that a stable growth rate is sustained forever, however, puts strong constraints on how high it can be. Since no **[*95]** firm can grow forever at a rate higher than the growth rate of the economy in which it operates, the constant growth rate cannot be greater than the overall growth rate of the economy." (Defs.' Request for Judicial Notice ["RJN"], Ex. B, ASWATH DAMODARAN, DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE 145 (John Wiley & Sons, Inc. 2d ed. 2006)). We have reviewed Defendants' expert Dr. Bradford Cornell's declaration in support of this Motion to Exclude, in which he argues that "Dr. Kennedy's use of an 18x EBITDA forward multiple is unreasonable . . . ." (Cornell Decl. in Supp. of Mot. to Exclude P 5). To cross-check the outcome of Dr. Kennedy's DCF analysis, Dr. Cornell used three hypothetical scenarios, in which MySpace's revenue growth rate declines by 2 percent, 1 percent, and 0.5 percent, respectively, each year until it reaches 6.5 percent, the average annual growth rate in nominal Gross Domestic Product between 1928 and 2008. (Id. PP 8-10 (citing Defs.' RJN, Ex. F, Bureau of Economic Analysis News Release, July 31, 2009)). Using Dr. Kennedy's assumptions and the Gordon Growth Model (id. PP 11-13), Dr. Cornell calculated the following total present **[*96]** values as of January 1, 2010 and implied EBITDA multiples for each scenario: (1) for the 2 percent annual reduction, $ 549.13 million and a 4.7x multiple; (2) for the 1 percent annual reduction, $ 606.18 million and a 5.2x multiple; and (3) for the 0.5 percent annual reduction (what he calls the "most aggressive scenario"), $ 695.34 million and a 6.0x multiple. (Id. PP 14-19; see also id., Exs. 5, 6). Applying the 19 percent discount rate used by Dr. Kennedy, Dr. Cornell calculates discounted values as of mid-2005 for each scenario, including: (1) $ 251.02 million; (2) $ 277.10 million; and (3) $ 317.8 million. (Cornell Decl. in Supp. of Mot. to Exclude P 20). Finally, Dr. Cornell concludes that "even assuming an instance where MySpace's revenues grow at a rate exceeding that of the economy as a whole for fifteen years after 2010, i.e., until 2025, Dr. Kennedy's implied EBITDA multiple of 18x is *three times too high* when compared with even [Dr. Cornell's] most aggressive implied EBITDA multiple of 6.0x to give a reasonable estimate of MySpace's value as of mid-2005." (Id. P 21 (emphasis original)).

Though a jury might conclude at trial that Dr. Kennedy's selection of an 18x EBITDA multiple **[*97]** was overzealous, Dr. Cornell's calculations do not demonstrate that Dr. Kennedy's *methodology* is fundamentally unreliable. At base, Dr. Cornell's challenge to this DCF analysis constitutes an attack on Dr. Kennedy's projections as to MySpace's annual growth rates and as to how long those growth rates can be sustained. Since Dr. Cornell is in essence attacking

---

[19] <u>Lippe v. Bairnco Corp., 288 B.R. 678, 689 (S.D.N.Y. 2003)</u> ("Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ('DCF') method.") (citations omitted); see also <u>Children's Broad. Corp. v. The Walt Disney Co., 245 F.3d 1008, 1018 (8th Cir. 2001)</u> (describing DCF analysis as "an uncontroversial accounting method").

the reasonableness of Dr. Kennedy's projections, the generation of which we have already noted is not an exact science, we conclude that his arguments do not render Dr. Kennedy's methodology fundamentally unreliable and therefore inadmissible. Dr. Cornell himself has testified that an adjustment in the terminal multiple based on the expert's assessment of the company's growth potential is appropriate. (Baron Decl., Ex. 2 (Cornell Tr. I at 167:19-168:3)). Additionally, Dr. Cornell rejected the proposition that "any time that the implied perpetual growth rate exceeds the growth of the economy, that the terminal value multiple used would be unreliable[.]" (*Id.,* Ex. 1 (Cornell Tr. II at 21:21-22:1)). He further explained that "it's just a question of how much [the implied perpetual growth rate] exceeds [the economy rate,]" and there **[*98]** is no standardized method to determine whether the difference between the two rates is "unreasonable." (*Id.* at 22:3-24:6; *id.* at 23:12-25 ("Q[:] And then do they use judgment to see whether it's reasonable to them or not reasonable to them? . . . . Is there some written scale as to how much variation there can be before, in your view, it becomes reasonable or unreasonable; or is that a judgment of the analyst? A[:] Well, there's not a written scale . . . . And these calculations Dr. Kennedy used struck me as [unreasonable].")). These statements suggest that Defendants' Motion turns on a difference of professional opinion, not some fatal methodological flaw.

Based on our review of the papers and evidence submitted, if anything is clear, it is that DCF analysis is, in not insubstantial measure, an inherently subjective and predictive methodology, which relies in part on the expert's judgment and experience. Indeed, neither Party has presented the Court with any accepted, standardized methodology for deriving the required inputs for DCF analysis. Accordingly, we are forced to conclude that DCF analysis is sufficiently pliable so that it may reasonably lead to a wide breadth of plausible **[*99]** conclusions. Dr. Kennedy's conclusions and the bases therefor may ultimately be subject to legitimate attacks on cross-examination, but we perceive no fundamental unreliability in his analysis that would counsel in favor of outright exclusion. We agree that our "gatekeeper role under Daubert is not intended to supplant the adversary system or the role of the jury." *DSU Med. Corp. v. JMS Co., Ltd., 296 F. Supp. 2d 1140, 1147 (N.D. Cal. 2003)* (citation, quotation marks, and alteration omitted). It is readily apparent that Defendants have thoroughly researched the case law on DCF methodology, and in all but one of the several cases they cite, the expert witness's DCF analysis was considered *at trial* and *then* rejected by the court. *Compare In re Iridium Operating, LLC, 373 B.R. 283, 350-52 (Bankr. S.D.N.Y. 2007)* (rejecting DCF analyses following trial); *In re Emerging Commc'ns, Inc. S'holders*

*Litig.,* No. Civ.A. 16415, 2004 WL 1305745, at *14-15 (Del. Ch. June 4, 2004) (same); *Gray v. Cytokine Pharmasciences, Inc., No. Civ.A. 17451, 2002 Del. Ch. LEXIS 48, 2002 WL 853549, at *8 (Del. Ch. Apr. 25, 2002)* (same), with *Kipperman v. Onex Corp., 411 B.R. 805, 844-49 (Bankr. N.D. Ga. 2009)* (simultaneously deciding summary **[*100]** judgment and granting motion to exclude an expert's testimony as unreliable under *Rule 702*, where the expert rejected management's projections and generated his own DCF analysis).

With respect to Dr. Kennedy's comparable public company analysis, Defendants argue that he only used the projected MySpace revenue and EBITDA figures for 2006, ignoring the 2005 numbers without explanation. (Mot. 17-18 (citing Moriarty Decl., Ex. 1, Kennedy Report, at 24)). They argue Dr. Kennedy's explanation for choosing to disregard the 2005 figures was inadequate *ipse dixit.* When asked if 2005 was "an aberrant year for MySpace," he replied: "No, but it wasn't who the company was expected to be." (Kennedy Tr. at 129:19-22). Furthermore, Defendants argue that Kennedy cherry-picked only the most profitable guideline companies referenced in Montgomery and TWP's fairness analyses, instead of applying an average of the multiples applicable to several companies. (Mot. 18). In support of this latter contention, they cite another treatise, which states: "In employing the guideline publicly traded company method, every effort should be made to select as broad a base of comparative companies as is reasonably possible, **[*101]** as well as to give full consideration to every possible factor in order to make the comparison more meaningful." (Defs.' RJN, Ex. E, PRATT, REILLY AND SCHWIEHS, THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 233 (2000) ("PRATT, et al.") (citation and internal quotation marks omitted)). Defendants contend that Dr. Kennedy erred in whittling down the broader base of comparable public companies identified by Montgomery and TWP to only Google and Yahoo!, "seasoned" companies with "proven revenue model[s]" that experienced explosive growth. (Mot. 19-20). Though this appears to strike Defendants as litigation-driven, we are instructed to evaluate the *methodology,* not the ultimate determination reached by the expert. Our "sole purpose is to determine the reliability of a particular expert opinion through a preliminary assessment of the methodologies underlying the opinion." *DSU Med. Corp., 296 F. Supp. 2d at 1147* (citing *Daubert, 509 U.S. at 592-93*). Of course, we must consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly **[*102]** for purposes of testifying." *Daubert II, 43 F.3d at 1317.* However, there is no evidence

App000350

in the record that Dr. Kennedy deviated from his standard methodology for the purposes of testifying in this case.

Dr. Kennedy explained his method as follows. First, he analyzed the companies selected by Montgomery and TWP and restricted his selection to those comparable companies. (Moriarty Decl., Ex. 1, Kennedy Report, at 18-20). Montgomery had chosen twelve companies (Google, Yahoo!, CNET Networks, iVillage, Monster Worldwide, Aptimus, ValueClick, Vertrue, Church & Dwight Co., Herbalife Ltd., Jarden Corp., and Nature's Sunshine Products) based on the following sectors: online advertising, online content and networking, online direct marketing, and offline direct marketing. (*Id.* at 19). TWP had chosen fourteen guideline companies (Bankrate, CNET, iVillage, 1-800-FLOWERS.COM, Blue Nile, Celebrate Express, Netflix, NutriSystem, Overstock.com, Provide Commerce, Aptimus, Marchex, ValueClick, and Vertrue) based on three sector categories: content, eCommerce, and direct marketing. (*Id.*). In identifying a narrower set of comparable companies, Dr. Kennedy explained that he considered these to be the [*103] most similar operational, financial, and growth guideline publicly traded companies." (*Id.* at 20). He justified his deviation from the investment banks, beginning with TWP, as follows:

> In implementing the public guideline company method, TWP selected guideline Companies based on all of the businesses of Intermix on a combined basis. . . . Montgomery selected guideline companies based on each business within Intermix because "the three businesses have different economics and peer groups." As a result, Montgomery selected only "Online Advertising" and "Online Content and Networking" to apply to MySpace. We agree with Montgomery's approach that each Intermix business segment, and specifically MySpace has different growth and profit potential and therefore, different multiples would be appropriate to apply to MySpace and the other Intermix business segments. Within TWP's comparables, only the "Content" group is applicable.

(*Id.* at 20-21). Accordingly, Dr. Kennedy selected the following six comparable companies: Bankrate, CNET, iVillage, Google, Yahoo!, and Monster. (*Id.* at 21). Then, based on "separate MySpace financial performance information," Dr. Kennedy narrowed the field down to Google [*104] and Yahoo!, contending those were the only two companies with comparable revenue and EBITDA growth metrics. (*Id.* at 21-25). Dr. Kennedy concluded that MySpace "[fell] into the higher profitability tier" of the six guideline companies, and therefore, he could discount the

2005 figures for MySpace and utilize an "average of the multiples indicated by Google and Yahoo." (*Id.* at 24-25).

There is nothing in the record to support the proposition that selecting comparable companies based on (1) services provided, (2) revenue metrics, and (3) EBITDA metrics renders a comparable public company analysis fundamentally unreliable. We will not exclude this evidence simply because Defendants dislike Dr. Kennedy's conclusion that the only guideline companies left standing in the final analysis were Google and Yahoo!. Even Defendants' cited treatise urges the selection of "as broad a base of comparative companies *as is reasonably possible.*" (Defs.' RJN, Ex. E, PRATT, et al., *supra,* at 233 (emphasis added)). Dr. Kennedy concludes, in effect, that the remaining comparable companies are as broad a base of comparable companies as is reasonably possible. Defendants' disagreement with this conclusion is [*105] properly explored on cross-examination.

Accordingly, we hereby **DENY** Defendants' Motion to Exclude Dr. Kennedy's testimony. As Dr. Kennedy's testimony is sufficient to at least raise triable issues on damages from out-of-pocket losses, we also **DENY** Defendants' Motion for Summary Judgment on this issue.

### 3. "Lost Opportunity" Damages

As a final alternative, Plaintiff seeks "lost opportunity" damages based on the allegedly impending Viacom bid. "When actual losses cannot be demonstrated," some circuit courts have recognized "an alternate theory of establishing damages," the "lost opportunity" theory. *DaimlerChrysler, 294 F. Supp. 2d at 627* (internal quotation marks omitted). Lost opportunity damages represent "loss of a possible profit or benefit, [defined as] an addition to the value of one's investment, unless the loss is wholly speculative." *Tse II, 123 F. Supp. 2d at 223* (internal citations omitted; alteration in original). "Lost opportunity damages are not 'wholly speculative' if they are based on 'certain, fixed and demonstrable profits thwarted by a defendant's alleged fraud.'" *DaimlerChrysler, 294 F. Supp. 2d at 627* (quoting *Rudinger v. Ins. Data Processing, Inc., 778 F. Supp. 1334, 1341 (E.D. Pa. 1991)).* [*106] "Further, lost opportunities damages 'are not available where the fact of the loss, i.e. whether there was any lost opportunity at all, is wholly speculative.'" *Id.* (quoting *Tse v. Ventana Med. Sys., Inc., 297 F.3d 210, 220 (3d Cir. 2002)* ("*Tse III*")). Finally, "'[t]he risk of uncertainty as to [the] amount of damages is cast on the wrongdoer and it is the duty of the fact finder to determine the amount of the damages as best he can from all the evidence in the case.'" *Tse III, 297 F.3d at 220* (quoting *Gould v. American-Hawaiian S.S. Co., 535 F.2d 761, 781-82 (3d Cir. 1976)).*

2010 U.S. Dist. LEXIS 60863, *106

In support of this theory of damages, Plaintiff argues that Viacom was contemplating a bid above $ 750 million, citing a single internal Viacom email, in which Jason Hirschhorn states: "My guess is that News [Corp.] is going to take the $ 12/share ask from Richard Rosenblatt and add a premium of 10-20%. $ 700-$ 750 million . . . . Don't know if offer will be binding from NEWS [Corp.]. But I belioeve [*sic*] they will deliver it anywhere from today-monday." (J.A., Ex. 192). Viacom never in fact put in a bid for Intermix. Therefore, the relevant question on this motion for summary judgment is whether there is a triable **[*107]** issue of material fact as to whether Viacom would have submitted a bid. This question must be answered in the negative, since it is undisputed that Viacom's board simply refused to engage in a public bidding war with its competitor News Corp. Freston, Viacom's CEO, testified that the Viacom board members were adamant on this point: "There already had been an offer and it wasn't ours and it didn't look like there was an opportunity to counter bid or if there was, we would have to do so in a public way and the board had said on the spot, no, let's not get involved in that." (Freston Tr. at 35:11-15; *see also* West Tr. at 123:22-24 ("We had some discussion and we ended up saying that it wasn't worth pursuing a counterbid strategy.")). Therefore, given this unwavering refusal to engage in a public bidding war following the July 18th merger announcement, the Proxy, including whatever alleged material omissions, issued in late August had no effect whatsoever on Viacom's willingness to place a bid for Intermix. Accordingly, the allegedly defective Proxy cannot support the notion that Intermix shareholders missed out on an opportunity with Viacom.

While it may be theoretically possible that **[*108]** Viacom would have entered a subsequent bid had the Intermix shareholders not been allegedly deceived by the defective Proxy and had they rejected the merger with News Corp., we conclude that under the totality of the evidence, Plaintiff's showing is no more than speculative. Moreover, mere rejection of the News Corp. bid by the shareholders would not necessarily have eliminated the specter of a public bidding war that Viacom abhorred. Nothing prevented News Corp. from countering any Viacom bid with a counterbid. This is precisely the type of speculation and indeterminacy that is insufficient to create a triable issue on the existence of any lost opportunity.

Accordingly, we **GRANT** Defendants' Motion for Summary Judgment as to this theory of damages. [20] On his Section 14(a) claim, Plaintiff may **ONLY** proceed at trial on his theory of out-of-pocket losses based on an intrinsic valuation of Intermix at the time of the merger.

## IV. Count III: Violation of Section 20(a) of the Securities and Exchange Act of 1934

Section 20(a) of the 1934 Act provides that: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The Parties agree that if there is no primary liability under Section 14(a), there can be no control person liability. (Joint Br. 87). However, since we have denied summary judgment with respect to three of the bases for Count II, we likewise **DENY** the Motion for Summary Judgment with respect to Count III.

## V. Conclusion

Plaintiff's Motion for Summary Judgment is **DENIED.** Defendants' Motion for Summary Judgment is hereby **GRANTED in part** and **DENIED in part** as set forth in this Order. **Within thirty [*110] (30) days hereof,** counsel **SHALL** file a joint status report setting forth their views regarding further mediation in light of these rulings.

**IT IS SO ORDERED.**

---

[20]   We have no occasion to consider and therefore express no opinion on whether the "lost opportunity" theory of damages premised on a potential Viacom bid would be viable with respect to the breach of fiduciary duty claim which is based on evidence beyond the alleged **[*109]** material omissions from the Proxy. The Parties have not addressed this issue in their Cross-Motions.

 Caution
As of: August 11, 2015 4:38 PM EDT

# *Brown v. Brewer*

United States District Court for the Central District of California

July 14, 2008, Decided; July 14, 2008, Filed

Case No. CV 06-3731-GHK (JTLx)

**Reporter**
2008 U.S. Dist. LEXIS 108904; 2008 WL 6170885

Jim Brown v. Brett C. Brewer, et al.

**Subsequent History:** Class certification granted by *Brown v. Brewer, 2009 U.S. Dist. LEXIS 47535 (C.D. Cal., May 29, 2009)*

**Prior History:** *Leboyer v. Greenspan, 2007 U.S. Dist. LEXIS 96231 (C.D. Cal., June 12, 2007)*

## Case Summary

### Procedural Posture

Plaintiff purported representative of a class of common stockholders of a corporation sued defendants, directors, officers, banks and institutional investors of and in the corporation, and asserted claims for violation of § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934, Rule 14a-9 thereunder, and § 20(a) (*15 U.S.C.S. § 78t(a)*) of the Act. The directors, the officers, the banks, and the investors filed motions to dismiss.

### Overview

The class representative failed to plead the requisite level of scienter regarding the purported omission in the 2003 proxy because while the consolidate second amended complaint detailed behavior that the class representative attempted to characterize as fraudulent, merely painting a picture of fraud was insufficient under the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C. § 78u-4* and *Fed. R. Civ. P. 9(b)*. Due to the class representative's failure to plead scienter for fraud, the class representative could not benefit from the two year/ five year limitations period of *28 U.S.C.S. § 1658(b)*, and thus, the claim under § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 based on the 2003 proxy statement was time-barred. Absent a more concrete pleading, there was no information by which the court could have considered, nor the banks could have defended, the allegations of subjective falsity. As such,

the banks' motions to dismiss were granted with respect to the claims against them for violation of § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934, and Rule 14a-9 thereunder.

### Outcome

The motions to dismiss were granted as to the claims for violation of *15 U.S.C.S. § 78n(a)* based on the 2003 proxy statement, and as to the claims against the banks for violation of *15 U.S.C.S. § 78n(a)* based on the 2005 proxy statements. The motions to dismiss were granted with respect to the claims for control person liability against two of the directors. The unjust enrichment claim was dismissed with prejudice.

## LexisNexis® Headnotes

Securities Law > ... > Recordkeeping & Reporting Requirements > Issuers of Securities > Accounting & Audit Oversight

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

***HN1*** Under the Sarbanes-Oxley Act of 2002, *28 U.S.C.S. § 1658(b)*, a claim under § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 sounding in fraud may be entitled to an extended statute of limitations period of the earlier of two years from discovery or five years from the violation. However, any complaint pleading fraud must also meet the requirements of *Fed. R. Civ. P. 9(b)* as well as the general requirements of particularity and the specific state of mind requirements of the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4*. Pursuant to the PSLRA, a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. The complaint must also 'state with

2008 U.S. Dist. LEXIS 108904, *108904

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

Mergers & Acquisitions Law > Takeovers & Tender Offers > General Overview

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

*HN2* In order to plead a violation of § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder, a plaintiff must allege that the statement contains either: (1) a false or misleading declaration of material fact; or (2) an omission of material fact that makes any portion of the statement misleading. An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. In addition, a § 14(a), Rule 14a-9 plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction.

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

*HN3* Merely painting a picture of fraud is insufficient under the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4* and *Fed. R. Civ. P. 9(b)*.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

*HN4* To state a claim for violations of violations of § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder, a plaintiff must allege that the statement contained a false or misleading statement or omission of material fact, made with at least negligence, that was an essential link in accomplishing the transaction.

Securities Law > ... > Express Liabilities > Misleading Statements > General Overview

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

*HN5* The plain language of the Private Securities Litigation Reform Act (PSLRA), *15 U.S.C.S. § 78u-4* seems to demand a heightened pleading standard for claims under § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 even in the context of negligence. Moreover, by its plain language the PSLRA applies in any private action arising under the Securities Exchange Act of 1934 and

alleging that a defendant made an untrue statement of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading. *15 U.S.C.S. § 78u-4(b)(1)*. Thus, to meet the requirements of the PSLRA, a pleading must specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.

Securities Law > ... > Express Liabilities > Misleading Statements > Elements of Proof

*HN6* In order to state a claim under § 14(a) (*15 U.S.C.S. § 78n(a)*) of the Securities Exchange Act of 1934 and Rule 14a-9 thereunder, a plaintiff must plead both subjective and objective falsity regarding the claim against the defendants.

Securities Law > ... > Express Liabilities > Misleading Statements > Elements of Proof

Securities Law > ... > Implied Private Rights of Action > Elements of Proof > Causation

Securities Law > Postoffering & Secondary Distributions > Securities Exchange Act of 1934 Actions > Heightened Pleading Requirements

*HN7* A plaintiff must plead with specificity any alleged material misstatements or omissions in a proxy statement. The plaintiff also has the burden of proving that the act or omission of the defendant alleged to violate *15 U.S.C.S. § 78n(a)* caused the loss for which the plaintiff seeks to recover damages. *15 U.S.C.S. § 78u-4(b)(4)*.

Securities Law > ... > Implied Private Rights of Action > Elements of Proof > Causation

Securities Law > ... > Implied Private Rights of Action > Elements of Proof > Connection Requirement

*HN8* Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.

Securities Law > ... > Secondary Liability > Controlling Persons > Elements of Proof

*HN9* Section 20(a) (*15 U.S.C.S. § 78t(a)*) of the Securities and Exchange Act of 1934 provides that every person who, directly or indirectly, controls any person liable under any provision of *15 U.S.C.S. § 78a et seq.*, or of any rule or

2008 U.S. Dist. LEXIS 108904, *108904

regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

> Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > General Overview

*HN10* State law violations for breach of fiduciary duty and for aiding and abetting a breach of fiduciary duty are governed by Delaware law. *Cal. Corp. Code § 2116*.

> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

*HN11* Under Delaware law, the effect of untainted stockholder approval of a merger is to invoke the protection of the business judgment rule and to insulate the merger from all attacks other than on the ground of waste.

> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN12* In a sale or change of control transaction it is the actions of the board, rather than the allegations in a complaint, that are subject to enhanced judicial scrutiny.

> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview

> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

> Securities Law > ... > Secondary Liability > Aiding & Abetting > Elements of Proof

*HN13* In order to state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must plead: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; and (3) knowing participation in that breach; and (4) damages. Knowing participation, though it need not be pleaded with particularity, must be reasonably inferred from the facts alleged in the complaint. It is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation.

> Civil Procedure > ... > Pleadings > Complaints > Requirements for Complaint

> Securities Law > Civil Liability Considerations > Remedies > Equitable Relief

*HN14* Under Delaware law, a claim of unjust enrichment requires: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and impoverishment; (4) the absence of justification; and (5) the absence of a remedy provided by law. The claim of unjust enrichment need only meet the minimal requirements of *Fed. R. Civ. P. 8(a)*.

**Counsel:** **[*1]** For Jim Brown, individually and on behalf of all others similarly situated, Plaintiff: Christy W Goodman, Molly Roff-Sheridan, LEAD ATTORNEYS, Goodman Sheridan and Roff, San Diego, CA; Darren J Robbins, LEAD ATTORNEY, Coughlin Stoia Geller Rudman and Robbins LLP, San Diego, CA; David T Wissbroecker, Randall J Baron, Stephen J Oddo, LEAD ATTORNEYS, Lerach Coughlin Stoia Geller Rudman and Robbins, San Diego, CA; Ramzi Abadou, LEAD ATTORNEY, Coughlin stoia Geller Rudman and Robbins, San Diego, CA; Michael D Torpey, Orrick Herrington and Sutcliffe, San Francisco, CA.

For Brett C Brewer, Daniel L Mosher, Lawrence Moreau, Christopher S Lipp, Richard Rosenblatt, James Quandt, William Woodward, Defendants: Bety Javidzad, Richard Lee Stone, LEAD ATTORNEYS, Hogan and Hartson LLP, Los Angeles, CA; Elizabeth A Moriarty, LEAD ATTORNEY, Hogan and Hartson, Los Angeles, CA; James N Kramer, Stephen M Knaster, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA; Julie A Shepard, LEAD ATTORNEY, Hogan & Hartson, Los Angeles, CA; Pamela S Palmer LEAD ATTORNEY, Latham & Watkins LLP, Costa Mesa, CA; Rebecca M Couto, LEAD ATTORNEY, Latham and Watkins LLP, Los Angeles, CA.

For Jeffrey Scott Edell, **[*2]** Bradley G Ward, Defendants: Richard Lee Stone, LEAD ATTORNEYS, Hogan and Hartson LLP, Los Angeles, CA; Elizabeth A Moriarty, LEAD ATTORNEY, Hogan and Hartson, Los Angeles, CA; James N Kramer, Stephen M Knaster, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA; Julie A Shepard, LEAD ATTORNEY, Hogan & Hartson, Los Angeles, CA; Pamela S Palmer, LEAD ATTORNEY, Latham & Watkins LLP, Costa Mesa, CA; Rebecca M Couto, LEAD ATTORNEY, Latham and Watkins LLP, Los Angeles, CA.

For David S Carlick, Andrew Sheehan, Vantagepoint Venture Partners, Defendants: Erin Bansal, Teodora Manolova, Michael D Torpey, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA; James N Kramer, Stephen M Knaster, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA; Julie A Shepard, LEAD ATTORNEY, Hogan & Hartson, Los Angeles, CA; Pamela S Palmer, LEAD ATTORNEY, Latham & Watkins LLP,

2008 U.S. Dist. LEXIS 108904, *4

Costa Mesa, CA; Richard Lee Stone, LEAD ATTORNEYS, Hogan and Hartson LLP, Los Angeles, CA.

For Montgomery & Co LLC, Thomas Weisel Partners Group Inc, Thomas Weisel Partners LLC, Defendants: Elizabeth A Moriarty, LEAD ATTORNEY, Hogan and Hartson, Los Angeles, CA; James N Kramer, Stephen M Knaster, **[*3]** LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA; Julie A Shepard, LEAD ATTORNEY, Hogan & Hartson, Los Angeles, CA; Pamela S Palmer, LEAD ATTORNEY, Latham & Watkins LLP, Costa Mesa, CA; Richard Lee Stone, LEAD ATTORNEYS, Hogan and Hartson LLP, Los Angeles, CA.

For VP Alpha Holdings IV LLC, Vantagepoint Venture Partners IV LP, Vantagepoint Venture Partners IV Principals Fund LP, Consol Defendants: James N Kramer, Michael D Torpey, Stephen M Knaster, Teodora Manolova, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA.

VantagePoint Venture, ThirdParty Defendant, Pro se.

For VantagePoint Venture, ThirdParty Defendant: James N Kramer, Stephen M Knaster, LEAD ATTORNEYS, Orrick Herrington and Sutcliffe, San Francisco, CA.

**Judges:** The Honorable GEORGE H. KING, U. S. DISTRICT JUDGE.

**Opinion by:** GEORGE H. KING

# Opinion

**CIVIL MINUTES - GENERAL**

**Proceedings: (In Chambers) Order Re: Defendants' Motions to Dismiss**

This matter is before the Court on Defendants' Motions to Dismiss (the "Motions") [1] Plaintiff's Consolidated Second Amended Complaint ("CSAC"). Plaintiff Jim Brown is the purported representative of a class of common stockholders of Intermix Media, Inc., formerly known as eUniverse, Inc.

**[*4]** ("Intermix"), [2] and acquired by News Corporation ("News Corp.") in 2005. Defendants are directors, officers, banks and institutional investors of and in Intermix from periods prior to its acquisition by News Corp. We have considered the papers filed in support of and in opposition to these Motions, and deem this matter appropriate for resolution without oral argument. *L.R. 7-15.* As the parties are familiar with the facts, we will not restate them except as necessary.

## I. Count One

In December 2003, Intermix filed a Proxy statement (the "2003 Proxy") with the SEC and disseminated it to shareholders in connection with a shareholder vote to be held in 2004. The vote was for elections to the Board of Directors and to obtain approval of the terms **[*5]** of an investment in Intermix by Defendant VantagePoint Venture Partners ("VantagePoint"), a venture capital firm. Count One of the CSAC alleges violations of Section 14(a) of the Securities Exchange Act of 1934, *15 U.S.C. § 78n(a),* and *Rule 14a-9,* promulgated thereunder, in connection with the filing and dissemination of the 2003 Proxy. Count One is alleged against Defendants Brett C. Brewer, Daniel L. Mosher, Lawrence Moreau, Jeffrey Scott Edell ("Edell"), Bradley G. Ward ("Ward"), David S. Carlick ("Carlick"), Andrew Sheehan ("Sheehan"), Christopher S. Lipp (collectively, the "2003 Individual Defendants") and VantagePoint.

In our January 17, 2008 Order Re: Defendants' Motion to Dismiss (the "1/17 Order"), we dismissed Count One of the CFAC as barred by the statute of limitations in light of Plaintiff's admission that he was alleging only negligence. In the 1/17 Order, we held that the applicable statute of limitations for a 14(a) claim is typically the lesser of one year from discovery or three years from the violation. Plaintiff conceded in briefing on Defendants' Motion to Dismiss the CFAC that his claim under Count One is not

---

[1]   The Motions include Defendants' Motion to Dismiss Counts One and Six of the CSAC, Defendants' Motion to Dismiss Count Two of the CSAC, as well as, with respect to Counts Three, Four, and Five, Defendants' former Motion to Dismiss the Consolidated First Amended Complaint ("CFAC").

[2]   For the sake of simplicity, all references in this order will be to Intermix, although the name change from eUniverse to Intermix occurred during the events discussed herein.

2008 U.S. Dist. LEXIS 108904, *5

timely under a 1/3 limitations period. [3] However, the [*6] 1/17 Order granted Plaintiff leave to amend. We instructed Plaintiff that, *HN1* under the Sarbanes-Oxley Act of 2002, a 14(a) claim sounding in fraud may be entitled to an extended statute of limitations period of the earlier of two years from discovery or five years from the violation. *28 U.S.C. § 1658(b).* [4] However, as we further instructed, any complaint pleading fraud must also meet the requirements of *Fed. R. Civ. P. 9(b)* as well as the general requirements of particularity and the specific state of mind requirements of the Private Securities Litigation Reform Act ("PSLRA"), *15 U.S.C. § 78u-4*. "Pursuant to the PSLRA, a complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. The complaint must also 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Ronconi v. Larkin, 253 F.3d 423, 429 (9th Cir. 2001)* (quotations omitted).

*HN2* In order to plead a violation of 14(a) and *Rule 14a-9*, Plaintiff must allege that the 2003 Proxy "contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." *Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000).* "An omitted fact is material [*8] if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976).* "In addition, a Section 14(a), *Rule 14a-9* plaintiff must demonstrate that the misstatement or omission was made with the requisite level of culpability and that it was an essential link in the accomplishment of the proposed transaction." *Desaigoudar, 223 F.3d at 1022* (citing *TSC Industries, 426 U.S. at 444* & n.7).

The alleged fraudulent omission of material fact in the 2003 Proxy lies in its purported failure to explain that the transaction with VantagePoint would force Intermix to forfeit tax credits from Net Operating Losses ("NOLs"). Plaintiff alleges that "[t]he 2003 Proxy was false and misleading in that it failed to disclose that the VantagePoint Transactions, if approved, would virtually eliminate the Company's ability to use over $ 60 million worth of Intermix's valuable federal and state NOLs." (CSAC PP 65, 74(h).) The 2003 Proxy allegedly omitted that, by accepting the VantagePoint financing, Intermix would sacrifice "over 90%" of federal NOLs and "almost 75%" of state NOLs. (CSAC P 65.)

As [*9] Defendants argue, based on the SEC filings on which Plaintiff purports to base this allegation, the CSAC appears to misstate the level of the loss of NOLs. In a 10-Q filed on February 14, 2005, Intermix disclosed that roughly $ 40 million in NOLs subject to annual limitations, and $ 7.7 million in NOLs not subject to annual limitation, were still available after the financing. (Defendants' Request for Judicial Notice, [5] Ex. 10 at 372-373.) However, as this 10-Q was issued long after the 2003 Proxy, it is clear this information was not part of the "total mix" of information available to investors considering the 2003 Proxy. *See In re Stac Electronics Securities Litigation, 89 F.3d 1399, 1408 (9th Cir. 1996)* (citing *Basic, Inc. v. Levinson, 485 U.S. 224, 231, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)).* Further, at the pleading stage, we conclude that a dispute over the degree of this purported omission is insufficient to render such omission immaterial as a matter of law. A reasonable shareholder may have considered even a smaller loss of NOLs to be "important in deciding how to vote."

However, Plaintiff fails to plead the requisite level of scienter regarding the purported omission in the 2003 Proxy. [*10] While the CSAC details behavior that Plaintiff attempts to characterize as fraudulent, *HN3* merely painting a picture of fraud is insufficient under the PSLRA and *Rule 9(b),* as we stated in the 1/17 Order. Plaintiff fails to state with particularity facts giving rise to a strong inference that the alleged omission regarding the loss of NOLs was more than negligent. Plaintiff makes a number of allegations in

---

[3]   Plaintiff conceded that he was on notice of [*7] the allegedly false and misleading statements in the 2003 Proxy by no later than February 14, 2005. (October 11, 2007, J.Br. 8:19-22.) This suit was filed on June 14, 2006, at least sixteen months after Plaintiff had actual notice of the claim in Count One.

[4]   There is no binding authority on this issue, and although several courts have concluded that Sarbanes-Oxley does not apply to a 14(a) claim, we are not persuaded by the reasoning of such decisions. The Ninth Circuit has held that a 14(a) claim may sound in fraud. *See Desaigoudar v. Meyercord,* 223 F.3d 1020, 1022-23 (9th Cir. 2000). By its plain language, *§ 1658(b)* applies to "a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance . . . ." We need not decide the issue here, however, as we hold that Plaintiff has failed to state a claim for fraud.

[5]   Hereinafter, "RJN."

2008 U.S. Dist. LEXIS 108904, *10

the CSAC purporting to show fraud. (*See* CSAC P 74.) The bulk of these allegations involve a fight for board control and the purportedly "manipulative" conduct of Defendants in approving certain prior VantagePoint financing over other options allegedly more favorable to shareholders. (*Id.*) However, the pleading does not state, nor even suggest, any relation between this allegedly fraudulent conduct and the purported omission of the loss of NOLs from the 2003 Proxy. We conclude, based on the facts pled, that it is no more than speculative that Defendants were aware of the purported omission of the NOLs, or the impact of the VantagePoint transactions on Intermix's NOLs at the time of the 2003 Proxy. The facts pled simply do not give rise to a "strong inference" that the Defendants acted  **[*11]** with the required state of mind. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 2504-05, 168 L. Ed. 2d 179 (2007)*. As such, Plaintiff has failed to plead scienter to the required level of specificity.

In light of our conclusion regarding the inadequacy of Plaintiff's pleading of scienter, we need not decide whether the CSAC adequately pleads the other requisite elements of Count One. Due to this failure to plead scienter for fraud, Plaintiff cannot benefit from the 2/5 limitations period of *28 U.S.C. § 1658(b)*. Count One is thus time-barred, and Defendants' Motions are **GRANTED** as to Count One.

## II. Count Two

Count Two alleges violations of § 14(a) and *Rule 14a-9* in connection with a Proxy statement filed by Intermix in August 2005 (the "2005 Proxy"). It was filed with the SEC and disseminated to shareholders in connection with a shareholder vote to consider approval of the sale of Intermix to News Corp. Unlike Count One, Defendants do not argue that Count Two is untimely, but rather that the CSAC fails to state a claim. Thus, the elements enumerated above for Count One are also applicable to Count Two, with the exception that Plaintiff is not required to plead fraud to meet the statute  **[*12]** of limitations. *HN4* To state a claim, Plaintiff must therefore allege that the 2005 Proxy contained a false or misleading statement or omission of material fact, made with at least negligence, that was an essential link in accomplishing the News Corp. transaction. *See Desaigoudar, 223 F.3d at 1022*.

As we reasoned in the 1/17 Order, *HN5* the plain language of the PSLRA seems to demand a heightened pleading standard for 14(a) claims even in the context of negligence. As we stated in that Order, at least one court in this circuit has held that heightened pleading standards apply to claims of negligence under 14(a). *See In re McKesson HBOC, Inc.*

*Securities Litigation, 126 F.Supp.2d 1248, 1266-67 (N.D.Cal. 2000)*. Moreover, by its plain language the PSLRA applies "in any private action" arising under the '34 Act and alleging that a defendant "made an untrue statement of material fact" or "omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading." *15 U.S.C. § 78u-4(b)(1)*. Thus, to meet the requirements of the PSLRA, a pleading must specify "each statement alleged to have been misleading" and "the reason or  **[*13]** reasons why the statement is misleading." *Id.*

### A. Montgomery and Weisel

Defendants Thomas Weisel Partners Group, Inc., Thomas Weisel Partners LLC (collectively, "Weisel"), and Montgomery & Co., LLC ("Montgomery," and collectively, with Weisel, the "Investment Banks") allegedly issued false and misleading fairness opinions in connection with News Corp.'s acquisition of Intermix. (CSAC P 172.) These fairness opinions were included with the 2005 Proxy, and stated that the transaction with News Corp. was fair from a financial point of view. (*Id.*)

*HN6* In order to state a claim, Plaintiff must plead both subjective and objective falsity regarding the claim against the Investment Banks. *McKesson, 126 F.Supp.2d at 1265* (citing *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991)* and *Freedman v. Value Health, Inc., 958 F.Supp. 745 (D.Conn. 1997))*. Plaintiff does not dispute this requirement, but rather argues that the CSAC adequately pleads both subjective and objective falsity. We conclude, however, that the CSAC fails to plead subjective falsity with the requisite particularity. Despite the instructions in our 1/17 Order, the CSAC relies solely on conclusory allegations, such as that, "the  **[*14]** Investment Banks were aware that the merger price was not a fair price based on the non-public MySpace financial information and projections and other information they had in their possession at the time of the issuance of their opinion." (CSAC P 159.) Such allegations offer an inadequate showing of subjective falsity, even at the pleading stage. Plaintiff argues that the subjective falsity requirement does not require a pleading of more than negligence. However, even were we to ignore the questionable epistemology of "negligent subjective falsity," Plaintiff would still be required to plead "factual specificity regarding the 'neutral circumstances' of the alleged misstatement (the 'who, what, where, when, and how')." *McKesson, 126 F.Supp.2d at 1266*. As to the Investment Banks, the CSAC fails to make sufficient, concrete allegations regarding even the "neutral circumstances" of subjective falsity.

Absent a more concrete pleading, there is no information by which we can consider, nor the Investment Banks can defend, the allegations of subjective falsity. As such, Defendants' Motions are **GRANTED** on Count Two with respect to the Investment Banks.

**B.    VantagePoint    and    the    2005    Individual  [\*15] Defendants**

As to the remaining Defendants under Count Two, however, Plaintiff has followed our instructions in the 1/17 Order, and has adequately stated a claim against such Defendants. These Defendants include Brett C. Brewer, Daniel L. Mosher, Lawrence Moreau, Christopher S. Lipp, James Quandt, William Woodward, Richard Rosenblatt, Carlick, Sheehan, (collectively, the "2005 Individual Defendants"), and VantagePoint.

Unlike the claim against the Investment Banks, Plaintiff is not required to plead both subjective and objective falsity in stating a claim against VantagePoint and the 2005 Individual Defendants. However, *HN7* Plaintiff still must plead with specificity any alleged material misstatements or omissions in the 2005 Proxy. Plaintiff also has "the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." *15 U.S.C. § 78u-4(b)(4)*.

The CSAC specifies five alleged omissions or misstatements in the 2005 Proxy. First, the 2005 Proxy allegedly failed to disclose the current revenues and profits of MySpace, purportedly Intermix's "crown jewel" asset. (CSAC PP 130-33.) Second, the 2005 Proxy [\*16] allegedly failed to disclose internal management projections forecasting the growth of Intermix and MySpace from 2005 through 2009. (CSAC PP 134-42.) Third, the 2005 Proxy allegedly failed to disclose/misrepresent Defendants' outstanding liability in derivative lawsuits, and the effect of the deal with News Corp. on such liability. (CSAC PP 142-45.) Fourth, the 2005 Proxy allegedly misrepresented the extent of Viacom's interest in acquiring Intermix, and Defendants' efforts to

foreclose any competing bid. (CSAC PP 146-48.) Fifth, and finally, the 2005 Proxy allegedly misrepresented the nature of the "MySpace option," [6] and the ability of some of the Defendants to preclude any exercise of such option in a manner potentially harmful to Intermix. (CSAC PP 149-51.)

Regarding the first three alleged omissions, at the pleading stage [7] we [\*17] cannot conclude that such omissions are immaterial as a matter of law. Viewed in the light most favorable to Plaintiff, a reasonable shareholder may have considered the allegedly omitted information important in deciding how to vote. Individually, each of these specific allegations presents a close call. Together, we find that these alleged omissions adequately plead material omissions from the 2005 Proxy.

The [\*18] first of these allegations regards the failure of the 2005 Proxy to include specific financial information showing the rapid growth of MySpace. Defendants argue that such allegations are unnecessary, in that the 2005 Proxy incorporated by reference Intermix's 10-Q for the quarter ending June 30, 2005, which disclosed the growth of Intermix (RJN, Ex. 36 at 886-87). However, the omission of financial data concerning MySpace was more significant than the "detailed breakdown of the company's region by region or month by month sales," that the Ninth Circuit suggested, in dicta, would be immaterial in *Brody v. Transitional Hospitals Corp., 280 F.3d 997, 1006 n.8 (9th Cir. 2002)*. Rather, we find the omission of such data to be more closely analogous to the improper omission of data concerning a "crown jewel" asset considered in *Lockspeiser v. Western Maryland Co., 768 F.2d 558 (4th Cir. 1985)*. There is a reasonable likelihood that a reasonable shareholder would have considered such specific financial information regarding a critical asset important in deciding how to vote. As such, we conclude that these allegations adequately plead a material omission from the 2005 Proxy.

The allegations [\*19] concerning the failure of the 2005 Proxy to disclose internal management projections for 2005-2009 also adequately plead a material omission. The

---

[6]    Intermix had previously sold a minority stake in MySpace, and the "MySpace option" purportedly allowed Intermix to repurchase that minority stake if certain conditions--foremost, a legitimate offer for Intermix--were met, though also purportedly foreclosing such repurchase if other conditions--foremost, a legitimate offer for MySpace--were met instead.

[7]    In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, we must accept the allegations of fact in the complaint as true and construe them in the light most favorable to the Plaintiff. *Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)*. "[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)* (internal quotation marks omitted). Claims should be dismissed only when there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir. 1990)*.

2008 U.S. Dist. LEXIS 108904, *19

existence of such projections is mentioned within the 2005 Proxy. (RJN, Ex. 35 at 770.) However, the details of these projections are not disclosed. As the Ninth Circuit has stated, "investors are concerned, perhaps above all else, with the future cash flows of the companies in which they invest. Surely, the average investor's interest would be piqued by a company's internal projections . . . ." *United States v. Smith, 155 F.3d 1051, 1064 n.20 (9th Cir. 1998)*.

We also conclude that Plaintiff's allegations concerning the derivative suit adequately plead a misleading omission. We dismissed one such derivative suit, *LeBoyer v. Greenspan, et al., No. CV 03-5603-GHK (JTLx), 2007 U.S. Dist. LEXIS 98909*, for lack of standing in a May 22, 2007 Order. Our dismissal relied upon the fact that plaintiff LeBoyer no longer held Intermix stock subsequent to the consummation of the merger with News Corp. As dismissal was not merely a remote possibility, we are unwilling to conclude that Defendants here were unable to include more detailed information about the likely effect of the News [*20] Corp. merger on such derivative suits. As such, we conclude that the purported omissions of details from the 2005 Proxy concerning the derivative suits were not immaterial as a matter of law. [8]

Defendants also argue that Plaintiff has failed to plead causation. However, *HN8* "[w]here there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if . . . he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970)*. Contrary to Defendants' arguments, there is no suggestion that the causation standard in *Mills* was abrogated by the Supreme Court's [*21] decision in *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, a *§ 10(b)* case. In *Dura*, the plaintiff purchased stock on a public securities market and alleged that misrepresentations by the company had inflated the price of the shares on the date of purchase, thereby amounting to "loss causation." *See id. at 338-39*. As many factors can influence the price paid for a security on the open market, the Court held that it was insufficient for a plaintiff to show merely that a misstatement "touches upon" a loss. *Id. at 342-43*. Unlike in the 10(b) context, however, where the market sets the price a plaintiff pays or receives

for securities, here the price paid to Plaintiff was established by the merger terms. The 2005 Proxy was essential to the approval of those terms. As such, it would be improper to read *Dura* as having changed the causation standard for a 14(a) claim established in *Mills*. Plaintiff here has adequately pled that the 2005 Proxy was an essential link in the approval of the Intermix merger with News Corp. Shareholder approval was required for consummation of that transaction. As such, we conclude that the CSAC adequately pleads causation.

In light of these findings [*22] and conclusions, Defendants' Motions are **DENIED** as to Count Two with respect to VantagePoint and the 2005 Individual Defendants.

### III. Count Three

Count Three alleges violations of § 20(a) of the '34 Act, *15 U.S.C. § 78t(a)*, for "control person" liability. Count Three is alleged against VantagePoint, the 2003 Individual Defendants, and the 2005 Individual Defendants. Defendants Edell and Ward are the only Defendants alleged to have served on the Intermix board at the time of the dissemination of the 2003 Proxy, but not the 2005 Proxy, and so the only 2003 Individual Defendants not also among the 2005 Individual Defendants. As such, Count Three pertains to Edell and Ward solely in connection with the actions alleged in Count One. In respect to the other Defendants named in Count Three, the actions in connection with the 2005 Proxy alleged in Count Two are also relevant.

*HN9* Section 20(a) provides that "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, [*23] unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." *15 U.S.C. § 78t(a)*. Defendants challenge Count Three on the sole basis that Plaintiff has failed to plead any underlying violation of the securities laws. Because we have dismissed Count One, there is no underlying violation as to Defendants Edell and Ward, and so Defendants' Motions are **GRANTED** as to Edell and Ward on Count Three. However, as we hold that Plaintiff has adequately pled a violation of § 14(a) in Count Two, Defendants' Motions are **DENIED** as to the remaining Defendants in Count Three.

---

[8]   In light of our findings and conclusions on Plaintiff's allegations concerning the value of My Space, the internal management projections, and the derivative suits, we need not consider the remaining allegations of the CSAC concerning the purported interest from Viacom and the MySpace option. We intimate no opinion as to the merits of these latter allegations at this time.

2008 U.S. Dist. LEXIS 108904, *23

## IV. Counts Four and Five

Counts Four and Five of the CSAC allege state law violations for breach of fiduciary duty and for aiding and abetting a breach of fiduciary duty in connection with the sale of Intermix to News Corp. Count Four, for breach of fiduciary duty, is alleged against the 2005 Individual Defendants. Count Five, for aiding and abetting, is alleged against VantagePoint. **HN10** These claims are governed by Delaware law. *Cal. Corp. Code § 2116*. **HN11** Under Delaware law, "the effect of untainted stockholder approval of [a] Merger is to invoke **[*24]** the protection of the business judgment rule and to insulate the Merger from all attacks other than on the ground of waste." *Harbor Finance Partners v. Huizenga, 751 A.2d 879, 890 (Del. Ch. 1999)*. However, in light of our conclusion that Count Two is adequately pled, we cannot find untainted stockholder approval of the merger here.

Defendants argue that Count Four fails to state a claim even absent shareholder approval. [9] However, Defendants' argument begins with a misunderstanding of the applicable law. Specifically, they argue that, in the sale of a company, "[t]he court engages in 'enhanced scrutiny' in the *allegations* to determine if the directors' conduct in the sale was 'within the range of reasonableness' and, if so, the business judgment rule applies, ending further scrutiny." (October 11, 2007, J.Br. 50:9-12; emphasis added.) **HN12** In a sale or change of control transaction it is the actions of the board, rather than the allegations in a complaint, that are subject to enhanced judicial scrutiny. *See Paramount Communications Inc. v. QVC Network Inc., 637 A.2d 34, 45 (Del. 1994)*. As Count Four is not subject to heightened pleading requirements, but need only meet the requirements of **[*25]** *Rule 8(a)*, we conclude that the CSAC adequately states a claim for breach of fiduciary duty in Count Four. [10] Defendants' Motions are therefore **DENIED** with respect to Count Four. [11]

Regarding Count Five, **HN13** in order to state a claim for aiding and abetting a breach of fiduciary duty, Plaintiff must **[*26]** plead: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) knowing participation in that breach . . . [and (4)] damages." *In re Lukens Inc. Shareholders Litigation, 757 A.2d 720, 734 (Del.Ch. 1999)*. Defendants argue that Plaintiff fails to plead knowing participation by VantagePoint in the alleged breach of fiduciary duty. "Knowing participation, though it need not be pleaded with particularity, must be reasonably inferred from the facts alleged in the complaint." *Id. at 734-35*. However, the CSAC includes numerous allegations against Carlick and Sheehan, purported managing directors of VantagePoint. "It is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation." *Teachers' Retirement System of Louisiana v. Aidinoff, 900 A.2d 654, 671 n.23 (Del.Ch. 2006)*. VantagePoint is therefore fairly charged with the knowledge of Carlick and Sheehan. As such, Defendants' Motions are **DENIED** with respect to Count Five.

## V. Count Six

The final Count of the CSAC alleges that Defendants Carlick and Sheehan, members of the Intermix board as well as the principals of Defendant VantagePoint, were unjustly enriched **[*27]** as a result of numerous benefits they secured from the events described in the CSAC. **HN14** Under Delaware law, a claim of unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law." *Cantor Fitzgerald, L.P. v. Cantor, 724 A.2d 571, 585 (Del.Ch. 1998)*. The claim of unjust enrichment need only meet the minimal requirements of *Fed. R. Civ. P. 8(a)*. The purported enrichment is the premium paid by News Corp. for Intermix preferred shares, while the purported impoverishment is the lower price paid for Intermix common shares held by Plaintiff. Defendants primarily argue that Count Six fails to allege a relation between the purported enrichment and impoverishment. As Defendants argue, however, the CSAC alleges that News Corp. offered $ 12 per share for common shares on July 12, 2005 (CSAC P 96), and then later, on July 17, 2005, agreed to the premium paid for preferred shares (CSAC P 104). These allegations, on

---

[9]   Defendants do not re-brief this issue with respect to the CSAC, and instead rely on and incorporate by reference their arguments for the dismissal of Counts Four and Five from the CFAC. Defendants followed the same approach with respect to Count Three. However, although Defendants expressed a willingness to re-brief these issues in their Motions, we reject this piecemeal approach, and decline to order re-briefing.

[10]   Plaintiff alleges that the omissions from the 2005 Proxy were made in bad faith, and further alleges numerous acts of intentional misconduct and violations of the duty of loyalty. As such, at this stage Defendants are not shielded by the exculpatory provision in the Intermix certificate of incorporation. *See 8 Del. C. § 102(b)(7)*.

[11]   Because we conclude that Count Four is adequate on other grounds, we intimate no opinion as to the legitimacy of the deal protection devices at this time.

their face, undermine any inference of a relation between the purported enrichment and impoverishment. Construed in the light most favorable  [*28] to Plaintiff, we might otherwise infer that $ 580 million offer from News Corp. was a firm cap, with Carlick and Sheehan dividing that pool to the benefit of the preferred shareholders, and thus to the detriment of Plaintiff and other common shareholders. However, the above allegations in the CSAC specifically undermine such an inference. Such allegations state that the prices paid for common and preferred shares were arrived at independently, and that any purported enrichment related to the preferred shares was agreed to only after the common share price was set. Hence, at least the third element of an unjust enrichment claim has not been adequately pled. As such, Plaintiff has failed to plead a claim for unjust enrichment as to Defendants Carlick and Sheehan. The Motions are therefore **GRANTED** with respect to Count Six.

### VI. Conclusion

The Motions are **GRANTED** in part, and **DENIED** in part. As we have afforded Plaintiff sufficient opportunities to amend, and as we find and conclude that Count One is barred by the statute of limitations, Count One of the CSAC is **DISMISSED,** with prejudice. With respect to Defendants Edell and Ward, as Count Three of the CSAC rests on the dismissed allegations  [*29] of Count One, Count Three is **DISMISSED,** with prejudice, as to Edell and Ward. With respect to the Investment Banks, Count Two of the CSAC is also **DISMISSED,** with prejudice. Count Six of the CSAC is inadequate on its face, and thus is also **DISMISSED,** with prejudice. Defendants' Motions are **DENIED** in all other respects. The remaining Defendants shall answer the remaining counts of the CSAC **WITHIN TWENTY (20) DAYS HEREOF.**

**IT IS SO ORDERED.**

\_\_:\_\_

Initials of Preparer AB for Bea

*17 CFR 240.14a-9*

This document is current through the August 5, 2015 issue of the Federal Register

*Code of Federal Regulations* > *TITLE 17 -- COMMODITY AND SECURITIES EXCHANGES* > *CHAPTER II -- SECURITIES AND EXCHANGE COMMISSION* > *PART 240 -- GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934* > *SUBPART A -- RULES AND REGULATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934* > *REGULATION 14A: SOLICITATIONS OF PROXIES*

## § 240.14a-9 False or misleading statements.

**(a)** No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

**(b)** The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

**(c)** No nominee, nominating shareholder or nominating shareholder group, or any member thereof, shall cause to be included in a registrant's proxy materials, either pursuant to the Federal proxy rules, an applicable state or foreign law provision, or a registrant's governing documents as they relate to including shareholder nominees for director in a registrant's proxy materials, include in a notice on Schedule 14N (§ 240.14n-101), or include in any other related communication, any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to a solicitation for the same meeting or subject matter which has become false or misleading.

NOTE: The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.

> **a.** Predictions as to specific future market values.

> **b.** Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

> **c.** Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

> **d.** Claims made prior to a meeting regarding the results of a solicitation.

⚠️  Caution

As of: August 11, 2015 4:49 PM EDT

## *In re Netsmart Techs., Inc. S'holders Litig.*

Court of Chancery of Delaware, New Castle

March 6, 2007, Submitted ; March 14, 2007, Decided

C.A. No. 2563-VCS

**Reporter**

924 A.2d 171; 2007 Del. Ch. LEXIS 35

IN RE NETSMART TECHNOLOGIES, INC. SHAREHOLDERS LITIGATION

**Disposition:** The court granted the motion for a preliminary injunction against the procession of the merger vote until the corporation's board disclosed more complete and accurate information about the board's decision to rule out exploring the market for strategic buyers and about the company's future expected cash flows. Otherwise, the motion was denied.

## Case Summary

**Procedural Posture**

Plaintiff stockholders filed a petition against defendants, the corporation, the officers of the corporation, the directors of the corporation, and two private equity firms, for a preliminary injunction against the consummation of a merger between the corporation and the private equity firms.

**Overview**

The corporation entered into a merger agreement with two private equity firms. The stockholders argued that the agreement flowed from a poorly-motivated and tactically-flawed sale process during which the corporation's board made no attempt to generate interest from strategic buyers. The stockholders also made allegations of misleading and incomplete disclosures. The court found that the stockholders established that the corporation's board likely did not have a reasonable basis for failing to undertake any exploration of interest by strategic buyers. The stockholders also established a probability that the proxy was materially incomplete because it failed to disclose the projections the financial advisor used to perform the discounted cash flow valuation supporting its fairness opinion. The merits showing of the stockholders, however, did not justify the entry of broad injunctive relief. Thus, the corporation's stockholders could decide for themselves whether to accept or reject the

merger, and, as to dissenters, whether to take the next step of seeking appraisal. However, the corporation could be required to disclose more complete and accurate information before the merger vote.

**Outcome**

The court granted the motion for a preliminary injunction against the procession of the merger vote until the corporation's board disclosed more complete and accurate information about the board's decision to rule out exploring the market for strategic buyers and about the company's future expected cash flows. Otherwise, the motion was denied.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN1* To warrant injunctive relief, the plaintiffs must prove that: (1) they are likely to succeed on the merits of their claims; (2) they will suffer imminent, irreparable harm if an injunction is not granted; and (3) the balance of the equities weighs in favor of issuing the injunction.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN2* Having decided to sell a company for cash, the company's board assumes the fiduciary duty to undertake reasonable efforts to secure the highest price realistically achievable given the market for the company. This duty -- often called a Revlon duty for the case with which it is most commonly associated -- does not, of course, require every board to follow a judicially prescribed checklist of sales activities. Rather, the duty requires the board to act reasonably, by undertaking a logically sound process to get the best deal that is realistically attainable. The mere fact that a board did not, for example, do a canvass of all possible acquirers before signing up an acquisition agreement

924 A.2d 171, *171; 2007 Del. Ch. LEXIS 35, **35

does not mean that it necessarily acted unreasonably. Delaware case law recognizes that there are a variety of sales approaches that might be reasonable, given the circumstances facing particular corporations.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN3** The corporate directors' role remains an active one, changed only in the respect that they are charged with the duty of selling a company at the highest price attainable for the stockholders' benefit. In the sale of control context, the directors must focus on one primary objective--to secure the transaction offering the best value reasonably available for the stockholders--and they must exercise their fiduciary duties to further that end.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN4** There is no single blueprint that a corporate board must follow to fulfill its duties.

Governments > Courts > Authority to Adjudicate

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN5** A court applying enhanced judicial scrutiny should be deciding whether corporate directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN6** What is important and different about the Revlon standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the Revlon standard contemplates a judicial examination of the reasonableness of the board's decisionmaking process. Although linguistically not obvious, this reasonableness review is more searching than rationality review, and there is less tolerance for slack by the directors. Although the directors have a choice of means, they do not comply with their Revlon duties unless they undertake reasonable steps to get the best deal.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN7** Independent directors need to be active when addressing leverage buyout transactions involving powerful economic incentives for management that might conflict with the interests of public stockholders.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN8** Corporate boards should use the negotiating power they possess to extract a higher value for their shareholders in transaction talks.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN9** When directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market. The corollary to this is clear: when they do not possess reliable evidence of the market value of the entity as a whole, the lack of an active sales effort is strongly suggestive of a Revlon breach.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN10** The reasonableness of a board's decisions in the merger and acquisition context turns on the circumstances. Not being cabined by a long set: of per se rules, boards have great flexibility to address the particular circumstances they confront. But equitable principles, including the heightened reasonableness standard in Revlon, ensure that this broad discretion is not abused.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN11** Directors of Delaware corporations must disclose fully and fairly all material information within the board's control when they seek shareholder action. An omitted fact is only material if there is a substantial likelihood that it would be considered important in a reasonable shareholder's deliberation and decision making process before casting his or her vote. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. To this end, disclosures must provide a balanced, truthful, and materially complete account of all matters they address.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

924 A.2d 171, *171; 2007 Del. Ch. LEXIS 35, **35

*HN12* Corporate disclosures are required to provide a balanced, truthful account of all matters. When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts.

Business & Corporate Law > ... > Meetings & Voting > Voting Shares > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

*HN13* When stockholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance. This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

*HN14* Delaware law has refused to deem projections material unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment. Speculation is not an appropriate subject for a proxy disclosure.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN15* In Delaware's jurisprudence, the Court of Chancery of Delaware has given credence to the notion that managers have meaningful insight into their firms' futures that the market does not. Likewise, weight has been given to the fairness-enforcing utility of investment banker opinions.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN16* Once a board broaches a topic in its disclosures, a duty attaches to provide information that is materially complete and unbiased by the omission of material facts. For this reason, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Only providing some of that information is insufficient to fulfill the duty of providing a fair summary of the substantive work performed

by the investment bankers upon whose advice the recommendations of the board as to how to vote rely.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN17* When directors communicate with their company's shareholders, completeness, not adequacy, is the mandate.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN18* So long as what an investment banker did is fairly disclosed, there is no obligation to disclose what the investment banker did not do.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN19* Under Delaware law, there is no obligation on the part of a corporate board to disclose information that simply does not exist.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN20* Directors are not deemed to lose their independence merely because they move in the same social circles or hold seats on the same corporate boards.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN21* Federal regulations and exchange rules address disclosure of relationships between directors in a detailed manner that balances the costs of disclosing all past relationships against the need to give stockholders information about some prior relationships that, while not rendering directors non-independent of each other, are important enough to warrant disclosure. Those bodies of authority should not be lightly added to by Delaware law.

Business & Corporate Law > ... > Directors & Officers > Terms in Office > Elections

*HN22* With respect to matters involving the election of directors, § 229.401(e)(2) of SEC Reg. S-K requires disclosure only of other current directorships held by each director or person nominated or chosen to become a director. SEC Reg. § 229.407 requires registrants to identify directors meeting exchange rule independence standards and to describe the basis on which the director was determined to be independent.

924 A.2d 171, *171; 2007 Del. Ch. LEXIS 35, **35

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

Mergers & Acquisitions Law > Mergers > Rights of Dissenting Shareholders

**HN23** Although not without dissonance, the Court of Chancery of Delaware's jurisprudence has tended to reject the notion that stockholders do not face a threat of irreparable injury when a board seems to have breached its Revlon duties or failed to disclose material facts in advance of a merger vote.

Business & Corporate Law > ... > Meetings & Voting > Voting Shares > General Overview

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

**HN24** Delaware corporate law strives to give effect to business decisions approved by properly motivated directors and by informed, disinterested stockholders. By this means, the law seeks to balance the interest in promoting fair treatment of stockholders and the utility of avoiding judicial inquiries into the wisdom of business decisions. Thus, doctrines like ratification and acquiescence operate to keep the judiciary from second-guessing transactions when disinterested stockholders have had a fair opportunity to protect themselves by voting no. Because this feature of the law is so centrally important, the Chancery Court of Delaware has typically found a threat of irreparable injury to exist when it appears stockholders may make an important voting decision on inadequate disclosures. By issuing an injunction requiring additional disclosure, the court gives stockholders the choice to think for themselves on full information, thereby vindicating their rights as stockholders to make important voting and remedial decisions based on their own economic self-interest. By this approach, the court also ensures that greater effect can be given to the resulting vote down the line, reducing future litigation costs and transactional and liability uncertainty.

Business & Corporate Law > ... > Meetings & Voting > Voting Shares > General Overview

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

**HN25** The threat of an uninformed stockholder vote constitutes irreparable harm. Irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information. It is appropriate for a court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.

Business & Corporate Law > ... > Meetings & Voting > Voting Shares > General Overview

Civil Procedure > Remedies > Injunctions > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

**HN26** An injunctive remedy specifically vindicates the stockholder right to receive fair disclosure of the material facts necessary to cast a fully informed vote in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

**HN27** In the Revlon context, the issue of full disclosure intersects with the broader remedial question. In cases where the refusal to grant an injunction presents the possibility that a higher, pending, rival offer might go away forever, Delaware courts have found a possibility of irreparable harm. In other cases when a potential Revlon violation has occurred but no rival bid is on the table, the denial of injunctive relief is often premised on the imprudence of having the court enjoin the only deal on the table, when the stockholders can make that decision for themselves. The difference in these contexts is not really about the irreparability of the harm threatened to the target stockholders as a theoretical matter, it is really about the different cost-benefit calculus arising from throwing the injunction flag. When another higher bid has been made, an injunction against the target board's chosen deal has the effect of ensuring a fair auction in which the highest bidder will prevail, at comparatively little risk to target stockholders. Indeed, in most circumstances, this means that the chances

924 A.2d 171, *171; 2007 Del. Ch. LEXIS 35, **35

for a later damages proceeding are greatly minimized given the competition between rival bidders.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

HN28 Where the opportunity for shareholders to receive a superior control premium would be irrevocably lost if injunctive relief were not granted, that alone would be sufficient to constitute irreparable harm.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Governments > Courts > Authority to Adjudicate

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Mergers > Rights of Dissenting Shareholders

HN29 When the Chancery Court of Delaware is asked to enjoin a transaction and another higher-priced alternative is not immediately available, it has been appropriately modest about playing games with other people's money. But even in that context, the court has not hesitated to use its injunctive powers to address disclosure deficiencies. When stockholders are about to make a decision based on materially misleading or incomplete information, a decision not to issue an injunction maximizes the potential that the crudest of judicial tools (an appraisal or damages award) will be employed down the line, because the stockholders' chance to engage in self-help on the front end would have been vitiated and lost forever.

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

HN30 When corporate directors describe their decisionmaking process leading up to a merger, they must do so in a fair and balanced way.

Counsel: [**1] Pamela S. Tikellis, Esquire, A. Zachary Naylor, Esquire, CHIMICLES & TIKELLIS, LLP, Wilmington, Delaware; Joseph A. Rosenthal, Esquire, Carmella P. Keener, Esquire, Jessica Zeldin, Esquire, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Delaware Liaison Counsel for Plaintiffs.

Richard B. Brualdi, Esquire, THE BRUALDI LAW FIRM, New York, New York; Robert P. Frutkin, Esquire, THE LAW OFFICES BERNARD M. GROSS, P.C., Philadelphia, Pennsylvania, Attorneys for Plaintiff.

Chet B. Waldman, Esquire, WOLF POPPER LLP, New York, New York; Eduard Korsinsky, Esquire, ZIMMERMAN, LEVI & KORSINSKY, LLP, New York, New York, Members of Plaintiffs' Executive Committee.

Kurt M. Heyman, Esquire, PROCTOR HEYMAN LLP, Wilmington, Delaware; Edward F. Cox, Esquire, Kenneth J. King, Esquire, Emily Goldberg, Esquire, PATTERSON BELKNAP WEBB & TYLER, LLP, New York, New York, Attorneys for Defendants Francis J. Calcagno, John S. T. Gallagher, Yacov Shamash and Joseph G. Sicinski.

Anne C. Foster, Esquire, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Peter A. Mahler, [**2] Esquire, FARRELL FRITZ, P.C., New York, New York, Attorneys for Defendants Netsmart Technologies, Inc., James L. Conway, Gerald O. Koop, John F. Phillips, Kevin Scalia and Alan B. Tillinghast.

Kenneth J. Nachbar, Esquire, MORRIS NICHOLS ARSHT & TUNNELL, LLP, Wilmington, Delaware; William J. Sushon, Esquire, Aaron Weiss, Esquire, O'MELVENY & MYERS, LLP, New York, New York, Attorneys for Defendants NT Acquisition, Inc., NT Merger Sub, Inc., NT Investor Holdings, Inc., Bessemer Venture Partners LP and Insight Venture Partners LP.

**Judges:** STRINE, Vice Chancellor.

**Opinion by:** STRINE

## Opinion

**STRINE, Vice Chancellor.**

I. Introduction

[*175] This case literally involves a microcosm of a current dynamic in the mergers and acquisitions market. Netsmart Technologies, Inc. has entered into a "Merger Agreement" with two private equity firms, Insight Venture Partners ("Insight") and Bessemer Venture Partners ("Bessemer"). If the $ 115 million "Insight Merger" (or "Merger") is consummated, Netsmart's stockholders will receive $ 16.50 per share and the buyers will take the micro-cap company, whose shares are currently listed on the NASDAQ, private.

924 A.2d 171, *175; 2007 Del. Ch. LEXIS 35, **2

Netsmart is a leading supplier of enterprise software [**3] to behavioral health and human services organizations and has a particularly strong presence among mental health and substance abuse service providers. It has been consistently profitable for several years and has effectively consolidated its niche within the healthcare information technology market. In October 2005, Netsmart completed a multi-year course of acquisitions by purchasing its largest direct competitor, CMHC Systems, Inc. ("CMHC"). After that acquisition was announced, private equity buyers made overtures to Netsmart management. These overtures were favorably received and management soon recommended, in May 2006, that the Netsmart board consider a sale to a private equity firm. Relying on the failure of sporadic, isolated contacts with strategic buyers stretched out over the course of more than a half-decade to yield interest from a strategic buyer, management, with help from its long-standing financial advisor, William Blair & Co., L.L.C., steered the board away from any active search for a strategic buyer. Instead, they encouraged the board to focus on a rapid auction process involving a discrete set of possible private equity buyers. Only after this basic strategy was [**4] already adopted was a "Special Committee" of independent directors formed in July 2006 to protect the interests of the company's non-management stockholders. After the Committee's formation, it continued to collaborate closely with Netsmart's management, allowing the company's Chief Executive Officer to participate in its meetings and retaining William Blair as its own financial advisor.

After a process during which the Special Committee and William Blair sought to stimulate interest on the part of seven private equity buyers, and generated competitive bids from only four, the Special Committee ultimately recommended, and the entire Netsmart board approved, the Merger Agreement with Insight. As in most private equity deals, Netsmart's current executive team will continue to manage the company and will share in an option pool designed to encourage them to increase the value placed on the company in the Merger.

The Merger Agreement prohibits the Netsmart board from shopping the company but does permit the board to consider a superior proposal. A topping bidder would only have to suffer the consequence of paying Insight a 3% termination fee. No topping bidder has emerged to date and [**5] a stockholder vote is scheduled to be held next month, on April 5, 2007.

A group of shareholder plaintiffs now seeks a preliminary injunction against the consummation of this Merger. As a

matter of substance, the plaintiffs argue that the Merger Agreement flowed from a poorly-motivated and tactically-flawed sale process during which the Netsmart board [*176] made no attempt to generate interest from strategic buyers. The motive for this narrow search, the plaintiffs say, is that Netsmart's management only wanted to do a deal involving their continuation as corporate officers and their retention of an equity stake in the company going forward, not one in which a strategic buyer would acquire Netsmart and possibly oust the incumbent management team. The plaintiffs also insinuate that Netsmart's Chief Executive Officer, James L. Conway, was beguiled by the riches being received by CEOs of larger companies in private equity deals and sought to emulate their success. At the end of a narrowly-channeled search, the Netsmart directors, the plaintiffs say, landed a deal that was unimpressive, ranking at the low end of William Blair's valuation estimates.

The plaintiffs couple their substantive claims [**6] with allegations of misleading and incomplete disclosures. In particular, the plaintiffs argue that the Proxy Statement (the "Proxy"), which the defendants have distributed to shareholders in advance of their vote next month, omits important information regarding Netsmart's prospects if it were to remain independent. In the context of a cash-out transaction, the plaintiffs argue that the stockholders are entitled to the best estimates of the company's future stand-alone performance and that the Proxy omits them.

The defendant directors respond by arguing that they acted well within the bounds of the discretion afforded them by Delaware case law to decide on the means by which to pursue the highest value for the company's stockholders. They claim to have reasonably sifted through the available options and pursued a course that balanced the benefits of a discrete market canvass involving only a select group of private equity buyers (e.g., greater confidentiality and the ability to move quickly in a frothy market) against the risks (e.g., missing out on bids from other buyers). In order to stimulate price competition, the Special Committee encouraged submissions of interest from the [**7] solicited bidders with the promise that only bidders who made attractive bids would get to move on in the process. At each turning point during the negotiations with potential suitors, the Special Committee pursued the bidder or bidders willing to pay the highest price for the Netsmart equity. In the end, the directors argue, the board secured a deal with Insight that yielded a full $ 1.50 more per share than the next highest bidder was willing to pay.

Moreover, in order to facilitate an implicit, post-signing market check, the defendants say that they negotiated for

924 A.2d 171, *176; 2007 Del. Ch. LEXIS 35, **7

relatively lax deal protections. Those measures included a break-up fee of only 3%, a "window shop" provision that allowed the board to entertain unsolicited bids by other firms, and a "fiduciary out" clause that allowed the board to ultimately recommend against pursuing the Insight Merger if a materially better offer surfaced. The directors argue that the failure of a more lucrative bid to emerge since the Merger's announcement over three months ago confirms that they obtained the best value available. Furthermore, the directors note that, unlike certain other private equity acquisitions, the Insight Merger is not one [**8] in which the selling company's CEO came out with a huge monetary win. Conway did all right for himself but not in any way that suggests that he received a windfall or had any particular reason to favor Insight over the other private equity bidders.

Lastly, the defendants note that most of the plaintiffs' disclosure claims are makeweight. As to the one they concede has the most color -- which goes to the question [*177] of whether the Proxy discloses all the material information about management's estimates of Netsmart's future cash flows -- the defendants claim to have gone as far as is required to disclose what reliable estimates existed.

In this opinion, I conclude that the plaintiffs have established a reasonable probability of success on two issues. First, the plaintiffs have established that the Netsmart board likely did not have a reasonable basis for failing to undertake *any* exploration of interest by strategic buyers. The record, as it currently stands, manifests no reasonable, factual basis for the board's conclusion that strategic buyers *in 2006* would not have been interested in Netsmart as it existed *at that time.* Likewise, the board's rote assumption (encouraged [**9] by its advisors) that an implicit, post-signing market check would stimulate a hostile bid by a strategic buyer for Netsmart -- a micro-cap company -- in the same manner it has worked to attract topping bids in large-cap strategic deals appears, for reasons I detail, to have little basis in an actual consideration of the M&A market dynamics relevant to the situation Netsmart faced. Relatedly, the Proxy's description of the board's deliberations regarding whether to seek out strategic buyers that emerges from this record is itself flawed.

Second, the plaintiffs have also established a probability that the Proxy is materially incomplete because it fails to disclose the projections William Blair used to perform the discounted cash flow valuation supporting its fairness opinion. This omission is important because Netsmart's

stockholders are being asked to accept a one-time payment of cash and forsake any future interest in the firm. If the Merger is approved, dissenters will also face the related option of seeking appraisal. A reasonable stockholder deciding how to make these important choices would find it material to know what the best estimate was of the company's expected future cash [**10] flows.

The plaintiffs' merits showing, however, does not justify the entry of broad injunctive relief. Because there is no other higher bid pending, the entry of an injunction against the Insight Merger until the Netsmart board shops the company more fully would hazard Insight walking away or lowering its price. The modest termination fee in the Merger Agreement is not triggered simply on a naked no vote, and, in any event, has not been shown to be in any way coercive or preclusive. Thus, Netsmart's stockholders can decide for themselves whether to accept or reject the Insight Merger, and, as to dissenters, whether to take the next step of seeking appraisal. In so deciding, however, they should have more complete and accurate information about the board's decision to rule out exploring the market for strategic buyers and about the company's future expected cash flows. Thus, I will enjoin the procession of the Merger vote until Netsmart discloses information on those subjects.

II. Factual Background

A. Netsmart's Business As Of The Start Of 2006

Netsmart is the leader in the behavioral healthcare information technology market. It provides enterprise software solutions to [**11] health and human services organizations, public health agencies, mental health and substance abuse clinics, psychiatric hospitals, and managed care organizations. Since its formation in 1992, Netsmart has accumulated over 1,300 customers, including over 30 state agencies, and has become the nation's largest supplier of automated computerized methadone dispensing systems, serving more than 400 of the 1,100 methadone clinics in the United States. [*178] Over the years, Netsmart grew primarily by consolidating other firms in its niche market, and in October 2005, capped off its strategy by acquiring its largest direct competitor, CMHC. By the close of 2005, the company was riding a tide of 30 consecutive quarters of consistent profitability, and, by any metric, was doing well. [1]

[**12] At the start of 2006, Netsmart was secure in its role as the largest player within its market niche. No other

---

[1]   Netsmart continued to build on its strong performance in 2005 by inking the largest contract in its history in early 2006 -- a $ 19.8 million account with the state of North Carolina. *See* Second Amended Consolidated Complaint ("Complaint"), Ex. A at 1.

924 A.2d 171, *178; 2007 Del. Ch. LEXIS 35, **12

behavioral healthcare company possessed the financial wherewithal to acquire it. [2] Netsmart's client base included agencies in a majority of the states; its software was dominant among the nation's methadone clinics; and, most importantly, switching costs for those using its software were high. Likewise, the limited size of the behavioral healthcare software market also discouraged other large players from encroaching onto Netsmart's turf.

Netsmart's management team had been in place for some time. In particular, Netsmart had stability in the top spot, as its CEO Conway had served in that position since the 1990s. Each of the other top executives saw themselves as potential successors to Conway, who was facing some serious health issues but desired to continue, yet each continued deferred to his authority. Among these top managers were [**13] Anthony Grisanti (Chief Financial Officer), Alan Tillinghast (Chief Technology Officer and Executive Vice President for Operations), and Kevin Scalia (Executive Vice President for Corporate Development). Netsmart's board of directors until December 2006 consisted of Conway, two former executives -- Gerald O. Koop (former President) and John F. Phillips (former Vice President) -- and four independent directors. The independent directors were Francis Calcagno (a managing director at the investment banking firm of Dominick & Dominick, L.L.C.), John S.T. Gallagher (CEO of Stony Brook University), Yacov Shamash (Vice President for Economic Development and Dean of the College of Engineering and Applied Sciences at Stony Brook University), and Joseph Sicinski (founder and chairman of the human resource firm, BDS Strategic Solutions, Inc.). [3]

[**14] Although Netsmart's directors and manager could take some pride in the operational successes the company had enjoyed, they also faced challenges presented by Netsmart's unique position as both a relatively small firm and yet the largest company in its niche market. On December 31, 2005, Netsmart had 6,487,943 outstanding shares and its stock closed at $ 12.61 per share, resulting in a market value of its equity of approximately $ 81.8 million. [4] This micro-cap size and relatively thin float prevented many institutional investors from staking large positions in the company and dissuaded all but one research analyst from covering the company's stock. That exception might prove the rule. [5] Additionally, from what one can [*179] discern, Netsmart was negatively affected by the stratification of the American healthcare system, which appears to regard mental health and substance abuse services as tangential, rather than integral, to the core of healthcare. This caused business problems for Netsmart because the advantage the company obtained insofar as it could deliver software and related support services that met its clients' precise needs was accompanied by a corresponding difficulty in growing [**15] substantially beyond that space or attracting the interest of larger players in the broader healthcare IT market, who served providers of, for want of a better term, physical health services (think hospitals, e.g.).

B. Netsmart's Prior Explorations Of Strategic Combinations

The issues presented by Netsmart's size and market were not new ones in 2006. Although the CMHC acquisition at the end of 2005 materially enlarged the company, Netsmart's management had pondered [**16] the prospect of outgrowing its market for some time and considered what could be done to address that concern. In order to better understand the reaction of the Netsmart directors to the private equity attention the company received in 2006, it is therefore helpful to review the company's previous experience in investigating strategic combinations and sales.

Over the years, one option Conway considered to address the narrowness of Netsmart's market niche was finding a larger healthcare IT software firm to acquire Netsmart and add its software to their larger array of products and services. Conway first pursued that line of inquiry in the late 1990s. Beginning then and continuing with isolated contacts throughout the early 21st century, Conway engaged in very sporadic discussions with larger corporations that provided enterprise software solutions in the health services sector, including GE Medical Systems, Electronic Data Systems Corporation, and Perot Systems Corporation (all in the late 1990s) as well as Quality Systems, Inc. (2001), Cerner Corp. and Siemens Corp. (2003), and QuadraMed Corp.

---

[2]   See Deposition of James L. Conway ("Conway Dep.") at 92.

[3]   In December 2006, after the Merger was adopted, Scalia and Tillinghast replaced Koop and Phillips on the board, but at all relevant times, the board was controlled by a majority of independent directors.

[4]   See Affidavit of Kenneth J. King, Esq. ("King Aff."), Ex. 5 at 41 & F-5 (Netsmart Technologies, Inc., Form 10-K (2005)).

[5]   Griffin Securities ("Griffin"), the lone firm covering Netsmart, "acted as a placement agent for the Company's private placement of equity and received cash compensation and warrants for such investment banking services" and "expects to receive, or intends to seek, compensation for investment banking services from the Company" in the future. See Affidavit of A. Zachary Naylor ("Naylor Aff."), Ex. I at 19.

924 A.2d 171, *179; 2007 Del. Ch. LEXIS 35, **16

(2005). [6] According to Conway, he signaled in these discussions an interest on Netsmart's [**17] part in a strategic alliance, a signal that given Netsmart's tiny size relative to the companies Conway approached could only be rationally perceived as a green light for an acquisition proposal. Conway says that none of these occasional, informal discussions resulted in an expression of interest, stating that the problem was that Netsmart's market niche was simply too small on a stand-alone basis to make Netsmart an attractive acquisition target for a larger software provider in the health services sector.

In November 2003, Netsmart engaged William Blair as its investment banker in connection with its desire to acquire CMHC, a desire that was not satisfied until October 2005. As [**18] part of its engagement of William Blair in 2003, Netsmart entered into an arrangement whereby Blair would have the right to a fee if Netsmart were eventually sold. That fee [*180] was set at 1.7% of the value of any sale of Netsmart. [7] This did not mean that William Blair was authorized to market Netsmart as if its board had decided to sell the company; rather, it simply gave Blair a right to compensation if the board later went down that road.

From late 2003 through 2005, William Blair dropped Netsmart's name when it made cold calls on corporations in the healthcare industry in which it specialized. As is typical of investment bankers, the Blair regularly trolled for business. According to Karl A. Palasz, the Blair partner who eventually ran the sales process leading to the Insight Merger, Netsmart was among a list of companies that William Blair [**19] mentioned in cold calls, a list that largely involved companies Blair did not represent. [8] In these cold calls, Blair did not say it represented Netsmart or that it was authorized to discuss a specific transaction. [9] Rather, one senses that it was just trying to take the temperature of prospective clients

and see whether there were common interests among healthcare companies with whom it had contact that could lead to a fee-paying deal. William Blair says that the hook it baited with Netsmart did not attract a hit, suggesting, like Conway, that Netsmart's market niche did not appeal to the bigger healthcare software fish. Therefore, instead of being acquired, Netsmart made several acquisitions during the first half-decade of the new century, culminating in the purchase of CMHC.

C. Netsmart Management Decides It Wants To Ride The Private Equity Wave

The announcement of the CMHC acquisition in October 2005 caught the attention of some [**20] players in the capital-flush private equity sector. After that announcement, Vista Equity Partners ("Vista") approached William Blair and expressed a preliminary interest in acquiring Netsmart. [10] Upon learning of Vista's interest, William Blair told Conway, but Conway did not immediately inform the Netsmart board of this contact, an omission he now attributes to Vista's lack of seriousness and specificity. [11]

Then, on Valentine's Day 2006, Francisco Partners ("Francisco"), another private equity firm that, like Vista, specialized in investments in technology businesses, approached Kevin Scalia, Netsmart's Executive Vice President, to see whether Netsmart fancied being taken in friendly conquest. [12] This initial wooing was followed by a March 24, 2006 meeting between [**21] Vista and a group of Netsmart's key managers, including Conway. His interest piqued, Conway claims to have promptly informed the board of this expression of interest. [13]

Thereafter, Conway and certain of his key advisors began chewing over options with William Blair. Their talks soon

---

[6] As no specific dates for these sporadic contacts were presented, I estimate these occurrence based on the vague recollections contained in the relevant depositions, which use broad strokes and relative dates to sketch these historical events. See Conway Dep. at 96-115; Deposition of Francis J. Calcagno ("Calcagno Dep.") at 31.

[7] Calcagno Dep. at 45. William Blair was also entitled to $ 400,000 if it was selected to, and ultimately did, prepare a fairness opinion with regard to such a sale. Id.

[8] Deposition of Karl A. Palasz ("Palasz Dep.") at 57-60.

[9] Id.

[10] Vista is identified as "PE-1" in the Proxy. King Aff., Ex. 4 ("Proxy") at 15; accord Palasz Dep. at 36 (confirming that "the approach was made sometime in the fourth quarter of '05 with respect to Vista").

[11] Conway Dep. at 78.

[12] Francisco is identified as "PE-2" in the Proxy. Proxy at 15; accord Conway Dep. at 84; Palasz Dep. at 40-41.

[13] Conway Dep. at 87.

924 A.2d 171, *180; 2007 Del. Ch. LEXIS 35, **21

centered on the emerging deal structure of [*181] the year: a going private transaction led by a private equity buyer. Armed with active expressions of interest on that front, Conway asked Scalia to prepare a presentation for the Netsmart board outlining various strategic options available to Netsmart -- including a going private transaction.

On May 11, 2006, the Netsmart board met and Scalia presented the options he developed. Among these options were the following: (1) continuing to build as a public company; (2) finding and selling the company to a strategic buyer; or (3) taking the company [**22] private by selling to a financial buyer. [14]

To help the board assess these options, Scalia outlined his estimate of Netsmart's expected revenues and profits under its existing business plans. His "Stay the Course" projections served as a base case model illustrating his assessment of organic growth and the challenges Netsmart faced as a small public company. [15] [**23] Those challenges included the quarter-to-quarter pressures and compliance costs of public filings, the dependence on but lack of coverage by research analysts, and the necessity of acquiring new managerial talent in light of Netsmart's increased size. [16] As a public company, Scalia implied that Netsmart would be constrained to offer the incentives necessary to attract good candidates. [17]

Scalia also presented two scenarios involving a sale. The first slide focused on the possibility of a strategic acquisition. It was brief and to the point, stating: "A strategic sale is a good alternative but we did try it once before and there was no interest so a reasonable approach would be to run a parallel track with private equity." [18]

Scalia's slide on the sale to a private equity buyer was more fulsome. The potential benefits of this alternative that he presented included: the ability to "operate [Netsmart's] business on a longer term rather than a quarterly basis," a chance to "add strength to the management team," "add industry and technical talent to the organization" and "increase [Netsmart's] effectiveness in product development," an opportunity to "address the issues of data sharing and interoperability without the short term impact [**24] issues," and the prospect of "eliminat[ing] public company costs at the rate of $ 1M to $ 1.5M per year." [19] Further, Scalia conveyed that this route could bear fruit, noting that "initial indications [of interest] are pretty good" and citing Vista, Francisco and two other private equity groups in support of that proposition. [20]

Interestingly, another version of this same slide contained another bullet adding "Second bite at the apple" to the list of benefits in a private equity deal. [21] This reference obviously refers to the potential for management to not only profit from [*182] the sale of its equity (including exercised options) in the going private transaction itself, but from future stock appreciation through options they were likely to be granted by a private equity buyer, a class of buyers that typically uses such incentives to motivate managers to increase equity value.

[**25] In summary, Scalia estimated that the company could be taken private by a private equity buyer in 2007 for a value that was attractive in a net present value comparison to the option of remaining independent. [22] To give him his due, Scalia also clearly illustrated that Netsmart had options for generating revenue and profit growth in the long-term that were also attractive. But the directional force of management's desires was manifest. In fact, minutes from a

---

[14]   Naylor Aff., Ex. 2 at NET 00003.

[15]   *Id.* at NET 00004, Net 00008 & NET 00009. In addition to his base case scenario, Scalia also illustrated a scenario whereby Netsmart could accelerate its growth while remaining independent, through a more aggressive acquisition strategy. *See id* at NET 00012 (presenting the "Accelerate the Course" model). But this strategy involved serious execution risk and uncertainty. *Id.* at NET 00013.

[16]   *Id.* at NET 00004.

[17]   *Id.*

[18]   *Id.* at NET 00005.

[19]   *Id.* at NET 00006.

[20]   *Id.*

[21]   *Id.* at NET 00054.

[22]   *Id.* at NET 00018 (projecting a private equity value for a 2007 transaction of over $ 163 million in comparison to $ 156 million for a strategic sale and between $ 116 million and $ 130 million for remaining independent).

924 A.2d 171, *182; 2007 Del. Ch. LEXIS 35, **25

meeting held later that day by the independent directors of Netsmart focus largely on the option of going private. [23]

[**26] After the meetings on May 11, management's focus on the going private option intensified. Over the following week, Scalia was working full bore with William Blair as it prepared its own assessment of these options. [24] Once that report was complete, a so-called "informal" board meeting was held on May 19. From there, things get fuzzy.

At that meeting, which was dubbed "informal" because no minutes were taken memorializing its contents, [25] William Blair reiterated many of the concerns about Netsmart's then-existing market position previously discussed by Scalia. [26] [**28] From those premises, the William Blair slides recommended [**27] that Netsmart explore both a "going private transaction" and a "strategic sale." [27] Along with this advice, Blair provided the board with a large volume of valuation metrics to get a sense of what value Netsmart might capture in a sale. It also provided the board with five-year projections drawn (through 2011) based on Scalia's earlier management model containing figures through 2010. [28]

Consistent with its slides indicating that Netsmart should explore a sale, William [*183] Blair dumped omnibus lists of possible financial and strategic buyers on the board, which apparently consisted of all the buyers William Blair could conceive of as having an interest or involvement in healthcare. For example, William Blair included HCA Inc., a huge hospital chain that was in the midst of going private itself, as a potential strategic acquirer. The reason why a hospital chain would buy a business providing software solutions to a large variety of mental health and substance abuse providers was not explained. More logically, the presentation also included a list of strategic players involved in the business of helping healthcare providers manage information through software and related technology. [29]

The most [**29] important aspect of the May 19 meeting, though, was the result of these various presentations and recommendations. The Proxy says that during this meeting an important strategic decision and a related tactical choice of similar import were both made. The strategic decision was to authorize William Blair to try to sell the company. The tactical choice was to focus on a sale to a private equity buyer and to eschew an active canvass of any strategic buyers. The Proxy describes these decisions and their rationale as follows:

> On May 19, 2006, representatives of William Blair attended an informal meeting of the board of directors and made a general presentation regarding various strategic and financial alternatives for the Company. . . . It was concluded that William Blair should continue the exploration of a potential going-private transaction, given the Company's size and operating characteristics, as well as the relative advantages and disadvantages of continuing to operate as a public company. . . . In examining the potential for a transaction with strategic acquirers, it was determined that the potential strategic acquirers in similar segments would either believe that the [**30] Company's specific market segment was too narrow or have insufficient scale and resources to enable them to acquire a company of Netsmart's size. Furthermore, the board of directors and management

---

[23]   During that meeting, Conway informed the independent directors that he and William Blair believed there to be serious interest by private equity players, and "a lengthy discussion ensued." Letter from Kurt M. Heyman, Esq. to the court (Mar. 7, 2007) ("Heyman Letter"), Ex. B at NET 02226.

[24]   He was likely doing so before the May 11 meeting. The William Blair presentation on May 19 clearly includes elements, including projections of financial performance, taken from Scalia's work. *Compare* Naylor Aff., Ex. 2 at NET 00009 (projecting annual revenues of $ 60,478, $ 69,549, $ 79,982, $ 89,579, $ 100,329 for 2006 through 2010) *with* King Aff., Ex. 2 at SCYS 000544 (same).

[25]   *See* Heyman Letter at 1 ("Minutes of the May 19, 2006 meeting do not exist, because, as explained in the Proxy, this was an 'informal meeting of the board of directors' at which William Blair 'made a general presentation regarding various strategic and financial alternatives for the Company.'") (citing King Aff., Ex. 4 at 15).

[26]   King Aff., Ex. 2 at SCYS 000535 & SCYS 000536. Blair's concerns included difficulty garnering the attention of investors and analysts, disproportional reporting and public company compliance costs that were material in relation to Netsmart's bottom line, and issues associated with Netsmart's strategy of "increasingly pursuing larger contracts with longer sales cycle[s]," which creates "lumpy revenue" and makes predicting financial results more difficult and renders year-over-year comparisons largely unhelpful. *Id.*

[27]   *Id.* at SCYS 000536.

[28]   *See* King Aff., Ex. 2 at SCYS 0005454.

[29]   King Aff., Ex. 2 at SCYS 000561.

924 A.2d 171, *183; 2007 Del. Ch. LEXIS 35, **30

considered the fact that Netsmart directly competes with these companies and ultimately made the determination that the risks involved in such an approach (including the risk of confidentiality leaks that would be detrimental to the Company in its sales efforts with customers and prospects) outweighed the benefits, especially given its previous preliminary discussions which did not result in material interest from potential strategic acquirers. [30]

Frankly, there is no credible evidence in the record that buttresses this recollection of events. Due to the importance of this disclosure and its doubtful accuracy in light of the entire record, I address it in parts.

First, entirely absent from the record is any serious "examin[ation of] the potential for a transaction with strategic acquirers. [**31] " [31] Netsmart's board never seriously considered whether the company, as it existed in May 2006, might potentially fit under the corporate umbrella of a larger healthcare enterprise software provider. The William Blair slides are replete with examples of firms in related industries that could have been approached, and Palasz admitted that William Blair believed, going into that meeting, that a transaction strategic [*184] buyers should at least be explored. [32] But, there is no indication that management, William Blair, or the board considered how Netsmart's acquisition of its largest competitor, CMHC, and its concomitant attainment of dominance in its market niche might influence the ardor that any of these strategic buyers might feel. The supposed important decision -- not reflected in any minutes or resolution -- to forsake approaching these buyers appears to have only been justified by reference to the sporadic pitches to strategic players Conway and William Blair made over the prior decade. The relevance of these contacts will be discussed again shortly. For now, what is

critical is that they do not reliably indicate that material interest from potential strategic acquirers did not exist [**32] because no contemporary search was conducted and these prior search attempts occurred when Netsmart was a very different (smaller and less consistently profitable) entity then it was in 2006.

Second, there is little, if anything, to support the assertion in the Proxy that Netsmart's ability to sell its products would be hindered by discreet and professional overtures to select strategic players. Given Netsmart's size, any rational customer would recognize that it and other of its competitors could be subject to acquisition. Unlike another situation with which the court is familiar, [33] [**34] the record contains no information from which one could conclude [**33] that the potential acquisition of Netsmart by a larger healthcare IT company posed any colorable threat to prospective customers of Netsmart. [34] Further, given the lack of any record of the use of confidentiality agreements during the scattershot approaches made by Conway and Blair over the years, Netsmart's claim that overtures to much larger strategic buyers in 2006 would scare off customers creates cognitive dissonance. Those prior contacts were made when Netsmart was smaller and less secure in its market niche -- that is, when it would seem to have had more to fear in terms of sales erosion from sending a signal that it was up for sale. Yet, despite those alleged contacts, Netsmart continued to make sales and gain new customers, which now face high switching costs should they consider abandoning Netsmart. [35]

Put bluntly, the informal and haphazard market canvass Netsmart's board relied on was insufficient, and it is hard to glean from the record any convincing reason why a discreet, targeted, and controlled marketing effort directed towards select strategic buyers posed a threat to Netsmart's ongoing

---

[30] Proxy at 15.

[31] Id.

[32] See Palasz Dep. at 20 (indicating that as of May 19, William Blair did not "have any preference for one type of transaction over the other"); see also King Aff., Ex. 2 at SCYS 000536 (stating in William Blair's May 19 presentation that "Netsmart should at least explore . . . [a] strategic sale" in addition to a "going-private transaction").

[33] I refer to the long struggle of Oracle to acquire PeopleSoft. In that case, PeopleSoft amassed a substantial amount of credible evidence showing that it faced great difficulty in making new sales of its enterprise while under the threat of a takeover by one of its few remaining direct competitors in its market space.

[34] To the contrary, the record indicates that Netsmart faced little danger of losing existing customers simply by shopping the company. See Calcagno Dep. at 174-75 (explaining that "there are barriers of entry for competitors to come into the business" such as "contracts with municipalities and proprietary software products" creating "high switching costs").

[35] Id. (describing how the costs associated with switching from Netsmart's products to a competitor's offerings would be "a deterrent" to dropping Netsmart).

924 A.2d 171, *184; 2007 Del. Ch. LEXIS 35, **33

operations. The Proxy implies that the absence of evidence of this **[*185]** kind is irrelevant because there was no rational reason to believe that a search for a strategic buyer had any hope of success. But the foundation upon which that conclusion rests cannot bear that weight.

From **[**35]** there, the record gets even more diffuse. The defendants claim that the Proxy implicitly refers to two sets of prior contacts with strategic buyers, one set involving Conway and the other involving William Blair. These were the same contacts identified earlier, the quality and quantity of which require additional mention given the importance the defendants place upon them.

Conway's alleged exploration of a strategic combination spans, according to him, at least the seven-year period from 1999 to 2006. During that time, he says he spoke at one time or another with "at least a half a dozen" possible strategic acquirers -- nearly one each year! -- about the possibility of a strategic combination. [36] Conway's testimony about these efforts suggests they were sporadic at best, did not involve any confidentiality restrictions, and were more the product of happenstance than of a close examination of the market. [37] As important, most of them came when Netsmart was much smaller and less established as firm.

**[**36]** The William Blair contacts are even less compelling. Between 2003 and 2006, William Blair claims that it bandied Netsmart's name about along with the names of other companies when it made cold calls on prospective clients in the healthcare sector. [38] **[**37]** Again, concerns about confidentiality seem to have been non-existent. Even more important, Palasz testified that most of the companies Blair mentioned in these cold calls were not its clients and that it had no authority to tell anyone that Netsmart was

interested in a sale. [39] In fact, Palasz stated, "[T]here would be no reason for the potential acquirers to think that any of these companies would be, quote, unquote, on the block." [40] Nor is there any indication that William Blair actually targeted its pitches to a specific set of strategic players in the healthcare IT space for whom Netsmart might be a good fit and to whom the company might make a reasoned proposal.

These erratic, unfocused, and temporally-disparate discussions by Conway and William Blair apparently constituted the information base that the board had at its disposal when it determined it was not worthwhile to seek out a strategic buyer in May 2006. Neither management nor William Blair seriously analyzed the healthcare IT universe as it existed at that time **[*186]** or considered which companies might find Netsmart, as it existed in 2006, to be attractive. As a result, there was apparently no consideration of making careful and focused approaches to a discrete set of larger players in the healthcare IT space who might wish to round out their enterprise software offerings, a method that would balance the utility of testing the marketplace against the confidentiality and other concerns that a broader canvass might **[**38]** threaten.

From the record, one gleans that the board, at best, quickly determined that strategic buyers were unlikely to be interested and eschewed any real look at them. In that thinking, they appear to have been influenced by management's and William Blair's favorable attitudes towards the private equity option. [41] **[**39]** Both believed that a private equity buyer could be found and seem to have touted the prevailing trend in the M&A markets, which involved private equity players pricing strategic buyers out

---

[36]   Conway Dep. at 96.

[37]   See Conway Dep. at 96-110 (describing Netsmart's contacts with potential strategic acquirers and admitting that there had been no contact with Cerner, Siemens, or Perot in the last three years, with Quality Systems in the last five, or with QuadraMed in over a year); *see also* Calcagno Dep. at 29-33 (adding GE Medical and EDS Corp. to the list of strategic buyers contacted in the late 1990s but not resurfacing again).

[38]   See Palasz Dep. at 13 ("There were no formal activities during that time frame. As a matter of course in our healthcare information technology investment banking practice, we have discussions with many potential acquirers of firms. And in the course of those discussions, from time to time Netsmart, among other multiple companies, would be discussed as possible avenues of acquisition or expansion for those potential strategic acquirers.")

[39]   *See id* at 59 (explaining that most of the companies' names used in these conversations were not Blair clients and that the company to whom the pitch was being made would not know whether the companies whose names Blair was mentioning were clients or not).

[40]   *Id.* at 58.

[41]   *See, e.g.,* Palasz Dep. at 56 (indicating that William Blair, Conway, and the Special Committee all shared the same viewpoint in eschewing strategic buyers in favor of a private equity transaction).

924 A.2d 171, *186; 2007 Del. Ch. LEXIS 35, **39

of deals. [42] Additionally, the board also seems to have been influenced by William Blair into perceiving that all M&A situations were the same in the sense that the signing up of a publicly-announced deal for a micro-cap company like Netsmart would generate a reliable post-signing market check in the same way that similar announcements for large-cap companies like Paramount, Warner-Lambert, MCI, and more recently, Caremark, drew other interested strategic bidders into the process. [43]

[**40] In any event, given the un-minuted nature of the May 19 meeting and the lack of good recollection by the defendants involved, it is difficult to determine what exactly motivated the board's decision, or if decision is really even the right word. What is certain is this: despite William Blair's presentation including a litany of potential strategic buyers Netsmart might pursue, no effort was taken from that point forward to explore whether any of these buyers were interested in Netsmart. None.

[*187] D. Pursuit Of A Private Equity Deal Accelerates

After the May 19 meeting, management and William Blair continued to collaborate on efforts to pursue a private equity deal. In early July, another private equity firm focused on companies in the software and healthcare markets, Thoma Cressey Equity Partners ("Cressey"), [44] approached Netsmart and expressed a preliminary interest in acquiring the company. [45] Without involvement of the board, a confidentiality agreement was inked and Cressey undertook some due diligence. [46] On July 7, Cressey made a preliminary, conditional proposal to acquire all of the company's shares for $ 15 apiece. That same day, Netsmart stock closed at $ 12.81 per [**41] share on the NASDAQ. [47]

From there, things began to move fast. On July 13, 2006, the board of directors met to consider the Cressey proposal. They decided to form a Special Committee of independent directors, with defendant Calcagno as Chairman, and defendants Gallagher, Shamash, and Sicinski as members. The Special Committee retained William Blair as its own advisor the next day.

At the same meeting, the Special Committee apparently decided on a very targeted approach to marketing the company, which involved an outreach [**42] to six private equity firms in addition to Cressey. These included Vista and Francisco, which had each already expressed an interest in a transaction with Netsmart, as well as four other firms -- TA Associates, Summit Partners, Insight, and Technology Crossover Ventures -- that William Blair said had each purchased healthcare software firms in the past. [48]

In the foregoing discussion, I use the word "apparently" because as with the meeting of May 19, no minutes exist for

---

[42]   This is a phenomenon that will be studied. The prior conventional wisdom was that strategic buyers could outbid private equity buyers because they could reap greater synergies. Some of the private equity players can now do synergistic deals because they own other companies and there is also a perception that a private corporation not subject to the constant minute-to-minute demands of the public market can execute an aggressive, multi-year business strategy with greater effectiveness. The evolving story also tends to involve more dubious claims about the avoidance of a material amount of the ongoing compliance costs associated with being a public firm, claims that seem questionable if the route of going public again within a half-decade or so remains a primary one for private equity firms. Will an accounting firm certify your going-public registration statement financials unless you are righteous with 404?

[43]   See, e.g., Edward D. Herlihy, Takeover Law and Practice 2006, 1584 PLI/CORP 433, 447 (Jan. 24, 2007) (chronicling recent hostile deals, including "GE's bid for Honeywell after reports of a deal with United Technologies surfaced, Pfizer's bid for Warner Lambert after Warner Lambert announced a merger with American Home Products, AIG's bid for American General following its announcement of a transaction with Prudential PLC, SunTrust's attempt to break up the First Union/Wachovia merger, and Qwest's continued efforts to acquire MCI after MCI's board twice accepted lower bids from Verizon."); Robert E. Spatt, The Four Ring Circus-Round Nine; A Further Updated View of the Mating Dance Among Announced Merger Partners and an Unsolicited Second or Third Bidder (2005) (updating Spatt's original article, published at I No. 9 M&A LAW 1 (Feb. 1998), and collecting instances of deal jumping for those attending the Tulane Corporate Law Institute).

[44]   Thoma Cressey is referred to as "PE-3" in the Proxy. See Proxy at 15-16.

[45]   Palasz Dep. at 45-47.

[46]   Proxy at 15-16.

[47]   NTST: Historical Prices, Yahoo! Finance, http://finance.yahoo.com/q/hp?s=NTST&a=06&b=7&c=2006&d=06&e=7&f=2006&g=d (last visited Mar. 14, 2007) (documenting the $ 12.81 closing price of Netsmart (NTST) shares on July 7, 2007); accord Calcagno Dep. at 132 (indicating that Netsmart's stock price at the time of the Cressey bid was "around $ 13").

[48]   Calcagno Dep. at 75-76.

924 A.2d 171, *187; 2007 Del. Ch. LEXIS 35, **42

these Special Committee's deliberations that appear in the Proxy. As such, one cannot determine who was present for this meeting or what specifically was said or done. One might even reasonably speculate that no formal meeting took place as the Committee's chairman, Calcagno, testified that there were no Special Committee meetings at which minutes were not taken. [49] In that case, Calcagno may well have signed off on the shopping list suggested by William Blair outside of the meeting room.

[**43] Ultimately, four of the seven private equity firms involved in the limited auction responded to William Blair's initial overture in a positive way. The four were Vista, Francisco, Cressey, and Insight. After agreeing to sign confidentiality agreements in order to facilitate access to due diligence materials, each was given the opportunity to review a set of Netsmart's records during the latter half of July and asked to provide a preliminary proposal [*188] outlining the terms on which they might acquire Netsmart by August 1.

In what was to be the pattern throughout, the Netsmart side of the due diligence process was handled by company management with little involvement from the Special Committee or its advisors. This occurred despite the fact that Netsmart management was keenly interested in the future incentives that would be offered by the buyers, including what, if any, option pool would be offered to them in the resulting private company. Given its lack of participation in this process, the Special Committee had virtually no insight into how consistent management was in its body language about Netsmart's prospects to the various private equity firms in the bidding process. But no plausible [**44] allegations of favoritism by management toward particular private equity firms among the seven have been made by the plaintiffs, and no evidence from which one can infer that Conway or other Netsmart managers had any pre-existing relationship or bias toward any of the bidders has been presented.

On the eve of receiving expressions of interest, July 31, the Special Committee met in its first minuted meeting. At that session, which was attended by CEO Conway and Netsmart's general counsel, the Special Committee retained Patterson Belknap Webb & Tyler as its legal counsel. [50] The same day as it was retained, Patterson Belknap provided a review for the Special Committee of its legal obligations. [51]

E. The Preliminary Bids Come In And The Board Confirms Its Prior Decision Not To Seek A Strategic Buyer

On August 3, the Special Committee met to consider the preliminary bids its limited action had generated. Each of the preliminary bids contemplated, as one [**45] would expect from private equity buyers, a continuing role for existing management after the sale and the provision of equity incentives to them. Cressey declined to update its prior $ 15 per share expression of interest. The other expressions of interest were: Insight (at $ 15.40- $ 15.60 per share); Francisco ( $ 15.75 to $ 16.75 per share); and Vista (at $ 17.00 per share). [52]

The Special Committee, with involvement by Conway, again rejected any broader market canvass. Instead, it decided to offer the two bidders who made the most attractive offers the opportunity to conduct additional due diligence in contemplation of making final bids on August 28. In coming to the conclusion not to try to approach a broader range of bidders, the Special Committee relied in important part on the intuition that, so long as the Merger Agreement contained a fiduciary out and did not contain preclusive deal protections, other strategic or financial buyers with an interest would seize on the public announcement [**46] of a Merger Agreement as an invitation to make a topping bid. [53]

[*189] In August, Vista and Francisco conducted due diligence, without involvement by the Special Committee, [**47] and also had talks with Conway about incentives for

---

[49] See Calcagno Dep. at 124-25 (inquiring whether July 31 was the first meeting of the Special Committee because it was the earliest set of minutes produced and whether there were any Committee meetings at which minutes were not taken and receiving an "I don't know" and "No" in response).

[50] King Aff., Ex. 9 at 1-2.

[51] Proxy at 16.

[52] Proxy at 16.

[53] During the executive session on August 3, the Special Committee received advice to that effect: "Mr. Cox [of Patterson Belknap] explained deal terms, including fiduciary outs . . . and modest break-up fees, that would permit a post-announcement market check in order to deal effectively with strategic investors that might offer a substantially higher price. William Blair confirmed this approach as its strategy for a post-announcement market check." King Aff., Ex. 10 at 4. At a later August 29 meeting, the Special Committee also relied on William Blair's supposed representation that it had contacted all the strategic identified buyers in its prior May 19 presentation.

924 A.2d 171, *189; 2007 Del. Ch. LEXIS 35, **47

management. When bids came in on August 28, Francisco's expression of interest had been reduced to $ 15 per share. Vista, meanwhile, submitted a bid of $ 16.75 per share. Insight, which had not been invited to the second round, continued to poke around the process, seeking to engage Conway's interest but being rebuffed.

On August 29, the Special Committee met. It received updated valuation figures from William Blair to use as a basis for assessing the bids and, more generally, the merits of pursuing a sale. The Special Committee discussed the relative advisability of Netsmart remaining independent as opposed to engaging in a going private transaction. Among the issues considered were Netsmart's current market valuation, serious health issues facing Conway and the succession issues that posed, and the company's need to raise large amounts of capital if it were to continue on its own. At the end of the discussion, the Special Committee asked Conway to leave and held an executive session during which it concluded that a transaction in the range proposed by Vista would be attractive and resolved to authorize William Blair to negotiate [**48] with Vista. The terms the Special Committee authorized Blair to seek included a purchase price of $ 17 per share (a quarter more than Vista's current bid), a 15-day exclusivity period (instead of the 25-day period Vista requested), and a break-up fee of no more than 3% in the final Merger Agreement.

Although Vista did not raise its price, an exclusivity agreement was struck allowing Vista an additional two weeks of due diligence. Again, Netsmart management, without the Special Committee's involvement, administered this process. At the end of Vista's review, disappointment resulted. Vista told Palasz of William Blair that it was no longer interested in making an offer at the $ 16.75 per share level and would only proceed at a level "materially south" of that number. [54] Palasz probed what that meant and came away with the reasonable impression it meant a bid of around $ 15 per share. [55]

[**49] William Blair and the Special Committee were not well pleased with Vista. They viewed them as having sported with the process. William Blair gave Vista the news that its reduced level of interest was not attractive. This put the onus on Vista to get its bid back up if it wished to stay in the game. Vista never did so and disappears from our story. A similar tack had been taken with Cressey earlier.

The peskiness of Insight, however, left the Special Committee with another option. On September 20, Insight had again approached Conway to inquire about the process and signaled an interest in making a bid higher than its prior $ 15.60 overture. Conway directed Insight to the Special Committee's advisor, William Blair. After Vista dropped its bid, William Blair followed up with Insight and determined it was serious. On September 27, the Special Committee met with its advisors as well as Conway. The Special Committee decided to give Insight, the highest bidder at that time, a chance to conduct due diligence in a tight timeframe.

[*190] On October 4, that due diligence was completed and Insight made a written expression of interest at $ 16.40 a share. By that date, Netsmart's management was completing [**50] the retention of counsel for themselves, to negotiate the conditions on which they might be retained by a private equity buyer. The Special Committee had left that separate negotiation track to management.

On October 5, the Special Committee met to consider Insight's offer. It decided, with Conway's input and with guidance from its advisors, to suggest a $ 16.50 per share price to Insight. Insight responded favorably to William Blair's dangling of that price and the Special Committee authorized the execution of an exclusivity agreement with Insight the next day. That agreement gave Insight a period of exclusive due diligence in exchange for its obligation to deliver a draft purchase agreement meeting that price by October 23.

## F. Insight Wins The Bidding And Executes A Merger Agreement With Netsmart

At the end of October, Insight did not disappoint. Negotiations over a Merger Agreement ensued. The Special Committee sought the chance to actively shop Netsmart -- through a "go shop" clause -- after the Merger Agreement was publicly announced. Insight refused and the Special Committee relented, instead accepting a "window shop" provision that allowed Netsmart to consider an unsolicited [**51] proposal that met a more or less standard definition of a superior proposal. The parties also haggled over termination fee issues. For its part, the Special Committee extracted a 1% reverse break-up fee payable if Insight failed to close by exercise of its financing out. Insight obtained a

---

That representation, if made, could only refer to the cold calls previously described. It does not refer to any authorized marketing in 2006. *See* King Aff., Ex. 13 at 6.

[54]   Palasz Dep. at 88-89.

[55]   Palasz Dep. at 93-94 (confirming that "we are not talking about 25 or 50 cents in terms of . . . reduction" and that while not "absolutely defined" the approximate level was comparable to "Francisco . . . at $ 15 a share").

924 A.2d 171, *190; 2007 Del. Ch. LEXIS 35, **51

break-up fee of 3% of the deal's implied equity value, inclusive of its expenses. But Insight's demand to trigger the break-up fee simply on a "naked no vote" of Netsmart's stockholders was rejected, and the triggers were tied to Netsmart's termination of the Merger Agreement in order to pursue a superior proposal. [56]

While the Special Committee haggled over the Merger Agreement, Conway and his top subordinate, Grisanti, bargained with Insight over their incentives. The Special Committee did not get itself involved in those discussions. But Netsmart's compensation committee, which included Calcagno, Sicinski, and Gallagher from the Special Committee, did meet with Conway and the legal advisors [**52] for management, to discuss the status of those talks.

By November 15, these parallel negotiations were both completed. Management had a tentative deal with Insight and the Special Committee's advisors had completed negotiating the Merger Agreement. Contrary to the plaintiff's early arguments, Conway did not come out of his negotiations with Insight a markedly richer man. It appears that his negotiations with Insight, as well as those of his subordinate Grisanti, who got a package proportionally identical to Conway's, were spirited and involved real give and take. [57]

[**53] [*191] On November 16, William Blair made an updated financial presentation to the Special Committee providing it with valuation metrics to assess the $ 16.50 per share Insight offer. The Special Committee was also apprised that Insight intended to bring in another equity sponsor, Bessemer. Then, Patterson Belknap reviewed the terms of the Merger Agreement.

The next day the Special Committee met again and formally decided to recommend approval of the Merger Agreement,

after receiving an oral fairness opinion from William Blair. The board then met and voted to approve the Merger Agreement, with Conway abstaining. The next day, November 18, Blair presented its final fairness opinion, and the Merger Agreement was executed as were new employment agreements for Conway and Grisanti that would become effective if the Merger were approved.

G. The Deal Is Announced And The Shareholder Vote Is Scheduled

On November 20, the Merger was publicly announced. That same week, several lawsuits seeking to halt the Merger were filed in this court. Those cases have since been consolidated into this action.

After this litigation commenced, the Special Committee met on December 21, 2006 and approved formal [**54] minutes for ten meetings ranging from August 10, 2006 through November 28, 2006. [58] That tardy, omnibus consideration of meeting minutes is, to state the obvious, not confidence-inspiring, especially when considered along with the total absence of minutes for the May 19 board meeting and the lack of clarity whether the Special Committee ever met to approve the limited set of private equity firms to be canvassed.

On December 21, 2006, Netsmart also filed its preliminary proxy with the Securities and Exchange Commission (the "SEC"). The SEC questioned whether the transaction was a *Rule 13e-3* going private transaction, but, upon further investigation, concluded that the disclosure requirements of that section were inapplicable. [59] Netsmart's definitive Proxy Statement was filed [**55] on February 28, 2007 and

---

[56]  *See* King Aff., Ex. 17 at 5.

[57]  Under his existing employment agreement with Netsmart, Conway earned a salary of $ 385,875 annually, was entitled to aggregate retirement benefits of between $ 679,000 and $ 821,000, and stood to receive a $ 2.3 million payment in the event of a change of control. King Aff., Ex. 6 at NET 02319 & NET 02320. He also owned 106,348 shares of stock and 142,500 options (roughly 3.7% of Netsmart's equity). Proxy at 26, 70-71. Following his negotiations with Insight, Conway entered into new agreements in which he accepted a reduced salary of $ 367,500, reduced benefits upon retirement, and a reduced one-time change-in-control payment of $ 1 million. King Aff., Ex. 6 at NET 02319-NET 02319. In exchange for these concessions, Conway will continue as CEO of Netsmart and can share in the future appreciation of the company by exercising options that will be granted to him at a strike price pegged to the consideration in the Merger ( $ 16.50 per share) and equaling 2.25% of the surviving company's shares. Proxy at 8. Thus, it does not appear that Conway stands to receive a financial windfall.

[58]  *See* Affidavit of Scott M. Tucker, Esq. ("Tucker Aff."), Ex. 10 at SC 000321 (approving minutes for August 10, August 23, August 29, September 27, October 5, October 26, November 2, November 16, November 17, and November 28, 2006).

[59]  See King Aff., Ex. 6; DAB at 21.

mailed to shareholders on March 2, 2007. [60] The special meeting to consider the Merger will be held on April 5, 2007 at which time the stockholder vote is scheduled to take place. [61]

III. Legal Analysis

The standard the court must apply to evaluate the plaintiffs' motion for preliminary injunction is familiar. **HN1** In order to warrant injunctive relief, the plaintiffs must prove that: (1) they are likely to succeed on the merits of their claims; (2) they will suffer imminent, irreparable harm if an injunction is not granted; and (3) the balance of the equities weighs in [*192] favor of issuing the injunction. [62] I begin my application of that standard with the plaintiffs' merits arguments, which come in two major categories. The first consists of their various arguments why the sales process leading up to the Merger was tainted. The second contains their contentions [**56] why the Proxy is materially deficient. After analyzing the merits argument in this order, I apply the remedial calculus contained in the rest of the preliminary injunction test.

A. The Merits

1. The Alleged Flaws In The Sale Process

**HN2** Having decided to sell the company for cash, the Netsmart board assumed the fiduciary duty to undertake reasonable efforts to secure the highest price realistically achievable given the market for the company. [63] This duty -- often called a *Revlon* duty for the case with which it is most commonly associated [64] -- does not, of course, require every board to follow a judicially prescribed checklist of sales activities. [65] Rather, the duty requires the board to act reasonably, by undertaking a logically sound process to get the best deal that is realistically attainable. [**58] [66] The mere fact that a board did not, for example, do a canvass of all possible acquirers [**57] before signing up an acquisition agreement does not mean that it necessarily acted unreasonably. [67] Our case law recognizes that are a variety of sales approaches that might be reasonable, given the circumstances facing particular corporations. [68]

**HN6** What is important and different about the *Revlon* standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the *Revlon* standard contemplates a judicial examination of the reasonableness of the board's decision-making process. [69] Although linguistically not obvious, this reasonableness review [**59] is more searching than rationality review, and there is less tolerance for slack by the directors. Although the directors have a choice of means, they do not comply with their *Revlon* duties unless they undertake reasonable steps to get the best deal.

[*193] Here, the plaintiffs claim that the Netsmart directors acted unreasonably in two key respects. First, they argue that the Special Committee did not do a reasonable job of extracting the highest value from the limited universe of

[60] Netsmart Technologies, Inc., Form 8-K (Mar. 5, 2007) at Ex. 1.

[61] *Id.*

[62] E.g., *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del. 1986).

[63] E.g., *Revlon,* 506 A.2d at 184 N.16 (**HN3** "The directors' role remains an active one, changed only in the respect that they are charged with the duty of selling the company at the highest price attainable for the stockholders' benefit."); *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 44 (Del. 1994) ("In the sale of control context, the directors must focus on one primary objective--to secure the transaction offering the best value reasonably available for the stockholders--and they must exercise their fiduciary duties to further that end.").

[64] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del. 1986).

[65] E.g., *Barkan v. Amsted Industries, Inc.,* 567 A.2d 1279, 1286 (Del. 1989) ("[T]here **HN4** is no single blueprint that a board must follow to fulfill its duties.").

[66] E.g., *QVC,* 637 A.2d at 45 ("[A] court **HN5** applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination.").

[67] E.g., *In re Toys 'R' Us, Inc. S'holder Litig.,* 877 A.2d 975, 1000 (Del. Ch. 2005).

[68] See *Barkan,* 567 A.2d at 1286-87 (describing different fact patterns and appropriate responses from corporate boards).

[69] See *QVC,* 637 A.2d at 45.

924 A.2d 171, *193; 2007 Del. Ch. LEXIS 35, **59

private equity bidders it sought out in the sales process. Second, they argue that the Netsmart board acted unreasonably by failing to conduct any canvass at all of possible strategic acquirers, leaving itself without any reliable basis to conclude that the Insight Merger it eventually landed was the best deal realistically achievable.

a. Within The Confines Of Its Limited Auction Of Certain Private Equity Firms, Did The Board Likely Breach Its *Revlon* Duties?

The plaintiffs [**60] criticize the methods the Special Committee used in dealing with the seven private equity firms that participated in its limited auction process. Most notably, the plaintiffs allege that Conway was too influential in the Special Committee process. The plaintiffs also make more particular arguments, including contending that the Special Committee should have gone back to Vista again after it dropped its bid and sought to get it back in the game. They also insinuate that the Special Committee should have resumed contact with Cressey when Vista dropped out and should not have dealt solely with Insight at the end stage. I do not believe there is a reasonable probability that these arguments, at a later stage, will be successful.

There are admittedly questions that can be raised about how the Special Committee did its work with private equity buyers. By the time the Special Committee was formed, William Blair was well along in its work with management. Even when it was formed, the Special Committee largely deliberated with Conway right at the table, along with the company's general counsel, and other of Conway's subordinates. Although the Special Committee had executive sessions, it included [**61] in those sessions the same bank that had been working with management all along. As a result, one rationally doubts how confidential these sessions really were.

Yet, despite these doubts, the plaintiffs' allegations that Conway dominated the Special Committee and drove it toward an inferior offer are not convincing. Admittedly, the Special Committee conducted itself in a manner that invites stockholder suspicion. [70] [**62] Even recognizing that Conway, although CEO, did not have anything approaching the clout of a controlling stockholder, the Special Committee gave him virtually unlimited access to their deliberations, and let him direct the due diligence process without close oversight. But the fact that these practices predictably raise the suspicions of the plaintiffs does not mean that they actually caused harm to Netsmart's stockholders. [71] Upon [*194] close examination, the process used seems to have had no adverse consequences.

[**63] All told, the Special Committee formally met eleven times, with five of those meetings containing "Executive Sessions" in which management was asked to leave and only the committee members participated. [72] It was during those sessions that the Committee considered and approved the Merger terms, [73] and, aside from Conway's participation in the important strategic buyer debate, [74] resolved virtually every other issue not involving the due diligence process, which was discussed with Conway because he was facilitating it.

The Special Committee's and its advisors' involvement in the due diligence process was less vigorous. They let this process be driven by management. In easily imagined circumstances, this approach to due diligence could be [*64] highly problematic. If management had an incentive to favor a particular bidder (or type of bidder), it could use

---

[70]   *Cf. In re SS&C Technologies, Inc. S'holders Litig.*, 911 A.2d 816, 820 (Del. Ch. 2006) (emphasizing the need for **HN7** independent directors to be active when addressing LBO transactions involving powerful economic incentives for management that might conflict with the interests of public stockholders).

[71]   The plaintiffs' arguments to the contrary rely on strained applications of two recent decisions: *In re Emerging Communications, Inc. S'holders Litig.*, 2004 Del. Ch. LEXIS 70, 2004 WL 1305745 (Del. Ch. 2004), and *In re Freeport-McMoran Sulphur, Inc. S'holders Litig.*, 2005 Del. Ch. LEXIS 96, 2005 WL 1653923 (Del. Ch. 2005). But those decisions focus on different situations in which management of the selling corporation had clear associations with the buyer and where members of the special committees themselves faced disabling conflicts as a result. *Emerging* involved a controlling stockholder merger in which both a majority of the full board and the special committee were found to be beholden to the company's Chairman and CEO, against whom the special committee was negotiating. *Freeport-McMoran* concerned a transaction in which the buyer and the seller shared common board members and where there were persuasive reasons to doubt the special committee's independence from the common directors. This case does not present conflicts of similar magnitude and, as a result, Conway's alleged involvement in the sale process is less troubling.

[72]   *See* King Aff., Exs. 10, 11, 13, 16 & 19 (containing minutes of the Special Committee's executive sessions).

[73]   King Aff., Ex. 19 at 4-8.

[74]   *See* King Aff., Ex. 10 at 4-5 (indicating that this conversation took place before Conway was asked to leave).

924 A.2d 171, *194; 2007 Del. Ch. LEXIS 35, **64

the due diligence process to its advantage, by using different body language and verbal emphasis with different bidders. "She's fine" can mean different things depending on how it is said.

One obvious reason for concern is the possibility that some bidders might desire to retain existing management or to provide them with future incentives while others might not. In this respect, the Netsmart Special Committee was also less than ideally engaged. Conway was left unattended to bandy such issues around with the invited bidders.

That said, I have no basis to conclude that these issues actually had any negative effect on the bidding process. Unlike some other situations, this was not one in which management came to the directors with an already baked deal involving a favorite private equity group. Conway had no pre-existing relationships with any of the invited bidders. None of the bidders was offering materially more or less to management.

Rather, at every turn, it appears that the Special Committee proceeded in an appropriately price-driven manner, dealing with the bidders [**65] or bidder, depending on the stage, that promised to pay the highest price. There is no evidence in the record that any bidder was ever put off the hunt by Conway because of his self-interest.

Indeed, the quibbles that the plaintiffs raise illustrate the Special Committee's tendency to deal with the bidder promising the highest price. When it chose to deal with Vista exclusively, it did so because Vista dangled a price of $ 16.75 per share. When Vista then failed to deliver and dropped down to the $ 15 range, the Special Committee's decision to give it the cold shoulder strikes me as entirely reasonable. Vista then knew it was up to it to get back into a more attractive range. Vista didn't need an engraved invitation to know it was its move.

Likewise, having already invited Cressey to improve its original, and never revised, offer into a comparable range, the Special Committee did not act unreasonably [*195] by failing to go back to it, as the plaintiffs suggest they should have. Again, Cressey knew how to reach the Special Committee if it wanted to make a more attractive bid. Yet, Cressey never did more than hint that it might be willing to pay more and the board cannot be faulted for [**66] considering this whisper to lack seriousness.

Given the circumstances, therefore, I do not think it unreasonable that the Special Committee focused at the end

stage on Insight and secured a deal with it at $ 16.50 per share. The mere fact that the Special Committee had, at one point, desired to get $ 17 per share from Vista, which had teased it with a $ 16.75 per share deal, did not mean that it should hold out for that price from Insight, at a later time when even Vista had dropped its interest well south of that level.

Finally, I perceive there to be no rational basis for the plaintiffs' argument that the Special Committee acted unreasonably by failing to demand a price increase from Insight when Insight brought in Bessemer as an equity partner. I don't know how this parses, frankly. Even accepting the principle that *HN8* corporate boards should use the negotiating power they possess to extract a higher value for their shareholders, [75] it is unclear that the Netsmart board gained any real negotiating leverage by Insight's desire to include Bessemer. Further, given the size of Netsmart, this was not a situation in which "clubbing" posed a material threat to competitive bidding. As [**67] important, Bessemer was never even contacted by the Special Committee. It was not one of the chosen bidders and did not pair up with Insight rather than make an independent bid. It was brought in by Insight after Insight had prevailed in the Special Committee process. I suppose the Special Committee could have taken a flyer and asked Insight for more money or more lax deal terms because it had obtained a partner. If Insight had said, "come again, why?" I'm not sure what the Special Committee would have said, other than, "we had to give it a shot."

In sum, within the constraints of the limited process it undertook, with the seven private equity firms, the Special Committee appears to have pursued the best deal it could get. Although some of its procedural choices were questionable, those [**68] choices do not seem to have had any negative effect on the result,

b. <u>Was The Board's Limited Action A Reasonable Approach To Maximizing Sale Value Given Netsmart's Circumstances?</u>

The plaintiffs' second argument has much more force. That argument is that the Special Committee and Netsmart board did not have a reliable basis to conclude that the Insight deal was the best one because they failed to take any reasonable

---

[75]  *See* <u>QVC, 637 A.2d at 51</u> (faulting Paramount's board for failing to use the enhanced negotiating leverage QVC's hostile bid provided and instead choosing to hide behind defensive measures already in place).

924 A.2d 171, *195; 2007 Del. Ch. LEXIS 35, **71

steps to explore whether strategic buyers might be interested in Netsmart. [76]

I believe on this score that the plaintiffs are, if this preliminary [**69] record is indicative of the ultimate record in the case, likely to be successful on this point. For reasons I have noted, the board's consideration of [*196] whether to seek out strategic buyers was cursory and poorly documented at best. The decade-spanning, sporadic chats by Conway and William Blair are hardly the stuff of a reliable market check. That is especially so given the dynamism of the business world. What strategic buyers might have desired in 1999, 2001 or 2003 often will be very different than what they would desire in 2006. To that point, the key decision makers will often differ over time spans of that length. As important, Netsmart itself had been transformed through a host of acquisitions and lucrative contracts over that extended period. Finally, executives at large corporations are busy and are less likely to give serious attention to passing comments or diffuse cold calls made without any real authority than they are to respond to more concrete marketing efforts.

What was never done by Conway, William Blair, or the board was a serious sifting of the strategic market to develop a core list of larger healthcare IT players for whom an acquisition of Netsmart might make [**70] sense. Perhaps such an effort would have yielded no names. But it might have. Moreover, the mere fact that some healthcare IT players had not responded to less authoritative overtures in years long-past does not mean that they might not have taken a look at Netsmart in 2006.

Having embarked on the pursuit of a cash sale, it was incumbent upon the board to make a reasonable effort to maximize the return to Netsmart's investors. On the existing record, I cannot conclude that their approach to this issue is indicative of such an effort. As described previously, the downside to having ultimately approached strategic buyers early in the process seems quite limited, if extant. When compared to Scalia's and William Blair's early analyses, the initial expressions of interest were not compelling ones. Moreover, the ultimate results obtained by pursuing the directors' strategy of excluding strategic buyers were less than exciting, as measured by William Blair's final analyses. As plaintiffs point out, the implied transaction multiples that the Insight Merger ultimately entailed were all (except one) below both William Blair's median and mean for comparable transactions: [77]

| Disclosed | Netsmart @ | | Selected Comparable Companies | |
|---|---|---|---|---|
| Deal Multiples | $ 16.50/share Implied Multiples | | Median | Mean |
| Enterprise Value to Revenue (LTM) | 1.82 | | 1.27 | 2.12 |
| Enterprise Value to Revenue (2006E) | 1.82 | | 2.25 | 2.27 |
| Enterprise Value to EBITDA (LTM) | 11.3 | | 14.2 | 14.3 |
| Enterprise Value to EBITDA (2006E) | 11.0 | | 14.8 | 14.7 |
| Enterprise Value to EBIT (LTM) | 20.6 | | 23.9 | 26.5 |
| Enterprise Value to EBIT (2006E) | 19.7 | | 21.3 | 22.4 |

[**71] Similarly, the implied transaction value of $ 115 million of a $ 16.50 share price fell below even the lower range of William Blair's DCF value of Netsmart, which was $ 142 million to $ 202 million or roughly $ 20 to $ 29 per share. [78]

---

[76]   *HN9* "When . . . directors possess a body of reliable evidence with which to evaluate the fairness of a transaction, they may approve that transaction without conducting an active survey of the market." *Barkan,* 567 A.2d at 1287. The corollary to this is clear: when they do not possess reliable evidence of the market value of the *entity* as a whole, the lack of an active sales effort is strongly suggestive of a *Revlon* breach.

[77]   Proxy at 38-39.

[78]   Proxy at 40.

924 A.2d 171, *196; 2007 Del. Ch. LEXIS 35, **71

In a targeted canvass, confidentiality issues could have been responsibly addressed, and there is no record basis to believe that strategic acquirers (which have their own confidentiality concerns) were more likely to leak than private equity firms. And, of course, Conway and **[*197]** William Blair claim to have tossed out Netsmart's name to strategic players through the years, when Netsmart was more, not less vulnerable, in terms of retaining and acquiring customers. And, like the canvass of private equity buyers, there was no need to fish with a seine net for strategic buyers. The Special Committee could have used a fly rod in that market, too.

Of course, one must confront the defendants' argument that they used a technique accepted in **[**72]** prior cases. The Special Committee used a limited, active auction among a discrete set of private equity buyers to get an attractive "bird in hand." But they gave Netsmart stockholders the chance for fatter fowl by including a fiduciary out and a modest break-up fee in the Merger Agreement. By that means, the board enabled a post-signing, implicit market check. Having announced the Insight Merger in November 2006 without any bigger birds emerging thereafter, the board argues that the results buttress their initial conclusion, which is that strategic buyers simply are not interested in Netsmart.

The problem with this argument is that it depends on the rote application of an approach typical of large-cap deals in a micro-cap environment. The "no single blueprint" mantra [79] is not a one way principle. The mere fact that a technique was used in different market circumstances by another board and approved by the court does not mean that it is reasonable in other circumstances that involve very different market dynamics. [80]

**[**73]** Precisely because of the various problems Netsmart's management identified as making it difficult for it to attract market attention as a micro-cap public company, an inert, implicit post-signing market check does not, on this record, suffice as a reliable way to survey interest by strategic

players. Rather, to test the market for strategic buyers in a reliable fashion, one would expect a material effort at salesmanship to occur. To conclude that sales efforts are always unnecessary or meaningless would be almost un-American, given the sales-oriented nature of our culture. [81] In the case of a niche company like Netsmart, the potential utility of a sophisticated and targeted sales effort seems especially high.

For example, Netsmart and its financial advisor could have put together materials explaining Netsmart's business, **[**74]** why it had attractive growth potential, and how Netsmart's products and services fit within the broader healthcare IT space. Those materials could have been tailored for a few logical buyers and William Blair could have used its (much touted by the defendants) **[*198]** healthcare reputation to secure the attention of the key executives at those firms, the ones with decision-making authority over acquisitions. In seeking that attention, they would have had the credibility that flows from having actual authority to act as an agent for a principal willing to sell. Such an approach would have given these key players a reason to chew on the idea, consider making applications for resources to explore and finance a bid, and to otherwise do the other things necessary to get a large corporation to spend over $ 100 million.

In the absence of such an outreach, Netsmart stockholders are only left with the possibility that a strategic buyer will: (i) notice that Netsmart is being sold, and, assuming that happens, (ii) invest the resources to make a hostile (because Netsmart can't solicit) topping bid to acquire a company worth less than a quarter of a billion dollars. In going down that road, the strategic **[**75]** buyer could not avoid the high potential costs, both monetary (e.g., for expedited work by legal and financial advisors) and strategic (e.g., having its interest become a public story and dealing with the consequences of not prevailing) of that route, simply because the sought-after-prey was more a side dish than a main course. It seems doubtful that a strategic buyer would

---

[79]   *See Barkan,* 567 A.2d at 1286.

[80]   An important recent decision of this court emphasizes that *HN10* the reasonableness of a board's decisions in the M&A context turns on the circumstances. *See Louisiana Mun. Police Employee's Retirement System v. Crawford,* 918 A.2d 1172, 2007 Del. Ch. LEXIS 27, 2007 WL 582510, at *4 n.10 (Del. Ch. 2007)* (requiring plaintiffs to "specifically demonstrate how a given set of deal protections operate in an unreasonable, preclusive or coercive manner," and likewise reminding defendants that they may not simply rely on notions of blanket rules (like a purported "3% rule" for termination fees) or "some naturally-occurring rate or combination of deal protection measures"). Not being cabined by a long set: of per se rules, boards have great flexibility to address the particular circumstances they confront. But equitable principles, including the heightened reasonableness standard in *Revlon,* ensure that this broad discretion is not abused.

[81]   The success of ebay is but one of the recent examples of how efforts at effective salesmanship -- in that case by efficiently creating an international flea market -- can pay off for sellers.

924 A.2d 171, *198; 2007 Del. Ch. LEXIS 35, **75

put much energy behind trying a deal jump in circumstances where the cost-benefit calculus going in seems so unfavorable. Analogizing this situation to the active deal jumping market at the turn of the century, involving deal jumps by large strategic players of deals involving their direct competitors in consolidating industries is a long stretch.

Similarly, the current market trend in which private equity buyers seem to be outbidding strategic buyers is equally unsatisfying as an excuse for the lack of *any* attempt at canvassing the strategic market. Given Netsmart's size, the synergies available to strategic players might well have given them flexibility to outbid even cash-flush private equity investors. Simply because many deals in the large-cap arena seem to be going the private equity buyers' way these  **[**76]**  days does not mean that a board can lightly forsake any exploration of interest by strategic bidders. [82]

In this regard, a final note is in order. Rightly or wrongly, strategic buyers might sense that CEOs are more interested in doing private equity deals that leave them as CEOs than strategic deals that may, and in this case, certainly, would not. That is especially so when the private equity deals give management, as Scalia aptly put it, a "second bite at the apple" through option pools. With this impression, a strategic buyer seeking to top Insight might consider this factor in deciding whether to bother with an overture.

Here, while **[**77]** there is no basis to perceive that Conway or his managerial subordinates tilted the competition among the private equity bidders, there is a basis to perceive that management favored the private equity route over the strategic route. Members of management desired to continue as executives and they desired more equity. A larger strategic buyer would likely have less interest in retaining all of them and would not have presented them with the potential for the same kind of second bite. The private equity route **[*199]** was therefore a clearly attractive one for management, all things considered.

William Blair had its own incentive to favor that route, too. Although William Blair had a right to 1.7% of any deal, its aging contract undoubtedly gave it a strong incentive to bring about conditions that would facilitate a deal that would close. The path of dealing with a discrete set of private equity players was attractive to its primary client contact -- management -- and the quickest (and lowest cost) route to a definitive sales agreement.

By acknowledging these incentives, I do not mean to imply in any way that Netsmart management or William Blair consciously pursued objectives at odds **[**78]** with getting the best price. Rather, I simply point out the reality that the Netsmart board rapidly narrowed its options to a channel consistent with those incentives. By the time the Special Committee began its work, the inertial energy of the sales process was already clearly directed at a private equity deal. The record evidence regarding the consideration of an active search for a strategic buyer is more indicative of an after-the-fact justification for a decision already made, than of a genuine and reasonably-informed evaluation of whether a targeted search might bear fruit. For all these reasons, I believe the plaintiffs have demonstrated a reasonable probability that they will later prove that the board's failure to engage in any logical efforts to examine the universe of possible strategic buyers and to identify a select group for targeted sales overtures was unreasonable and a breach of their *Revlon* duties.

2. The Plaintiffs' Disclosure Claims

The plaintiffs allege that the Proxy Statement is deficient because it omits material facts and presents other issues in a materially misleading manner. Specifically, the plaintiffs complain about the following aspects of **[**79]** the Proxy: (i) the failure of the Proxy to include the Scalia "Stay the Course" projections presented to the board on May 11, 2006; (ii) the failure of the Proxy to provide a complete set of the projections used by William Blair in preparing its discounted cash flow valuation, which was presented to the board and used in connection with its issuance of a fairness opinion concerning the Merger; and (iii) the failure of the Proxy to identify certain instances in which members of the Special Committee had served on other boards with Conway.

The basic standards applicable to the consideration of these arguments are well settled. *HN11* Directors of Delaware corporations must "disclose fully and fairly all material information within the board's control when they seek shareholder action." [83] An omitted fact is only material if there is a substantial likelihood that it would be considered

---

[82]   Nor does the record indicate that the board reasonably determined (or even pondered the possibility) that there was extreme time urgency to take advantage of a private equity bubble that would soon pop; indeed, the initial expressions of interest and the eventual deal landed do not suggest that Insight, or any other of the bidders, were on undisciplined spending sprees.

[83]   *Arnold v. Society for Savings Bancorp., Inc.,* 650 A.2d 1270, 1277 (Del. 1994) (quoting *Stroud v. Grace,* 606 A.2d 75, 84 (Del. 1992)).

924 A.2d 171, *199; 2007 Del. Ch. LEXIS 35, **79

important in a reasonable shareholder's deliberation and decision making process before casting his or her vote. [84] "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' [**80] of information made available." [85] To this end, disclosures must provide a "balanced," "truthful," and "materially complete" [*200] account of all matters they address. [86]

**HN13** When stockholders [**81] must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance. [87] This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows.

a. The Proxy Is Not Deficient Because It Omitted The May 11 Scalia Projections

The figures at issue are the "Stay the Course" projections included in Scalia's presentation to the Netsmart board on May 11, 2006. In that model, Scalia projected revenues and profits based on organic growth and presented company valuations based on a price-to-earnings multiple of 25 -- a figure materially higher than Netsmart's trading multiple at the time. [88] [**82] The relevant portion of these projections reads as follows: [89]

|  | **FY 2006** | **FY 2007** | **FY 2008** | **FY 2009** | **FY 2010** |
|---|---|---|---|---|---|
| Revenue | $ 60,478 | $ 69,549 | $ 79,982 | $ 89,579 | $ 100,329 |
| EBITDA | $ 10,000 | $ 11,500 | $ 13,225 | $ 14,812 | $ 16,589 |
| Net Income | $ 3,720 | $ 4,650 | $ 5,719 | $ 6,703 | $ 7,805 |
| EPS | $ 0.57 | $ 0.72 | $ 0.88 | $ 1.03 | $ 1.20 |
| P/E | 25 | 25 | 25 | 25 | 25 |
| Share Price | $ 14 | $ 18 | $ 22 | $ 26 | $ 30 |
| Market Cap | $ 93,000 | $ 116,248 | $ 142,987 | $ 167,583 | $ 195,135 |

I conclude that the disclosure of these projections would not have a material effect on a rational shareholder's impression of the proposed Merger. Admittedly, the Proxy omitted the Scalia May 11 projections and presented different ones. But this discrepancy is entirely non-insidious because the later disclosed projections, which were relied upon by William Blair and shaped by management input, including from Scalia himself, were more current and more bullish. [**83] That is, the plaintiffs are arguing for the disclosure of a set of projections that are more pessimistic than those disclosed in the Proxy. [90] Using the dated Scalia projections as a basis for an independent valuation of Netsmart's future earnings would demonstrate only that the Merger consideration offered was "fairer" to the selling shareholders than the projections presented in the Proxy imply. As such, that portion of the Scalia model would not materially influence any rational [*201] shareholder's vote, and no duty was breached by its omission.

The oddment of the plaintiffs' pressing of this point was clarified at oral argument. At that time, it became clear that the plaintiffs were mostly interested [**84] in disclosure of Scalia's prior work because of its estimates of share prices of $ 18 in 2007, $ 22 in 2008, $ 26 in 2009, and $ 30 in

---

[84]   Zirn v. VLI Corp., 621 A.2d 773, 778-79 (Del. 1993).

[85]   Id.(quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)).

[86]   E.g., Malone v. Brincat, 722 A.2d 5, 12 (Del. 1998) (requiring **HN12** disclosures to "provide a balanced, truthful account of all matters"); In re Pure Resources, Inc. S'holders Litig., 808 A.2d 421, 448 (Del. Ch. 2002) ("When a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts.") (citing Arnold, 650 A.2d at 1280-82).

[87]   Pure Resources, 808 A.2d at 447-48.

[88]   According to Griffin's June 5, 2006 research report, Netsmart had a trailing P/E multiple of 20.2 and a forward P/E multiple of 15.2. See King Ex. 2 at SC-YS 000582.

[89]   Id. at NET 00009.

[90]   Compare Naylor Aff., Ex. 2 at NET-00009 (listing Scalia's May 11 projections, which include 2009 revenues of $ 89.579 million and EBITDA of $ 14.812 million) with Proxy at 79 (listing William Blair's November 18 projections, which include 2009 revenues of $ 100.041 million and EBITDA of $ 24.367 million).

924 A.2d 171, *201; 2007 Del. Ch. LEXIS 35, **84

2010. [91] The plaintiffs say those estimates are material. The problem with that argument is that there has been no demonstration that this part of Scalia's estimate was at all reliable. The chart produced above clearly illustrates that Scalia got to his share price estimate by multiplying the projected earnings per share value by a constant price-to-earnings multiple of 25. That high multiple is what the plaintiffs want disclosed and multiplied by projections; indeed, for their purpose the later projections are even better, because when multiplied by 25 they yield an even higher per share value than Scalia's earlier May 11 projections.

But, the market, not [**85] Netsmart or Scalia, determines the price-to-earnings multiple. Unlike managerial projections of revenues, costs, and profits, factors over which management can exercise some control and provide a greater level of insight than independent investors, there is no basis to believe that someone like Scalia would have a reliable basis to estimate future trading multiples of his particular firm. [92] Even more importantly, the plaintiffs have failed to demonstrate that Scalia's constant use of a P/E multiple of 25 reflected his best estimate of the multiple Netsmart shares would attain in the market. The plaintiffs never took Scalia's deposition. Absent testimony to the contrary, the use of such a constant high number seems more likely to have been an optimistic "plug figure" than a reasoned estimate. That is especially the case when Netsmart's historically much lower multiples -- only 20.2 as of June 2006 [93] -- are considered. Although the past is not an indicator of future performance (as any mutual fund manager will tell you), on what reasonable basis could Scalia have predicted a huge increase in Netsmart's multiple to 25 and the constant maintenance of that multiple for the succeeding [**86] years? What is far more likely is that Scalia intended to make no such prediction but simply wished to give the board a generous illustration of what attainment of his projections might yield in terms of the company's market price. Given this record, the Proxy's failure to disclose Scalia's earlier analysis is not troubling.

b. The Proxy's Failure To Disclose All The Projections Used By William Blair In Preparing Its DCF Valuation Renders It Materially [**87] Incomplete

In the Proxy, William Blair's various valuation analyses are disclosed. One of those analyses was a DCF valuation founded on a set of projections running until 2011. Those projections were generated by William Blair based on input from [*202] Netsmart management, and evolved out of the earlier, less optimistic, Scalia projections. Versions of those figures were distributed to interested parties throughout the bidding process, and one such chart is reproduced in part in the Proxy. The final projections utilized by William Blair in connection with the fairness opinion, however, have not been disclosed to shareholders. Those final projections, which were presented to the Netsmart board on November 18, 2006 in support of William Blair's final fairness opinion, take into account Netsmart's acquisition of CMHC and management's best estimate of the company's future cash flows. [94]

In its disclosures concerning William Blair's fairness opinion, the Proxy does not contain [**88] any charts of revenue or earnings projections. In a separate section, though, the Proxy presents two sets of projections. Neither is identical to the set of projections used in the fairness opinion. The first set, titled "Sell Side Projections," uses the same revenue estimates as William Blair's final model but differs in its projection of EBITDA. [95] [**89] It was apparently used "as part of the formal process of soliciting interest in the acquisition of the company." [96] The second, captioned "Financing Projections," is completely distinct from the final figures used by William Blair because it served a different purpose -- that set was apparently given by Insight to prospective lenders in its effort to finance its acquisition

---

[91]   See Transcript of Oral Argument on Motion for Preliminary Injunction (Feb. 27, 2007) at 50 (stating that the "critical fact" contained in the Scalia model was that the company was projecting its share price to rise).

[92]   See In re PNB Holding Co. S'holders Litig., 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at *16 (Del. Ch. 2006) ("[O]ur HN14 law has refused to deem projections material unless the circumstances of their preparation support the conclusion that they are reliable enough to aid the stockholders in making an informed judgment."); Loudon v. Archer-Daniels Midland Co., 700 A.2d 135, 145 (Del. 1997) ("Speculation is not an appropriate subject for a proxy disclosure.").

[93]   See King Ex. 2 at SC-YS 000582 (presenting Griffin's P/E multiple calculations).

[94]   See King Aff., Ex. 21 at SC 000264.

[95]   Compare King Aff., Ex. 21 at SC 000264 (showing William Blair's revenue projections of $ 67.641, $ 80.253, and $ 100.041 million and EBITDA projections of $ 13.941, $ 18.422, and $ 24.9 million for 2007 through 2009) with Proxy at 79 (Table 1) (listing identical revenue projections but projecting EBITDA to be $ 13.737 million in 2007, $ 17.89 million in 2008, and $ 24.367 million in 2009).

[96]   Proxy at 79.

924 A.2d 171, *202; 2007 Del. Ch. LEXIS 35, **89

of Netsmart. [97] Neither set of projections included in the Proxy includes any revenue, cost, or earnings estimates for Netsmart's performance in years 2010 and 2011. A likely explanation for that omission is that the projections for those years were not given to any of the bidders.

The parties' original briefs missed the fact that the disclosed Sell Side Projections were not the ones ultimately utilized in connection with William Blair's fairness opinion. They therefore dueled over the materiality of the failure to disclose the Sell Side Projections for 2010 and 2011. The defendants took the position that they were not material because, among other reasons, they were not given to buyers and, as the most distant projections, they were too speculative to require disclosure.

But, that was thin gruel to sustain the omission. Even if it is true that bidders never received 2010 and 2011 projections, that explanation does not undercut the materiality of those forecasts to Netsmart's stockholders. They, unlike the bidders, have been presented with William Blair's fairness opinion and are being asked to make an important voting decision to which Netsmart's future prospects are directly relevant. Further, the Proxy clearly states that the discounted cash flow analysis conducted by William Blair covered the "period commencing January 1, 2007 and [**90] ending December 31, 2011" and that "approximately 82% to 86% of the present value of Netsmart's calculated enterprise value was attributable to the terminal value calculated from the 2011 projected EBITDA." [98] Yet, nowhere in the Proxy is there any financial information [*203] covering that critical, terminal year (or the prior year for that matter).

Making the defendants' position even weaker is the reality that emerged after argument. At that time, it became clear that the Proxy did not contain the *final* William Blair projections underlying its ultimate DCF model and fairness opinion. Thus, the Proxy now fails to give the stockholders the best estimate of the company's future cash flows as of the time the board approved the Merger. Because of this, it is crucial that the entire William Blair model from November 18, 2006 -- not just a two year addendum -- be disclosed in order for shareholders to be fully informed.

Faced with the question of whether to accept cash now in exchange for forsaking [**91]   an interest in Netsmart's

future cash flows, Netsmart stockholders would obviously find it important to know what management and the company's financial advisor's best estimate of those future cash flows would be. **HN15** In other of our state's jurisprudence, we have given credence to the notion that managers had meaningful insight into their firms' futures that the market did not. [99] Likewise, weight has been given to the fairness-enforcing utility of investment banker opinions. It would therefore seem to be a genuinely foolish (and arguably unprincipled and unfair) inconsistency to hold that the best estimate of the company's future returns, as generated by management and the Special Committee's investment bank, need not be disclosed when stockholders are being advised to cash out. That is especially the case when most of the key managers seek to remain as executives and will receive options in the company once it goes private. Indeed, projections of this sort are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or (as already discussed) market multiples. What they cannot hope to do is replicate management's [**92] inside view of the company's prospects.

In concluding that this omission is material, I also take into account that stockholders might place greater value on company-specific estimates of future performance in this situation than on inferences based on supposedly comparable companies. The defendants themselves have stressed Netsmart's unique market niche and its dominant position in a niche market. Therefore, the materiality of a direct evaluation of the value of the company's expected future cash flows might rationally take on more importance in this instance than comparisons to other firms or transactions several times larger or smaller or in different sectors than Netsmart. And the mere fact that William Blair claims to have placed little weight on its DCF analysis seems a poor reason [**93] to blind stockholders to their management's best estimates of the company's future profits.

The conclusion that this omission is material should not be surprising. **HN16** Once a board broaches a topic in its disclosures, a duty attaches to provide information that is "materially complete and unbiased by the omission of

---

[97]   *Id.*

[98]   Proxy at 40.

[99]   *See* Bernard Black & Reinier Kraakman, *Delaware's Takeover Law: The Uncertain Search for Hidden Value,* 96 NW. U. L. REV. 521 (2002) (presenting an amusing and incisive critique of this aspect of our law).

924 A.2d 171, *203; 2007 Del. Ch. LEXIS 35, **93

material facts." [100] [**94] For this reason, when a banker's endorsement [*204] of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. [101] Only providing some of that information is insufficient to fulfill the duty of providing a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the[] board as to how to vote . . . rely." [102]

Aside from the omission of the projections underlying the Blair fairness opinion, the plaintiffs have failed to persuade me that the Proxy does not fairly describe William Blair's work. Several of the items that plaintiffs find objectionable amount to mere nit-picking. For example, the fact that the Proxy states that "minor decreases" in the company's growth rate or margins would have a material negative impact on valuation while omitting the inverse of that proportional relationship [**95] is not a material omission. Likewise, I reject the plaintiffs' demand that the directors and William Blair engage in self-flagellation over the fact that the $ 16.50 Insight price comes in at the low range of William Blair's valuation analyses. [103] Like the plaintiffs, other stockholders can discern that reality from the Proxy itself, which describes the mean and medians of those analyses. Requiring disclosure of the reason why William Blair still gave a fairness opinion in these circumstances would require disclosure of information that the record suggests does not exist. In prior decisions, this court has noted that **HN18** so long as what the investment banker did

is fairly disclosed, there is no obligation to disclose what the investment banker did not do. [104]

Here, there is no evidence in the record indicating that William Blair ever explained its decision to issue a fairness opinion when the Merger price was at a level that was in the lower part of its analytical ranges of fairness. The relevant board minutes simply state:

> In response to Mr. Conway's question of whether William Blair's analysis shows that the proposed transaction is the best possible deal for the Corporation or a deal that is within the range of a fair deal for the Corporation's shareholders, Mr. Palasz answered that the proposed deal is within the range of fairness. [105] [**98]

From this "range of fairness" justification, one can guess that William Blair believed that, given the limited auction it had conducted and the price competition it generated, a price in the lower range was "fair," especially given William Blair's apparent assumption [**97] that an implicit, post-signing market check would be meaningful. I say [*205] guess because these reasons are not developed in the record. The one reason in the record is simply that the price fell within, even if at the lower end, of William Blair's fairness ranges. William Blair's bare bones fairness opinion is typical of such opinions, in that it simply states a conclusion that the offered Merger consideration was "fair, from a financial point of view, to the shareholders" [106] but plainly does not opine whether the proposed deal is either advisable or the best deal reasonably available. Also in keeping with the industry norm, William Blair's fairness

---

[100] *Pure Resources*, 808 A.2d at 448; *see also Frank v. Arnelle*, 1998 Del. Ch. LEXIS 176, 1998 WL 668649, at *3 (Del. Ch. 1998) (citing *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977), and explaining that **HN17** when directors communicate with their company's shareholders, "[c]ompleteness, not adequacy, is the mandate").

[101] *Pure Resources*, 808 A.2d at 449 ("The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result. . . . Like a court would in making an after-the-fact fairness determination, a Pure minority stockholder engaging in the before-the-fact decision whether to tender would find it material to know the basic valuation exercises that First Boston and Petrie Parkman undertook, the key assumptions that they used in performing them, and the range of values that were thereby generated.").

[102] *Id.* at 449.

[103] *In re JCC Holding Co., Inc.*, 843 A.2d 713, 721 (Del. Ch. 2003) ("This kind of quibble with the substance of a banker's opinion does not constitute a disclosure claim.")

[104] *E.g.*, *id* at 721 (**HN19** "Under Delaware law, there [**96] is no obligation on the part of a board to disclose information that simply does not exist."); *see also In re Dataproducts Corp. S'holders Litig.*, 1991 Del. Ch. LEXIS 149, 1991 WL 165301, at *8 (Del. Ch. 1991) (refusing to affirmatively oblige directors to create and then disclose valuations that had not been previously prepared).

[105] King Aff., Ex. 17 at 3.

[106] Proxy at B-2.

924 A.2d 171, *205; 2007 Del. Ch. LEXIS 35, **97

opinion devotes most of its text to emphasizing the limitations on the bank's liability and the extent to which the bank was relying on representations of management. [107] Logically, the cursory nature of such an "opinion" is a reason why the disclosure of the bank's actual analyses is important to stockholders; otherwise, they can make no sense of what the bank's opinion conveys, other than as a stamp of approval that the transaction meets the minimal test of falling within some broad range of fairness.

c. The Proxy Did Not Omit Any Material Information Regarding The Special Committee's Independence

The plaintiffs have also alleged that the Proxy omits information regarding the contemporaneous service of Conway and two members of the Special Committee on other boards of directors.

First, plaintiffs say that Netsmart should have disclosed the simultaneous service of Conway and Special Committee member Shamash on the board of the Long Island Software Technology Network Association ("LISTnet"). This claim is frivolous because that information is, in fact, fully disclosed in the Proxy, which states, "Conway was recently elected to the board of LISTnet" and that Shamash "is a member of the board of directors of LISTnet." [108] Furthermore, LISTnet is a trade group promoting the software industry in Long Island, New York. Simultaneous service on LISTnet's 30 to 35 member board by Conway, a CEO of a Long Island-based software firm, and Shamash, the Vice President of Economic Development and the Dean of the College of Engineering and Applied Sciences [**99] at Stony Brook University in New York, hardly seems confidence-eroding.

The plaintiffs' second allegation has some more color. More by happenstance than by design, the plaintiffs discovered that Conway had previously been invited by Special Committee member Sicinski to serve on the board of Trans Global Services, Inc. ("TransGlobal"), and had held that position for a couple of years while Sicinski was CEO of that company. [109] The Proxy discloses that Sicinski was the CEO of TransGlobal and that he eventually joined the board of Netsmart while Conway was CEO. [110] [**100] But it does not disclose that Conway served on TransGlobal's board. [111] Exactly when Conway served on TransGlobal's board and whether that service overlapped with Sicinski's service on Netsmart's board while Conway was CEO is unclear. The fault for that rests with the plaintiffs, who failed to follow up.

The reason that this claim has some color is that it is plausible to think that in circumstances when a busy executive [*206] (such as Conway) had agreed to help another CEO (such as Sicinski) by serving on his board (TransGlobal), the CEO in Sicinski's position might bring some feeling of beholdness to his later service once he reciprocates by agreeing to serve on Conway's board. In considering the vigor of a Special Committee, this sort of past interlock might be thought to be relevant to a (cynical?) stockholder, on the theory that Conway and Sicinski were part of an implicit CEOs' club whose members did not as outside directors rock the ships other members captained. That does not in any sense imply that a past interlock of this kind would render someone like Sicinski non-independent; [112] rather, it is to admit of the possibility that there are facts that, although not in themselves sufficient to render a committee member non-independent, might be material. Otherwise, there would be no need to disclose anything about independent directors, on the grounds that only the disclosure of [**101] facts that were fatal to their independence was required.

The plaintiffs bear a special burden in this delicate territory, however. *HN21* Federal [**102] regulations and exchange rules address disclosure of this kind in a detailed manner

---

[107] Proxy at B-1, B-2.

[108] Proxy at 73-74.

[109] Conway Dep. at 28-30.

[110] Proxy at 74-75.

[111] *Id.*

[112] Without more, *HN20* directors are not deemed to lose their independence merely because they move in the same social circles or hold seats on the same corporate boards. *E.g., Beam v. Stewart,* 845 A.2d 1040, 1051-52 (Del. 2004) (holding "mov[ing] in the same business and social circles . . . is not enough to negate independence for demand excusal purposes"); *Langner v. Brown,* 913 F. Supp. 260, 266 (S.D.N.Y. 1996) ("The fact that several director defendants sat on the same boards of directors of other companies does not in itself establish lack of independence."); *see also* NASD Rule 4200(14)(E) (including only "a director who is employed as an executive of another entity where any of the company's executives serve on that entity's compensation committee" within its examples of non-independence stemming from simultaneous board service).

that balances the costs of disclosing all past relationships against the need to give stockholders information about some prior relationships that, while not rendering directors non-independent of each other, are important enough to warrant disclosure. Those bodies of authority should not be lightly added to by our law. After a consultation of the pertinent provisions of that authority, unaided by the parties themselves, I fail to perceive any requirement for the disclosure the plaintiffs demand. [113] In view of the tightened definitions of independence that now prevail, I am chary about adding a judicially-imposed disclosure requirement that past interlocking board service involving a target's CEO and another independent director must always be disclosed. This area of disclosure -- i.e., the description of factors bearing on independence -- is already well-covered, some might even say smothered. Certainly, I cannot prudently add to those requirements here where the plaintiffs have entirely failed to make a clear record about when Conway and Sicinski served on the two boards in question, how material [**103] their service as outside directors was to each other as CEOs, and what remuneration they received for their board service.

[*207]  B. Irreparable Harm And The Balance Of The Equities

Having concluded my considerations of the merits prong of the preliminary injunction inquiry, I turn now to the other [**104] prongs, both of which are designed to help the court determine whether the powerful tool of an injunction should be used or whether the court should stay its hand, let events proceed, and address any harm after a final hearing.

I begin with the question of whether the Netsmart stockholders face a possibility of irreparable injury if an injunction does not issue. The defendants say no, because the court, in a later appraisal or equitable action, can always award monetary damages if it believes that the compensation the stockholders stand to receive does not reflect the value of Netsmart and if the plaintiffs meet the other requirements

for obtaining relief (e.g., in the case of an equitable action, proving a non-exculpated breach of fiduciary duty). Therefore, even if the Netsmart stockholders face the possibility of voting on the Insight Merger without access to material facts, the defendants say that the loss of the ability to make an informed decision can be compensated for in cash down the road.

**HN23** Although not without dissonance, this court's jurisprudence has tended to reject the notion that stockholders do not face a threat of irreparable injury when a board seems to have breached [**105] its *Revlon* duties or failed to disclose material facts in advance of a merger vote. No doubt there is the chance to formulate a rational remedy down the line, but that chance involves great cost, time, and, unavoidably, a large degree of imprecision and speculation. After-the-fact inquiries into what might have been had directors tested the market adequately or stockholders been given all the material information necessarily involve reasoned guesswork. Foundational principles of Delaware law also color the approach our courts take to this issue. **HN24** Delaware corporate law strives to give effect to business decisions approved by properly motivated directors and by informed, disinterested stockholders. By this means, our law seeks to balance the interest in promoting fair treatment of stockholders and the utility of avoiding judicial inquiries into the wisdom of business decisions. Thus, doctrines like ratification and acquiescence operate to keep the judiciary from second-guessing transactions when disinterested stockholders have had a fair opportunity to protect themselves by voting no.

Because this feature of our law is so centrally important, this court has typically found a threat [**106] of irreparable injury to exist when it appears stockholders may make an important voting decision on inadequate disclosures. [114] [**107] By issuing an injunction requiring additional disclosure, the court gives stockholders the choice to think for themselves on full information, thereby vindicating their rights as stockholders to make important voting and remedial

---

[113]  As it appears, on a hasty review, that the SEC's proxy disclosure rules do not establish disclosure requirements regarding special committee members who negotiate and approve going-private transactions like this one, I am guided by the SEC's disclosure rules in other contexts. For example, **HN22** with respect to matters involving the election of directors, § 229.401(e)(2) of SEC Reg. S-K requires disclosure only of "other [current] directorships held by each director or person nominated or chosen to become a director. *See also* SEC Reg. § 229.407 (requiring registrants to identify directors meeting exchange rule independence standards and to describe the basis on which the director was determined to be independent).

[114]  *See, e.g., ODS Technologies, Inc. v. Marshall,* 832 A.2d 1254, 1262 (Del. Ch. 2003) (**HN25** "The threat of an uninformed stockholder vote constitutes irreparable harm."); *Pure Resources,* 808 A.2d at 452 ("[I]rreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information."); *see also In re Staples, Inc. S'holders Litig.,* 792 A.2d 934, 960 (Del. Ch. 2001) ("[I]t is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.").

924 A.2d 171, *207; 2007 Del. Ch. LEXIS 35, **107

decisions based on their own economic self-interest. [115] By this approach, **[*208]** the court also ensures that greater effect can be given to the resulting vote down the line, reducing future litigation costs and transactional and liability uncertainty.

**HN27** In the *Revlon* context, the issue of full disclosure intersects with the broader remedial question. In cases where the refusal to grant an injunction presents the possibility that a higher, pending, rival offer might go away forever, our courts have found a possibility of irreparable harm. [116] In other cases when a potential *Revlon* violation occurred but no rival bid is on the table, the denial of injunctive relief is often premised on the imprudence of having the court enjoin the only deal on the table, when the stockholders can make that decision for themselves. [117] **[**109]** The difference in these contexts is not really about the irreparability of the harm threatened to the target stockholders as a theoretical matter, [118] it is really about the different **[**108]** cost-benefit calculus arising from throwing the injunction flag. When another higher bid has been made, an injunction against the target board's chosen deal has the effect of ensuring a fair auction in which the highest bidder will prevail, at comparatively little risk to target stockholders. Indeed, in most circumstances, this means that the chances for a later damages proceeding are greatly minimized given the competition between rival bidders.

**HN29** By contrast, when this court is asked to enjoin a transaction and another higher-priced alternative is not immediately available, it has been appropriately modest **[**110]** about playing games with other people's money. But even in that context, this court has not hesitated to use its injunctive powers to address disclosure deficiencies.

When stockholders are about to make a decision based on materially misleading or incomplete information, a decision not to issue an injunction maximizes the potential that the crudest of judicial tools (an appraisal or damages award) will be employed down the line, because the stockholders' chance to engage in self-help on the front end would have been vitiated and lost forever. [119]

**[*209]** Applied here, the learning from past experience points toward the following result. The Netsmart stockholders face a threat of irreparable injury if an injunction does not issue until such time as the Netsmart board discloses additional information, to wit, the full November 18, 2006 William Blair revenue and earnings projections including the years 2010 and 2011. Absent such disclosure, the company's shareholders will vote without important information regarding their management's and William Blair's best estimates regarding the future cash flow of the company. In a cash-out transaction, this information is highly material, as the stockholders **[**111]** are being asked to give up the possibility of future gains from the on-going operation of the company in exchange for an immediate cash payment. That is especially so when management is staying in the game, leaving the public stockholders behind with their exit payment as compensation for forsaking any share of future gains.

Likewise, here it also seems to me to be important for Netsmart to at least disclose this judicial decision or otherwise provide a fuller, more balanced description of the board's actions with regard to the possibility of finding a strategic buyer. As the Proxy now stands, its description of that issue leads one to the impression that a more reasoned

---

[115]  See *Staples,* 792 A.2d at 960 (*HN26* "An injunctive remedy . . . specifically vindicates the stockholder right at issue--the right to receive fair disclosure of the material facts necessary to cast a fully informed vote--in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable.").

[116]  See, e.g., *QVC Network, Inc. v. Paramount Communications, Inc.,* 635 A.2d 1245, 1273 n.50 (Del. Ch. 1993) (*HN28* "Since the opportunity for shareholders to receive a superior control premium would be irrevocably lost if injunctive relief were not granted, that alone would be sufficient to constitute irreparable harm."), *aff'd,* 637 A.2d 34 (Del. 1994).

[117]  See, e.g., *Toys 'R' Us,* 877 A.2d at 1023 ("[T]he bottom line is that the public shareholders will have an opportunity [] to reject the merger if they do not think the price is high enough in light of the Company's stand-alone value and other options.").

[118]  In *Revlon* itself, the court actually focused on the harm to the frustrated bidder qua bidder, because it would lose the unique opportunity to acquire Revlon. 506 A.2d at 184-85 (finding that absent an injunction the opportunity for the competing bidder to gain control of Revlon would be lost and "the need for both bidders to compete in the marketplace outweighed any injury to [the defendant]"). As a theoretical matter, the damages inquiry of a *Revlon* case is relatively easy to frame -- the difference between what the stockholders received in the deal tainted by *Revlon* violations and what they would have received had the directors complied with their *Revlon* duties. But in a situation when there are no dueling bidders, such as the case here, such an inquiry involves great speculation: Did no one bid because there was no effective sales effort or because the company was not valuable to other buyers?

[119]  See *T. Rowe Price Recovery Fund, L.P. v. Rubin,* 770 A.2d 536, 557-59 (Del. Ch. 2000) (recognizing the utility of more tailored relief).

924 A.2d 171, *209; 2007 Del. Ch. LEXIS 35, **111

and thorough decision-making process had been used, and that the process was heavily influenced by earlier searches for a strategic buyer that provided a reliable basis for concluding that [**112] no strategic buyer interest existed in 2006. [120]

Once that information is disclosed, however, the remedial calculus tilts against a more aggressive injunction. If I enjoined the procession of the Merger vote until Netsmart's board conducted a search for strategic buyers, I would give Insight the right to walk. [121] Insight did not promise to pay $ 16.50 per share in a deal when Netsmart got to actively shop their bid. They promised to pay $ 16.50 per share based on the opposite: Netsmart could only respond to unsolicited superior bids. I perceive no basis where I would have the equitable authority to require Insight to remain bound to complete their purchase of Netsmart while simultaneously reforming the Merger Agreement to increase their transactional risk in that endeavor. Certainly, on this [**113] record, I could not justify such an unusual exercise of authority on the grounds of any misconduct by Insight. The 3% termination fee in the Merger Agreement is not unreasonable, especially given the size of the transaction and the fact that upon triggering more than a third of the fee would simply go to repay Insight's actual expenses. The granting of a broader injunction would therefore pose a risk that Insight might walk or materially lower its bid. It would be hubristic for me to take a risk of that kind for the Netsmart stockholders, and the plaintiffs have not volunteered to back up their demand with a full bond.

With full information, Netsmart stockholders can decide for themselves whether to accept or reject the Insight [**114] deal. If they are confident that the company's prospects are sound and that a search for a strategic buyer or higher-paying financial [*210] buyers will bear fruit, they can vote no and take the risk of being wrong. If they would prefer the bird in hand, they can vote yes and accept Insight's cash. Because directors and officers control less than 15% of the vote on the most generous estimate, the disinterested Netsmart stockholders are well-positioned to carry the day, and most of them are institutional investors.

In refusing to grant a broader injunction, I am also cognizant of the availability of appraisal rights. In an appraisal, the failure of the Netsmart board to test the market for strategic buyers in an active way will have relevance. Unlike past circumstances when the company was fully shopped and the resulting Merger price was deemed the most reliable evidence of fair value in appraisal, [122] a future appraisal proceeding involving Netsmart will involve more uncertainty given the lack of an active market check and Netsmart's micro-cap status. As a result, dissenting Netsmart stockholders might have comparatively greater success in relying upon analyses based on discounted cash [**115] flows or market comparables in appraisal than stockholders whose boards more aggressively shopped their companies.

V. Conclusion

For these reasons, I therefore GRANT the motion for a preliminary injunction against the procession of the Merger vote until the Netsmart board discloses the information I have described. Otherwise, the motion is DENIED. The parties shall collaborate about an implementing order.

---

[120]   *HN30* When directors describe their decision-making process leading up to a merger, they must do so in a fair and balanced way. *E.g., Malone, 722 A.2d at 12; Arnold, 650 A.2d at 1280-82.*

[121]   *See* Proxy at A-44, A-45 & A-47 (setting a termination date of May 15, 2007 and establishing as a condition precedent to closing the absence of any court order or other regulatory action which "prohibits, restricts, or makes illegal consummation of the transactions contemplated").

[122]   *See Union Illinois 1995 Inv. Ltd. Partnership v. Union Financial Group, Ltd., 847 A.2d 340 (Del. Ch. 2004).*

⚠️ Caution

As of: August 12, 2015 12:07 PM EDT

## *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*

Court of Chancery of Delaware, New Castle

May 13, 2010, Submitted; May 13, 2010, Decided

C.A. No. 5402-VCS

**Reporter**

11 A.3d 1175; 2010 Del. Ch. LEXIS 115; 2010 WL 1931084

MARIC CAPITAL MASTER FUND, LTD., Plaintiff, v. PLATO LEARNING, INC., THOMA BRAVO, LLC, PROJECT PORSCHE HOLDINGS CORPORATION, PROJECT PORSCHE MERGER CORP., STEPHEN R. BECKER, MATTHEW A. DRAPKIN, SUSAN E. KNIGHT, JOHN G. LEWIS, M. LEE PELTON, ROBERT S. PETERKIN, VINCENT P. RIERA, JOHN T. SANDERS, and DAVID W. SMITH, Defendants.

## Case Summary

### Procedural Posture

Plaintiff stockholder filed a request for a preliminary injunction (PI) in order to stop a proposed merger by defendants, an acquirer, a corporation to be acquired, and others. The stockholder asserted that defendants failed to comply with their duties under Revlon and its progeny.

### Overview

The stockholder asserted that defendants' failure to comply with their duties under Revlon and its progeny supported issuance of the PI against the closing of the merger, which was set for a stockholder vote. The court issued a prior bench ruling, finding that the stockholder had not established a reasonable probability of success on the Revlon issue. Other issues that were more substantial were reserved. Upon consideration of the reserved issues, the court determined that the merger should be enjoined until corrective disclosures were made on issues in the corporation's proxy statement. The court noted that the proxy statement presented a materially misleading description of how the investment bank that provided the corporate board with a fairness opinion came to its discount rate for its discounted cash flow valuation. Further, the proxy statement selectively disclosed projections relating to the corporation's future performance and selectively removed the free cash flow estimates. Lastly, the proxy statement created a materially misleading impression that management was given no

expectations regarding the treatment they could receive from the acquirer.

### Outcome

The court granted the request for the PI.

## LexisNexis® Headnotes

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... Meetings & Voting > Voting Shares > General Overview

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

*HN1* A breach of the disclosure duty leads to irreparable harm. On account of this, a court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information. Irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

*HN2* While directors do not have to provide information that is simply "helpful," once they take it upon themselves to disclose information, that information must not be misleading.

Business & Corporate Law > ... > Meetings & Voting > Voting Shares > General Overview

*HN3* When stockholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance. This is because the stockholders must measure the relative attractiveness of retaining their shares

11 A.3d 1175, *1175; 2010 Del. Ch. LEXIS 115, **1

versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows. A proxy statement should give the stockholders the best estimate of the company's future cash flows as of the time the board approved the transaction.

**Counsel:** **[**1] Norman M. Monhait, Esquire, P. Bradford deLeeuw, Esquire, ROSENTHAL, MONHAIT & GODDESS, P.A., Wilmington, Delaware; Joseph F. Rice, Esquire, William S. Norton, Esquire, J. Brandon Walker, Esquire, Rebecca P. Merritt, Esquire, MOTLEY RICE, LLC, Mt. Pleasant, South Carolina, Attorneys for Plaintiff Maric Capital Master Fund, Ltd.

Gregory P. Williams, Esquire, Blake Rohrbacher, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Wendy J. Wildung, Esquire, Will F. Stute, Esquire, Leif T. Simonson, Esquire, Justin P. Krypel, Esquire, FAEGRE & BENSON, LLP, Minneapolis, Minnesota, Attorneys for Defendants PLATO Learning, Inc., Steven R. Becker, Matthew A. Drapkin, Susan E. Knight, John G. Lewis, M. Lee Pelton, Robert S. Peterkin, Vincent P. Riera, J. Ted Sanders, and David W. Smith.

Michael D. Goldman, Esquire, Brian C. Ralston, Esquire, Matthew D. Stachel, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; James F. Basile, Esquire, Eliot A. Adelson, Esquire, KIRKLAND & ELLIS LLP, San Francisco, California, Attorneys for Defendants Thoma Bravo, LLC, Project Porsche Holdings Corporation and Project Porsche Merger Corp.

**Judges:** STRINE, Vice Chancellor.

**Opinion by:** STRINE

## Opinion

[*1175] MEMORANDUM OPINION

**STRINE, Vice Chancellor.** **[**2]

Earlier today, the plaintiff, Maric Capital Master Fund, Ltd., sought a preliminary injunction against the procession of a proposed merger, involving the acquisition **[*1176]** of PLATO Learning, Inc. ("PLATO") by Thoma Bravo, LLC ("Thoma Bravo") for $ 5.60 per share. The plaintiff argued that the defendants had failed to comply with their duties under *Revlon v. McAndrews & Forbes Holdings, Inc.* [1] and its progeny, and that this failure supported the issuance of an injunction against the closing of the merger, which is set for a stockholder vote on May 19, 2010. The buyer can walk away if the merger does not close before June 1, 2010. In a bench ruling, I found that the plaintiff had not established a reasonable probability of success on the *Revlon* issue and that it did not constitute grounds for an injunction. I reserved on three issues raised by the plaintiffs that were more substantial, and indicated that I would rule promptly.

After further reflection on the record and today's argument, I conclude that the merger should be enjoined until corrective disclosures are made on three issues in the corporation's proxy statement. [2] Because the merger vote is **[**3] fast approaching, there is a risk to stockholders if they wish to support the merger and the termination date of June 1 arrives without closing, and thus there is no benefit, and great danger, to delay if that can be responsibly avoided, I have endeavored to rule expeditiously.

First, the proxy statement presented a materially misleading description of how Craig-Hallum, the investment bank that provided the PLATO board with a fairness opinion, came to its discount rate for its discounted cash flow valuation. In the proxy statement, it says that Craig-Hallum selected discount **[**4] rates "based upon an analysis of PLATO Learning's weighted average cost of capital." [3] The proxy statement then indicates that Craig-Hallum used a range of 23% to 27% in conducting its DCF. [4] In that respect, it is the literal case that the DCF analysis presented to the Special Committee used a range of 23% to 27%. [5] But that range was not the result of the analysis of the WACC simultaneously given to the Special Committee. In reality, Craig-Hallum calculated two estimates of a so-called WACC,

---

[1]   506 A.2d 173 (Del. 1986).

[2]   *See* In re Transkaryotic Therapies, Inc., 954 A.2d 346, 360-61 (Del. Ch. 2008) (*HN1* "[A] breach of the disclosure duty leads to irreparable harm. On account of this, the Court grants injunctive relief to prevent a vote from taking place where there is a credible threat that shareholders will be asked to vote without such complete and accurate information."); In re Pure Resources, Inc. S'holders Litig., 808 A.2d 421, 452 (Del. Ch. 2002) ("This court has recognized that irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.").

[3]   Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 33.

[4]   *Id.*

[5]   Rohrbacher Aff. Ex. 7 (Craig-Hallum presentation to PLATO's Special Committee (Mar. 25, 2010)) at PLATO 0060.

one using a very loose variation of the capital asset pricing model and one using a comparable companies analysis. These generated discounts rates of 22.6% and 22.5%, both very hefty but both below the 23% bottom disclosed in the proxy statement. [6] These analyses were given to the Special Committee. [7]

To explain this discrepancy, the defendants point to the deposition of Craig-Hallum's Hugh Hoffman, who said that Craig-Hallum chose the 23% to 27% range because (1) the WACC of [**5] comparable companies was around 25%, (2) PLATO's estimated WACC was about 23%, and (3) Craig-Hallum felt that choosing a higher [*1177] number -- 27% -- was appropriate because PLATO is a micro-cap company with illiquid stock. [8] But there is no evidence that Craig-Hallum told the Special Committee that it chose the 23% to 27% range for these reasons, and, at oral argument, defendants' counsel candidly conceded that there is no evidence, such as board minutes, indicating that Craig-Hallum ever told the Special Committee these reasons. As important, the only tangible evidence of any *actual analysis* by Craig-Hallum is the analysis generating the 22.5% and 22.7% figures. Thus, I conclude that the proxy statement, which explains that the range is derived from PLATO's WACC analyses, is likely misleading. Indeed, the explanation that the 25% figure was necessary because that was the WACC of Saba, a company which Craig-Hallum considered most comparable to PLATO, is directly contradicted by Craig-Hallum's analysis of the discount rate using a comparable company approach, an analysis that resulted in a 22.5% rate. [9] Because of the use of this lofty 23-27% range, the deal price is portrayed as being [**6] more favorable than it would have been if Craig-Hallum had used even the girthy 22.5% and 22.6% discount rates derived in its actual calculations. Notably, these large rates are comprised of eyebrow-raising premiums that Craig-Hallum heaped on top of the core CAPM analysis, including a technology "industry risk premium" of 1.4% and a small cap premium of 9.5%. [10] These alone comprise a cost of equity higher than many blue chip companies. Because PLATO has no debt, its cost of capital equals its cost of equity. The idea that Craig-Hallum subjectively added a further liquidity discount on top of PLATO's healthy beta of 1.12 and the other subjective discounts is itself dubious as a valuation practice. [11] For now, however, what is critical is that the only actual analysis performed by Craig-Hallum and given to the Special Committee generated discount rates of 22.5% and 22.7%, not anything higher.

Because the proxy statement spoke on this subject, there was a duty to do so in a non-misleading fashion. [12] As important, because the failure to describe what the banker actually came up with in its (as noted) quite high WACC, the proxy statement presents a range that suggests that the merger price is far more attractive than what the Craig-Hallum valuation would have shown had it used the discount rate generated by Craig-Hallum's actual "analysis of PLATO Learning's weighted average cost of capital." [13] This, in my [*1178] view, bears materially on the decision to be made by PLATO's stockholders. Unless the proxy statement is supplemented by a corrective disclosure

---

[6]   *Id.* at PLATO 0077.

[7]   *Id.*

[8]   Hoffman Dep. 65-72.

[9]   *See supra* note 6.

[10]   *See* O'Connor Aff. Ex. B at PLATO 0077; Hoffman Dep. at 55-60.

[11]   Obviously, this approach has the risk of counting identical risks multiple times -- *e.g.*, heaping a liquidity discount based on a small market capitalization on top of a small stock premium. Indeed, [**7] the use of a liquidity discount by a *sell-side* banker is strange for many reasons, including the legal one that such discounts cannot be considered in appraisal, *see Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144-45 (Del. 1989), and several business reasons, including PLATO's status as a public company.

[12]   *See In re MONY Group Inc. S'holder Litig.*, 852 A.2d 9, 25 (Del. Ch. 2004) (*HN2* "[W]hile directors [**8] do not have to provide information that is simply 'helpful,' once they take it upon themselves to disclose information, that information must not be misleading."); *see also Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding that defendants had violated their duty of disclosure where they disclosed a "floor" value but not an equally reliable "ceiling" value, because "full disclosure . . . was a prerequisite" to endorsing one value over another).

[13]   Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 33. *Cf. In re Topps Co. S'holders Litig.*, 926 A.2d 58, 74-77 (Del. Ch. 2007) (finding that a proxy was materially misleading where it did not disclose a second, more conservative analysis prepared by the target's financial advisor, but instead used an "analysis [that] cast the price [the acquiror] was offering to pay in a quite different light").

indicating the value that would be obtained by using the discount rates Craig-Hallum actually calculated, the merger will be enjoined.

Likewise, the proxy statement selectively disclosed projections relating to PLATO's future performance. In particular, the proxy statement for some inexplicable reason excised the free cash flow estimates that had been made by PLATO's management and provided to Craig-Hallum. This is odd. Although I recognize [**9] that there is a legitimate concern about the prolixity of proxy statements and that reasonable minds might differ on this issue, [14] in my view, management's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information. [15] If, as is encouraged under sound corporate finance theory, the value of stock should be premised on the expected future cash flows of the corporation, [16] the question that PLATO investors should be asking in determining whether to vote for the cash merger is clear: is the price being offered now fair compensation for the benefits I will receive as a stockholder from the future expected cash flows of the corporation if the corporation remains as a going concern? The trade off here is that PLATO's stockholders can get $ 5.60 for sure, but must forsake the value that might obtain if the corporation remains independent and delivers on management's expected cash flows.

Given the centrality of this issue, I believe that the proxy statement omits material information by, for reasons not

adequately explained, selectively removing the free cash flow estimates from the projections provided to PLATO's stockholders.  [*1179]  Until this information is disclosed, the merger will be enjoined.

Finally, the proxy statement also says that "[i]n reaching their decision to approve the merger and the merger agreement," PLATO's special committee and board considered "the fact that Thoma Bravo did not negotiate terms of employment, including any compensation arrangements or equity participation in the surviving corporation, with [PLATO's] management for the period [**12] after the merger closes." [17] This statement suggests that the decision whether to sell PLATO to Thoma Bravo was unaffected by any understandings between Thoma Bravo and the company's management about future economic arrangements. Although it may be the case that there were not "negotiations" over a formal employment agreement between PLATO's CEO, Vincent Riera, and Thoma Bravo, the reality is that Riera had extended discussions with Thoma Bravo in which the typical equity incentive package given by Thoma Bravo to management was discussed. [18] That package was described as typically consisting of 10% of the common stock, with 4% going to the CEO, and the record suggests that Riera was led to believe that the typical package could be expected and that

---

[14]   See In re PNB Holding Co. S'holders Litig., 2006 Del. Ch. LEXIS 158, 2006 WL 2403999, at * 16 (Del. Ch. Aug. 18, 2006) ("Even in the cash-out merger context, though, it is not our law that every extant estimate of a company's future results, however stale or [**10] however prepared, is material."); see also In re General Motors (Hughes) S'holder Litig., 2005 Del. Ch. LEXIS 65, 2005 WL 1089021, at * 13 (Del. Ch. May 4, 2005) ("Delaware law does not require 'directors to bury the shareholders in an avalanche of trivial information. Otherwise, shareholder solicitations would become so detailed and voluminous that they will no longer serve their purpose.'") (citations omitted).

[15]   See In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 203 (Del. Ch. 2007) (HN3 "When stockholders must vote on a transaction in which they would receive cash for their shares, information regarding the financial attractiveness of the deal is of particular importance. This is because the stockholders must measure the relative attractiveness of retaining their shares versus receiving a cash payment, a calculus heavily dependent on the stockholders' assessment of the company's future cash flows."); see also David P. Simonetti Rollover IRA v. Margolis, 2008 Del. Ch. LEXIS 78, 2008 WL 5048692, at *10 (Del. Ch. June 27, 2008) ("A proxy statement should 'give the stockholders the best estimate of the company's future cash flows as of the time the board approved the [transaction].'" (quoting Netsmart, 924 A.2d at 203)).

[16]   See  [**11] RICHARD A. BREALEY & STEWART C. MYERS, PRINCIPLES OF CORPORATE FINANCE 75 (7th ed. 2003) ("[The] value [of stock] always equals future cash flow discounted at the opportunity cost of capital."); SHANNON P. PRATT, ROBERT F. REILLY & ROBERT P. SCHWEIHS, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 40 (4th ed. 2000) ("The value of [stock] depends upon an estimate of the future benefits and the required rate of return at which those future benefits are discounting back to the valuation date.").

[17]   Rohrbacher Aff. Ex. A (PLATO Learning, Inc. Proxy Statement (Apr. 20, 2010)) at 25.

[18]   See Riera Dep. at 72, 89.

11 A.3d 1175, *1179; 2010 Del. Ch. LEXIS 115, **13

top management would likely be retained. [19] During those discussions, Riera also specifically asked whether Thoma Bravo liked to retain management, and was assured that Thoma Bravo typically liked to keep existing management after an acquisition. [20] Although I see no reason in the record or from my understanding of industry practices to believe that PLATO's management would not have rationally believed that another private equity buyer would [**13] provide incumbent management with similar incentives, the proxy statement in my view creates the materially misleading impression that management was given no expectations regarding the treatment they could receive from Thoma Bravo. [21] The proxy statement should be corrected to clarify the extent of actual discussions between Riera and Thoma Bravo.

The parties shall collaborate on an implementing order. Once timely and satisfactory disclosures are made in a way that gives the PLATO stockholders adequate opportunity to digest them before a final merger vote, the injunction will be lifted.

---

[19] *Id.* at 92-93; deLeeuw Aff. Ex. 20 (handwritten notes of Riera) at PLATO 0967.

[20] *See* Reira Dep. at 73 (indicating that, at a dinner with Thoma Bravo sometime in February 2010, he had "asked if they [Thoma Bravo] typically teamed with existing management teams or they had their own management teams that they like to put in place, in which case they responded we typically team with existing management teams"); *see also* deLeeuw Aff. Ex. 26 (initial offer letter from Thoma Bravo to PLATO (July 30, 2009) (indicating that "[a]s with most of our investments, Thoma Bravo views this transaction as an opportunity to partner with PLATO's current management team to continue to build the Company. As such we would expect to offer the Company's [**14] management a market based compensation package, including significant incentive ownership interest in the business going forward.").

[21] *Arnold v. Soc'y for Sav. Bancorp*, 650 A.2d 1270, 1280 (Del. 1994) ("[O]nce the defendants traveled down the road of partial disclosure of the history leading up to [a merger], they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.").

⚠️ Caution

As of: September 2, 2015 3:01 PM EDT

## *Seinfeld v. Barrett*

United States District Court for the District of Delaware

March 31, 2006, Decided

Civil Action No. 05-298-JJF

**Reporter**

2006 U.S. Dist. LEXIS 14827; Fed. Sec. L. Rep. (CCH) P93,840

FRANK R. SEINFELD, Plaintiff, v. CRAIG R. BARRETT, CHARLENE BARSHEFSKY, E. JOHN P. BROWNE, D. JAMES GUZY, REED E. HUNDT, PAUL S. OTELLINI, DAVID S. POTTRUCK, JANE E. SHAW, JOHN L. THORNTON, DAVID B. YOFFIE, ANDREW S. GROVE, and INTEL CORPORATION, Defendants.

## Case Summary

### Procedural Posture

Plaintiff shareholder alleged that defendants, corporate officers and a corporation, violated § 14(a) of the Securities Exchange Act of 1934 and S.E.C. Rule 14a-9 and breached their fiduciary duties under Delaware law by making false or misleading statements in a proxy statement. Defendants filed a motion to dismiss pursuant to *Fed. R. Civ. P. 23.1* and for lack of subject matter jurisdiction. The shareholder filed a motion for summary judgment.

### Overview

The proxy statement provided that if the shareholders approved executive incentive bonuses, the bonuses would be tax deductible under *I.R.C. § 162(m)*. The shareholder claimed that *26 C.F.R. § 1.162-27(e)(4)(i)* barred the deductions when the bonuses were paid regardless of approval and that defendants misled the shareholders by omitting material terms like the variables used and the amount of the bonuses. The court found that while the shareholder failed to demonstrate that the directors were interested or lack independence, the shareholder pleaded facts sufficient to raise a reason to doubt that the action was taken honestly and in good faith. Thus, the shareholder showed that it was futile to make a demand under *Fed. R. Civ. P. 23.1*. The case was ripe for review because the parties were adverse; the claim did not involve uncertain events; and the possible expiration of the statute of limitations under § 14(a) of the Securities Exchange Act of 1934 was a hardship on the shareholder. However, the court found that the shareholder was not entitled to summary judgment because reasonable minds could differ on the materiality of the tax deduction and the omitted information.

### Outcome

The court denied all motions.

## LexisNexis® Headnotes

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Civil Procedure > Preliminary Considerations > Federal & State Interrelationships > Erie Doctrine

Civil Procedure > ... > Class Actions > Derivative Actions > Demand Requirement

***HN1*** *Fed. R. Civ. P. 23.1* requires a plaintiff to allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors and the reasons for the plaintiff's failure to obtain the action or for not making the effort. *Fed. R. Civ. P. 23.1*. *Rule 23.1* only goes to the adequacy of a plaintiff's pleadings, however; the substantive requirements of demand are a matter of state law.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Civil Procedure > ... > Class Actions > Derivative Actions > Demand Futility

***HN2*** Under Delaware law, the entire question of demand futility under *Fed. R. Civ. P. 23.1* is inextricably bound to issues of business judgment and the standards of that doctrine's applicability. As a result, in considering whether demand would have been futile, a trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a

2006 U.S. Dist. LEXIS 14827, *14827

reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment. These two inquiries are disjunctive, meaning that if either prong is met, demand is excused.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Civil Procedure > ... > Class Actions > Derivative Actions > Demand Futility

Evidence > Inferences & Presumptions > Presumptions

*HN3* Under the first prong of the demand futility test for *Fed. R. Civ. P. 23.1*, directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders. A director lacks independence when a director's decision is based on extraneous influences, rather than the merits of the transaction. In order for a court to find that demand is futile due to director interest or a lack of independence, a majority of the board of directors, or one-half of an evenly-numbered board, must be interested or lack independence. If the first prong is not satisfied, there is a presumption that the board's actions were the product of a valid exercise of business judgment. Thus, to satisfy the second prong, a plaintiff must plead sufficient particularized facts to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision.

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Civil Procedure > ... > Class Actions > Derivative Actions > Demand Futility

*HN4* The mere threat of personal liability for approving a board action does not lead to the conclusion that a director is interested or lacks independence under the demand futility test.

Civil Procedure > ... > Justiciability > Ripeness > General Overview

Constitutional Law > The Judiciary > Case or Controversy > Ripeness

*HN5* U.S. Const. art. III, § 2 requires the existence of a justiciable case or controversy before a federal court may exercise jurisdiction over a matter. One aspect of justiciability is ripeness which determines when a proper party may bring an action.

Civil Procedure > ... > Justiciability > Ripeness > Tests for Ripeness

Constitutional Law > The Judiciary > Case or Controversy > Ripeness

*HN6* The United States Supreme Court has established a two-part inquiry for determining whether a case is ripe for review. Under this two-part inquiry, a court must look to (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. Under the fitness inquiry, a court will consider whether the issues are legal or factual, whether the disputed action is final, whether the claim involves contingent events, and the adversarial nature of the parties' relationship. Under the hardship inquiry, a court looks to whether the challenged action creates a direct and immediate dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices.

Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Fraud & Misrepresentation

Business & Corporate Law > ... > Actions Against Corporations > Derivative Actions > Procedural Matters

Securities Law > Postoffering & Secondary Distributions > Proxies > Private Rights of Action

*HN7* Under § 14(a) of the Securities Exchange Act of 1934 and S.E.C. Rule 14a-9, there is no additional requirement that a defendant do anything beyond making a false statement.

Governments > Legislation > Statute of Limitations > Time Limitations

Securities Law > Postoffering & Secondary Distributions > Proxies > Private Rights of Action

Securities Law > ... > Statute of Limitations > Postoffering & Secondary Distributions > Implied Private Rights of Action

*HN8* The statute of limitations on claims filed pursuant to § 14(a) of the Securities Exchange Act of 1934 expires one year after a plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

*HN9* Pursuant to *Fed. R. Civ. P. 56(c)*, a party is entitled to summary judgment if a court determines from its examination of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that there are no genuine issues of material

2006 U.S. Dist. LEXIS 14827, *14827

fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. However, a court should not make credibility determinations or weigh the evidence.

> Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof

**HN10** To defeat a motion for summary judgment, the non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of *Fed. R. Civ. P. 56(c)*, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. However, the mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue.

> Business & Corporate Law > ... > Meetings & Voting > Voting Shares > Proxy Agreements

> Securities Law > Postoffering & Secondary Distributions > Proxies > Materiality

> Securities Law > Postoffering & Secondary Distributions > Proxies > Private Rights of Action

**HN11** In order to prevail on a claim under § 14(a) of the Securities Exchange Act of 1934, a plaintiff must prove that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than a particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction. The materiality of the misrepresentation or omission is determined by looking to whether there is a substantial likelihood that a reasonable shareholder would find the fact significant in deciding how to vote.

> Business & Corporate Law > ... > Directors & Officers > Compensation > Bonuses & Severance Pay

> Tax Law > ... > Compensation & Welfare Benefits > Tips, Wages & Other Compensation > Bonuses & Tips

> Tax Law > Federal Income Tax Computation > Business Expenses > Entertainment & Trade Expenses

> Tax Law > ... > Individuals > Business Deductions > Deductibility Requirements

**HN12** *I.R.C. § 162(m)* provides a deduction for performance-based compensation in excess of $ 1,000,000,

subject to several restrictions. *26 U.S.C.S. § 162(m)*. This deduction is not available, however, if the compensation would be paid regardless of whether the material terms are approved by shareholders. *26 C.F.R. § 1.162-27(e)(4)(i)*.

> Business & Corporate Law > ... > Meetings & Voting > Voting Shares > Proxy Agreements

> Securities Law > Postoffering & Secondary Distributions > Proxies > Materiality

> Securities Law > Postoffering & Secondary Distributions > Proxies > Private Rights of Action

**HN13** Materiality is a mixed question of law and fact and cannot be decided as a matter of law unless the omission is so obviously important to the shareholder's decision that reasonable minds cannot differ on the question of materiality and the underlying facts and inferences to be drawn from those facts are free from controversy.

> Business & Corporate Law > ... > Meetings & Voting > Voting Shares > Proxy Agreements

> Securities Law > Postoffering & Secondary Distributions > Proxies > Materiality

**HN14** A court must look to whether a statement was material to a shareholder in making its decision, not to whether the amount was material in the overall scheme of company profitability.

> Business & Corporate Law > ... > Directors & Officers > Compensation > Bonuses & Severance Pay

> Business & Corporate Law > ... > Meetings & Voting > Voting Shares > Proxy Agreements

> Securities Law > Postoffering & Secondary Distributions > Proxies > Materiality

> Securities Law > Postoffering & Secondary Distributions > Proxies > Minimum Disclosure Standards

**HN15** The Code of Federal Regulations gives a non-exhaustive list of material terms including: the employees eligible to receive compensation; a description of the business criteria on which the performance goal is based; and either the maximum amount of compensation that could be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained. *26 C.F.R. § 1.162-27(e)(4)(i)*.

> Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

> Business & Corporate Law > ... > Meetings & Voting > Voting Shares > Proxy Agreements

2006 U.S. Dist. LEXIS 14827, *14827

Securities Law > Postoffering & Secondary Distributions > Proxies > Materiality

**HN16** Under Delaware law, a board of directors is under a fiduciary duty to disclose fully and fairly all material information within the board's control when seeking shareholder action. This disclosure obligation clearly attaches to proxy statements. Because the Delaware Supreme Court has adopted the same standard for materiality as that established by the United States Supreme Court, materiality is a mixed question of law and fact.

**Counsel:**  **[*1]**  For Frank D. Seinfeld, Plaintiff: Francis G.X. Pileggi, FOX ROTHSCHILD, LLP, Wilmington, DE.

For Craig R. Barrett, Charlene Barshefsky, E. John P. Browne, D. James Guzy, Reed E. Hundt, Paul S. Otellini, David S. Pottruck, Jane E. Shaw, John L. Thornton, David B. Yoffie, Andrew S. Grove, Intel Corporation, Defendants: Stephen C. Norman, Potter Anderson & Corroon, LLP, Wilmington, DE.

**Judges:** Joseph J. Farnan Jr., UNITED STATES DISTRICT JUDGE.

**Opinion by:** Joseph J. Farnan Jr.

# Opinion

## MEMORANDUM OPINION

March 31, 2006

Wilmington, Delaware

Joseph J. Farnan Jr.

**Farnan, District Judge.**

Pending before the Court is Defendants' Motion To Dismiss Based Upon Failure To Comply With *Rule 23.1* (D.I. 15), Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter (D.I. 19), and Plaintiff's Motion For Summary Judgment (D.I. 5). For the reasons discussed, all Motions will be denied.

## Background

This derivative lawsuit relates to a Proxy Statement, issued by Defendants in March 2005, which discussed four proposals to be voted on by Intel Corporation's ("Intel") shareholders: the reelection of ten of the eleven board members, the approval a public accounting firm for the year, amendments to and extension of the 2004 Equity Incentive Plan, and amendments to and extension of the Executive Officer Incentive Program ("EOIP"). Plaintiff alleges that **[*2]**  the Proxy Statement provided that if the shareholders approved the bonuses listed under the EOIP, the bonuses would be tax deductible; if the shareholders did not approve, however, the same bonuses would be given but they would not be deductible.

On May 16, 2005, Plaintiff filed his Complaint, alleging that Defendants violated *Section 14(a)* of the Securities Exchange Act of 1934 (and *Rule 14a-9* promulgated thereunder) and breached their fiduciary duties under Delaware law. Specifically, Plaintiff alleges that Defendants made false or misleading statements in the Proxy Statement by representing to the shareholders that the company would receive a tax deduction if the EOIP were approved. According to Plaintiff, there would be no deduction, regardless of whether the shareholders approved the EOIP, because the tax code does not allow a deduction where the same benefits will be given to the executive officers even if the shareholders do not approve the plan. Plaintiff further alleges that the Proxy Statement was false or misleading because material terms were omitted, specifically, the variables used and the amount of the bonuses for 2005.

On June 7, 2005, Plaintiff filed its Motion For **[*3]** Summary Judgment (D.I. 5). Defendants filed their motions to dismiss (D.I. 15, 19) on June 27, 2005.

**Parties' Contentions**

By their first Motion (D.I. 15), Defendants contend that Plaintiff violated *Federal Rule of Civil Procedure 23.1* and Delaware state law by failing to make a demand on the Board prior to filing this lawsuit. By their second Motion (D.I. 19), Defendants contend that the Court lacks subject matter jurisdiction because the claims are not ripe for review. Specifically, Defendants contend that the claims will not be ripe for review until payments are made under the 2005 EOIP, a tax deduction has been claimed, or the IRS rules that the deductions would be improper. Finally Defendants contend that the Court should not grant Plaintiff's motion for summary judgment because "there are multiple issues of fact affecting multiple elements of plaintiff's claims" and because Plaintiff is not entitled to judgment as a matter of law. (D.I. 26 at 2).

In response, Plaintiff contends that demand would have been futile due to the Directors' interest and lack of business judgment. Plaintiff further contends that the claims are ripe

2006 U.S. Dist. LEXIS 14827, *3

for **[*4]** review because the claims arose when the allegedly false or misleading statements were made to shareholders. Finally, Plaintiff requests that the Court grant summary judgment on all of its claims because he contends that there are no issues of fact and he is entitled to judgment as a matter of law.

## Discussion

## I. Whether Plaintiff Failed To Comply With Rule 23.1 And Delaware State Law By Failing To Make A Demand On The Board of Directors

*HN1* *Federal Rule of Civil Procedure 23.1* requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors…and the reasons for the plaintiff's failure to obtain the action or for not making the effort." *Fed. R. Civ. P. 23.1*. *Rule 23.1* only goes to the adequacy of a plaintiff's pleadings, however; "the substantive requirements of demand are a matter of state law." *Blasband v. Rales, 971 F.2d 1034, 1047 (3d Cir. 1992)*.

*HN2* Under Delaware law, "the entire question of demand futility is inextricably bound to issues of business judgment and the standards of that doctrine's applicability." **[*5]** *Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984)* (overruled on other grounds). As a result, in considering whether demand would have been futile,

> the trial court is confronted with two related but distinct questions: (1) whether threshold presumptions of director disinterest or independence are rebutted by well-pleaded facts; and, if not, (2) whether the complaint pleads particularized facts sufficient to create a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.

*Levine v. Smith, 591 A.2d 194, 205 (Del. 1990)* (overruled on other grounds). These two inquiries are disjunctive, meaning that if either prong is met, demand is excused. *In re J.P. Morgan Chase & Co. S'holder Litig., No. 531-N, 2005 Del. Ch. LEXIS 51, at *28 (Del. Ch. Apr. 29, 2005)*.

*HN3* Under the first prong, "directorial interest exists whenever divided loyalties are present, or where the director stands to receive a personal financial benefit from the transaction not equally shared by the shareholders." *Blasband, 971 F.2d at 1048*. A director lacks independence when a director's decision **[*6]** is based on extraneous influences, rather than the merits of the transaction. *Id.* In order for a court to find that demand is futile due to director interest or a lack of independence, a majority of the board of directors, or one-half of an evenly-numbered board, must be interested or lack independence. *Beam v. Stewart, 845 A.2d 1040, 1046 n.8 (Del. 2004)*.

If the first prong is not satisfied, there is a presumption that the board's actions were the product of a valid exercise of business judgment. *Id. at 1049*. Thus, to satisfy the second prong, a plaintiff must plead sufficient particularized facts to "raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision." *In re J.P. Morgan Chase & Co., 2005 Del. Ch. LEXIS 51, at *39* (quoting *In re Walt Disney Co. Derivative Litig., 825 A.2d 275, 286 (Del. Ch. 2003)*) (citations omitted).

The Court concludes that Plaintiff has failed to plead particularized facts sufficient to overcome the presumption of director disinterest and independence. Plaintiff states that **[*7]** "the entire board is neither disinterested nor independent since every member of the board is liable for violation of *§ 14(a)* of the Exchange Act, *Rule 14a-9*, and Schedule 14A." (D.I. 1 at 3). *HN4* The mere threat of personal liability for approving a board action, however, does not lead to the conclusion that a director is interested or lacks independence. *Aronson, 473 A.2d at 815*. Furthermore, Plaintiff has not alleged any other facts demonstrating that a majority of the Board is interested, nor has he refuted Defendants' contention that the Board of ten members contains, at most, three interested members. (D.I. 16 at 3-4) ("Of Intel's ten current Directors, only one is an officer of the company, and only two are eligible to participate in the 2005 EOIP.").

While Plaintiff has failed to demonstrate that the directors are interested or lack independence, the Court concludes that Plaintiff has pleaded facts sufficient to raise a reason to doubt that the action was taken honestly and in good faith. In his Complaint, Plaintiff alleges that Defendants made a false or misleading statement when they promised tax deductions to shareholders in return for their approval of the **[*8]** EOIP, when, in fact, no tax deduction would result under *26 CFR 1.162-27(e)(4)(i)*. Plaintiff further alleges that Defendants misled shareholders when they omitted material terms, namely the variables used and the amount of the bonuses for 2005. These allegations could raise issues as to the honesty and good faith of the Directors. Accordingly, the Court concludes that demand on the Board would be futile, and the Court will, therefore, deny Defendants' Motion To Dismiss Based Upon Failure To Comply With *Rule 23.1* (D.I. 15).

## II. Whether The Court Should Dismiss Plaintiff's Complaint For Lack Of Jurisdiction Over The Subject Matter

Having concluded that demand would be futile, the Court must determine whether the Court has subject matter jurisdiction over Plaintiff's claims.

*HN5* Article III, Section 2 of the United States Constitution requires the existence of a justiciable case or controversy before a federal court may exercise jurisdiction over a matter. *Presbytery of New Jersey of the Orthodox Presbyterian Church v. Florio, 40 F.3d 1454, 1462 (3d Cir. 1994).* "One aspect of justiciability is ripeness which 'determines when a proper **[*9]** party may bring an action.'" *Philadelphia Fed'n of Teachers v. Ridge, 150 F.3d 319, 323 (3d Cir. 1998)* (quoting *Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1154 (3d Cir. 1995))* (citations omitted).

*HN6* The United States Supreme Court has established a two-part inquiry for determining whether a case is ripe for review. Under this two-part inquiry, a court must look to (1) "the fitness of the issues for judicial decision and [(2)] the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner, 387 U.S. 136, 149, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967).* Under the fitness inquiry, a court will consider whether the issues are legal or factual, whether the disputed action is final, whether the claim involves contingent events, and the adversarial nature of the parties' relationship. *Ridge, 150 F.3d at 323.* Under the hardship inquiry, a court looks to "whether the challenged action creates a 'direct and immediate' dilemma for the parties, such that the lack of pre-enforcement review will put the plaintiffs to costly choices." Id.

The Court concludes that this case is ripe for review. First, the case is fit for judicial review. **[*10]** The parties are adverse; Plaintiff is a shareholder suing derivatively for false statements allegedly made by Defendants to shareholders. Additionally, the claim does not involve contingent or uncertain events, nor is the claim bound up in the facts. Defendants contend that the case will not be ripe for review until after there are payments under the 2005 EOIP, a tax deduction has been claimed, or the IRS rules that the deductions would be improper. The Court concludes, however, that if *Section 14(a)* and *Rule 14a-9* were violated, they were violated by the making of the allegedly false and misleading statements in order to solicit shareholder approval. See *General Elec. Co. v. Cathcart, 980 F.2d 927, 932 (3d Cir. 1992).* *HN7* There is no additional requirement that a defendant do anything beyond making the false statement.

Second, the Court finds there would be a great hardship to Plaintiff if the Court withholds consideration. The most significant hardship may be the expiration of the statute of limitations. *HN8* The statute of limitations on claims filed pursuant *Section 14(a)* expires "one year after the plaintiff discovers the facts constituting the violation, and in no event **[*11]** more than three years after such violation." *Westinghouse Elec. Corp. v. Franklin, 993 F.2d 349, 353 (3d Cir. 1993).* If the Court delays this action until a tax deduction is claimed or is rejected by the IRS, the statute of limitations may run, and Plaintiff would be unable to assert his claim. Additionally, the Court finds Plaintiff will be harmed if the Court withholds consideration, because the payments, approved by the shareholders due to the allegedly false or misleading statements, will be made in 2006.

Because this case is fit for judicial review and there will be a hardship to Plaintiff if the Court withholds consideration, the Court will deny Defendants' Motion To Dismiss For Lack Of Jurisdiction Over The Subject Matter (D.I. 19).

### III. Whether The Court Should Grant Plaintiff's Motion For Summary Judgment

Having concluded that Plaintiff did not fail to comply with *Rule 23.1* and that the Court does not lack jurisdiction over the subject matter, the Court turns to Plaintiff's Motion For Summary Judgment (D.I. 5).

#### A. Legal Standard

*HN9* Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure,* a party **[*12]** is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c).* In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. *Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).* However, a court should not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).*

*HN10* To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (citations omitted). **[*13]** However, the

2006 U.S. Dist. LEXIS 14827, *13

mere existence of some evidence in support of the nonmovant will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmovant on that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

B. Analysis

1. *Plaintiff's Claims Under Section 14(a) Of The Securities Exchange Act Of 1934*

Plaintiff alleges that Defendants violated *Section 14(a)* of the Securities Exchange Act of 1934 by making false and misleading statements in the Proxy Statement. **HN11** In order to prevail on his *Section 14(a)* claims, Plaintiff must prove that "(1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than a particular defect in the solicitation materials, was 'an essential link in the accomplishment of the transaction.'" *Cathcart, 980 F.2d at 932.* [1] The materiality of the misrepresentation or omission is determined by looking to whether "there is a substantial likelihood that a reasonable shareholder would find the fact significant in deciding [*14] how to vote." Id.

a. Whether Plaintiff Is Entitled To Summary Judgment Under *Section 14(a)* For Defendants' Statement That Payments Under The EOIP Would Be Tax Deductible

The Proxy Statement provided that the purpose of the EOIP was to guarantee that compensation paid to executives over $ 1,000,000 would be tax deductible under *Section 162(m) of the Internal Revenue Code*. **HN12** *Section 162(m)* provides a deduction for performance-based compensation in [*15] excess of $ 1,000,000, subject to several restrictions. D.I. 5, Ex. 2 at B-1; *26 U.S.C. § 162(m)*. This deduction is not available, however, if "the compensation would be paid regardless of whether the material terms are approved by shareholders." *26 C.F.R. § 1.162-27(e)(4)(i)*.

Plaintiff contends that the Proxy Statement contained a false or misleading statement because it represented that compensation paid under the EOIP would be tax deductible when it would not be, because the executives would allegedly receive the bonus regardless of whether the

shareholders approved the proposal. The Proxy Statement provided in pertinent part:

> If our stockholders do not approve the EOIP at the annual meeting, we will terminate the EOIP plan, and we will not pay any incentives under this plan for the 2005 performance year. However, we expect to make incentive payments to the executive officers in amounts similar to those that would have otherwise been paid under the EOIP; the difference is that we will lose a portion of the tax deductibility that would have otherwise been available to us. The Compensation Committee has not adopted a policy [*16] that all compensation paid must be tax-deductible and qualified under *Section 162(m)* of the Tax Code. If we cannot deduct incentives from our taxes, it will increase the overall cost of these incentive payouts to us and thus to our stockholders through reduced net income.

(D.I. 5, Ex. B at 39).

In arguing that summary judgment should be granted, Plaintiff primarily relies on the Third Circuit's decision in *Shaev v. Saper, 320 F.3d 373 (3d Cir. 2003)*. In *Shaev*, the Proxy Statement at issue provided that the board of directors "may grant another bonus for fiscal year 2000, a portion of which may not be deductible under *Section 162(m)*" if the shareholders did not approve the executive compensation plan. (D.I. 5, Ex. 1 at 13). The Court, deciding a motion to dismiss, concluded that this statement "undermined the deductibility of the bonus even if the shareholders approved it." *Shaev, 320 F.3d at 381*. Accordingly, the plaintiff had adequately alleged that the defendants made a false statement by promising a tax deduction if the shareholders approved the executive compensation plan. *Id. at 384-85*.

The Court concludes that summary [*17] judgment is not appropriate at this juncture. First, **HN13** materiality is a "mixed question of law and fact," *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*, and cannot be decided as a matter of law unless the omission is "so obviously important to the shareholder's decision that reasonable minds cannot differ on the question of materiality and the underlying facts and inferences to be drawn from those facts are free from controversy." *Gould v. American Hawaiian Steamship Co., 535 F.2d 761, 771 (3d Cir. 1976)*. The Court is unable to

---

[1]   The parties dispute the existence and extent of a "state of mind" requirement. Plaintiff contends that a mental state is not required because he seeks only an injunction, or alternatively, that only negligence is required to prove a violation of *Section 14(a)*. Defendants contend that actual knowledge is required under a safe harbor provision for forward-looking statements. The Court concludes that it need not reach the question of a state of mind requirement because the motion for summary judgment will be denied on other grounds.

App000406

conclude as a matter of law that tax deductibility was so obviously important that reasonable minds could not differ on the question of materiality. [2]

[*18]    Second, the Court concludes that *Shaev* is distinguishable from this case because the allegedly false statements in the Proxy Statement differ from those in Shaev. Furthermore, the Court cannot rely on *Shaev* to dispose of the issues here because *Shaev* involved a motion to dismiss and looked only to the adequacy of the plaintiff's pleadings. Here the Court is presented with a motion for summary judgment and, therefore, must look to the merits of the claims. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment on Plaintiff's claim that Defendants violated *Section 14(a)* by making a false statement pertaining to the tax deductibility of executive bonuses under the EOIP.

b. Whether Plaintiff Is Entitled To Summary Judgment Under *Section 14(a)* For Alleged Omissions From The Proxy Statement

Plaintiff's original claim was that Defendants [3] violated *Section 14(a)* by omitting the three variables used to determine the bonuses and the amount of the bonuses for 2005 from the Proxy Statement. In his reply brief, however, Plaintiff recognized that neither the EPS nor the amount of the bonuses for 2005 would be determined until the end of 2005. (D.  [*19]  I. 68 at 3-4). Thus, the Court will discuss Plaintiff's claim in light of the other omitted variables.

The Court concludes that summary judgment cannot be granted. As discussed above, materiality is a mixed question of law and fact. The Court is unable to conclude that the variables were so obviously important that reasonable minds could not differ on their materiality, particularly because the terms were defined and were provided for other years.

Additionally, *HN15* the Code of Federal Regulations gives a non-exhaustive list of material terms including:

the employees eligible to receive compensation; a description of the business criteria on which the performance goal is based; and either the maximum amount of compensation that could [*20] be paid to any employee or the formula used to calculate the amount of compensation to be paid to the employee if the performance goal is attained.

*26 C.F.R. § 1.162-27(e)(4)(i)*. The Proxy Statement provides for each of these terms: the employees eligible to receive compensation are Intel's executive officers; the EOIP includes the formula for calculating the bonuses; and the maximum amount of compensation that can be provided to any employee is $ 5,000,000. The Court cannot determine as a matter of law whether there were other material terms requiring inclusion. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment on Plaintiff's claim that Defendants violated *Section 14(a)* by omitting certain variables for the year 2005 from the Proxy Statement.

2. *Plaintiff's Claim For Breach Of Fiduciary Duty*

Plaintiff contends that the false and misleading statements also give rise to a claim for breach of fiduciary duty. **HN16** "Under Delaware law, a board of directors is under a fiduciary duty to disclose fully and fairly all material information within the board's control when seeking shareholder action. This disclosure obligation clearly [*21] attaches to proxy statements." *State of Wisconsin Inv. Bd. v. Peerless Sys. Corp., No. 17657, 2000 Del. Ch. LEXIS 170, *58 (Del. Ch. December 4, 2000)* (citing *Stroud v. Grace, 606 A.2d 75, 84 (Del. 1992)*). Because the Delaware Supreme Court has adopted the same standard for materiality as that established by the United States Supreme Court in TSC Industries, materiality is a mixed question of law and fact. *Rosenblatt v. Getty Oil Co., 493 A.2d 929, 944 (Del. 1985)*. As discussed above, the Court concludes that a determination of materiality in this case is inappropriate for consideration on summary judgment. Accordingly, the Court will deny Plaintiff's Motion For Summary Judgment (D.I. 5).

**Conclusion**

For the reasons discussed, Plaintiff's Motion For Summary Judgment (D.I. 5), Defendants' Motion To Dismiss Based Upon Failure To Comply With *Rule 23.1* (D.I. 15), and Defendants' Motion To Dismiss For Lack Jurisdiction Over The Subject Matter (D.I. 19) will all be denied.

---

[2]   Defendants argue that the statement is immaterial because the amount of the tax deduction is small in relation to Intel's revenues for 2005. This is not the standard. *HN14* The Court must look to whether the statement was material to the shareholder in making its decision, not to whether the amount was material in the overall scheme of company profitability.

[3]   The three variables are the earnings per share ("EPS"), annual incentive baseline amounts, and annual factor for each executive officer. These three variables are used in a mathematical formula to determine the amount of the qualified executive officers' bonuses each year.

App000407

2006 U.S. Dist. LEXIS 14827, *21

An appropriate Order will be entered.

**ORDER**

At Wilmington, the 31 day of March 2006, for the reasons set forth in the Memorandum Opinion issued **[*22]** this date;

IT IS HEREBY ORDERED that:

    1. Plaintiff's Motion For Summary Judgment (D.I. 5) is **DENIED.**

    2. Defendants' Motion To Dismiss Based Upon Failure To Comply With *Rule 23.1* (D.I. 15) is **DENIED.**

    3. Defendants' Motion To Dismiss For Lack of Subject Matter Jurisdiction (D.I. 19) is **DENIED.**

Joseph J. Farnan Jr.

UNITED STATES DISTRICT JUDGE

⚠️ Caution

As of: August 11, 2015 6:28 PM EDT

# *Arnold v. Soc'y for Sav. Bancorp*

Supreme Court of Delaware

October 21, 1994, Submitted ; December 28, 1994, Decided

No. 473, 1993

**Reporter**

650 A.2d 1270; 1994 Del. LEXIS 406; Fed. Sec. L. Rep. (CCH) P98,492

ROBERT H. ARNOLD, Plaintiff Below, Appellant, v. SOCIETY FOR SAVINGS BANCORP., INC., a Delaware Corporation, DAVID T. CHASE, SANFORD CLOUD, JR., LAWRENCE CONNELL, ROBERT E. GREEN, JEROME H. GROSSMAN, BETSY HENLEY-COHN, RONALD D. JARVIS, EDWARD W. LARGE, EDWARD J. OKAY, JOHN F. SHEA, JR., FLORIAN A. STANG, JERRY F. STONE, JR., BANK OF BOSTON CORPORATION, and BBC CONNECTICUT HOLDING CORPORATION, Defendants Below, Appellees.

**Subsequent History:** **[**1]** As Corrected January 4, 1995. Released for Publication January 20, 1995.

**Prior History:** Court Below: Court of Chancery of the State of Delaware in and for New Castle County. C.A. No. 12883.

**Disposition:** AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

## Case Summary

**Procedural Posture**

Plaintiff appealed from decision of the Court of Chancery of the State of Delaware, New Castle County, granting summary judgment to defendants in a suit arising out of a merger of defendant, a Massachusetts holding corporation, with a wholly-owned Connecticut subsidiary of defendant Delaware corporation.

**Overview**

Plaintiff sought preliminary injunction to enjoin the consummation of merger of defendant Massachusetts holding corporation with a wholly-owned Connecticut subsidiary of defendant Delaware corporation. Plaintiff claimed that the trial court erred in holding that certain alleged omissions and misrepresentations in the merger's proxy statement were immaterial and were not required to be disclosed. On

appeal, the court held that once defendants traveled down the road of partial disclosure of history leading up to the merger, they had an obligation to provide stockholders with an accurate, full, and fair characterization of those historic events. The court found that the existence of a bid for an acceptance corporation, a subsidiary of defendant Delaware corporation, was material. The court further held that a limitation provision in defendant Delaware corporation's certificate of incorporation, which paralleled language of *Del. Code Ann. tit. 8, § 102(b)(7)*, shielded the individual defendants from personal liability for failing to disclose the bid for the acceptance corporation and that the shield was not waived.

**Outcome**

The court reversed in part as to the materiality of the partial disclosure of the proxy and affirmed the remainder of the judgment.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > General Overview

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

Civil Procedure > Appeals > Standards of Review > De Novo Review

*HN1* A trial court's decision granting summary judgment is subject to de novo review. A court's appellate review implicates a determination of whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law. In making this determination, if the trial court's factual conclusions are sufficiently supported by the record and are the product of an orderly and logical deductive process, the court accepts them, even though independently the court might have reached opposite conclusions. In an appropriate case, the court may review de novo mixed questions of law and fact,

650 A.2d 1270, *1270; 1994 Del. LEXIS 406, **1

such as determinations of materiality, and in certain cases make its own findings of fact upon the record below. The court will affirm the trial court's legal rulings unless they represent an error in formulating or applying legal principles.

> Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview
>
> Governments > Fiduciaries
>
> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders
>
> Mergers & Acquisitions Law > Takeovers & Tender Offers > General Overview

*HN2* A majority stockholder owes a fiduciary duty which requires "complete candor" in disclosing fully all the facts and circumstances surrounding a tender offer.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
>
> Governments > Fiduciaries
>
> Mergers & Acquisitions Law > Mergers > General Overview
>
> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Shareholders

*HN3* Directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action. The obligation attaches to proxy statements and any other disclosures in contemplation of stockholder action. The essential inquiry is whether the alleged omission or misrepresentation is material.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
>
> Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

*HN4* An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
>
> Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > General Overview

*HN5* Courts should not assess the qualitative importance of a particular disclosure item when corporate directors seek shareholder action because the standard requires "full" disclosure of all material facts. Further, materiality is to be assessed from the viewpoint of the "reasonable" stockholder, not from a director's subjective perspective.

> Mergers & Acquisitions Law > Mergers > General Overview

*HN6* In a merger proxy statement disclosures, materiality requires a careful balancing of the potential benefits of disclosure against the possibility of resultant harm.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
>
> Securities Law > Investment Advisers > Fiduciary Responsibilities

*HN7* A board of directors must balance potential benefit versus harm when deciding whether or not to disclose an investment advisor's earnings per share valuation. In opining that an offer is fair, where an investment advisor promulgates a "best case" projection predicated on an interplay of several, uncertain variables, the forecasted value need not be disclosed because it is too speculative and thus immaterial. Disclosing an overly optimistic per share figure may be harmful because it might induce stockholders to hold out for an elusive, higher bid. This risk cannot be reduced significantly by attempting to qualify the figure. In fact, disclosure of an unreliable share valuation can, under some circumstances, constitute material misrepresentation.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
>
> Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview
>
> Governments > Fiduciaries

*HN8* See *Del. Code Ann. tit. 8, § 102(b)(7)*.

> Governments > Legislation > Interpretation

*HN9* A court should not resort to legislative history in interpreting a statute where statutory language provides unambiguously an answer to the question at hand.

> Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

650 A.2d 1270, *1270; 1994 Del. LEXIS 406, **1

**HN10** Claims alleging disclosure violations that do not otherwise fall within any exception are protected by *Del. Code Ann. tit. 8, § 102(b)(7)* and any certificate of incorporation provision adopted pursuant thereto.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

**HN11** Where a defendant is a director and officer, only those actions taken solely in the defendant's capacity as an officer are outside the purview of *Del. Code Ann. tit. 8, § 102(b)(7)*.

Contracts Law > Contract Conditions & Provisions > Waivers > General Overview

**HN12** The standard for finding waiver in Delaware is quite exacting. Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and intent to waive. Moreover, the facts relied upon must be unequivocal in nature.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview

Mergers & Acquisitions Law > Mergers > General Overview

Mergers & Acquisitions Law > Sales of Assets > General Overview

**HN13** The directors of a corporation have the obligation of acting reasonably to seek the transaction offering the best value reasonably available to the stockholders in at least the following three scenarios: (1) when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company; (2) where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company; or (3) when approval of a transaction results in a sale or change of control. In the latter situation, there is no sale or change in control when control of both companies remains in a large, fluid, changeable and changing market.

**Counsel:** William Prickett, Esquire, Michael Hanrahan, Esquire, and Ronald A. Brown, Jr., Esquire (argued), Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Delaware, for Appellant.

A. Gilchrist Sparks, III, Esquire (argued), and Seth D. Rigrodsky, Esquire, Morris, Nichols, Arsht & Tunnell,

Wilmington, Delaware; Bingham, Dana & Gould, Boston, Massachusetts, Of Counsel, for Corporate Defendants.

Jesse A. Finkelstein, Esquire, Richards, Layton & Finger, Wilmington, Delaware; Richard F. Ziegler, Esquire (argued), Cleary, Gottleib, Stein & Hamilton, New York, New York, Of Counsel, for Individual Defendants.

**Judges:** Before VEASEY, Chief Justice, WALSH, HOLLAND, HARTNETT and BERGER, Justices, constituting the Court en Banc.

**Opinion by:** VEASEY

# Opinion

 [*1273]  VEASEY, Chief Justice:

In this appeal from a judgment of the Court of Chancery  [**2]     in favor of defendants we consider the contention of plaintiff below-appellant Robert H. Arnold ("plaintiff") that the trial court erred in granting defendants' summary judgment motion and denying his own. This suit arose out of a merger (the "Merger") of BBC Connecticut Holding Corporation ("BBC"), a wholly-owned Connecticut subsidiary of Bank of Boston Corporation ("BoB"), a Massachusetts corporation, into Society for Savings ("Society"), a wholly-owned Connecticut subsidiary of Society for Savings Bancorp, Incorporated ("Bancorp"), a Delaware corporation. In accordance with the Merger, Bancorp ultimately merged with BoB. Plaintiff was at all relevant times a Bancorp stockholder. Plaintiff named as defendants Bancorp, BoB, BBC, and twelve of fourteen members of Bancorp's board of directors (collectively "defendants"). [1]

 [**3]  Plaintiff's central claim is that the trial court erred in holding that certain alleged omissions and misrepresentations in the Merger proxy statement were immaterial and need not have been disclosed. Plaintiff also claims that the Court of Chancery erroneously held that the duties enunciated in *Revlon* [2] and its progeny were not implicated. Also at issue on this appeal is whether or not the individual defendants can be held liable if a disclosure violation is found in view of the exemption from liability provision in Bancorp's certificate of incorporation, adopted pursuant to *8 Del. C. § 102(b)(7)* ("*Section 102(b)(7)*"). For the reasons set forth below, we hold that the Court of Chancery erred in failing

---

[1]    Plaintiff did not name as defendants Rudolph P. Arnold, Esq. (no relation to plaintiff), the Chairman of the board of directors of Bancorp (the "Chairman"), and director Robert Weinerman ("Weinerman"), both of whom abstained from the Merger vote.

[2]    *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del. Supr. 506 A.2d 173 (1986).

650 A.2d 1270, *1273; 1994 Del. LEXIS 406, **3

to find that plaintiff's claim that the partial disclosures in the Merger proxy statement made it materially misleading with respect to one particular fact. In all other respects we find that the trial court committed no reversible error.

 [**4]  We further hold that, in all events, the limitation provision in Bancorp's certificate of incorporation shields the individual defendants from personal liability for the disclosure violation found to exist in this case. Finally, we hold that plaintiff's claim that *Revlon* was implicated under the circumstances of this case is without merit. Therefore, we REVERSE in part and AFFIRM in part the judgment of the Court of Chancery, and REMAND the case to the Court of Chancery for proceedings consistent with this opinion.

### I. NATURE AND STAGE OF PROCEEDINGS

On March 3, 1993, plaintiff sought a preliminary injunction to enjoin consummation of the Merger, scheduled to occur on July 9, 1993. Under the terms of the Merger, Bancorp stockholders would receive 0.80 shares of BoB in exchange for each Bancorp share based on the trading price of BoB shares at closing (subject to an adjustable $ 20 per share cap). Plaintiff alleged that defendants breached their fiduciary duties of care and candor in the proxy statement dated February 1, 1993 (the "proxy statement") which was sent to stockholders seeking approval of the Merger. [3]

 [**5]  The Court of Chancery denied plaintiff's motion for preliminary injunction, concluding that plaintiff had failed to show a reasonable probability of success on the merits. [4]
 [**6]   The trial court did not find any need for corrective disclosures in *Arnold I*. Defendants had filed motions to dismiss and for summary  [*1274]  judgment before the ruling on the preliminary injunction. The trial court deferred ruling on these motions at that time. The Merger was effected on July 9, 1993. On that date, plaintiff filed a cross-motion for partial summary judgment. In an opinion and order dated December 15, 1993 (the "Opinion"), the Court of Chancery granted defendants' motion for summary judgment and denied plaintiffs cross motion, holding that defendants did not violate their duty of disclosure. [5] The

Court found that the alleged omissions and misrepresentations were immaterial as a matter of law. The Court also rejected plaintiff's "*Revlon* claim." The judgment of dismissal based on the Opinion is the subject of this appeal.

### II. FACTS

The following operative facts govern this litigation. In 1991 Bancorp was suffering from severe financial distress, including an imminent threat of regulatory takeover, due mostly to Society's poor performance. In fact, Bancorp was being kept afloat mainly by the high profitability of Fidelity Acceptance Corporation ("FAC"), a Society subsidiary. Early that year, Bancorp began investigating whether it could "unlock" FAC's value from Bancorp's other poorly-performing assets.

On April 30, 1991, Bancorp publicly announced that it had retained Goldman, Sachs & Company ("Goldman") to identify transactions that would enhance stockholder value. After having canvassed the market for potential acquirors, Goldman informed the Bancorp board of directors (the "board") that there was a paucity of interest in Bancorp. Bancorp then considered selling itself in four parts--Society's deposits, Society's investment and loan assets, FAC, and a "stub" entity. [6] Under this scenario, the sale of each part was  [**7]   contingent upon sale of the others. As part of this effort, Goldman solicited bids for FAC and for Society's deposits, informing bidders in late 1991 and early 1992 that Bancorp was still available for sale in its entirety. Offers for Bancorp were not forthcoming.

Although FAC was not offered for sale separately, Goldman received nine bids solely for FAC. Eventually, Norwest Corporation ("Norwest") merged as the highest bidder, with a bid for FAC forecasted to be approximately $ 275 million as of December 31, 1992. [7]

Norwest's bid for FAC also was conditioned on the securing of all requisite regulatory approvals, among other provisos.

---

[3]    In support of his preliminary injunction motion, plaintiff also contended that defendants violated 10 Del. C. § 371. Defendants in turn moved to dismiss based on jurisdictional grounds. The Court of Chancery rejected plaintiff's claim and deferred ruling on defendants' arguments. *Arnold v. Society for Sav. Bancorp, Inc.,* Del. Ch., 1993 Del. Ch. LEXIS 85, *11-12, C.A. No. 12883 (May 25, 1993) ("*Arnold I*"). The trial court's treatment of these two issues is not before this Court.

[4]    *Arnold I, slip op.* at 17-18. Plaintiff did not appeal from this decision. The failure to appeal the interlocutory order denying the preliminary injunction does not affect plaintiff's right to prosecute this appeal.

[5]    *Arnold v. Society for Sav. Bancorp., Inc.,* Del. Ch., 1993 Del. Ch. LEXIS 275, C.A. No. 12883 (Dec. 15, 1993).

[6]    The "stub" consisted primarily of foreclosed real estate properties potentially subject to environmental liabilities.

[7]    The exact, final figure was subject to market-driven interest rate fluctuations.

650 A.2d 1270, *1274; 1994 Del. LEXIS 406, **7

Regulatory [**8] approval, however, turned out to be problematic. The board engaged several financial advisors to evaluate potential profit-maximizing alternatives, including Goldman, Salomon Brothers Incorporated ("Salomon"), and Merrill, Lynch, Fenner, Smith & Pierce, Incorporated ("Merrill Lynch"), all of whom confirmed the unlikelihood of FAC's sale being effected without selling simultaneously the remaining components of Bancorp.

On May 28, 1992, Goldman presented the following mutually-dependent proposal (the "May Proposal") to the board: BoB would purchase Society's deposits; Norwest would purchase FAC; Goldman itself would purchase much of Society's loan portfolio; and Society's unsalable assets would be relegated to the stub. Goldman advised the board that no such transaction had ever been executed successfully. Also, all three potential purchasers insisted that their purchases be secured by the stub and that sufficient cash be reserved to indemnify them against any asset losses. Given that Society's liabilities exceeded its assets, the reserve cash would have been transferred to the stub from FAC's sale proceeds.

Goldman estimated that stockholders could receive a net value of $ 15.94 per [**9] share, subject to market fluctuations. That value could be increased should a positive value of $ 3.32 per share for the stub assets materialize. In [*1275] that scenario, Goldman estimated a total value of $ 229.4 million or $ 19.26 per share. The stub value was very uncertain, however. In fact, Director David T. Chase ("Chase") opined to the board that the stub more likely had a negative value of $ 3 per share. If that were the case the net value receivable by Bancorp stockholders would amount to approximately $ 13 per share. [8]

Lawrence Connell ("Connell"), Bancorp's recently-hired Chief Executive Officer, President and board member, recommended that the board pursue the May Proposal, notwithstanding potential associated risks. After deliberations, however, the board rejected the May Proposal, five in [**10] favor and eight opposed (5-8), [9] as too risky

and speculative. The board thereafter terminated Goldman and issued a press release indicating that Bancorp intended to focus on strengthening itself as an independent entity. Connell was to concentrate on managing Bancorp. [10]

Shortly thereafter, representatives of BoB and Connell discussed a possible acquisition of Bancorp, examining the possibility throughout the summer of 1992. Connell enlisted Goldman's assistance as well as help from Bancorp senior personnel in the negotiations. In June or July, 1992, Connell casually mentioned BoB's interest to the Chairman. Connell did not formally disclose these developments to any board members until BoB sent a written expression of interest on [**11] August 24, 1992, which Connell relayed in substance to some board members.

On August 27, 1992, Connell informed the entire board that BoB had conducted due diligence in July and August and was interested in merging with Bancorp. The board discussed the terms of BoB's offer--each Bancorp share would be exchanged for 0.78 BoB share, with BoB to receive no-shop and lock-up rights. BoB conditioned the offer on quick approval by the board. The board negotiated with BoB over the next three days and, when the board reconvened on August 31, approved the Merger. The final terms were as follows: the exchange ratio was increased in favor of Bancorp stockholders from 0.78 to 0.80, BoB was granted a share cap of $ 20 and a modified lock-up agreement, and Bancorp obtained a "fiduciary out" provision as part of the no-shop clause. The initial vote was eight in favor, one opposed, with five abstentions (8-1-5). After BoB satisfied the concerns of certain board members, [11] [**12] twelve directors voted in favor and two (the Chairman and Weinerman) abstained (12-0-2). [12] Under the terms of the Merger, Bancorp stockholders would receive $ 17.30 per share as of August 28, 1992.

On February 1, 1993, Bancorp issued the proxy statement, which discussed: the May Proposal; the May 28, 1992, board decision rejecting the May Proposal; the negotiations between Connell and BoB during the summer of 1992; the

[8]   During a hearing on plaintiff's motion for preliminary injunction, defendants admitted that they had not and could not determine with precision the magnitude of negative value attributable to Bancorp's non-FAC assets.

[9]   Director Florian A. Stang ("Stang") left the meeting before the vote was taken but favored the May Proposal.

[10]   The Chairman, who voted against the May Proposal, equivocated on the question of whether Connell was also authorized to entertain inquiries from potential acquirors.

[11]   BoB agreed to two modifications: first, that BoB would use "best" rather than "reasonable" efforts to obtain regulatory approval; and second, that the $ 20 per share cap would be adjusted upward in the event the transaction failed to close by June 30, 1993.

[12]   The Chairman and Weinerman later approved the Merger at a March 4, 1993 shareholder meeting.

650 A.2d 1270, *1275; 1994 Del. LEXIS 406, **12

substance of the August 27 and 31 board meetings (including the final terms approved by the board and the two vote tallies); and the Chairman's and Weinerman's abstentions including their reasons therefor. The proxy statement did not disclose the contingent $ 275 million bid by Norwest for FAC or Goldman's qualified estimate of $ 19.26 for Bancorp shares, both of which were generated in connection with the failed May Proposal. On March 4, 1993, Bancorp's stockholders approved the Merger **[*1276]** with 7,750,253 shares in favor, [13] 1,389,272 in opposition, 264,146 abstaining, and 2,552,297 not voting. The Merger was consummated on July 9, 1993.

**[**13] III. SCOPE OF APPELLATE REVIEW**

Here, the case was decided by the Court of Chancery on cross-motions for summary judgment. ***HN1*** A trial court's decision granting summary judgment is subject to de novo review. *Stroud v. Grace, Del. Supr., 606 A.2d 75, 81 (1992).* Our appellate review implicates a determination of whether the record shows that there is no genuine, material issue of fact and the moving party is entitled to judgment as a matter of law. Ch. Civ. R. *56(c); Fleer Corp. v. Topps Chewing Gum, Inc., Del. Supr., 539 A.2d 1060, 1061-62 (1988)* (interpreting Ch. Civ. R. 56(c)); *Bershad v. Curtiss-Wright Corp., Del. Supr., 535 A.2d 840, 844 (1987).*

In making this determination, if the trial court's factual conclusions "are sufficiently supported by the record and are the product of an orderly and logical deductive process . . . we accept them, even though independently we might have reached opposite conclusions." *Levitt v. Bouvier, Del. Supr., 287 A.2d 671, 673 (1972).* Nevertheless, in an appropriate case, this Court may review de novo mixed questions of [**14] law and fact, such as determinations of materiality, *Zirn v. VLI Corp., Del. Supr., 621 A.2d 773, 777 (1993),* and in certain cases make its own findings of fact upon the record below, *Shell Petroleum, Inc. v. Smith, Del. Supr., 606 A.2d 112, 114 (1992).* The Court will affirm the trial court's legal rulings unless they represent an "error in formulating or applying legal principles." *Gilbert v. El Paso Co., Del. Supr., 575 A.2d 1131, 1142 (1990).*

**IV. DISCLOSURE CLAIMS**

Plaintiff claims that defendants violated their fiduciary duty of disclosure in four ways. Plaintiff's two material omissions claims are that defendants, though making partial disclosures

as to each, omitted (i) Norwest's $ 275 million bid for FAC and (ii) Goldman's valuation of Bancorp shares at $ 19.26. The misrepresentation claims relate to (i) the negotiation, approval and attempted renegotiation of the Merger and (ii) the validity and reliability of management's projections. Additionally, plaintiff argues that BoB is liable as an aider and abettor because it played a significant and substantial role in preparing the [**15] allegedly deficient proxy statement.

Defendants respond that each of these categories of facts is immaterial and need not have been disclosed. They further contend that disclosure could actually have misled Bancorp stockholders absent extensive qualifiers in the proxy statement. The Court of Chancery found that the alleged omissions and misrepresentations were immaterial as a matter of law and granted summary judgment to defendants. Opinion at 10-20. As to BoB's liability as an alleged aider and abettor, defendants argue that because the Court of Chancery did not reach this claim, this Court should remand the issue if they are found to have committed disclosure violations.

The genesis of Delaware law regarding disclosure obligations can be traced to the seminal case of *Lynch v. Vickers Energy Corp.,* Del. Supr., 383 A.2d 278 (1978), where, in the context of a self-tender, this Court held that ***HN2*** a majority stockholder "owed a fiduciary duty . . . which required 'complete candor' in disclosing fully 'all the facts and circumstances surrounding the' tender offer." *383 A.2d at 279* (quoting *Lynch v. Vickers Energy Corp., Del. Ch., 351 A.2d 570, 573 (1976));* [**16] *accord Shell Petroleum, Inc. v. Smith, Del. Supr., 606 A.2d 112, 114-15 (1993)* (majority stockholder bears burden of showing full disclosure of all facts within its knowledge that are material to stockholder action). A number of subsequent decisions have recognized the existence of fiduciary disclosure obligations. E.g., *In re Tri-Star Pictures, Inc., Del. Supr., 634 A.2d 319, 331-32, 334 (1993); Cede & Co. v. Technicolor, [*1277] Inc., Del. Supr., 634 A.2d 345, 372-73 (1993); Zirn v. VLI Corp., Del. Supr., 621 A.2d 773, 778 (1993); Stroud v. Grace, Del. Supr., 606 A.2d 75, 84-88 (1992); Bershad v. Curtiss-Wright Corp., Del. Supr., 535 A.2d 840, 846 (1987); Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929, 936, 944-45 (1985); Smith v. Van Gorkom, Del. Supr., 488 A.2d 858, 889-93 (1985); Weinberger v. UOP, Inc., Del. Supr., 457 A.2d 701, 710-12 (1983).*

In *Stroud,* the Court explicated that the disclosure obligation [**17] "represents nothing more than the well-recognized

---

[13]   Of this number, the directors, officers, and their affiliates owned 3,405,938 shares as of January 20, 1993, all of which were cast in favor of the Merger. Accordingly, of the votes cast in favor of the Merger, approximately 44 percent were owned by directors, officers, and their affiliates.

proposition that *HN3* directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *606 A.2d at 84*; *accord Cede, 634 A.2d at 372-73*; *Shell Petroleum, 606 A.2d at 113 n.3*. The obligation attaches to proxy statements and any other disclosures in contemplation of stockholder action. *Stroud, 606 A.2d at 85*; *Blasius Indus. v. Atlas Corp., Del. Ch., 564 A.2d 651, 659 n.2 (1988)*. The essential inquiry is whether the alleged omission or misrepresentation is material. *E.g., Stroud, 606 A.2d at 84*.

Materiality is defined as follows:

> *HN4* An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused a reasonable investor to change his vote. What the standard does **[**18]** contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*TSC Indus. v. Northway, Inc., 426 U.S. 438, 449, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)* (emphasis added); *Rosenblatt v. Getty Oil Co., Del. Supr., 493 A.2d 929, 944 (1985)* (adopting *Northway* standard as law of Delaware); *see also Zirn v. VLI Corp., Del. Supr., 621 A.2d 773, 778-79 (1993)*. *HN5* Courts should not assess the qualitative importance of a particular disclosure item, *Lynch*, 383 A.2d at 281-82, because the standard requires "full" disclosure of all material facts, *Van Gorkom, 488 A.2d at 890* (noting that *Lynch's* requirement to disclose "germane" facts means those that are "material"). Further, materiality is to be assessed from the **[**19]** viewpoint of the "reasonable" stockholder, not from a director's subjective perspective. *Zirn, 621 A.2d at 779*.

## V. DISCLOSURE ISSUES IN THIS CASE

The Court of Chancery decided that the contingent FAC bid of $ 275 million was immaterial as a matter of law "under all the circumstances" because "the sale of FAC was an event that could occur only under certain circumstances (e.g., with regulatory approval, and/or concurrent with the sale of Bancorp)." Opinion at 13-14. Plaintiff challenges

this holding on two independent grounds: (i) that the FAC bid was material as a matter of law and had to be disclosed in all events; and (ii) that in view of the partial disclosures in the proxy statement the FAC bid became material and the failure to disclose it was misleading. The Vice Chancellor decided this case on the first ground, but failed to address the second ground.

In our view, however, the case turns on the partial disclosure issue. We hold that the partial disclosures in the proxy statement were misleading in their description of the background information, and that the misleading partial disclosures made the FAC bid material under all the circumstances. **[**20]** Assuming hypothetically that there had been no partial disclosures as set forth and discussed below, the FAC bid may or may not have been material. We need not address that issue because of our holding that the FAC bid was material in view of the partial disclosures. Therefore, we reverse on that ground alone.

We turn now to the partial disclosure-materiality issue. In the instant case, the proxy statement at page 21 reads, in pertinent part:

**[*1278]** **Background of and Reasons for the Affiliation; Recommendation of the Bancorp Board of Directors**

*Background.* In April of 1991, Bancorp engaged the investment banking firm of Goldman Sachs to aid it in evaluating various possible financial or strategic alternatives intended to maximize stockholder value, which engagement was publicly announced on April 30, 1991. At the time of Goldman Sachs' engagement, the Bancorp Board recognized that the strategic alternatives to be considered might include, but not be limited to, the sale of Bancorp or the sale of Society. During the spring of 1991, Society was in the midst of an examination being conducted by the FDIC and was experiencing asset deterioration. It was also a time when there had been, **[**21]** and continued to be, consolidation in the United States banking and financial services industry.

During the late spring and the summer of 1991, the management of Bancorp, with the assistance of Goldman Sachs, analyzed transactions involving the sale of Bancorp as a whole or the sale of Society or FAC. During the summer and early fall of 1991, management and Goldman Sachs also studied the possibility of a transaction structured as a deposit assumption by a bank or thrift and an asset sale to one or more third parties. During the summer of 1991,

650 A.2d 1270, *1278; 1994 Del. LEXIS 406, **21

Goldman Sachs, on behalf of Bancorp, solicited indications of interest to acquire Bancorp or Society. By the fall of 1991, these efforts had produced no attractive opportunities for the sale of Bancorp or the sale of Society, at which point there began a more intensive evaluation of a three-part strategy in which Society's loan and investment assets, its ownership interest in FAC and its retail branch bank system would be sold in separate transactions. After Bancorp's management and Goldman Sachs had investigated such transactions for several months, which investigation included contacting certain entities previously contacted as well as other [**22] parties and evaluating certain potential indications of interest, the Bancorp Board of Directors, at a meeting held on May 28, 1992, considered whether to pursue a series of transactions in which (a) FAC would be sold to a third party, (b) substantially all of Society's assets would be sold to an affiliate of Goldman Sachs, (c) the remainder of Society's assets (other than cash and its branches) would be placed in a "stub bank" or similar entity and distributed to Bancorp's stockholders and (d) Bancorp (which would then consist of Society's deposits and certain other liabilities, its branches and the cash received from the sale of FAC and the sale of assets) would be merged with a subsidiary of Bank of Boston. In such merger, the holders of Bancorp Common Stock would have received shares of Bank of Boston Common Stock. The transactions discussed at the May 28, 1992 Bancorp Board meeting were tentative and the Board was advised that, in light of uncertainties involving the value of certain assets, the value ultimately distributable to stockholders could only be estimated. The Bancorp Board was also informed that a number of steps would have to be completed before the transactions could [**23] proceed. These steps included the completion of the sale of FAC in an auction process, the completion by the Goldman Sachs affiliate of its due diligence on Society's assets and the negotiation and execution of definitive agreements with all interested parties.

In light of a number of factors, including (a) the lack of certainty of the value to be received in the sale of FAC and Society's assets and consequently the value to be received by Bancorp's stockholders, (b) the substantial costs of proceeding to the stage where more certain values would be ascertainable, (c) the significant risks of failure to close associated with three separate transactions all conditioned upon each other, and the substantial expenses and costs to be incurred in the event of a failure to close and (d) recent improvements in Society's condition and results and Bancorp's prospects, the Board of Directors of Bancorp determined at the conclusion of the May 28, 1992 meeting that it was in the best interests of [*1279] Bancorp not to pursue the proposed transactions further and to terminate Goldman Sachs' efforts in connection with exploring strategic alternatives.

(Emphasis added). Plaintiff's partial disclosure [**24] arguments stem from the portions of the proxy statement highlighted above.

## A. Norwest's $ 275 Million Contingent Bid for FAC

*HN6* Materiality requires a careful balancing of the potential benefits of disclosure against the possibility of resultant harm. Even assuming that there was no material issue of fact that the FAC bid was contingent on the sale of other parts of Bancorp, and that regulatory approval for a stand-alone sale of FAC pursuant to the May proposal would not have been forthcoming, [14] the disclosures in the proxy statement were incomplete and therefore misleading under all the circumstances.

One must parse the proxy statement disclosures [**25] in light of the essential facts regarding the FAC bid to determine if the disclosures which were made were adequate or incomplete. Set forth below is a parsing of the proxy statement juxtaposed with the findings of the Vice Chancellor concerning the contingent FAC bids. [15] According to the proxy statement:

(1) In 1991 Goldman, on behalf of Bancorp, "solicited indications of interest to acquire Bancorp or Society."

(2) By the fall of that year "these efforts had produced no attractive opportunities for the sale of Bancorp or the sale of Society."

(3) At that point "there began a more intensive evaluation of a three-part strategy in which Society's

---

[14]   There may have been, theoretically, a material issue of fact on the issue of the unlikelihood of regulatory approval. But we need not decide that question because plaintiff has not predicated his appeal on that ground, and because we have assumed, solely for purposes of this analysis, that regulatory approval would not have been forthcoming. *See infra* note 19.

[15]   The relevant proxy statement material is set forth in numbered paragraphs in regular type. The findings of the Vice Chancellor are bracketed and in bold type.

650 A.2d 1270, *1279; 1994 Del. LEXIS 406, **25

loan and investment assets, its ownership interest in FAC and its retail branch bank system would be sold in separate transactions."

(4) Bancorp and Goldman investigated "such transactions for several months."

(5) This "investigation included contacting certain entities . . . and evaluating certain potential indications of interest."

[The Vice Chancellor found, with regard to this "investigation" and these "potential indications of interest," that:

> Several companies submitted bids for FAC, one of which was valued at [**26] approximately $ 275 million. The bids were indeed submitted and were genuine offers to purchase FAC. However, these circumstances do not mean that FAC could be or was intended to be sold, in a stand-alone transaction, to the highest bidder. On the contrary . . . the FAC bids were solicited as one part of the proposed Goldman transaction . . . If any part of [the May Proposal] was contingent or speculative in any way, the sale of FAC must have been contingent, too . . . The sale of FAC was not an event that could occur under any scenario... the sale of FAC . . . could occur only under certain circumstances (e.g., with regulatory approval, and/or concurrent with the sale of Bancorp).

Opinion at 13-14.]

(6) Thereafter the Bancorp board met on May 28, 1992, and "considered whether to pursue a series of transactions in which (a) FAC would be sold to a third party, (b) substantially all of Society's assets would be sold to . . . Goldman . . . (c) [the stub assets would be] distributed to Bancorp's stockholders and (d) Bancorp. . . would be merged with a subsidiary of Bank of Boston."

(7) The transactions discussed at this meeting "were tentative and the board was advised [**27] that, in light of uncertainties involving the value of certain assets, the [*1280] value ultimately distributable to stockholders could only be estimated."

(8) The board was also informed at the May 28, 1992 meeting "that a number of steps would have to be completed before the transactions could proceed."

[The Vice Chancellor further found that "as contemplated by Goldman Sachs, the solicitor of the

FAC bids, the sale of FAC was but one component in a complicated transaction." Opinion at 14.]

(9) "These steps included the completion of the sale of FAC in an auction process."

[In an earlier part of the Opinion the Vice Chancellor had found:

> In order to quantify its strategy, Goldman Sachs sought to value the FAC component of the Proposed Transaction. It accomplished this by conducting an auction of FAC.

> Nine companies submitted "serious" preliminary bids for FAC; Norwest submitted a high bid of $ 275 million. Goldman Sachs invited the five highest bidders to conduct due diligence of FAC, and after Norwest's completion of due diligence, it confirmed its offer to buy FAC for $ 275 million. In May 1992, contracts for the sale of FAC were drafted; the only steps remaining were [**28] for Bancorp and its shareholders to approve the Proposed Goldman Transaction and the parties to the sale to sign the agreements.

Opinion at 2.]

(10) "In light of a number of factors, including (a) the lack of certainty of the value to be received in the sale of FAC and Society's assets and consequently the value to be received by Bancorp's stockholders" and costs, risks of failure to close and recent improvements in Society's condition and Bancorp's prospects, the board determined not to pursue the proposed transactions further.

[The Vice Chancellor further found:

> The bids submitted for FAC were highly speculative and contingent. As a result, they in no way established a value of Bancorp. . . . They were bids for FAC, not Bancorp. No reasonable shareholder could extrapolate the value of a parent company from the value of one of its subsidiaries. The shareholder would have no way of knowing if other subsidiaries... had a negative value and the extent of the negative value, if any.

Opinion at 15.]

[**29] The problem with the Vice Chancellor's conclusion that the FAC bid was not material is that the partial and elliptical disclosures in the proxy materials were misleading without a disclosure of the $ 275 million bid and an

650 A.2d 1270, *1280; 1994 Del. LEXIS 406, **29

explanation of its contingent nature. The Vice Chancellor's own findings reveal the incompleteness of the disclosures in the proxy statement and how the contingent FAC bids could have been described without inundating the stockholders with information and without "an overemphasis of the FAC bids." Opinion at 14.

We hold only that, once defendants traveled down the road of partial disclosure of the history leading up to the Merger and used the vague language described, they had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events. Cf. _Lynch, 383 A.2d at 281_ (holding that defendants violated their disclosure obligations when they partially disclosed a reliable, "floor" asset valuation but did not disclose an equally reliable "ceiling" value). [16] [**31] We agree with the Vice Chancellor that, as an abstraction, Delaware law does not require disclosure of inherently unreliable [**30] or speculative information which would tend to confuse stockholders or inundate them with an overload of information. This principle is consistent with _Bershad v._

_Curtiss-Wright Corp., Del. Supr., 535 A.2d 840, 847 (1987)_ ("Efforts by public corporations to arrange mergers are immaterial under the _Rosenblatt v. Getty_ standard, as a matter of law, until the firms have agreed on [*1281] the price and structure and the transaction."). [17] But, under the circumstances of this case--which involve a partial and incomplete disclosure of historical information--we disagree with the Vice Chancellor's holding that the existence of the $ 275 million bid for FAC was not material. [18]

[**32] To be sure, the bid for FAC was contingent since it was only one part of an interdependent series of transactions and apparently required regulatory approval. [19] [**34] It does not follow from this fact, however, that a reasonable stockholder, having been partially informed of the history in the language of the proxy statement, would not have found it significant that one subsidiary of Bancorp had been the subject of a genuine auction bid of $ 275 million under contingent and explainable circumstances when the Merger transaction itself was valued at $ 200 million, some 37 percent less than Norwest's contingent bid for FAC. We find

---

[16]   Cf. _Freedman v. Restaurant Assocs., Del. Ch., 1990 Del. Ch. LEXIS 142_, *24, C.A. No. 9212, Allen, C. (Sept. 19, 1990) reprinted in _16 DEL. J. CORP. L. 1462, 1476 (1991)_ ("Although management may have no general obligation to disclose its purposes or motivation, once it undertook to disclose its purpose in revising the offer, it had an obligation to do so truthfully and candidly.").

[17]   Cf. _Kahn v. Household Acquisition Corp., Del. Supr., 591 A.2d 166, 171 (1991)_ (not requiring supplemental disclosure of a pending, governmental subsidy to corporation); _Weinberger v. Rio Grande Indus., Del. Ch., 519 A.2d 116, 129-30 (1986)_ (not requiring disclosure of overly speculative earnings projections). But cf _Basic Inc. v. Levinson, 485 U.S. 224, 232-37, 99 L. Ed. 2d 194, 108 S. Ct. 978 (1988)_ (rejecting bright line rule adopted in _Bershad_).

[18]   The Court notes that it is not appropriate to decide whether or not, if there had been no partial disclosures, a reasonable stockholder would consider it important to know the facts regarding a sale of a corporate asset that could not be effected under any of the circumstances as they existed at the time of disclosure. See _SEC v. Texas Gulf Sulphur Co., 2d Cir., 401 F.2d 833, 849 (1968)_ (en banc) ("whether facts are material . . . will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity"), _cert. denied, 394 U.S. 976, 22 L. Ed. 2d 756, 89 S. Ct. 1454 (1969)_; see also _In re Anderson, Clayton Shareholders' Litig., Del. Ch., 519 A.2d 680, 691-93 (1986)_ (finding success on merits of disclosure claim unlikely on preliminary injunction; rejecting argument that asset appraisal was material because the valuation was irrelevant to the recapitalization transaction at hand); _Lewis v. Charan Indus., Del. Ch., 1984 Del. Ch. LEXIS 547_, *7-8, C.A. No. 7738, Berger, V.C. (Sept. 20, 1984) reprinted in _10 DEL. J. CORP. L. 233, 238 (1985)_ (same; finding unpersuasive an argument that asset appraisal was material because the valuation was based on an irrelevant liquidation scenario and was rejected by investment advisor).

[19]   The record is somewhat inconsistent regarding whether regulatory approval of FAC's stand-alone sale was merely unlikely or impossible. Milton R. Berlinski ("Berlinski"), a Goldman Vice President, stated in his affidavit that "a sale of FAC independently of the rest of Society was not possible." Connell in his affidavit stated that "selling FAC . . . was simply not a viable option." Chase in his deposition stated that "[FAC] could not be sold by itself." A document promulgated by Salomon titled "Regional Overview," states that "it is highly unlikely that proceeds from the sale of FAC could be realized . . . due to regulatory constraints." A document Merrill Lynch produced, titled "Capital Alternatives," states that "it is questionable whether regulators would give approval of the dividend or even sale of FAC." Plaintiffs expert, Professor Donald J. Puglisi ("Professor Puglisi"), in an affidavit submitted on plaintiff's behalf, stated in conclusory terms: "There is no basis for arguing that FAC could not be sold. Indeed, the Goldman Sachs auction bids were premised on the assumption that FAC could, indeed, be sold." We need not decide whether there was a material issue of fact relating to the regulatory approval proposition because plaintiff does not rely in his argument on such a finding. Further, for purposes of our analysis of the partial disclosure issue, we have predicated our holding on the assumption most favorable to the defendants--namely that it is undisputed that the FAC bid was contingent and interdependent on the sale of the other parts of Bancorp, and that regulatory approval of a stand-alone sale of FAC would not have been forthcoming.

650 A.2d 1270, *1281; 1994 Del. LEXIS 406, **34

that there is a substantial likelihood that the disclosure of this information would have significantly altered the "total mix" of information in the view of a reasonable stockholder. The voting choice of a stockholder included the decision of whether it was better to remain a stockholder in a continuing Bancorp with FAC as an asset (though there are other components with negative value and it may not be viable to sell FAC alone) or to be transformed into a stockholder in a new entity with Bancorp's asset/liability mix plus other assets and liabilities combined [**33] as part of the surviving entity. [20] [**35] Without this information, the reasonable [*1282] stockholder could infer from language in the proxy statement that there only was an "evaluation," an "investigation," "certain potential indications of interest," and that there were no "genuine" bids for actual dollar amounts in an "auction." Thus, the Court of Chancery erred as to the partial disclosure claim, in granting defendants' motion for summary judgment, and denying plaintiff's cross-motion for partial summary judgment. [21]

We have concluded that the partial disclosure issue should be decided on the summary judgment record. For purposes of our decision, predicated as it is on the partial disclosure ground, the record is complete and this Court is in as good a position as the Court of Chancery to decide this mixed question of law and fact.

We decide only the case before us. *See* QVC, 637 A.2d at 51. Therefore, it is important to understand what we are not deciding. First, we are not deciding that the FAC bid was material as a matter of law. Second, since we have predicated our decision narrowly on the partial disclosure ground and

assumed the facts in the light most favorable to the defendants on the regulatory approval [**36] question, [22] the material issue of fact analysis on that question is moot.

## B. Goldman's Valuation of Bancorp at $ 19.26 Per Share

Plaintiff argues that Goldman's valuation of Bancorp at $ 19.26 per share in the Executive Summary of the May Proposal was material in light of the value of those shares under the Merger--$ 17.30 as of August 28, 1992. [23] Defendants counter that Goldman never fixed Bancorp's share value at $ 19.26 because the May Proposal explicitly, inextricably bound that figure to a number of speculative contingencies, such as the uncertain value of the stub. The Court of Chancery held that exclusion of the $ 19.26 figure was proper because it was not material. We agree.

[**37] Goldman's share valuation was too unreliable to be material. **HN7** A board of directors must balance potential benefit versus harm when deciding whether or not to disclose an investment advisor's earnings per share valuation. In re Vitalink Communications Corp. Shareholders' Litig., Del. Ch., 1991 Del. Ch. LEXIS 195, *39, C.A. No. 12085, Chandler, V.C. (Nov. 8, 1991) *reprinted in* 17 DEL. J. CORP. L. 1311, 1335 (1992). In opining that an offer is fair, where an investment advisor promulgates a "best case" projection predicated on an interplay of several, uncertain variables, the forecasted value need not be disclosed because it is too speculative and thus immaterial. Weinberger v. Rio Grande Indus., Del. Ch., 519 A.2d 116, 129-30 (1986) (earnings projection immaterial even though it depicted outlook more optimistic than that underlying the offer). Disclosing an overly optimistic per share figure may be

[20]    As for the actual value of FAC, because the Merger was an exchange of stock transaction, post-Merger BoB stockholders (such as plaintiff) theoretically stand to reap the benefits of FAC's profitability in the future. That is, in merging with Bancorp, BoB absorbed the value of FAC. Thus, FAC's net profit would be reflected in the value of shares held by post-Merger BoB stockholders. This Court has earlier held that stockholders in certain situations are entitled to a control premium in a merger context where consummation of the proposed merger would effectively eliminate any expectation of such a premium in the future. Paramount Communications, Inc. v. QVC Network, Inc., Del. Supr., 637 A.2d 34, 42-43 (1994). The facts of this case did not entitle plaintiff to such a premium. *See infra* part VII (discussing plaintiff's "*Revlon* claim"). To the extent that plaintiffs concern is that he will not realize profits stemming from FAC's operations, as a post-Merger BoB stockholder, plaintiff has not lost such an opportunity. Nonetheless, the failure to disclose the FAC bid under these circumstances deprived plaintiff of the information necessary to make an informed choice of whether or not to support the Merger (which would place FAC as an asset in the merged entity) or to vote against the Merger and keep FAC as part of an independent Bancorp. Plaintiff was entitled to this choice whether or not the control premium is still available in the merged enterprise.

[21]    As we note *infra* in part VIII, we leave to the Court of Chancery upon remand the question of whether plaintiff is entitled to a remedy under the circumstances of this case, and, if so, the nature of that remedy. Further, because of our holding regarding this claim, the Court also remands to the trial court plaintiff's derivative aiding and abetting claim against BoB.

[22]    *See supra* notes 14, 19.

[23]    The Court notes that it is unclear why plaintiff focuses on the value of Bancorp shares as of August 28, 1992, rather than the date on which Bancorp issued the proxy statement, Febmary 1, 1993. The Court's analysis *infra* is not dependent on which date is more appropriate, however.

650 A.2d 1270, *1282; 1994 Del. LEXIS 406, **37

harmful because it might induce **[*1283]** stockholders to hold out for an elusive, higher bid. This risk cannot be reduced significantly by attempting to qualify the figure. *Vitalink, slip op.* at 29, 17 DEL. J. CORP. L. at 1335-36. **[**38]** In fact, disclosure of an unreliable share valuation can, under some circumstances, constitute material misrepresentation. *Smith v. Van Gorkom, Del. Supr., 488 A.2d 858, 891 (1985).*

In the instant case, plaintiff argues that the $ 19.26 figure found in the "Estimated Values" section of the Executive Summary, which Goldman used to describe the May Proposal to the board, was fixed. The record refutes plaintiff's claim. First, footnote (c) in the "Estimated Values" section qualifies the "Stub Security" value. It states that the "stub requires some cash to satisfy indemnity. Amount of cash is subject to negotiations with various buyers." Second, in the section in the Executive Summary titled "Issues to Consider Regarding Valuation Changes," two concerns are indicative of the uncertainty attached to the $ 19.26 valuation: (i) if there is a "material deterioration of loan portfolio's credit quality, existence of environmental issues, [or] inability to obtain clear title," there would be no positive effect and the following negative effect--"Assets will be transferred to stub reducing cash value to stockholders. Deterioration may impair deal economics"; and **[**39]** (ii) if the "loan does not meet secondary market documentation standards," there again would be no positive effect and the following negative effect--"Legal restrictions in loan documents or servicing agreements may prohibit sale or transfer of loans. Failure to meet standards will increase assets in the stub entity, reducing cash value to shareholders."

Additionally, defendants submitted several affidavits and deposition testimony confirming the unreliability of the stub's estimated value, which in turn made the $ 19.26 figure unreliable. Connell in his affidavit stated in relevant part:

There was a fourth element to the May Proposal. Society had and still has substantial assets which are essentially unsalable, generally comprised of foreclosed commercial real estate which, in many cases, have a negative value due to environmental or other problems. . . . The necessity for this stub entity created further complexity and made it difficult, if not impossible, to value accurately the entire transaction. Although Goldman indicated that the value of the stub might be as high as $ 3.32 per share. . . Goldman made it clear to Board that that value was based on the book value of the **[**40]** stub assets, which is not reflective of the

amount of their market or liquidation value. Stated differently, no buyer would purchase such assets at book value at that time.

In pertinent part, Berlinski in his affidavit stated:

The Board . . . determined not to proceed further with [the May Proposal] since it viewed it as too speculative, complex and difficult to value. . . . The values it would achieve were uncertain, in part due to the inability to assess the likely trading value of the stock in the "stub entity" that would hold the Bank's unsalable assets, such as its foreclosed real estate. We told the Board that the $ 3.32 per share value we attributed to the stub was simply its estimated book value and that stock in the stub was likely to trade for considerably less.

In the relevant portion of Stone's affidavit, he stated:

while I believed [in May 1992 that] it was worth at least pursuing the [May Proposal] further, I certainly did not believe, and to the best of my knowledge, no one else on the Board believed that that proposal -- even if it could be successfully concluded -- would be worth as much as $ 19.26. This was in part because the existence of the "stub **[**41]** security" (representing ownership of generally unsalable assets) made it difficult if not impossible to know what the actual value of the proposal would be and the need to set aside cash in the stub to indemnify purchasers of Society's assets created further uncertainty as to that value. Although Goldman indicated in its presentation to the Board that the stub could have a book value of $ 3.32 per share, Goldman made it clear to the Board both in its written presentation and orally that this value was speculative and by no means **[*1284]** represented the value at which the stub security would trade in the market.

In his deposition testimony, Chase stated:

What Goldman has done in this executive summary . . . . is offer a projection . . . which may or may not have materialized[.] . . . [The Executive Summary] does talk about the stub security as it describes $ 3.32 as a value *[sic]*, and that was one that I just described prior to looking at this, that would have been like a $ 3.00 minus rather than $ 3.00 plus. Take $ 3.00 off the 15.94 which is the per share basic bid and [that] would have dropped the bottom line from $ 19.26 to like maybe $

650 A.2d 1270, *1284; 1994 Del. LEXIS 406, **41

12 and change, and that's why I didn't [**42] like [the May Proposal] at all. [24]

Defendants' submissions shifted the burden to plaintiff to counter their claim that the stub had some value less than the estimated $ 3.32 [**43] per share. See Ch. Civ. R. 56(e); Irwin & Leighton, Inc. v. W.M. Anderson, Del. Ch., 532 A.2d 983, 986 (1987); Tanzer v. International Gen. Indus., Del. Ch., 402 A.2d 382, 385 (1979). Rather than make any such offer of proof, plaintiff elected to argue in the alternative without ever having made an affirmative case that the $ 3.32 reflected a realizable value. [25] Accordingly, plaintiff failed to meet his counter-burden. [**44] See Ch. Civ. R. 56(e); Irwin & Leighton, 532 A.2d at 986; Tanzer, 402 A.2d at 385. [26]

[**45] Unlike the elliptical disclosure of facts surrounding Norwest's $ 275 million bid for FAC, discussed supra, defendants made a simple, accurate disclosure in the proxy statement relating to the value of Bancorp shares under the May Proposal: "The Board was advised that, in light of uncertainties involving the value of negative assets, the value ultimately distributable to stockholders could only be estimated." Given that the finding of the Court of Chancery as to the unreliability of the $ 19.26 figure is supported by the record, the statement above was neither misleading nor incomplete. Thus, the trial court did not err in holding [*1285] the $ 19.26 estimate immaterial as a matter of law. E.g., Vitalink, slip op. at 28-29, 17 DEL. J. CORP. L. at 1335-36; Rio Grande, 519 A.2d at 129-30.

## C. The Merger Negotiations

Plaintiff raises four misrepresentation arguments relating to the disclosure of merger negotiations in the proxy statement: that the statement (i) disclosed that the board had negotiated the Merger when in fact Connell "negotiated" the Merger during the summer of 1992 without board approval, himself arriving at [**46] the $ 20 figure for the share cap; (ii) should have disclosed more emphatically Weinerman's and the Chairman's abstentions; (iii) should not have described the final Merger vote as "unanimous" when in fact the vote purportedly was eight in favor, one in opposition, and five abstaining (8-1-5); and (iv) should have been supplemented with disclosure of the board's post-approval "renegotiation" meetings with BoB. The Court of Chancery held that these purported "facts" were immaterial. We agree.

Plaintiff's misrepresentation claims lack merit. His claim that Connell first suggested the $ 20 share cap figure, which was not the exchange value as of the date the board approved the Merger, does not satisfy the materiality test

[24] Plaintiff claims that the Court of Chancery erred in factoring in Chase's concern because a director's subjective concerns are not cognizable under the objective materiality test. See Zirn v. VLI Corp., Del. Supr., 621 A.2d 773, 779 (1993). Even disregarding Chase's concerns as to the unreliability of the $ 19.26 figure, the Executive Summary and defendants' other submissions consistently attest that the value was a mere estimate predicated on many uncertainties. Furthermore, the Court of Chancery does not appear to have relied on Chase's subjective opinion to conclude that the figure was immaterial. Rather, the trial court used Chase's skepticism as one basis among many for its finding that the $ 19.26 per share figure was unreliable. In any event, this Court's conclusion is not dependent on Chase's opinion.

[25] Plaintiff's argument begins with the phrase: "Even assuming, as the directors claim, Society had some undeterminable negative value . . . ." Professor Puglisi, in a supplementary affidavit submitted on plaintiff's behalf, stated: "While I agree that a precise fair value cannot be assigned to Bancorp's components from reference to its Form 10-K, I am of the strong view that a reasonable estimate of such value can be derived therefrom." This statement was made in the context of his discussion of the fairness of the Merger's exchange ratio. The Court finds that this is not sufficient to create a genuine issue of material fact regarding whether the $ 3.32 figure attributed to the stub reflected an attainable value. See Ch. Civ. R. 56(e).

[26] The Court notes that defendants' submissions are internally inconsistent with regard to the extent that the stub's value was less than the estimated $ 3.32 per share, but this inconsistency is not determinative. Chase stated that the stub had a negative value of $ 3 per share whereas Connell and Berlinski stated only that the value was less than $ 3.32, without speculating as to the exact discrepancy between the estimated and actual value. Though this variance in opinions relating to the stub's actual value created a factual dispute, the dispute was not material in this case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) (only disputes regarding material facts can preclude summary judgment under Federal Rule of Civil Procedure 56; which facts are material depend on the specific facts and substantive law in individual cases); Burkhart v. Davies, Del. Supr., 602 A.2d 56, 59 (1991) (noting persuasiveness of Anderson in Delaware summary judgment analysis), cert. denied, 504 U.S. 912, 112 S. Ct. 1946, 118 L. Ed. 2d 551 (1992). The fact that the stub's actual value was less than the $ 3.32 figure was relevant only to demonstrate that the $ 19.26 value was not reliable, not to show that some other figure more accurately reflected Bancorp's true value. Thus, regardless of the extent to which the stub's actual value was less than $ 3.32, the fact that it was less is the only material summary judgment fact. This latter factual assertion was uncontroverted and thus must be accepted as true. See Tanzer, 402 A.2d at 385; Plant v. Catalytic Constr. Co., Del. Super., 287 A.2d 682, 684, aff'd, Del. Supr., 297 A.2d 37 (1972).

650 A.2d 1270, *1285; 1994 Del. LEXIS 406, **46

under the circumstances of this case. *See Cede & Co. v. Technicolor, Inc., Del. Supr. 634 A.2d 345, 372 (1993)* (affirming trial court's finding that there was no need to disclose a share value which a target director initially deemed acceptable, without consulting investment advisors, because "non-disclosure [of such was] plainly not material"). *But cf. Smith v. Van Gorkom, Del. Supr. 488 A.2d 858, 890-92 (1985)* **[**47]** (finding violation of disclosure obligations where proxy statement partially disclosed that target director first suggested final, agreed-upon merger share price but failed to describe accurately the motive behind focusing on that figure). Given that the proxy statement described Weinerman's and the Chairman's abstentions and their respective reasons therefor in great detail, [27] plaintiff's second argument is without merit.

**[**48]** The third and fourth arguments simply mischaracterize the facts. With regard to the third argument, the 8-1-5 vote was an interim one which was disclosed; the final vote, which also was disclosed, was twelve in favor with two abstentions. Further, the description of the 12-0-2 vote--"unanimous[] . . . (with two directors abstaining)"--was proper. *See Weinberger v. UOP, Inc., Del. Ch., 426 A.2d 1333, 1353 (1981),* rev'd on other grounds, *Del. Supr, 457 A.2d 701 (1983).* As to plaintiff's final argument, the board's discussion with BoB did not involve a "renegotiation" of the Merger. The primary purpose of the meeting was to ensure compliance with the terms and conditions of the original, approved Merger--more specifically, that the closing of the Merger be timely. Such subsequent, purely implemental meetings are immaterial under the circumstances of this case. *See Bershad v. Curtiss-Wright Corp., Del. Supr, 535 A.2d 840, 847 (1987)* (holding that there is no requirement under *Rosenblatt* for "play-by-play" disclosure of merger negotiations because such details would not alter the "total mix" **[**49]** of information provided stockholders and are immaterial). Thus, the Court of Chancery did not err in rejecting plaintiff's claims relating to the Merger negotiations.

**D. The Board's Disavowal of the Reliability of the Management Projections**

Plaintiff argues that the proxy statement misled stockholders by disclosing that the board did not rely on Goldman's

earnings projections, prepared in connection with the May Proposal, when in fact the board relied **[*1286]** on such projections in evaluating the fairness of the Merger. In support, Plaintiff relies on a memorandum dated May 26, 1992, from Connell to the board (the "Connell memo") regarding "Project Elite" (the May Proposal). The Court of Chancery rejected plaintiff's claim as factually unsupported.

Plaintiff's claim is without merit. In relevant part, the proxy statement reads:

> (With respect to Bancorp's prospects, the Board of Directors took into account, among other things, management's base case projections (prepared in April, 1992 in conjunction with Bancorp's capital plan for regulatory purposes) (the "base case") and certain alternative projections prepared by management under more favorable assumptions (the "best case"). **[**50]** The projected 1994 earnings per share ("EPS") under the base case and best case were $ 1.79 and $ 2.75, respectively, which reflected numerous assumptions [listing assumptions]. It should be noted that many of the assumptions, including those referenced above, were outside the control of Bancorp, and neither Bancorp nor any other person or entity makes any representation as to their achievability *[sic]*; such projections have not been updated and Bancorp does not assume hereby any obligation to update them. Accordingly, neither Bancorp nor any other person or entity believes that Bancorp stockholders should rely on such projections.)

(Emphasis added). The crux of plaintiff's argument is that the board (or at least management) relied on the "best case" projections in evaluating the fairness of the Merger. The Connell memo, however, does not rely on the "best case" scenario. Rather, it concludes that, because the risks associated with achieving the "best case" scenario outweigh the potential benefits, the board should reject the "best case" projection and instead pursue the May proposal. [28] Nothing in the challenged, above-highlighted portion of the proxy

---

[27]   The relevant paragraph in the Proxy Statement reads:

[The Chairman] and Mr. Weinerman abstained from the Board's recommendation and determination. [The Chairman] stated that, while the [Merger] might be a good transaction for stockholders, he could not vote at that time to recommend it because he believed he would benefit from a lengthier period to review the transaction and he felt it was difficult to assess whether further attempts to find alternative acquirors might have resulted in the receipt of more attractive offers. Mr. Weinerman believed that he would benefit from a lengthier period to review Bank of Boston's financial condition and business.

[28]   The Connell memo states in relevant part:

650 A.2d 1270, *1286; 1994 Del. LEXIS 406, **50

statement was inaccurate [**51] or misleading. [29]

[**52] **VI.** _SECTION 102(b)(7)_ PROTECTION

Plaintiff argues that the exemption from liability in Bancorp's certificate of incorporation, adopted pursuant to _Section 102(b)(7)_, does not extend to disclosure claims, and that, even if the provision so extended, the individual defendants' conduct falls within two exceptions Plaintiff further contends that his claims against Connell for disclosure violations in his capacity as an officer (rather than a director) would still survive. Finally, plaintiff argues that the individual defendants waived their _Section 102(b)(7)_ protection in the Court of Chancery. The Court of Chancery did not reach the _Section 102(b)(7)_ issue. In view of our finding that there was a disclosure violation, we are required to reach these questions. We hold that _Section 102(b)(7),_ as adopted by Bancorp, shields the individual defendants from liability, and that the shield was not waived.

**A. Application of** _Section 102(b)(7)_ to Disclosure Claims

Article XIII of Bancorp's certificate of incorporation, which parallels the language [*1287] in _Section 102(b)(7)_, states in relevant part:

_HN8_ No director of the Corporation shall be liable to the Corporation or its stockholders [**53] for monetary damages for breach of fiduciary duty as a director,

except for liability: (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law …

(Emphasis added). Plaintiff claims that the legislative history of _Section 102(b)(7)_ supports his argument that the shield is not applicable here. Plaintiff's argument, however, bypasses a logical step in statutory analysis. [30] _HN9_ A court should not resort to legislative history in interpreting a statute where statutory language provides unambiguously an answer to the question at hand. _E.g., Grand Ventures, Inc. v. Whaley, Del. Supr., 632 A.2d 63, 68 (1993)_ ("In the absence of any ambiguity, the language of the statute must be viewed as conclusive of the legislative intent. . . . The judicial role is then limited to an application of the literal meaning of the words[]") (internal citation omitted); _Hudson Farms, Inc. v. McGrellis, Del. Supr., 620 A.2d 215, 217 (1993)_ ("If there is no reasonable doubt as to the meaning of [**54] the words used, the statute is unambiguous and the Court's role is limited to an application of the literal meaning of the words[]"); _Silverbrook Cemetery Co. v. Department of Fin., Del. Supr., 449 A.2d 241, 242 (1982)_ (holding that trial court erred by engaging in statutory interpretation where interplay of two provisions yielded clear and unambiguous result). [31]

[**55] In the instant case, plaintiff's claim that _Section 102(b)(7)_ does not extend to disclosure violations must be

---

While management firmly believes it can accomplish projections in its best case scenario and is willing and fully committed to do so, given the projected value presented by Goldman Sachs & Co. of $ 15.50 per share in a tax free exchange of stock, a stub with an estimated additional stated value of $ 3.50 [the stub value is highly uncertain due to various encumbrances and liquidation uncertainties], plus a profit participation, management believes the risks associated with achieving the best case results outweigh the potential of actually attaining those results and attaining those results _[sic]_ and accordingly believes it would be in the best interests of the Company to proceed with the project [the May Proposal].

(Emphasis added).

[29]  The Court of Chancery found that Connell's statement in the memo was made in support of the Merger. Opinion at 19. This finding is clearly erroneous because Connell made the statement in support of the May Proposal, not the Merger. The trial court's confusion may stem from defendants having assigned the name "Project Elite" to both the May Proposal and the Merger. Though the findings of the Court of Chancery appear somewhat flawed in this minor respect, it properly held that defendants did not breach their disclosure obligations with respect to the management projections.

[30]  Statutory interpretation involves a purely legal determination, see _Hercules Inc. v. Leu Trust & Banking, Del. Supr., 611 A.2d 476, 481, cert. dismissed, 113 S. Ct. 1836 (1992),_ and thus review is de novo, _Cede & Co. v. Technicolor, Inc., Del. Supr., 634 A.2d 345, 360 (1993)._

[31]  See also _Burlington N.R.R. Co. v. Oklahoma Tax Comm'n, 481 U.S. 454, 461, 95 L. Ed. 2d 404, 107 S. Ct. 1855 (1987)_ ("Unless exceptional circumstances dictate otherwise, 'when [a court] finds the terms of a statute unambiguous, judicial inquiry is complete[]'") (citation omitted); _Uniform Stat. & Rule Constr. Act_ § 19 (Proposed Official Draft June 10, 1994) ("The text of a statute or rule is the primary, essential source of its meaning[]"); _id._ § 18 cmts. ("The starting point is always the text; an examination of it and its context may yield a construction that is certain. If so, that ends the inquiry[]"); 2A _Sutherland Stat. Constr._ § 48.01, at 302 ("extrinsic aids [such as legislative history] may [generally] be considered only when a statute is ambiguous and unclear"). Further, where the statute expressly

650 A.2d 1270, *1287; 1994 Del. LEXIS 406, **55

rejected as contrary to the express, unambiguous language of that provision. *Section 102(b)(7)* provides protection "for breach of fiduciary duty." Given that the fiduciary disclosure requirements were well-established when *Section 102(b)(7)* was enacted and were nonetheless not excepted expressly from coverage, *see* *Hudson Farms, 620 A.2d at 218* ("it is presumed that the General Assembly is aware of existing law when it acts"), there is no reason to go beyond the text of the statute, *see, e.g., Grand Ventures, 632 A.2d at 68; Hudson Farms, 620 A.2d at 217.* Thus, *HN10* claims alleging disclosure violations that do not otherwise fall within any exception are protected by *Section 102(b)(7)* and any certificate of incorporation provision (such as Article XIII) adopted pursuant thereto. In any event, nothing in the legislative history of the adoption of *Section 102(b)(7)* is inconsistent with the result we reach herein.

**B. Applicability of the Exceptions to** *Section 102(b)(7)*

Plaintiff argues [**56] that the individual defendants' conduct implicates the duty of loyalty and the proscription against knowing, intentional violations of law. [32] [**57] He argues [*1288] that the individual defendants' conduct falls within the exceptions in *Section 102(b)(7)(i)* & *(ii)* because they: (i) "improperly interfered with the voting process by knowingly or deliberately failing to make proper disclosure"; (ii) acted in bad faith and recklessly; and (iii) improperly granted no-shop and lock-up clauses as part of the Merger. [33] Plaintiff also contends that Connell and Stang were interested directors who violated their duty of loyalty and that Connell's actions in his role as an officer fall outside *Section 102(b)(7)*'s protection.

The individual defendants counter that plaintiff's claims are essentially conclusory for there is no affirmative proof that they knowingly or deliberately failed to disclose facts they knew were material. That is, they argue that they balanced in good faith which facts to disclose against those to withhold as immaterial. Next, they assert that case law does not support plaintiff's claim relating to the no-shop and lock-up clauses under the facts of this case. Finally, the individual defendants contend that the claim relating to Connell's conduct as an officer is barred pursuant to Supreme Court Rule 8 because it was not raised in the Court of Chancery. [34] On the merits, they assert that plaintiff has failed to segregate any of Connell's actions as an officer that fall within the exceptions to *Section 102(b)(7)*.

[**58] Plaintiff's claims are not supported by the record or Delaware law. The individual defendants did not violate the duty of loyalty under the facts of this case. [35] [**59] Plaintiff's intentional violation argument is unsupported by the record. [36] As to plaintiff's third claim, though the granting of no-shop and lock-up rights can under certain circumstances implicate the duty of loyalty, without any additional, supportive factual basis for his claim, sufficient at least to create a genuine issue of material fact, plaintiff's reliance on *Mills* and *Unocal* is unpersuasive. Even assuming that plaintiff's final argument is not procedurally barred, it lacks merit because plaintiff has failed to highlight any specific actions Connell undertook as an officer (as distinct from actions as a director) that fall within the two pertinent exceptions to *Section 102(b)(7)*. *See* R. Franklin Balotti & Jesse A. Finkelstein, *Delaware Law of Corp. & Business Org.* § 4.19, at 4-335 (Supp. 1992) *HN11* (where a defendant is a director and officer, only those actions taken

---

enumerates specific exceptions, courts should not imply or create new exceptions from otherwise generally-applicable language, *id.* § 47.11, at 165, unless failure to do so would lead to a "manifest contradiction of the apparent purpose of [the] statute," *id. at 50 (Supp. 1994).*

[32]   *See Zirn v. VLI Corp.*, Del. Supr., 621 A.2d 773, 778 (1993) ("The requirement that a director disclose to shareholders all material facts bearing upon a merger vote arises under the duties of care and loyalty[]"); *see also* Bradford D. Bimson, Comment, *Zirn v. VLI Corp.: The Far-Reaching Implications of Loquacity,* 19 Del. J. Corp. L. 1067, 1116 (1994) (arguing that it would be a misinterpretation of *Zirn* to conclude that the case subsumed Delaware's disclosure obligations solely within the duty of loyalty).

[33]   In support of this latter argument, plaintiff cites *Mills Acquisition Co. v. MacMillan, Inc.,* Del. Supr., 559 A.2d 1261, 1287 (1988), and *Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr., 493 A.2d 946, 954 (1985).

[34]   That rule states in relevant part: "Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented." Supr. Ct. R. 8.

[35]   The Court finds unpersuasive plaintiff's contention during oral argument that defendants' intentional decision to disseminate the proxy statement leads ineluctably to a finding that they deliberately violated their disclosure obligations.

[36]   We agree with defendants that, on this record, the single disclosure violation which we have found was consistent only with a good faith omission. Thus, the equitable fraud claim argued in *Zirn,* 621 A.2d at 783, is inapplicable under the facts of this case.

650 A.2d 1270, *1288; 1994 Del. LEXIS 406, **59

solely in the defendant's capacity as an officer are outside the purview of Section 102(b)(7)). [37]

**C. Waiver of the Section 102(b)(7) Shield**

Plaintiff argues that the individual defendants can, and did, waive their Section 102(b)(7) contractual protection. The individual defendants "are prepared to assume" that the shield provided by Section 102(b)(7) can be waived, but argue that such waiver must be clear and unambiguous, which they contend is absent here. [38] We agree.

[**60]   [*1289] The individual defendants did not waive their Section 102(b)(7) protection. *HN12* "The standard for finding waiver in Delaware is quite exacting. 'Waiver is the voluntary and intentional relinquishment of a known right. . . . It implies knowledge of all material facts and intent to waive.' Moreover, 'the facts relied upon must be unequivocal in nature.'" *American Family Mortgage Corp. v. Acierno, Del. Supr., 1994 Del. LEXIS 105,* *13, No. 290, 1993, Moore, J. (Mar. 28, 1994) (ORDER) (quoting *Realty Growth Inv. v. Council of Unit Owners, Del. Supr., 453 A.2d 450, 456 (1982))* (internal citations omitted). In the instant case, the following colloquy occurred in the Court of Chancery during argument on plaintiff's motion for a preliminary injunction:

> MR. ZIEGLER [defense counsel]: . . . There are remedies available to this plaintiff if in the end, after a trial, it should turn out - if there needs to be a trial - that any of these added bits of information could be determined, in fact, to have been material and not confusing, so that the balance of equities clearly favors letting this transaction proceed to a closing.
>
> If the Court has no questions -

   [**61]

> THE COURT: Finish that thought for me. I didn't really - if there were . . . misleading disclosures, how would I remedy those if they weren't corrected at this stage, after a trial?
>
> MR. ZIEGLER: Your Honor, it has - I believe this Court has fashioned remedies in such circumstances. In addition, in the *Ocean Drilling* case, the Court concluded in fact - denied an injunction in much more colorable circumstances than we have here on the ground that because it was a stock-for-stock exchange, a quasi-appraisal remedy could be fashioned. I believe the Court could attempt to determine the value of non-disclosures, so to speak, or determine a quasi-appraisal remedy.

(Emphasis added). Plaintiff's interpretation of the reference to "the value of non-disclosures" hardly constitutes the unequivocal facts necessary to find a voluntary, intentional relinquishment of the protection of Section 102(b)(7). Thus, plaintiff's waiver argument lacks merit.

**VII. "REVLON CLAIM"**

Plaintiff argues that the Court of Chancery erred in holding that *Revlon* [39] was not "triggered" under the facts of this case because (i) Bancorp was seeking to sell itself and (ii) the Merger constituted a [**62] change in control. He contends that the board breached its "Revlon duties." [40]   [**63] Defendants contend that *Revlon* was not implicated and, even if it were, they fulfilled their duties. They further argue that, even if their conduct fell short of the requirements of *Revlon,* Bancorp stockholders ratified any improprieties by voting in favor of the Merger. [41] The Court of Chancery held that *Revlon* was inapplicable under the facts of this

---

[37]   Plaintiff's argument that Connell and Stang were interested directors who violated the duty of loyalty is without merit.

[38]   The Court does not decide, but only assumes *arguendo,* that directors of Delaware corporations can waive their Section 102(b)(7) protection because the parties have so stipulated. In any event, as discussed *infra,* we find that the individual defendants did not waive the shield.

[39]   *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del. Supr., 506 A.2d 173 (1986).

[40]   Presumably, plaintiff is referring colloquially but inappropriately to the enhanced scrutiny courts accord to certain types of transactions described *infra. See* Lawrence A. Cunningham & Charles M. Yablon, *Delaware Fiduciary Duty Law After QVC and Technicolor: A Unified Standard (and the End of Revlon Duties?),* 49 Bus. law. 1593, 1593-94 (1994) (noting inappropriateness of such colloquialisms as "Revlon duties" and "Revlon-land" in arguments before this Court).

[41]   To combat defendants' argument that Bancorp stockholders ratified any improprieties, plaintiff argued in the Court of Chancery that defendants were liable for corporate waste, which if proven purportedly requires a unanimous stockholder vote to constitute ratification. Plaintiff appears to have abandoned his corporate waste claim on appeal.

case because the Merger did not involve a change in control. [42] We agree. [43]

The Court need not apply enhanced scrutiny under the circumstances of this case. *HN13* The directors of a corporation "have the obligation of acting reasonably to [*1290] seek the transaction offering the best value reasonably available to the stockholders." *Paramount Communications, Inc. v. QVC Network, Inc., Del. Supr, 637 A.2d 34, 43 (1994)*, [**64] in at least the following three scenarios: (1) "when a corporation initiates an active bidding process seeking to sell itself or to effect a business reorganization involving a clear break-up of the company," *Paramount Communications, Inc. v. Time Inc., Del. Supr, 571 A.2d 1140, 1150 (1990)* [*Time-Warner*]; (2) "where, in response to a bidder's offer, a target abandons its long-term strategy and seeks an alternative transaction involving the break-up of the company," *id.;* or (3) when approval of a transaction results in a "sale or change of control," *QVC, 637 A.2d at 42-43, 47.* In the latter situation, there is no "sale or change in control" when "'control of both [companies] remains in a large, fluid, changeable and changing market.'" *Id. at 47* (citation and emphasis omitted). [44]

[**65] In the instant case, the events transpiring between May 28, 1992 (when the board rejected the May Proposal), and August 31, 1992 (when the board approved the Merger), and thereafter do not fit the circumstances requiring enhanced scrutiny of board action. Plaintiff emphasizes *Time-Warner's* language "seeking to sell itself" in arguing that *Revlon* was implicated, but that argument fails because, to fall within that category, the target must have "initiated an active bidding process." *See Time-Warner, 571 A.2d at 1150.* He also focuses on the board's subjective intent, a basis for enhancing director's duties which was rejected in Time-Warner. See *id. at 1151.*

Alternatively, plaintiff argues that there was a "sale or change in control" of Bancorp because its former

stockholders are now relegated to minority status in BoB, losing their opportunity to enjoy a control premium. As a continuing BoB stockholder, plaintiff's opportunity to receive a control premium is not foreclosed. [45] Thus, plaintiff's claim that enhanced scrutiny is required under the circumstances of this case lacks merit and the Court of Chancery did [**66] not err in so holding.

## VIII. CONCLUSION

We hold that the Court of Chancery erred in rejecting plaintiff's claim that an appropriately explained reference to the FAC bid in the context of the historic disclosures made in the proxy statement was required. We do not reach plaintiff's claim that the contingent FAC bid was material and had to be disclosed regardless of the partial disclosures in the proxy statement. We affirm the Court of Chancery in all other respects.

We further hold that Article XIII of Bancorp's certificate of incorporation shields the individual defendants from liability, and that the liability shield was not waived. Finally, we hold that the circumstances of this case do not require heightened scrutiny of the [**67] board's approval of the Merger and thus plaintiff's claim premised on a contrary argument lacks merit.

We therefore REVERSE the judgment of the Court of Chancery dismissing the action based on its grant of summary judgment to defendants, and denial of plaintiff's cross-motion for partial summary judgment solely as to the FAC nondisclosure claim based on the partial disclosure theory. Accordingly, we REMAND that claim and plaintiff's aiding and abetting claim against BoB to the Court of Chancery for proceedings consistent with this opinion. We AFFIRM in all other respects the denial of plaintiff's cross-motion for partial summary judgment. We also AFFIRM the grant of summary judgment by the Court of Chancery to defendants as to plaintiff's second, third, and fourth disclosure claims, and his "*Revlon* claim."

---

[42]   Opinion at 20-25. The trial court declined to reach the stockholder ratification issue in light of this holding. This Court similarly does not reach the issue.

[43]   In agreeing with the conclusion reached by the Vice Chancellor we do not necessarily adopt all of that court's language, Opinion at 20-25, but note merely that the language of *Paramount Communications, Inc. v. QVC Network, Inc.,* Del. Supr., 637 A.2d 34 (1994), controls on this issue.

[44]   *See also* Marcel Kahan, *Paramount or Paradox: The Delaware Supreme Court's Takeover Jurisprudence,* 19 J. Corp. L. 583, 595 (1994) ("What is important about the fact that 'control' remains in the hands of unaffiliated shareholders, 'in the market,' is that all these unaffiliated shareholders have virtually identical interests with respect to the company: to maximize the value of their shares.").

[45]   *See QVC, 637 A.2d at 47-48* (finding, under the facts of that case, that a single person would have control of the surviving corporation and the stockholders would lose their opportunity to command a control premium). *See also supra* part V.A., note 20.

650 A.2d 1270, *1291; 1994 Del. LEXIS 406, **67

[*1291] With regard to the issue or issues before the Court of Chancery on remand, we decide only that there is no liability as to any individual defendant. We do not decide whether or not there is any remedy as to any corporate defendant. We leave it to the Court of Chancery to determine whether or not any such remedy is appropriate and, if so, to fashion such a remedy. Jurisdiction [**68] in this Court is not reserved.

 Positive

As of: August 11, 2015 6:29 PM EDT

## *Smith v. Robbins & Myers, Inc.*

United States District Court for the Southern District of Ohio, Western Division

November 19, 2012, Decided; November 19, 2012, Filed

Case No. 3:12-cv-281

**Reporter**

2012 U.S. Dist. LEXIS 164868; 2012 WL 5845072

J. ROBERT SMITH, Individually and On Behalf of All Others Similarly Situated, Plaintiff, vs. ROBBINS & MYERS, INC., et al., Defendants.

**Prior History:** *Smith v. Robbins & Myers, Inc., 2012 U.S. Dist. LEXIS 157294 (S.D. Ohio, Oct. 26, 2012)*

**Counsel:** **[\*1]** For James Robert Smith, Individually, and On Behalf of All Others Similarly Situated, Plaintiff: Bridget M Wasson, LEAD ATTORNEY, Meyer Wilson Co., LPA, Dublin, OH; Matthew R Wilson, LEAD ATTORNEY, Meyer Wilson Co., LPA, Columbus, OH; David T Wissbroecker, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA.

For Robbins & Myers Inc, an Ohio Corporation, Peter C Wallace, Thomas P Loftis, Richard J Giromini, Stephen F Kirk, Andrew G Lampereur, Dale L Medford, Albert J Neupaver, Defendants: Christine M Haaker, LEAD ATTORNEY, Thompson Hine - 3 Austin Landing I, Dayton, OH; Anthony J Rospert, Cleveland, OH; Brian J Lamb, Cleveland, OH; Thomas M Ritzert, Cleveland, OH.

For National Oilwell Varco Inc, Raven Process Corp, Defendants: Joseph Steven Justice, LEAD ATTORNEY, Dungan & LeFevre Co., L.P.A., Troy, OH; Joseph M Graham, Jr, Peter A Stokes, PRO HAC VICE, Fulbright & Jaworski L.L.P., Houston, TX.

**Judges:** Timothy S. Black, United States District Judge.

**Opinion by:** Timothy S. Black

## Opinion

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT (Doc. 34)**

This civil action is before the Court on Plaintiff's motion for leave to amend the complaint (Doc. 34), and the parties' responsive memoranda **[\*2]** (Docs. 36, 38).

### I. BACKGROUND FACTS

Plaintiff seeks to amend the complaint in order to: (1) add derivative claims and demand futility allegations; (2) clarify the disclosure claims, including pleading particularized facts showing that the omissions in the Proxy are material and rendered affirmative statements in the Proxy false or misleading; and (3) eliminate the aiding and abetting claims. Plaintiff maintains that these amendments address the issues raised by this Court in its Order denying expedited discovery and clarify and/or moot five of the six grounds on which Defendants based their motion to dismiss.

Defendants maintain that the motion for leave to amend the complaint should be denied because the proposed second amended complaint is futile, does not correct the deficiencies in the amended complaint, and would cause undue delay and prejudice.

### II. STANDARD OF REVIEW

Leave to amend "shall be freely granted when justice so requires." *Fed. R. Civ. P. 15(a)*. See also *Moore v. City of Paducah, 790 F.2d 557, 559-60 (6th Cir. 1986)*. "Nevertheless, leave to amend 'should be denied if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the **[\*3]** opposing party, or would be futile.'" *Carson v. U.S. Office of Special Counsel, 633 F.3d 487, 495 (6th Cir. 2011)*. A court may deny a motion for leave to amend for futility if the amendment could not withstand a motion to dismiss. *Riverview Health Inst., LLC v. Med. Mut. of Ohio, 601 F.3d 505, 512 (6th Cir. 2010)*. To survive a motion to dismiss, a complaint must contain direct or inferential allegations with respect to all material elements required for recovery. *Weisbarth v. Geauga Park Dist., 499 F. 3d 538, 541 (6th Cir. 2007)*. The court must accept plaintiff's well-pleaded factual

2012 U.S. Dist. LEXIS 164868, *4

allegations as true, and the allegations of the complaint must be at least plausible on their face. *Id. at 541-542*.

The grant or denial of a request to amend a complaint is left to the broad discretion of the district court. *Gen. Electric Co. v. Sargeant & Lundy, 916 F.2d 1119, 1130 (6th Cir. 1990)*.

### III. ANALYSIS

The question of sufficiency of the pleadings should be considered in the context of a motion to dismiss, not a response to a motion for leave to plead. Accordingly, the Court declines to engage in a far reaching analysis pursuant to *Fed. R. Civ. P. 12(b)(6)*, but briefly notes as follows:

### A. Derivative [*4] Claims

Defendants argue that any attempt to add derivative claims is futile because Warren Clifford's demand bars Plaintiff from pleading demand futility.[1]

While the Court acknowledges the seeming inconsistency in both serving a demand letter on R&M and its Directors on behalf of Mr. Clifford and seeking here to amend to add derivative claims based on alleged demand futility, a demand from a nonparty shareholder does not bar Plaintiff from pleading demand futility. *In Re FirstEnergy Shareholder Derivative Litig., 320 F. Supp. 2d 621, 626 (N.D. Ohio 2004)*.[2] Mr. Clifford is not a party to this litigation.

Accordingly, a demand on the Company by non-party Warren Clifford does not bar Plaintiff from pleading demand futility.

### B. Demand Futility

Next, Defendants argue that any attempt to add derivative claims is futile because Plaintiff cannot show demand futility by alleging that all directors are named Defendants

and all Defendants participated in the complained-of [*6] wrongdoing.

Plaintiff must "point to facts which show that the presumed ability of the directors to make unbiased, independent business judgments about whether it would be in the corporation's best interests to file the action does not exist in this case." *In Re Ferro Corp. Derivative Litig. (Ferro II), 511 F.3d 611, 618 (6th Cir. 2008)*. Moreover, Ohio law "presumes" that directors can exercise their independent business judgment about whether it would be in the best interests of the corporation to sue some or all of the other directors, and Ohio courts "have consistently rejected the idea that demand is always futile when the directors are targeted as the wrongdoers of the suit the shareholders wish the corporation to bring." *Id*. However, demand is presumptively futile "where the directors are antagonistic, adversely interested, or involved in the transactions attacked." *Id*.

Alleging that all directors are defendants can be enough to show demand would be futile. *Carlson v. Rabkin, 152 Ohio App. 3d 672, 2003 Ohio 2071, 789 N.E.2d 1122, 1128 (Ohio Ct. App. 2003)* ("Examples of when a demand would be excused as futile include when all directors are named as wrongdoers and defendants in a suit."). Moreover, alleging that all [*7] directors are defendants and that each defendant participated in the wrongdoing that is the basis of the litigation is sufficient to plead demand futility. *Fradkin v. Ernst, 571 F. Supp. 829, 840 (N.D. Ohio 1983)* (Court found that a demand on the Board would be futile where "all of the directors at the time of the purported adoption of the Option Plan and issuance of the Proxy statements are defendants; and they are all alleged to have committed violations of federal and state law for which they are accountable to the Company and to the class; so that the directors of the Company have irreconcilable conflicts of interest which

---

[1]   On August 17, 2012, Plaintiff filed the original complaint in this case without asserting any derivative claims. (Doc. 2). That same day, Plaintiff's counsel, representing another purported shareholder, served a demand letter on R&M and its Directors. (Doc. 36, Ex. D). The Demand Letter raises essentially the same issues raised in Plaintiff's original complaint here and "demands that the Company immediately commence an action against the Board for injunctive and other equitable relief as permitted by law." (Doc. 36, Ex. D at 3).

[2]   Conversely, the cases cited by Defendants "conclude that [*5] once a shareholder makes a demand, that same shareholder (or his co-plaintiff in the same lawsuit) can no longer argue demand futility." *In re FirstEnergy S'holder Derivative Litig.,* 320 F. Supp. 2d 621, 625-626 (N.D. Ohio 2004). *See, e.g., Sommers v. Lewis,* No. CV 07-1142-MO, 2009 U.S. Dist. LEXIS 29776, at *14-15 (D. Or. Apr. 8, 2009) (finding that plaintiff was bound by another shareholder's demand where "under the unusual facts" of the case, plaintiff was the "functional equivalent of a co-plaintiff" because, among other things, plaintiff attempted to join the suit of the shareholder who made the demand before it was dismissed); *Boeing Co. v. Shrontz,* No. 11,273, 1992 Del. Ch. LEXIS 84, at *16 (Del. Ch. Apr. 20, 1992) (finding that plaintiffs were precluded from arguing demand futility where one co-plaintiff had made a demand).

2012 U.S. Dist. LEXIS 164868, *7

render them incapable of considering objectively whether it is in the Company's best interest to pursue this litigation.").[3]

The second amended complaint alleges that all directors are named defendants and all defendants actively participated [*8] in the complained-of wrongdoing, including their actions in connection with the merger and proxy statement at issue in this litigation. *See, e.g., Carlin v. Brownfield, No. 84AP-345, 1985 Ohio App. LEXIS 8141, at *13-14 (Ohio Ct. App. June 18, 1985)* ("Construing the material facts before us in a light most favorable to plaintiffs, we believe that reasonable minds could find that demand upon the directors of Fidelity would be futile, and conclude that the trial court erred in rendering summary judgment in favor of defendants on this basis. For example, plaintiffs allege that Brownfield dominated the board of directors and the corporation, and that the directors took an active role in the wrongful acts which formed the basis of plaintiffs' complaint. These allegations, if proven, would be sufficient to support a finding that demand on the directors would be a futile act and, therefore, that the demand requirement would be excused."). Conversely, the cases cited by Defendants stand for the proposition that where, (unlike in this case), there are no allegations that all directors are defendants and all defendants took an active role in the wrongdoing, something more must be alleged to [*9] establish futility. *See, e.g., Stanley v. Arnold, No. 1:12cv482, 2012 U.S. Dist. LEXIS 152096, at *15-23 (S.D. Ohio Oct. 23, 2012)* (did not involve allegations concerning affirmative misconduct by the directors so that directors were not directly threatened with the substantial likelihood of liability and demand futility could not be established by alleging that these directors were threatened by liability); *Drage v. P&G, 119 Ohio App. 3d 19, 694 N.E.2d 479, 485 (Hamilton Cty. App. 1997)* (only six out of the nineteen directors named as

defendants and no allegation that the thirteen non-defendant directors were "dominated" or "took an active role in the wrongdoing alleged").

Plaintiff need not actually prove liability of each defendant at this stage in the litigation in order to show demand futility. Plaintiff's allegations that all directors are named defendants in this action and all defendants actively participated in the alleged wrongdoing is sufficient under Ohio law to demonstrate demand futility.

## C. Materiality

Next, Defendants argue that the additional 14(a) allegations in the proposed second amended complaint are futile because none of the alleged omissions are material.[4] A determination of materiality [*10] "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him and these assessments are peculiarly ones for the trier of fact." *TSC Indus. v. Northway Inc., 426 U.S. 438, 450, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976).*[5] This Court declines to engage in a fact-intensive test and finds that for purposes of its inquiry at this stage in the litigation, Defendants have sufficiently alleged material omissions.[6]

Additionally, "in order to prevail in their motions, defendants must convince the court that each allegation made by the plaintiff is immaterial as a matter of law." *Feiner v. SS&C Techs. Inc., 11 F.Supp.2d 204, 208 (D. Conn. 1998)* ("if plaintiffs have alleged a single misstatement that can not be

---

[3]   *See also, NECA-IBEW Pension Fund v. Cox, et al.*, No. 1:11cv451, 2011 U.S. Dist. LEXIS 106161, at *14-15 (S.D. Ohio Sept. 20, 2011) (demand was futile where "director defendants are the very same people who approved the pay hikes and bonuses, and plaintiff has named all directors who approved the compensation as defendants.").

[4]   There is a private right of action for breach of Section 14(a) of the Exchange Act which prohibits the solicitation of proxies by means of materially false or misleading statements. *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1086-87, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991). "To state a claim under section 14(a), a plaintiff must aver that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *NACCO Indus., Inc. v. Applica Inc.*, No. 1:06cv3002, 2006 U.S. Dist. LEXIS 91940, at *7 (N.D. Ohio 2006). "[A] misrepresentation or [*11] omission is considered material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.*

[5]   *See also City of Monroe v. Bridgestone Corp.*, 387 F.3d 468, 487 (6th Cir. 2004) ("As for materiality, whether or not a statement is material turns on a fact-intensive test").

[6]   *See, e.g., Halpern v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) ("Recognizing that the materiality of an omission is a mixed question of law and fact, courts often will not dismiss a securities fraud complaint at the pleading stage of the proceedings, unless reasonable minds could not differ on the importance of the omission.").

2012 U.S. Dist. LEXIS 164868, *10

deemed immaterial as a matter of law, the action survives [the] motions to dismiss").[7]

For example, the proposed second amended complaint alleges that Defendants omitted critical information about the strategic alternatives pursued and then abandoned by the Board. (Doc. 34, Ex. 2 at ¶¶ 56-57). The proposed second amended complaint explains that this information was material in the context of other statements made by Defendants in the Proxy regarding the strategic alternatives and "because shareholders are entitled to be informed of: (i) stand-alone options that may provide greater long-term value for shareholders than the consideration offered by NOVI, before they are asked to vote in favor of the Merger; and (ii) the extent of the Board's consideration of the standalone options in the context of their consideration of the Merger, necessary for the Company's shareholders to make a meaningful decision on whether they agreed with the Board's recommendation in favor of the Merger." (*Id.* at ¶ 58). *Zirn v. VLI Corp., 681 A.2d 1050, 1057 (Del. 1996)* ("any misstatement **[*13]** contained in the 14 D-9 which misled the stockholders concerning the value of the company would necessarily be material.").

Defendants have not provided any authority supporting a finding that the alleged omissions are immaterial as a matter of law at this stage in the litigation. Accordingly, Plaintiff may amend the complaint to add Section 14(a) allegations.

### D. Misleading Statements

Next, Defendants argue that the additional 14(a) allegations in the proposed second amended complaint are futile in connection with the PSLRA requirement that plaintiff identify statements in the Proxy which are rendered false or misleading by virtue of the alleged omissions. However, the proposed second amended complaint identifies specific statements in the Proxy rendered misleading by each alleged omission and specifically explains how the alleged omissions made these statements misleading. (*See* Doc. 34, Ex. 2 at ¶¶ 59, 63-64, 67, 70, 73, 76, 80, 83, 86-88, 90).

### E. Prejudice

Finally, Defendants maintain that the motion to amend should be denied because: (1) Defendants would be prejudiced by delay and additional costs of rebriefing the motion to dismiss; and (2) Plaintiff had not identified a "good faith **[*14]** basis" to amend.

First, neither delay nor rebriefing is sufficient to demonstrate prejudice. *Murray v. The Fidelity & Deposit Co. of Maryland, No. 1:10cv1367, 2012 U.S. Dist. LEXIS 23115, at *5-6 (N.D. Ohio Feb. 22, 2012)* (stating that "delay, by itself, does not justify denial of leave to amend"; and "the Sixth Circuit also noted that another round of motion practice . . . does not rise to the level of prejudice that would warrant denial of leave to amend"). Additionally, Defendants have yet to set a date for the shareholder vote, so there is no evidence that they will be prejudiced by any delay. Furthermore, should Defendants choose to file a motion to dismiss the second amended complaint, they can use significant portions of the existing motion to dismiss.

Second, there is no evidence that Plaintiff's counsel hid their intent to seek to amend the complaint until after Defendants filed their motion to dismiss. Plaintiff's counsel, as officers of the Court, maintain that they decided to amend the complaint after considering the arguments made by Defendants in the motion to dismiss and after reading the Court's Order denying expedited discovery. (*See* Docs. 26 and 32, respectively). In **[*15]** fact, the Court finds that it is quite common for a plaintiff to file a motion to amend in order to cure deficiencies exposed in a motion to dismiss.

Therefore, Defendants will not be prejudiced by Plaintiff's amended complaint.

### IV. CONCLUSION

Accordingly, for the reasons stated here, Plaintiff's motion to amend the complaint (Doc. 34) is **GRANTED**. Plaintiff's counsel is **DIRECTED** to file the amended complaint forthwith.

Additionally, the Court finds that because a second amended complaint supersedes the first complaint, Defendants' pending motion to dismiss is now moot. *See, e.g., Yates v. Applied Performance Techs., Inc., 205 F.R.D. 497, 499 (S.D. Ohio 2002)* ("Because amended complaints supersede the original pleading, the filing of the amended complaint in this case did technically render the pending motion to dismiss moot."). Therefore, Defendants' motion to dismiss (Doc. 26) is **DENIED as MOOT**, without prejudice to refiling.

### IT IS SO ORDERED.

Date: November 19, 2012

---

[7]  *See, e.g., Edge Partners, L.P. v. Dockser, 944 F. Supp. 438, 441 (D. Md. 1996)* ("Also, the Court will not address the materiality issue with **[*12]** respect to Plaintiff's § 14(a) allegations at this rather early stage of the case"; "Furthermore, depending on what develops through discovery, the issue of materiality may be better left to the trier of fact.").

2012 U.S. Dist. LEXIS 164868, *15

*/s/ Timothy S. Black*                                 United States District Judge

Timothy S. Black

App000432

⚠️ Caution

As of: August 11, 2015 6:30 PM EDT

## *Blau v. Harrison*

United States District Court for the Northern District of Illinois, Eastern Division

March 24, 2006, Decided ; March 24, 2006, Filed

No. 04 C 6592

**Reporter**

2006 U.S. Dist. LEXIS 19795; 2006 WL 850959

Dr. Stephen Blau, Individually and On Behalf of All Others Similarly Situated, Plaintiffs, v. William B. Harrison, Jr. Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M.. Anthony Burns, Laurence Fuller, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford, and J.P. Morgan Chase & Co., Defendants.

**Prior History:** *Blau v. Harrison, 2006 U.S. Dist. LEXIS 9822 (N.D. Ill., Mar. 8, 2006)*

**Counsel:** **[\*1]** For Dr Stephan Blau, individually and on behalf of all others similarly situated, Plaintiff: Adam J. Levitt, Mary Jane Fait, Wolf, Haldenstein, Adler, Freeman & Herz LLC, Chicago, IL; Gregory M Nespole, Jeffrey G. Smith, Wolf Haldenstein Adler Freeman & Hertz LLP, Chicago, NY.

For American Growth Fund, Inc., Plaintiff: Adam J. Levitt, Wolf, Haldenstein, Adler, Freeman & Herz LLC, Chicago, IL.

For Jr William B Harrison, Hans W Becherer, Frank A Bennack, Lawrence A Bossidy, M Anthony Burns, Laurence Fuller, Ellen V Futter, William H Gray, Helene L Kaplan, Lee R Raymond, John R Stafford, Defendants: Kathleen Lynn Roach, Courtney Ann Rosen, Sidley Austin LLP, Chicago, IL; Chante Danielle Spann, Goldberg Kohn, Chicago, IL; Michael A. Cooper, Sharon L. Nelles, Sullivan & Cromwell LLP, New York, NY.

For Riley P Bechtel, Defendant: Kathleen Lynn Roach, Sidley Austin LLP, Chicago, IL; Chante Danielle Spann, Goldberg Kohn, Chicago, IL; Michael A. Cooper, Sharon L. Nelles, Sullivan & Cromwell LLP, New York, NY.

For John H Giggs, Defendant: Kathleen Lynn Roach, Courtney Ann Rosen, Sidley Austin LLP, Chicago, IL; Michael A. Cooper, Sharon L. Nelles, Sullivan & Cromwell LLP, New **[\*2]** York, NY.

For J.P. Morgan Chase & Company, Defendant: Julie A. Lepri, JPMorgan Chase, Chicago, IL; Kathleen Lynn Roach, Courtney Ann Rosen, Sidley Austin LLP, Chicago, IL; Chante Danielle Spann, Goldberg Kohn, Chicago, IL.

For Samuel Hyland, proposed: Joseph N. Gielata, Wilmington, DE.

For Stephanie Speakman, proposed: Joseph N. Gielata, Wilmington, DE.

**Judges:** Honorable William J. Hibbler, United States District Judge.

**Opinion by:** William J. Hibbler

## Opinion

MEMORANDUM OPINION AND ORDER

MOTION TO STRIKE

As an initial matter, Defendants filed a motion to strike the expert report of Steven Wolfe attached to Plaintiffs' response to the motion to dismiss. Defendants' move to strike this submission because the pleadings neither referenced nor included the report. Blau argues that the report is an "affidavit" submitted with the intent of demonstrating that the materiality of a proxy omission raises issues of fact that cannot be determined on a motion to dismiss.

In reviewing a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. The Court, however, may consider matters outside the pleadings **[\*3]** without converting the motion to dismiss into one for summary judgment if they are referred to in the plaintiffs complaint and are central to plaintiff's claim. *Rosenblum v. Travelbyus.com Ltd., 299 F.3d 657, 661 (7th Cir. 2002)*. In addition, documents incorporated by reference into the pleadings and documents attached to the pleadings as

2006 U.S. Dist. LEXIS 19795, *4

exhibits are considered part of the pleadings for all purposes. *Fed. R. Civ. P. 10(c)*. As Wolfe's affidavit is neither referenced in the Complaint nor attached to the pleadings, the Court may not consider this affidavit in ruling on the Defendants' *Rule 12(b)(6)* motion. Accordingly, the Court grants Defendants' motion to strike and excludes the extraneous material.

MOTION TO DISMISS

Plaintiffs allege that Defendants negligently failed to disclose material terms of the negotiation involving the merger between Bank One Corporation ("Bank One") and J.P. Morgan Chase & Co. ("J.P. Morgan") to J.P. Morgan shareholders in its proxy statement. Specifically, Plaintiffs contend that Defendants failed to disclose Bank One's CEO's offer to "do the deal for no premium if he could become chief executive immediately." According to Plaintiffs, [*4] Defendants' actions amounted to negligence, and resulted in J.P. Morgan Shareholders approval of a 14 percent premium in favor of Bank One shares.

Defendants seek to dismiss Blau's Amended Class Action Complaint ("Complaint") for failure to state a claim upon which relief can be granted pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, for failure to plead fraud with particularity pursuant to *Federal Rule of Civil Procedure 9(b)*, and for failure to meet the pleading standards set forth in the Private Securities Litigation Reform Act of 1995, *15 U.S.C. § 78u-4(b)* (the "PSLRA"). In addition, Defendants maintain that the putative class lacks standing to bring this claim. For the reasons set forth below, Defendants' motion is DENIED in part and GRANTED in part.

**FACTUAL BACKGROUND**

I. The Parties

This putative class action lawsuit is brought by Dr. Stephen Blau individually and on behalf of all persons who held common stock of J.P. Morgan, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date on which the company consummated the merger with Bank One. On [*5] January 5, 2005, this Court entered an order appointing Dr. Blau and American Growth Fund lead Plaintiffs. [1]

Prior to the merger, J.P. Morgan was a Delaware corporation with its principal place of business in New York, New York.

J.P. Morgan, a financial and multi-bank holding firm, was engaged in the provision of investment banking, securities, investment management, and other financial and banking services. Defendants William B. Harrison, Jr., Hans W. Becherer, Riley P. Bechtel, Frank A. Bennack, Jr., John H. Biggs, Lawrence A. Bossidy, M. Anthony Burns, Ellen V. Futter, William H. Gray, III, Helene L. Kaplan, Lee R. Raymond, John R. Stafford (collectively "Individual Defendants") were all directors of J.P. Morgan prior to the merger. [2] William B. Harrison ("Harrison") also served as Chief Executive Officer ("CEO") and Chairman of the Board during the relevant period. Bank One was a financial holding and multi-bank holding [*6] company, incorporated in Delaware, with its headquarters in Chicago.

II. Merger

In resolving the motion to dismiss, the Court takes as true the following facts from Plaintiffs' Complaint. In November 2003, J.P. Morgan CEO and Chairman William Harrison began discussing the possibility of a merger with James Dimon ("Dimon"), then the CEO and Chairman of Bank One. After briefing their respective boards on their conversations on November 18, 2003, both CEO's were encouraged to continue discussions regarding the potential merger. During December 2003, Dimon and Harrison continued their discussions regarding the key terms of the financial transaction and periodically updated their respective boards on these communications. In early to mid-January 2004, each company's respective board of directors convened special meetings to consider the terms of the merger. At these meetings board members reviewed the terms of Dimon's employment agreement, [*7] proposed employment arrangements for other senior management, along with the exchange ratio and related valuation information for the stock. On January 14, 2004, the Board of Directors of both J.P. Morgan and Bank One each unanimously approved a stock-for-stock merger in which 1.32 shares of J.P. Morgan common stock would be issued to Bank One shareholders for each share of Bank One common stock. On April 21, 2004, the J.P. Morgan Board of Directors disseminated its proxy statement regarding the merger to its shareholders. While the proxy statement listed the factors the board considered in approving the merger, it did not disclose Dimon's offer to transact the merger without a premium in favor of Bank One if Dimon were appointed CEO of the merged company immediately.

On May 25, 2004, J.P. Morgan shareholders approved the merger at a special meeting, with 99.18% of the shareholders

---

[1]   Lead Plaintiff American Growth Fund withdrew as co-Lead Plaintiff on February 18, 2005.

[2]   Defendant Laurence Fuller was dismissed from this action on June 6, 2005.

2006 U.S. Dist. LEXIS 19795, *7

voting in favor of transacting the merger. On July 1, 2004, the merger was consummated and included a premium, based on closing stock prices the trading day before the merger was agreed to and announced, of approximately 14% for Bank One shares. The merger agreement also included a provision that Harrison [*8] would remain CEO of J.P. Morgan for two years after completion of the merger, Dimon would serve as President and Chief Operating Officer, and would become CEO after Harrison's tenure.

III. Newspaper Articles

Shortly after the merger was transacted, several news sources reported that during negotiations Dimon offered to conduct the transaction with no premium if he could become CEO of the merged entity immediately. According to these sources, Harrison rejected the Dimon's offer so that he could be appointed CEO of the merged company and, in response, Dimon requested a premium for Bank One shares. Specifically, on June 27, 2004, the *New York Times* published an article containing allegations regarding Harrison's refusal to accept Bank One's proposal to conduct a no premium stock exchange. The article stated:

> During the negotiations with Mr. Dimon, he [Mr. Harrison] fought hard to give himself the extra two years, to secure a smooth transition, **although he may cost J.P. Morgan shareholders extra money in doing so**. Mr. Dimon, always the tough deal maker, **offered to do the deal for no premium** if he could become chief executive immediately, **according to two [*9] people close to the deal**.

> **When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr. Harrison was able to push down to 14 percent**. The two men declined to comment on the specifics of their negotiations.

Comp. P 31 (emphasis supplied in Complaint). Several days later on July 3, 2004, *The Financial Times* (London) reported on the merger negotiations and quoted an additional source, allegedly an advisor on the negotiations, who attested that Harrison refused to conduct the merger for no premium if he were named the immediate CEO. That article noted "'There was a spectrum of outcomes in terms of

premium and governance,' said one advisor at the time. Translated into English, this meant Mr. Dimon was saying the sooner I get the job the less you have to pay." Id. P 32. Additionally, on December 29, 2004, the *Wall Street Journal* reported that "in-house bankers at J.P. Morgan endorsed the $ 56.9 billion price [Merger] -- negotiated by their boss [Harrison] -- as fair,'" even though "during the negotiations [Dimon] . . . suggested selling his bank [Bank One] for billions of dollars less if, among other conditions, he immediately became chief [*10] of the merged firm, according to a person familiar with the talks. The suggestion wasn't accepted by J.P. Morgan." Id. P 35.

**ANALYSIS**

The two-count Complaint in this case is premised on the alleged negligence of J.P. Morgan with regard to an alleged omission of a material fact in its proxy statement. In count one, Plaintiffs allege that Defendants violated *Section 14(a)* [3] [*11] of the Securities and Exchange Act of 1934 ("the Exchange Act") and *Rule 14a-9* [4] promulgated by the SEC. Count two alleges that the Individual Defendants violated *Section 20(a) of the Exchange Act*. Defendants move to dismiss the Complaint in its entirety for failure to state a claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, for failure to plead fraud with particularity pursuant to *Federal Rule of Civil Procedure 9(b)*, and for failure to meet the pleading standards set forth in the PSLRA. Defendants further allege that Plaintiffs lack standing to bring this cause of action.

I. Standard of Review

The purpose of a motion to dismiss pursuant to *Rule 12(b)(6)* is to test the legal sufficiency of a complaint, not the merits of the case. See *Triad Assocs.. Inc. v. Chicago Housing Auth., 892 F. 2d 583, 586 (7th Cir. 1989)*. When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." *Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073, 1078 (7th Cir. 1992)*. The Court views all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the light most favorable to Plaintiff. See *Stachon v. United Consumers Club, Inc., 229 F.3d 673, 675 (7th Cir. 2000)*.

---

[3]   Section 14(a) of the Exchange Act provides that "It shall be unlawful for any person, by use of the mails . . . or otherwise . . . to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of the title."

[4]   Rule 14a-9 prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ." 17 C.F.R. § 240.14a

2006 U.S. Dist. LEXIS 19795, *11

Dismissal of a [*12] complaint is appropriate only where it appears beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. *Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)*; *Kennedy v. National Juvenile Det. Ass'n, 187 F.3d 690, 695 (7th Cir. 1999).*

## II. Count I -- Section 14(a)

### A. Pleading

In order to state a claim under *Section 14(a)*, Plaintiffs must allege that (1) a proxy statement contained a material misrepresentation or omission, which (2) caused plaintiffs injury, and (3) that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link" in the accomplishment of the transaction. *Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384-85, 90 S. Ct. 616, 621-22, 24 L. Ed. 2d 593 (1970)*. "The purpose of [Section] 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *J. I. Case Co. v. Borak, 377 U.S. 426, 431, 12 L. Ed. 2d 423, 84 S. Ct. 1555 (1965)*. *Section 14(a)* and *Rule 14a-9* regulate the proxy solicitation process [*13] and "prohibit[] the solicitation of proxies by means of materially false or misleading statements." *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1087, 115 L. Ed. 2d 929, 111 S. Ct. 2749 (1991).*

In enacting the Private Securities Litigation Reform Act, Congress raised the pleading standards for claims alleging private securities fraud, "to a very specific version of fact pleading -- one that exceeds even the particularity requirements of *Federal Rule of Civil Procedure 9(b)*. *See Makor Issues & Rights, Ltd., et al. v. Tellabs, Inc., et al., 437 F.3d 588 (7th Cir. 2006) citing In re Rockefeller Ctr. Props. Secs. Litig., 311 F.3d 198, 217 (3d Cir. 2002)*(noting that the PSLRA "imposes another layer of factual particularity to allegations of securities fraud"). As such plaintiffs asserting a securities fraud claim must assert the "who, what, when, where, and how," of the claim. *DiLeo v. Ernest & Young, 901 F.2d 624, 627 (7th Cir. 1990)*. The PSLRA mandates that for a securities fraud claim, the complaint must "specify each statement alleged to have been misleading, the reasons or reasons why the statement [*14] is misleading, and if an allegation regarding the state or omissions is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *15*

*U.S.C. § 78u-4(b)(1)*. Additionally, a plaintiff is required to demonstrate "proof that the defendant acted with a particular state of mind, the complaint with respect to each act or omission . . . must state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2).*

Defendants contend that both the PLSRA's heightened pleading standards and the heightened pleading requirements of *Federal Rule of Civil Procedure 9(b)*, apply to Plaintiffs' *Section 14(a)* claims. *See e.g., Hayes v. Crown Cent. Petroleum Corp., 249 F. Supp. 2d 725, 728 (E.D. Va. 2002)*, (aff'd in part, vacated in part); *In re Harmonic Inc., 2002 U.S. Dist. LEXIS 26676 * 64 n. 17 (N.D. Cal. Nov. 13, 2002)*; *Bond Opportunity Fund v. Unilab Corp., 2003 U.S. Dist. LEXIS 7838 at * 8 (S.D.N.Y. May 9, 2003)*. Defendants argue that Blau's [*15] *Section 14(a)* claims must plead with particularity facts that give rise to a strong inference of negligence on the part of all defendants. *See In re McKesson HBOC, Inc. Secs. Litig., 126 F. Supp. 2d 1248, 1267 (N.D. Cal. 2000)*. Defendants further argue that Plaintiffs' Complaint fails to meet the heightened standards as it fails to state with particularity facts giving a strong inference of negligence. Further, in its allegations based upon "information and belief," the Complaint fails to state with particularity all facts on which that belief is formed as required by the PSLRA. *15 U.S.C. § 78u-4(b)(1).*

Plaintiffs respond that its *Section 14(a)* claims are sufficiently pled pursuant to *Federal Rule of Civil Procedure 8(a)*. *5* Plaintiffs argue that because the Complaint purports that Defendants acted with negligence, *not fraud*, the heightened pleading requirements of the PSLRA are not implicated. *See California Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 145 n.9 (3d Cir. 2004)*(noting that because plaintiff's *Section 14(a)* claims were grounded in fraud, the claims must meet the PSLRA particularity [*16] requirements.); *In re Cendant Corp. Litig., 60 F. Supp. 2d 354, 378 (D.N.J. 1999)*(holding that because plaintiffs have alleged that defendants acted negligently, they need not plead fraud at all, let alone with particularity); *In re Trump Hotels Shareholder Derivative Litig., 2000 U.S. Dist. LEXIS 13550, (S.D.N.Y. Sept. 21, 2000)*. Thus, Plaintiff contends that its Complaint is sufficiently pled in accordance with *Fed. R. Civ. Pro. 8(a)* as the Complaint neither alleges intentional conduct, nor does the Complaint "sound in fraud." *See e.g. Kennedy v. Venrock Assocs., 348 F.3d 584, 593 (7th Cir. 2003).*

In *Kennedy*, the Seventh Circuit considered the pleading requirements for a claim that alleged that the proxy statement

---

*5*   *Federal Rule of Civil Procedure 8(a)* requires a pleading to set forth a short and plain statement of the claim showing that the pleader is entitled to relief.

2006 U.S. Dist. LEXIS 19795, *16

contained material omissions and discussed the nuances between a proxy claim [*17] pleading fraud and a proxy claim pleading solely negligence. The *Kennedy* court queried "In charging that the proxy statement contained material omissions and misstatements, are the plaintiffs charge fraud, and fraud alone?" *Id.* In response, the Seventh Circuit stated that a plaintiff was not required to plead fraud with regard to a proxy statement omitting material facts. *Id.* The court reasoned that if a claim failed to plead fraud, than *Rule 9(b)* was inapplicable to the plaintiffs' allegations, and, therefore did not have to be pled with particularity. *Id.* The court further explained that a plaintiff was not precluded from alleging negligence in omission of a material fact from a proxy statement because pursuant to *Section 14(a)* negligent omission of material information from a proxy statement violated federal law. *Id.* (citations omitted). While the *Kennedy* court did not set forth the applicability of the PSLRA to *Section 14(a)* claims, this Court finds its reasoning applicable to the facts of the instant case.

Viewing, as the Court must, all the facts alleged in the Complaint, as well as any reasonable inferences drawn from those facts, in the [*18] light most favorable to Plaintiff. *Stachon, 229 F.3d 673 at 675*. Plaintiffs' Complaint sets forth a *Section 14(a)* claim alleging that Defendants acted negligently; thus, they need not plead fraud at all, let alone fraud with particularity. Simply, Plaintiffs' *Section 14(a)* allegations are not required to meet the PSLRA particularity requirements because these claims are based on averments of negligence. Plaintiffs allege that the Defendants acted negligently in not revealing the "no premium" offer which resulted in shareholders voting on the proxy without benefit of the knowledge of the alternative offer. Plaintiffs charge that this material omission/misrepresentation from this proxy statement caused them injury, and that the proxy solicitation itself was an essential link in the transaction. Specifically, the Complaint alleges that the Proxy Statement was materially misleading because "it failed to disclose material facts about Mr. Dimon's offer on behalf of Bank One to engage in a transaction with no premium for Bank One shareholders." Am. Comp. P 86. The Complaint further alleges that Defendants were negligent in disseminating the Proxy Statement containing [*19] the materially false and misleading statements. Id. at P 87. The Complaint also states that each shareholder has been damaged ". . . as a direct and proximate result of such violations because they were denied an opportunity to make an informed decision in response to the proposed transaction with respect to the Merger premium . . ." Id. at. P 91. Accordingly, the Court finds that Blau's Complaint sufficiently pled violations of *Section 14(a)*.

B. Materiality

An omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)*. "The determination requires delicate assessments of the inferences a reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *Id. at 450*.

The crux of Plaintiffs' Complaint is Defendants negligently failed to disclose a material fact during the proxy solicitation regarding Harrison's rejection of an offer to conduct the merger [*20] with no premium. According to the Complaint, after Harrison rejected this offer, the negotiations resulted in Bank One shareholders receiving a 14% premium for their stock and which ultimately cost J.P. Morgan shareholders over 7 billion dollars in unnecessary merger compensation. Defendants argue that the proxy statement was not required to disclose alleged negotiating positions. *See e.g. Kaufman v. Cooper Comps., Inc., 719 F. Supp. 174, 183 (S.D.N.Y. 1989)*(holding that defendant's efforts to work out an arrangement for preferred shareholders were adequately disclosed and that defendant did not have to describe each step of negotiations); *Beaumont v. American Can Co., 797 F.2d 79, 85 (2d Cir. 1986)*.

On a motion to dismiss, the Court must assume the truth of the facts asserted by Plaintiffs and all reasonable inferences in favor of the Plaintiff. The Proxy Statement indicated that the offer was "fair, from a financial point of view." If, as Plaintiffs allege, Dimon offered to consummate the transaction for no premium and the only reason Harrison rejected the offer was to retain a position as CEO of the merged company, this may be a fact a "reasonable [*21] shareholder would consider . . . important." *TSC Indus., 426 U.S. at 449*. While it is not necessary to disclose all factors in a negotiation, failure to offer shareholders a more profitable exchange may have been important to shareholders in considering whether or not to approve the merger. For the purposes of the instant motion to dismiss, the Court concludes that the omission regarding an alleged "no premium" stock exchange is material.

Accordingly, Defendants' motion to dismiss Plaintiffs' *Section 14(a)* claim against them in Count I of the Complaint is DENIED.

III. Count II -- *Section 20(a)*

*Section 20(a)* of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of

2006 U.S. Dist. LEXIS 19795, *21

any rule or regulation thereunder shall be liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation [*22] of the cause of the action.

*15 U.S.C. § 78t(a)*. Plaintiffs must allege the following in order to state a *Section 20(a)* claim: (1) a primary securities violation; (2) each of the Individual Defendants exercised general control over the operations of J.P. Morgan; (3) each of the Individual Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992)*.

Plaintiffs have pled an underlying violation of *Section 14(a)* of the Exchange Act by Individual Defendants. The Complaint alleges that the Individual Defendants "By virtue of their positions as Directors . . . and, participation as directors . . . they had the power to influence and control and did influence and control the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contend are false and misleading." Am. Comp. P 93. The Complaint further alleges that these Defendants were "provided with or had unlimited access to copies [*23] of the Company's proxy statements and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected." Id. P 95. Lastly, it alleges that "each of the individual defendants . . . is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein." Thus, Plaintiffs have sufficiently alleged that the Individual Defendants acted as controlling persons within the meaning of *§ 20* of the Exchange Act. The ultimate determination of whether Defendants were controlling persons involves questions of fact not to be resolved at the pleading stage of this litigation. *See e.g. In re Sears, Roebuck & Co. Sec. Litig., 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003)*. Accordingly, the Defendants' motion to dismiss the *§ 20(a)* claims against them in Count II is denied.

IV. Standing

Alternatively, Defendants argue that, as defined, the putative class lacks standing because the Proxy Statement explicitly sets forth that only "common stockholders of record at the close [*24] of business on April 2, 2004 may vote at the meeting." [6] Def. Exh. A at Notice of Annual Meeting. They allege that *Section 14(a)* and *Rule 14a-9* establishes a cause of action solely for shareholders who are entitled to vote on the transaction as set forth in the proxy statement. *See In re AOL Time Warner, Inc. Sec. & ERISA Litig., 381 F. Supp. 2d 192, 2004 U.S. Dist. Lexis 7917*, * 125 (S.D.N.Y. May 5, 2004)(holding that "Section 14(a)'s emphasis on the Proxy Statement solicitation process indicates that the stature was designed to protect only those shareholders with voting rights"). Defendants maintain that because some members of the putative class were not entitled to vote on the merger, the class is overbroad and, thus does not have standing to bring this claim. *See Shields v. Erickson, 710 F. Supp. 686, 693 (N.D. Ill. 1989)*(dismissing class action where complaint failed to indicate whether any plaintiffs had standing under the proxy statement and class as a whole was improperly defined).

[*25] Plaintiffs respond alleging that because the defined class is inclusive of all individuals who were injured through dilution of their stock by Defendants' violations of *Section 14(a)* and *Rule 14a-9*, the class as a whole has standing. Plaintiffs further argue that several courts have certified classes, bringing private actions pursuant to Section 14(a), which included members other than those entitled to vote on the proxy statement. *See, e.g., Alexander v. Centrafarm Group, N. V. 124 F.R.D. 178, 186 (N.D. Ill 1988)*; *Koppel v. 4987 Corp., 191 F.R.D. 360, 369 n. 12*; *Tracinda Corp v. DaimlerChrysler AG*, 216 F.R.D. 291, 301 (D. Del. 2003).

Indeed, the Proxy Statement notice entitled J.P. Morgan "common stockholders of record at the close of business on April 2, 2004" to vote on the merger. In converse to the proxy statement, Plaintiffs' Complaint defined the putative Class as:

. . . all persons . . ., who held shares of the common stock of J.P. Morgan Chase, either on April 2, 2004 (the record date for voting at the May 25, 2004 shareholder meeting), or at any time from April 19, 2004 (the date of the proxy statement associated with such [*26] meeting (the "Proxy Statement")) through July 1, 2004, (the date on which the Company consummated a merger with Bank One Corporation ("Bank One")),

---

6   In ruling on a *Rule 12(b)(6)* motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. *Fed. R. Civ. P. 10(c)* Accordingly, the Court may consider the proxy statement.

2006 U.S. Dist. LEXIS 19795, *26

Comp. P 1. Thus, extending the class to include members who held shares from the date the proxy statement was issued to the date the merger was consummated.

Standing to sue, even in class actions, is determined at the time the suit is filed. *See Walters v. Edgar, 163 F.3d 430, 432-33 (7th Cir. 1998)*("Certification of a class action comes after the suit is filed, so if the named plaintiffs lacked standing when they filed the suit . . . there was no case when class certification was sought."). There is no issue that members who held shares on April 2, 2004 have standing to bring this claim pursuant to *Section 14(a)* and *Rule 14a-9*. The question remains whether *Section 14(a)* and *Rule 14a-9*, which mandate the proxy solicitation process and prohibit the selection of proxies by means of materially false or misleading statements, provide causes of action for shareholders with no voting rights.

*Section 14(a)* of the Exchange Act provides that:

It shall be unlawful for any person, by use of the mails **[*27]** . . . or otherwise . . . to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to *section 12* of the title.

*15 U.S.C. § 78n(a)*. *Rule 14a-9* prohibits the solicitation of a shareholder's vote by means of a proxy statement that "is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . ." *17*

*C.F.R. § 240.14a-9*. The *AOL Time Warner* court reasoned that *Section 14(a)'s* focus on the proxy solicitation process reflects the statute's intent to protect only the shareholder's having voting rights. *In re AOL Time Warner, Inc., 381 F. Supp. 2d 192, 2004 U.S. Dist. Lexis 7917 at *125 (4th Cir. 1994)*; Hazen, The Law of Securities Regulation § 11.3 (3d ed. 1995)("Since the proxy regulations are designed to protect shareholder voting rights, standing should be limited to shareholders who had the right to vote."). This Court agrees with the District **[*28]** Court's approach in *AOL Time Warner, Inc.* Accordingly, this Court finds that only common stockholders of record who held J.P. Morgan stock on April 2, 2004 the record date for voting on the merger, have standing to bring this private action under *Section 14(a)*.

**CONCLUSION**

For the reasons set forth above, Defendant Harrison's motion to dismiss is DENIED in part and Granted in Part. Plaintiff Blau is ordered to file an Amended Complaint consistent with this opinion.

IT IS SO ORDERED.

Dated March 24, 2006

The Honorable William J. Hibbler

United States District Court

(A) Neutral

As of: August 12, 2015 12:05 PM EDT

## *Allergan, Inc. v. Valeant Pharms. Int'l, Inc.*

United States District Court for the Central District of California, Southern Division

November 4, 2014, Decided; November 4, 2014, Filed

Case No.: SACV 14-1214 DOC(ANx)

**Reporter**

2014 U.S. Dist. LEXIS 156227

ALLERGAN, INC., et al., Plaintiffs, vs. VALEANT PHARMACEUTICALS INTERNATIONAL, INC., et al., Defendants.

**Prior History:** *Allergan, Inc. v. Valeant Pharms. Int'l, Inc., 2014 U.S. Dist. LEXIS 117160 (C.D. Cal., Aug. 21, 2014)*

**Counsel:** **[\*1]** For Allergan Inc, a Delaware corporation, Karah H. Parschauer, an individual, Plaintiffs, Counter Defendants: Michele D Johnson, LEAD ATTORNEY, Latham and Watkins LLP, Costa Mesa, CA; Peter Allen Wald, LEAD ATTORNEY, Latham and Watkins LLP, San Francisco, CA; Adam M Gogolak, William Savitt, Bradley R Wilson, Carrie M Reilly, Courtney L Shike, PRO HAC VICE, Wachtell Lipton Rosen and Katz, New York, NY; Colleen C Smith, Latham and Watkins LLP, San Diego, CA; J Peter Shindel, Jr, PRO HAC VICE, Abrams and Bayliss LLP, Wilmington, DE; Raymond J DiCamillo, Susan M Hannigan, PRO HAC VICE, Richards Layton and Finger, Wilmington, DE; Steven J Fineman, PRO HAC VICE, Richards Layton and Finger PA, One Rodney Square, Wilmington, DE.

For Valeant Pharmaceuticals International Inc, Valeant Pharmaceuticals International AGMS Inc, AGMS, Inc., Defendants, Counter Claimants: Edward Eric Johnson, Robert A Sacks, LEAD ATTORNEYS, Sullivan and Cromwell LLP, Los Angeles, CA; Brian T Frawley, John L Hardiman, Max S Heuer, PRO HAC VICE, Sullivan and Cromwell LLP, New York, NY.

For Pershing Square Capital Management, L.P., PS Management, GP, LLC, PS Fund 1, LLC, William A. Ackman, an individual, Defendants, Counter **[\*2]** Claimants: Mark C Holscher, Michael Shipley, LEAD ATTORNEYS, Austin C Norris, Jay Bhimani, Kristin Rose, Kirkland and Ellis LLP, Los Angeles, CA; Andrew C Orr, Danielle R Sassoon, Jay P Lefkowitz, John P Del Monaco, Matthew Solum, PRO HAC VICE, Kirkland and Ellis LLP, New York, NY; Martin S Lessner, PRO HAC VICE, Young Conaway Stargatt and Taylor LLP, Wilmington, DE.

For David Pyott, Deborah Dunsire, Michael R Gallagher, Trevor M Jones, Louis J Lavigne, Russell T Ray, Peter J McDonnell, Timothy D Proctor, Henri A Termeer, Counter Defendants: Peter Allen Wald, LEAD ATTORNEY, Latham and Watkins LLP, San Francisco, CA; Michele D Johnson, Latham and Watkins LLP, Costa Mesa, CA.

**Judges:** DAVID O. CARTER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** DAVID O. CARTER

# Opinion

## ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION [160]

Before the Court is Plaintiffs' Motion for Preliminary Injunction ("Motion" or "Mot.") (Dkt. 160). After reviewing the papers and considering the arguments at the hearing on the Motion, the Court GRANTS IN PART the Motion.

## I. Background

This case arises from a live battle for corporate control that has spilled over into the courts. In February 2014, Canadian-based pharmaceutical company Valeant **[\*3]** and hedge fund management company Pershing Square teamed up to help Valeant pursue a combination with Irvine-based pharmaceutical company Allergan.[1] Between February and April, Pershing Square acquired 9.7% of Allergan's shares. In June 2014, Valeant publicly announced a tender offer for

---

[1]   The Court refers to Defendants Valeant Pharmaceuticals International, Inc., Valeant Pharmaceuticals International, and AGMS, Inc. as "Valeant," and to Defendants Pershing Square Capital Management, LP, PS Management, GP, LLC, and William A. Ackman as "Pershing Square." For clarity, Defendant PS Fund 1 will be referred to separately.

2014 U.S. Dist. LEXIS 156227, *4

Allergan shares after Allergan's board of directors had rebuffed an unsolicited merger proposal. Valeant and Pershing Square then went directly to Allergan's shareholders to urge them to call a special shareholder meeting to replace Allergan's current directors with directors friendlier to Valeant. At the much-publicized urging of Pershing Square and some other shareholders, and after settling litigation in Delaware, Allergan agreed to hold a special shareholders meeting on December 18, 2014.

This litigation is but one of several court cases spawned by this corporate drama. [*4]  In this case, Plaintiffs Allergan, Inc. and Karah H. Parschauer allege that Defendants violated federal securities laws and regulations in connection with Valeant's tender offer for Allergan and in connection with Valeant's and Pershing Square's proxy solicitations. In the instant Motion, Plaintiffs seek an order from this Court (1) preliminarily enjoining Defendant PS Fund 1, the entity holding Allergan stock, "from exercising any of the privileges of ownership attaching to its 9.7 percent stake in Allergan, including voting or acting" at the December 18, 2014 Allergan shareholder meeting; and (2) preliminarily enjoining Defendants from voting any proxies solicited by them in violation of _Section 14(a)_ or _Rule 14a-9_ until corrective disclosures are made. Mot. at 37.

**A. Facts Regarding Alleged Securities Law Violations**

**1. February 2014 and Earlier**

Valeant initially approached Allergan regarding a potential transaction between their companies in September 2012, but was rebuffed by Allergan's CEO David Pyott and board of directors. Mot. at 6.

On February 4, 2014, Valeant's CEO and board chairman J. Michael Pearson had a face-to-face introductory meeting with William Ackman of Pershing Square. They discussed unsolicited [*5]  bids in the pharmaceutical industry generally and Pershing Square's expertise in handling unsolicited bid situations but did not discuss Allergan in detail. The meeting was set up by William F. Doyle from Pershing Square, who knew that Mr. Ackman and Pershing Square had experience handling unsolicited bids. Doyle Dep. 29:3-10, 134-3-10, Sept. 27, 2014. After the meeting, Pershing Square began conducting due diligence on Valeant in anticipation of potentially working with Valeant. Pearson Dep. 49:16-21, Sept. 30, 2014.

On February 6, 2014, Valeant's CEO Mr. Pearson scheduled a meeting with Allergan's CEO Mr. Pyott for February 15, 2014, in hopes that Mr. Pyott would be willing to discuss a

potential transaction between Allergan and Valeant. On the same day, Valeant engaged law firm Sullivan & Cromwell LLP ("Sullivan & Cromwell") to work on a potential Allergan-Valeant transaction. Sometime later in February, Valeant also hired Skadden, Arps, Slate, Meagher & Flom LLP and Osler, Hoskin & Harcourt LLP to work on the transaction. _See_ Declaration of Colleen Smith (Dkt. 161-3) ("Smith Decl.") Ex. 3 at 39.

On February 7, 2014, the Finance and Transactions Committee of Valeant's board of directors [*6]  held a telephonic meeting in which it discussed a potential Allergan-Valeant combination. Smith Decl. Ex. 3 at 40. The slide deck used for the meeting shows that Sullivan & Cromwell was "Pulling together key diligence items" and "Working on structure and key actions to launch offer" and that Bank of America Merrill Lynch and Goldman Sachs were "clearing conflicts." Smith Decl. Ex. 12 at 24. Bankers were brought up because Valeant was beginning to "line up financing." Schiller Dep. 97:18-98:18, Sept. 30, 2014.

On February 9, 2014, Pershing Square and Valeant signed a confidentiality agreement. Later that day, Mr. Pearson revealed the identity of Valeant's target, Allergan, to Mr. Ackman. The Valeant board of directors met later that day and discussed the confidentiality agreement and the potential Allergan-Valeant transaction. Smith Decl. Ex. 3 at 40.

On or around February 10, 2014, Sanford B. Bernstein & Co. published a note reporting on its meeting with Allergan. Allergan had said that Allergan was not interested in acquisition by Valeant and that Allergan "shareholders will hesitate to take Valeant paper." Smith Decl. Ex. 86 at 2. Subsequently, Mr. Pearson cancelled the scheduled meeting [*7]  with Mr. Pyott, thinking there was no point in meeting if Allergan was not interested in a potential Allergan-Valeant transaction. Pearson Dep. 55:19-56:18.

On February 11, 2014, Pershing Square formed PS Fund 1, LLC, with five Pershing Square entities as members (but not Valeant). Smith Decl. Ex. 15.

On February 13, 2014, representatives from Valeant and Pershing Square met to discuss a potential Allergan-Valeant transaction. Smith Decl. Ex. 3 at 40. They discussed assumptions about Allergan and discussed the possibility that they would have to call a special meeting to replace Allergan's board members. Smith Decl. Ex. 85 at 2; Schiller Dep. 115:1-18. Emails and slide decks circulated within Valeant and within Pershing Square during the next couple of days reveal that Valeant and Pershing Square both thought there was a strong possibility that Allergan would

2014 U.S. Dist. LEXIS 156227, *7

be a "Hostile cash and stock merger" because Allergan would resist Valeant's plan to "make an unsolicited cash and stock offer with \$10-15B of cash and 20-25% premium" and that Pershing Square's participation would be important "to drive greater certainty of deal closing." Smith Decl. Ex. 4; Smith Decl. Ex. 85 at 3; Pearson Dep. [*8] 91:14-21; Ackman Dep. 41:11-42:17, Oct. 2, 2014; Smith Decl. Ex. 25.

Around the middle of February 2014, there was still a possibility that Allergan would negotiate a friendly transaction. Schiller Dep. 67:18-68:8. During Valeant's board meeting on February 21, 2014, board members discussed the pros and cons of an Allergan-Valeant transaction and of Pershing Square's role in closing the deal. One factor that was discussed was Mr. Ackman's ability to purchase 10% of Allergan stock, which would go a long way toward the 25% needed to call a special meeting. Another factor was whether having Mr. Ackman participate would make it easier to persuade Allergan's board to negotiate. Pearson Dep. 153:18-158:23. Nevertheless, the general consensus was that Allergan would most likely be unreceptive to a merger proposal.

## 2. February 25 Relationship Agreement

During this time, Valeant's and Pershing Square's respective lawyers drafted a "Proposed Acquisition Plan" laying out how Valeant and Pershing Square would work together to acquire Allergan. The plan was finalized and memorialized in a February 25, 2014 letter agreement. Smith Decl. Ex. 34 ("Feb. 25 Relationship Agreement"). The plan involved Valeant [*9] and Pershing Square becoming members in "a newly formed jointly owned entity" dubbed the "Co-Bidder Entity." Feb. 25 Relationship Agreement § 1(a). Pershing Square would manage the Co-Bidder Entity, including the manner and timing of purchasing Allergan stock, except that Valeant had to consent before the Co-Bidder Entity's purchases triggered Hart-Scott-Rodino reporting requirements. Id. §§ 1(a), (e). Pershing Square would also control the voting rights associated with the Co-Bidder Entity's Allergan stock except that the Co-Bidder Entity was required to vote all of its shares in favor of Valeant's proposals and against any proposal that would undermine Valeant's proposals. Id. § 1(e). Pershing Square was not permitted to purchase Allergan stock through any other person or entity but the Co-Bidder Entity. Id. § 1(c).

With regard to decision-making authority for the anticipated Allergan-Valeant transaction, the agreement provided:

> Prior to making any material decision relating to a Company Transaction (including, for the avoidance of

doubt, any proxy contest, proxy solicitation, written consent solicitation or other action relating to or potentially affecting the composition of the board of directors of Allergan), [*10] [Valeant] will consult with Pershing Square and will consider in good faith Pershing Square's comments on such prospective actions; provided that the parties acknowledge that no steps have been taken towards a tender or exchange offer for securities of Allergan and the parties agree that the consent of both Pershing Square and [Valeant] shall be required for launching such a tender offer or an exchange offer. If a Company Transaction is being pursued by [Valeant] through a tender or exchange offer or a merger or any related proxy or other solicitation prior to the Termination Time, each of [Valeant], Pershing Square and the Co-Bidder Entity will be identified as co-bidders or soliciting persons, respectively.

Id. § 1(d).

With regard to financing, Valeant agreed to contribute \$75.9 million to the Co-Bidder Entity once the Co-Bidder Entity purchased 4% of Allergan stock. Id. § 1(a). Immediately prior to the consummation of the anticipated Allergan-Valeant transaction, if Valeant wished to do so, it could require Pershing Square to purchase \$400 million of Valeant stock. Id. § 2(a); Ackman Dep. 169:13-171:18. If the transaction was consummated in a way that allowed Allergan shareholders to receive either [*11] cash or Valeant shares, then Pershing Square agreed to have the Co-Bidder Entity receive stock. Feb. 25 Relationship Agreement § 2(b). Once the transaction was consummated, the Co-Bidder Entity would dissolve and its assets, including any net profits arising from the Allergan stock, would be divided pro rata between Valeant and Pershing Square. Id. § 3.

After the transaction was consummated, Pershing Square agreed to hold \$1.5 billion worth of Valeant stock for one year. Id. § 2(c). At one point the parties discussed the idea of Pershing Square designating one director to Valeant's board, but the final version of the agreement did not provide for that. Compare Smith Decl. Ex. 10 with Feb. 25 Relationship Agreement.

## 3. February 25 — July 2014

On February 25, 2014, the Co-Bidder Entity, PS Fund 1, began to purchase Allergan stock. On April 3, Pershing Square notified Valeant that PS Fund 1 had acquired 4% of Allergan stock. PS Fund 1's LLC Agreement was amended on April 6 to add Valeant as a member. Smith Decl. Ex. 3 at

2014 U.S. Dist. LEXIS 156227, *11

42. On April 7, Valeant's board gave its consent for PS Fund 1 to proceed across the 5% threshold and to take further action to facilitate the potential transaction with Allergan, "provided **[*12]** that the Authorized Officers are not authorized [to] commence a tender offer or a proxy solicitation without the approval of the Board." Defs.' App'x Ex. 70 at 10. On April 10, a day before PS Fund 1 acquired 5% of Allergan stock, Valeant contributed its promised $75.9 million to PS Fund 1. Also on April 10, Valeant approved PS Fund 1 going over the 5% threshold. Between April 11 and 21, PS Fund 1 increased its ownership up to 9.7% of Allergan's shares. Smith Decl. Ex. 3 at 42.[2] Plaintiff Karah Parschauer exercised and sold Allergan stock options on February 26 at $127.60 per share and on March 11 at $129.08 per share. Compl. ¶ 21.

Between February 25 and April 21, Valeant held several board meetings where the potential transaction with Allergan was discussed. Smith Decl. Ex. 26 at 7-10; Exs. 46-48. McKinsey & Co., a consulting firm, helped Valeant conduct due diligence and prepare valuation analyses of Allergan. Valeant also **[*13]** developed post-announcement communication strategies and made post-acquisition plans. *E.g.*, Pearson Dep. 103:9-104:19; Smith Decl. Ex. 2; Smith Decl. Ex. 96.

On April 21, PS Fund 1 publicly disclosed its 9.7% stake in Allergan through a Schedule 13D filing. Smith Decl. Ex. 43. On April 22, Valeant issued a press release announcing that it had sent an unsolicited bid for all of Allergan's shares to Allergan's board and CEO. Smith Decl. Ex. 67. In response, Allergan's stock price rose 22%. Allergan's board adopted a shareholder rights plan, or poison pill, the next day and Pershing Square began preparing to hold a shareholder referendum to pressure Allergan's board to negotiate with Valeant. Declaration of William Ackman ("Ackman Decl.") (Dkt. 194-5) ¶¶ 21, 27.

As of April, no tender offer or exchange offer had been explicitly announced yet. In response to an investor's question on April 22 about whether an exchange offer was forthcoming, Mr. Ackman responded:

> I think that anyone in the room who talks to a good M&A attorney will understand, you'll read the documents on the company, there are opportunities to call special meetings. There are opportunities for investors to launch various **[*14]** kinds of offers. You

should assume that we're familiar with all these various techniques. I think the first choice for everyone on the podium and for ultimately, I think, the Allergan shareholders and for Valeant shareholders is, this is an extremely attractive offer from the Allergan shareholders' perspective. Now, I'm sure the board will have some input, some ideas, and some feedback, and I think the best thing that can happen here is for this management team to sit down with Allergan's management team and board of directors, and work out a transaction that's the best interests of everyone.

Smith Decl. Ex. 105 at 168-69. On June 17, upon announcing the tender offer, Mr. Pearson reflected back to the April announcement: "On April 22, we announced our offer for Allergan. We suspected at the time it would ultimately have to go directly to Allergan shareholders. We were correct." Smith Decl. Ex. 137 at 3.

On May 12, Allergan's board rejected the merger proposal. Smith Decl. Ex. 71 at Item 8.01. In late May, officers of Pershing Square and Valeant attended the Sanford Bernstein investor conference in New York where they spoke with many Allergan shareholders. Schiller Dep. 233:15-234:1;  **[*15]** Ackman Dep. 164:19-165:4. Responding to feedback from those shareholders, on May 30, Valeant announced a new, higher offer for Allergan's shares. Declaration of Michael J. Pearson ("Pearson Decl.") (Dkt. 194-9) ¶ 27. Around this time, Valeant's board formally authorized management to pursue a tender offer. Valeant also secured financing for a tender offer, asked its legal counsel to draft documents for the tender offer, and contacted an exchange agent and dealer manager. Defs.' App'x Ex. 85; Pearson Decl. ¶ 30. On June 2, Pershing Square announced that it was abandoning the referendum idea and would instead begin soliciting shareholder requests for a special shareholder meeting.

On June 11, Valeant formed AGMS, Inc. ("AGMS"), a wholly-owned subsidiary, to hold Allergan shares acquired through the tender offer. Pearson Decl. ¶ 30. On June 17, Valeant publicly announced that it would launch a tender offer to Allergan shareholders. Smith Decl. Ex. 133 at 10. On the following day, Valeant, AGMS, and PS Fund 1 filed a tender offer statement ("Schedule TO") listing Valeant and AGMS as "offerors" and PS Fund 1 as an "other person" on the cover page. Smith Decl. Ex. 77. The Schedule TO described **[*16]** AGMS as the "Purchaser" and stated that PS

---

[2]   The rapid purchase of shares between April 11 and 21 was done to take advantage of Rule 13d-1, under which a person has 10 days from the date he or she becomes a 5% shareholder to file Schedule 13D and disclose his or her ownership to the SEC. *See* 17 C.F.R. § 240.13d-1(a); Ackman Dep. 87:5-88:12.

2014 U.S. Dist. LEXIS 156227, *16

Fund 1 was also filing the Schedule TO "as a person that is considered a co-bidder for SEC purposes." *Id.* at 3. In July, the SEC requested that Pershing Square list itself as an offeror in the tender offer materials. Defs.' App'x Ex. 37 at 1. Accordingly, on July 22, Defendants amended the Schedule TO to list Pershing Square and PS Fund 1 as "offerors." Defs. App'x Ex. 44. The amended Schedule TO (and subsequent versions of the Schedule TO) continued to describe the tender offer as a "third-party tender offer by Purchaser" AGMS. The amended Schedule TO described Pershing Square and PS Fund 1 as "co-bidder[s] for SEC purposes." *Id.*

**B. Procedural History**

Plaintiffs filed suit in this Court on August 1, 2014. *See* Compl. (Dkt. 1). Plaintiffs allege that Defendants' conduct constituted insider trading in violation of *Section 14(e)* of the Exchange Act and *Rule 14e-3*. Compl. ¶¶ 168-180. Plaintiffs also allege that Defendants violated *Section 14(a)* and *Rule 14a-9*, *inter alia*, by not adequately disclosing the above facts to Allergan shareholders. Compl. ¶¶ 159-167.

On September 12, the Court approved the parties' stipulation to a period of expedited discovery so that Plaintiffs could file a motion for preliminary **[*17]** injunction. *See* Order Granting Joint Stipulation re: Scheduling (Dkt. 87). Plaintiffs filed the instant Motion on October 6 (Dkt. 160). Defendants filed their Opposition on October 20 (Dkt. 194) and Plaintiffs filed their Reply on October 23 (Dkt. 214). Oral argument took place on October 28 (Dkt. 220).

**II. Legal Standard**

Pursuant to *Rule 65 of the Federal Rules of Civil Procedure*, the court may grant preliminary injunctive relief in order to prevent "immediate and irreparable injury." *Fed. R. Civ. P. 65(b)(1)(A)*. The decision to grant or deny a preliminary injunction is within the discretion of the district court. *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011)*. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*.

In the Ninth Circuit, a plaintiff may obtain preliminary injunctive relief if he satisfies either the *Winter* factor test or the "sliding scale" test, also referred to as the "serious

questions" test. *See Alliance for the Wild Rockies, 632 F.3d at 1135*. Under the *Winter* factor test, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that the balance of equities tips in favor of the moving party; and (4) that an injunction is in the public interest. *Winter, 555 U.S. at 20*.

Under the sliding scale test, a slightly weaker **[*18]** showing of success on the merits ("serious questions going to the merits") can be outweighed by strong equitable considerations ("a balance of hardships that tips sharply towards the plaintiff."). The irreparable harm and public interest factors are the same as in the *Winter* test. *See Alliance for the Wild Rockies, 632 F.3d at 1134-35*. While the sliding scale test "requires the plaintiff to make a showing on all four prongs," the showing need not be equally strong. *See id*.

**III. Discussion**

The Court addresses each factor in turn.

**A. Likelihood of Success on the Merits / Serious Questions Going to the Merits**

Plaintiffs argue that they are likely to succeed or at least raise serious questions going to the merits of their *Section 14(e)* and *Rule 14e-3* claim as well as their *Section 14(a)* and *Rule 14a-9* claim. The Court addresses each in turn.

**1. Section 14(e) and Rule 14e-3 Claim**

Plaintiffs' core allegations are based on Section 14(e) of the Williams Act, *15 U.S.C. § 78n(e)* and Rule 14e-3, *17 C.F.R. § 240.14e-3*. In *Brody v. Transitional Hospitals Corp.*, the Ninth Circuit assumed without deciding that a private right of action exists under *Rule 14e-3*, *280 F.3d 997, 1002-03 (2002)*. The Court held that only contemporaneous traders who could have purchased from or sold to the alleged inside trader can bring suit under *Rule 14e-3*. *Id. at 1005*. Here, Ms. Parschauer sold shares on February 26 and March 11, 2014, during the time period **[*19]** that PS Fund 1 purchased shares. Thus, Ms. Parschauer has standing to bring suit under *Rule 14e-3*. Allergan, however, was not a contemporaneous trader and therefore cannot bring suit under *Rule 14e-3*.[3] The Court thus restricts its Rule 14e-3 analysis to Ms. Parschauer's claim.

---

3   Multiple courts have held that the issuer of stock has standing to seek injunctive relief under the Williams Act, including under Section 14(e), on the ground that the issuer is much more likely than shareholders to have the information and the resources to act quickly in the midst of a hostile tender offer. *E.g., Elec. Specialty Co. v. Int'l Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969)*. These cases,

Section 14(e) prohibits "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." Under Rule 14e-3(a), once an "offering person" "has taken a substantial step or steps to commence . . . a tender offer," "any other person who is in possession of material information relating to such tender offer" that he knows or has reason to know is nonpublic and that he received directly or indirectly from the offering person must either abstain from trading or disclose the information to the public before trading. 17 C.F.R. § 240.14e-3(a). Relatedly, Rule 14e-3(d) makes it unlawful for an "offering person" to communicate "material, nonpublic information relating to a tender offer to any other person under circumstances in which it is reasonably foreseeable that such communication is likely to result in a violation of this section." 17 C.F.R. 240.14e-3(d).

Here, there is no dispute that Pershing Square [*22] possessed nonpublic information and did not disclose that information to the public before causing PS Fund 1 to purchase Allergan shares between February 25 and April 21, 2014. The parties dispute only whether any substantial steps toward a tender offer were taken by then, i.e., whether the nonpublic information in Pershing Square's possession was related to a tender offer at that point. Even if substantial steps were taken, the parties dispute whether it was unlawful for PS Fund 1 to buy Allergan shares because it is unclear whether PS Fund 1 and other Pershing Square Defendants were "offering person[s]." The Court addresses each area of disagreement in turn.

### a. Whether Substantial Steps Were Taken to Commence a Tender Offer

In order for Rule 14e-3's "disclose or abstain" requirement to be triggered, there must have been "a substantial step or steps to commence . . . a tender offer" before PS Fund 1 began purchasing Allergan equity. To determine whether a "substantial step or steps" toward a tender offer were taken, a court looks mainly to the offering person's objective conduct. The SEC chose an objective standard in order to avoid "the difficulty of identifying when a person has actually determined [*23] to make a tender offer." Tender Offers, 45 Fed Reg. 60,410, 60,413 n.33 (Sept. 12, 1980) ("SEC Adopting Release"). In adopting the "substantial step or steps" standard, the SEC stated:

> [S]ubstantial step or steps to commence a tender offer include, but are not limited to, voting on a resolution by the offering person's board of directors relating to the tender offer; the formulation of a plan or proposal to make a tender offer by the offering person or the person(s) acting on behalf of the offering person; or activities which substantially facilitate the tender offer such as: arranging financing for a tender offer; preparing or directing or authorizing the preparation of tender offer materials; or authorizing, negotiating or entering into agreements with any person to act as a dealer manager, soliciting dealer, forwarding agent or depository in connection with the tender offer.

Id.

---

however, were focused on the target corporation's ability to protect shareholders from false or misleading disclosures, not from insider trading itself. E.g., Dan River, Inc. v. Unitex, Ltd., 624 F.2d 1216, 1224 (4th Cir. 1980) (finding that issuer has standing to seek equitable relief against defendants who made a false statements in a Schedule 13D filing); GAF Corp. v. Milstein, 453 F.2d 709, 721(2d Cir. 1971) (holding that an issuer has standing to bring Section 13(d) claims because "[t]he issuer is the only party which can promptly and effectively police Schedule 13D filings, for it is fair to assume that it scrutinizes carefully changes in its stock ownership -- particularly of the sort which can initiate control."); see also Florida Commercial Banks v. Culverhouse, 772 F.2d 1513, 1519 (11th Cir. 1985) ("[W]e hold that under the Williams Act [*20] an issuer has a private right of action to seek the remedy of corrective disclosures."); Polaroid Corp. v. Disney, 862 F.2d 987, 1003 (3d Cir. 1988) ("A target company such as Polaroid has standing to sue, under section 14(e)'s implied right of action, to enjoin misrepresentations made by a tender offeror in connection with the offer."); Gulf & W. Indus., Inc. v. Great Atl. & Pac. Tea Co., 476 F.2d 687, 696 (2d Cir. 1973) (holding that the target corporation has standing to seek injunctive relief under Section 14(e) in case involving material omissions by the tender offeror). Essex Chem. Corp. v. Gurit-Heberlein AG and Burlington Industries, Inc. v. Edelman, relied upon by Plaintiffs, do state that a target company has standing to bring an insider trading claim under Rule 14e-3. Essex Chem. Corp., No. 88-2478, 1988 U.S. Dist. LEXIS 19515, at *15 (D.N.J. June 24, 1988); Burlington, 666 F. Supp. 799, 813 (M.D.N.C. 1987). However, Essex relies only on Burlington. Burlington itself only cites back to its own discussion about the target corporation's standing to bring inadequate disclosure claims without any discussion of the potential difference between an insider trading claim and an inadequate disclosure claim, both of which could arise under Section 14. See Burlington, 666 F. Supp. at 806, 813. Moreover, the Burlington court defined a Rule 14e-3 claim as including a breach of fiduciary duty element, similar to Rule 10b-5. If breach of duty was an element of Rule 14e-3, then it would make sense for the target corporation to have standing to bring a Rule 14e-3 claim against the person [*21] who breached his or her duty to the corporation by trading on inside information, which were the facts in Burlington. See id. at 814. However, as modernly understood, no breach of fiduciary duty is required to violate Rule 14e-3, United States v. O'Hagan, 521 U.S. 642, 676, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997), and in this case, there is no allegation that Valeant and Pershing Square breached any fiduciary duty to Allergan or Ms. Parschauer.

Courts have interpreted this list as only a list of examples and have found that other actions are sufficient to constitute substantial steps. *E.g.*, *SEC v. Ginsburg, 362 F.3d 1292, 1303 (11th Cir. 2004)* (finding that a meeting between executives, followed by due diligence, a confidentiality agreement, and an awareness that "the deal had to go down fast" constituted substantial steps); *SEC v. Mayhew, 121 F.3d 44, 53 (2d Cir. 1997)* (finding that bidder and target companies' [*24] representatives signing a confidentiality agreement and holding a series of confidential discussions regarding a possible merger, and retaining McKinsey to do financial analysis and come up with strategy for the combination constituted substantial steps). The courts in *Ginsburg* and *Mayhew* both found that substantial steps toward a tender offer had taken place even though the offeror had not yet settled on a name for the form of the merger. *See Ginsburg, 362 F.3d at 1303*.

Here, the Court must determine whether a substantial step was taken toward a tender offer before PS Fund 1's purchases of Allergan stock between February 25 and April 21, 2014. Before February 25, Valeant's board of directors met multiple times and discussed a potential combination with Allergan. Board meeting materials reflect that Valeant knew there was a high likelihood that a transaction with Allergan would involve a "[h]ostile cash and stock merger." Valeant hired three law firms and reached out to bankers to begin doing due diligence and lining up financing for the potential Allergan transaction. Valeant representatives met with Mr. Ackman and others from Pershing Square, who were known for their experience in handling unsolicited bids, [*25] and signed a confidentiality agreement with Pershing Square in order for Valeant to reveal the name of its proposed target to Pershing Square.

Valeant and Pershing Square also negotiated and ultimately agreed on a plan pursuant to which Pershing Square would purchase Allergan stock, would commit to voting in favor of any bid for Allergan stock by Valeant, and would accept shares and not cash if the Allergan-Valeant transaction was consummated in a way that gave Allergan shareholders the option to choose stock or cash. Feb. 25 Relationship Agreement § 2(b). The February 25 Relationship Agreement specifically provided that Valeant and Pershing Square would form a "Co-Bidder Entity" and would be named as "co-bidders" if a tender offer was launched for Allergan's shares. *Id.* § 1(a), 1(d). Internal emails indicate that their lawyers were concerned about regulators being offended by a person who is not a co-bidder acquiring a toehold. Smith Decl. Ex. 83.

Defendants argue that, before May, they had taken substantial steps toward a negotiated merger with Allergan, which included a strategy of using Allergan's shareholders to pressure Allergan's board to negotiate, but had taken no steps toward a tender offer [*26] to Allergan's shareholders. They argue that they took substantial steps toward a tender offer only after the Sanford Bernstein conference on May 29, 2014, where Allergan shareholders urged Valeant and Pershing Square to make a tender offer. Defendants point to provisions of Valeant's and Pershing Square's February 25 Relationship Agreement, in which both sides acknowledged that no steps have been taken toward a tender offer and which required both sides to consent before launching a tender offer. They also point to a resolution by Valeant's board on April 7, 2014 which provided that "the Authorized Officers are not authorized [to] commence a tender offer or a proxy solicitation without the approval of the Board," as well as the fact that they did not line up financing for a tender offer or hire an exchange agent or dealer manager until late May and early June. Opp'n at 25-27.

Defendants stating in a contract that they had not taken any steps toward a tender offer does not necessarily make it so. Evidence that Defendants took more definite steps toward a tender offer in May does not necessarily mean that a "substantial step" did not happen in February. Defendants have not adequately [*27] explained why the February 25 Relationship Agreement used the term "Co-Bidder Entity" and required Pershing Square and Valeant to identify themselves as "co-bidders" in the event that Valeant launched a tender offer if there was no plan for a tender offer at that time, or at least a strong possibility at that time that their actions would lead toward and facilitate a tender offer. With further discovery and upon presentation of the evidence to the jury, a jury could find for Defendants on the substantial steps issue. However, based on this record, the Court concludes that Plaintiffs have at least raised serious questions as to whether substantial steps to commence a tender offer were taken before PS Fund 1 began purchasing Allergan shares.

**b. Whether Rule 14e-3 Contains a "Co-Offering Person" Exception**

Even if Pershing Square purchased Allergan shares based on confidential information about a forthcoming tender offer, Defendants argue that their conduct was not illegal. There are two potential theories under which Pershing Square would be permitted to trade on confidential information that it received from Valeant: (1) if Pershing Square is Valeant's "broker" or "agent" within the meaning of *Rule 14e-3(c)(1)* [*28] or fits into the exception under *Rule 14e-3(b)*, or (2) if Pershing Square and Valeant are collectively an "offering person" and it is possible for two persons to work together

2014 U.S. Dist. LEXIS 156227, *28

as one "offering person" within the meaning of *Rule 14e-3*. Since Defendants do not argue that Pershing Square fits into *Rule 14e-3(b)* or *(c)*, the Court addresses the second theory, the "co-offering person" theory. Plaintiffs argue based on the text and legislative and regulatory history of *Rule 14e-3*, an "offering person" cannot be more than one person. Mot. at 17-23. However, the Court concludes from its review of the relevant statutory and regulatory text that the term "offering person" can include multiple persons.

The idea that more than one person can be behind a tender offer comes from *Section 14(d)* and Regulation 14D. *Section 14(d)* requires any person who makes a tender offer and who would hold over 5% of a company's shares as a result of the tender offer to make certain disclosures at the time of the offer. *Section 14(d)* contains a provision that "[w]hen two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for purposes of this subsection." *15 U.S.C. § 78n(d)(2)*.[4] Regulation 14D, promulgated by the SEC, defines a "bidder" as "any person who makes a tender offer or on whose behalf a tender offer is made." *17 C.F.R. § 240.14d-1(g)(2)*. Regulation 14D(g) states that the definitions in *subsection (g)* apply to "sections 14(d) and 14(e) of the Act." From these provisions, the Court deduces that Congress and the SEC both recognize that multiple persons may work together to make a tender offer.

Plaintiffs assert that, although the disclosure requirements of *Sections 13(d)* and *14(d)* recognize that a tender offeror can be more than one person, *Rule 14e-3* does not. This contention is based on the fact that neither *Section 14(e)* nor *Rule 14e-3* contains the same "two or more persons . . . shall be deemed a 'person'" language as *Sections 13(d)* and *14(d)*. Also, neither *Section 14(e)* nor *Rule 14e-3* uses the term "bidder." *Section 14(e)* refers only to a "person." The Exchange Act provides that "[w]hen used in this chapter, unless the context otherwise requires--. . . . (9) The term 'person' means a natural person, company, government, or political subdivision, agency, or instrumentality of a government." *15 U.S.C. § 78c(a)(9)*. *Rule 14e-3* uses the term "offering person," which is defined as "any person who has taken a substantial step or steps to commence, or has commenced, a tender offer." *17 C.F.R. § 240.14e-3(a)*. Plaintiffs correctly point out that these definitions are stated in the singular. *Rule 14e-3*'s prohibition against insider trading does not apply to the offering person itself nor to

purchases of any security by the offering person's "broker" or "agent." Plaintiffs argue that the [*30] broker or agent exception is proof that "offering person" means only a single person because otherwise there would be no need to clarify that the offering person's brokers and agents are permitted to trade on insider information on the offering person's behalf.

The Court does not find this argument persuasive for several reasons. First, even though *Section 14(d)(2)* and *Section 13(d)(3)* limit the "two or more persons . . . shall be deemed a 'person'" provision only to those particular subsections, Regulation 14D's definition of "bidder," which also contemplates multiple persons acting as one tender offeror, applies to both *Section 14(d)* and *Section 14(e)* of the Exchange Act. Second, the SEC has broad authority under *Section 14(e)* to define and regulate manipulative and deceptive practices in connection with tender offers, including defining an "offering person" as more than one person. Although the SEC has not made that clear in the text of *Rule 14e-3*, it indicated through Regulation 14D that more than one person can act together to make a tender offer for purposes of *Section 14(e)*. Third, the Exchange Act's definition of "person" has a built-in flexibility, as the Exchange Act states that its definitions are to be used "unless context otherwise requires." Here, in passing the Williams Act, Congress explicitly contemplated [*31] that tender offers could be made by co-offerors working together as a partnership or a group. Congress also gave the SEC authority to promulgate regulations regarding tender offers, which the SEC has used in defining a "bidder" as potentially including more than one person. Given this context, the Court reads *Section 14(e)*'s "person" and *Rule 14e-3*'s "offering person" as encompassing the possibility that two or more persons may act together as one "offering person," or "co-offering persons."

### c. Who is a Co-Offering Person

The Court's conclusion that *Rule 14e-3* allows multiple persons to act as one "offering person" does not end the analysis. If a co-offering person exception is not to swallow the general rule that an offering person cannot tip off another person and other persons cannot then trade on that confidential tip, there must be certain characteristics that distinguish a co-offering person from "any other person" for Rule 14e-3 purposes. The parties have not cited nor has the Court been able to find any legal authority directly addressing how to distinguish between a co-offering person and "any

---

[4]   *Section 13(d)* of the Exchange [*29] Act, which requires that a person make certain disclosures upon becoming a 5% shareholder (whether because of a tender offer or not), contains the same language. *See 15 U.S.C. § 78m(d)(3)*.

2014 U.S. Dist. LEXIS 156227, *31

other person" for Rule 14e-3 purposes. Neither Congress nor the SEC has provided guidance directly on point.

Defendants urge the Court to [*32] equate "offering person" with "bidder" and "offeror" as the SEC already defines them for disclosure purposes, that is, as "any person who makes a tender offer or on whose behalf a tender offer is made." SEC Regulation M-A; *17 C.F.R. § 229.1000(d)*; *Rule 14d-1(g)(2)*; *17 C.F.R. 240.14d-1(g)(2)*.[5] When the SEC analyzes "bidder" status for Regulation 14D purposes, the staff consider factors such as:

• Did the person play a significant role in initiating, structuring, and negotiating the tender offer?

• Is the person acting together with the named bidder?

• To what extent did or does the person control the terms of the offer?

• Is the person providing financing for the tender offer, or playing a primary role in obtaining financing?

• Does the person control the named bidder, directly or indirectly?

• Did the person form the nominal bidder, or cause it to be formed?, and

• Would the person beneficially own the securities purchased by the named bidder in the tender offer or the assets of the target company?

One or two of these factors may control the determination, depending on the circumstances. These factors are not exclusive.

We also consider whether adding the person as a named bidder means shareholders will receive material

information that is not otherwise [*33] required under the control person instruction . . . .

In addition, we would consider the degree to which the other party acted with the named bidder, and the extent to which the other party benefits from the transaction.

Excerpt from Current Issues and Rulemaking Projects Outline (Nov. 14, 2000), § II.D.2. Mergers & Acquisitions—Identifying the Bidder in a Tender Offer, *http://www.sec.gov/divisions/corpfin/guidance/ci111400ex_tor.htm*.

This fact-specific, case-by-case inquiry is also used by the courts. Based on the Court's review of the sparse case law, if there is any clear principle from the case law, it is that bankers who do no more than supply the tender offeror with money to make the tender offer in return for a fee or in return for a security interest in the post-transaction company's stock are not co-bidders. *Van Dusen Air, Inc. v. APL Ltd. Partnership, 622 F. Supp. 1216, 1985 WL 56596, at *1-3 (D. Minn. 1985)*; *Revlon, Inc. v. Pantry Pride, Inc., 621 F. Supp. 804, 816-17 (D. Del. 1985)*. Beyond that, "there is no bright, hard-line test" for distinguishing a co-bidder from the "rest of humanity." *MAI Basic Four, Inc. v. Prime Computer, Inc., 871 F.2d 212, 221 (1st Cir. 1989)*; *Koppers Co., Inc. v. American Exp. Co., 689 F.Supp. 1371, 1387 (W.D. Pa. 1988)*. Courts have considered many different factors in determining whether the person alleged to be a bidder is a "principal participant" who is "central to the offer," *Koppers, 689 F. Supp. at 1388*, including the alleged bidder's [*34] role in planning and financing the tender offer and the extent of their interest in and relationship with their co-bidding entities.[6] Defendants rely heavily on the "principal participant" language to distinguish Pershing Square's role from a mere banker's role and to bring Pershing Square within the "co-bidder" safety zone despite the fact that Pershing Square does not appear to have as

---

[5]   To be precise, "bidder" excludes issuers who make tender offers for its own stock. 17 C.F.R. § 240.14d-3. "Offeror" does not make any such exclusion. 17 C.F.R. § 240.14d-100.

[6]   In *MAI Basic Four, Inc. v. Prime Computer, Inc.*, the First Circuit affirmed the district court's ruling that Drexel, who helped a group of companies ("Basic") make a tender offer for Prime Computer, was a co-bidder based on the following facts:

• Drexel's primary role in financing the tender offer was to place $875 million in junk bonds. If Drexel was successful, it would get $65 million in fees. Even if the junk bonds were not sold, there was some evidence that Drexel was still expected to contribute $875 million;

• Drexel was also instrumental in raising $20 million that a Basic-affiliated entity was using to finance the tender offer;

• As of the date of the tender offer, Drexel [*35] had the right to name one of three board directors in LeBow, one of Basic's principal shareholders, with veto power over some corporate actions. After the tender offer commenced, Drexel inexplicably relinquished its directorship, but still had the right to attend board meetings and had first rights of refusal with regard to underwriting and placement;

2014 U.S. Dist. LEXIS 156227, *35

dense a relationship with Valeant or as deep an interest in the surviving entity as the co-bidders in *MAI Basic Four and Koppers*.

Plaintiffs argue that "offering person" cannot be defined identically as "bidder" or "offeror" because effecting the purpose of the Williams Act—to ensure that investors have access to the material information they need to decide how they will respond to a tender offer—requires defining "bidder" broadly to ensure broad disclosures under *Sections 13(d)* and *14(d)* while defining "offering person" narrowly to restrict the number of persons allowed to trade on insider information about tender offers. The Court finds Plaintiffs' argument persuasive because, in promulgating *Rule 14e-3*, the SEC was concerned about the practice of "warehousing"

(the practice of the tender offeror intentionally leaking information to institutional investors to allow those other entities to make early trades before other investors heard about the tender offer) because such a practice is unfair to investors who are trading at an informational disadvantage.[7] SEC Adopting Release at 60,412; Proposed Rule 14e-2 at 9976-77; *see also Chiarella v. United States, 445 U.S. 222, 234, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980)* (noting that the SEC promulgated *Rule 14e-3* to prevent warehousing). Although Plaintiffs did not explicitly frame it as such, the Court also finds compelling their proposed test for distinguishing an "offering person" from a "bidder" or "offeror." Plaintiffs argue that an offering person should be more than a financier, and should actually make an offer to

- Drexel held significant equity interests in three different Basic-affiliated entities; and

- Drexel had helped arrange financing for Basic-affiliated entities to acquire other companies in the past.

871 F.2d at 221 ("In this case we cannot say that, as a matter of law, an active advisor-broker-financier-participant who owns less than a majority interest in the surviving entity is not a bidder where, as here, there has been a history of close association, equity sharing, board representation and involvement from the beginning of the present offer, and where there is the possibility of the advisor-broker being the indispensable key to the offer's success.").

In *Koppers Co., Inc. v. American Exp. Co.*, the district court held that Shearson, who worked with Beazer and other entities to make a tender offer for Koppers shares, was a co-bidder based on the following **[*36]** facts:

- Shearson had been involved from the start in advising Beazer on acquisition possibilities;

- Evidence from their early negotiations showed that Shearson intended from the start to take an active and aggressive role in the Koppers takeover;

- Shearson contributed $23.05 million to acquire a toehold in Koppers before the tender offer;

- Shearson held a significant equity interest in BNS, Inc., an entity created by Shearson, Beazer, and others for the sole purpose of holding the Koppers shares acquired through tender offer, and would hold slightly less than 50% interest in BNS, Inc. after the tender offer was consummated;

- Shearson committed to making a financial contribution of $570 million to BNS, Inc. to carry out the tender offer;

- In return, Shearson would receive either unsecured notes from BNS, Inc. or stock in BNS, Inc.; and

- Shearson would earn hefty brokerage fees by underwriting the purchase of Koppers stock pursuant to the tender offer.

The court characterized Shearson as not just the typical investment banker. Shearson "play[ed] a central participatory role" in the tender offer despite the fact that it did not have "control" over BNS, Inc. because Shearson was "unquestionably **[*37]** . . . a motivating force fueling the formation and capitalization of BNS, Inc., as it now stands, and as it is intended to stand after the purchase." 689 F. Supp. at 1390.

[7]   The SEC was so concerned about trading on confidential **[*38]** information in connection with a tender offer that it originally proposed trading by the "bidder" itself, and only dropped the proposal because of concerns that it would be difficult to determine when the bidder had actually determined to make a tender offer, i.e., when the bidder's confidential information would be in connection with a tender offer. Tender Offers, 44 Fed. Reg. 9956, 9976-78, 9988 (Feb. 15, 1979) ("Proposed Rule 14e-2"); Tender Offers, 44 Fed. Reg. 70,326, 78,338 (Dec. 6, 1979) ("Proposed Rule 14e-3").

2014 U.S. Dist. LEXIS 156227, *38

purchase shares and should have some degree of control over the terms of the tender offer and over the surviving entity. These factors are included among the factors used by the SEC to determine whether someone is a "bidder" or "offeror" for disclosure purposes. Thus, in essence, Plaintiffs would use the same test as that proposed by Defendants. The only difference is that, similar to how the SEC considers whether adding a person as a named bidder for Regulation 14D purposes would result in more material information being **[*39]** disclosed to shareholders, in determining whether someone is an "offering person," Plaintiffs would add the consideration of whether labeling the person an "offering person" would be consistent with *Rule 14e-3*'s purpose of limiting the universe of persons permitted to trade on inside information only to the person making the tender offer. This may involve emphasizing control factors, such as control over the terms of the offer, control over the surviving entity, and control over and identity with the named bidder.

In adopting this test, the Court is aware that the SEC may one day issue a clarifying interpretation or even promulgate an amended rule that imposes a different test. However, in the absence of action by the SEC and Congress, the Court must do its best to interpret existing laws and regulations and to apply them to the cases before the Court in a manner faithful to their text and purpose. With these considerations in mind, the Court must determine if Pershing Square was a co-offering person within the meaning of *Rule 14e-3*.

#### d. Whether Pershing Square Was a Co-Offering Person

In crafting the February 25 Relationship Agreement, Defendants appear to have been trying to fit their relationship into **[*40]** what they hoped would be recognized as a co-offering person or "co-bidder" exception to *Rule 14e-3*. Neither the SEC nor the Congress has provided clear guidance in this area. Based on the existing legal authorities and the factual record currently before the Court, the Court concludes that, in this case, Plaintiffs have raised serious questions as to whether Pershing Square is a co-offering person.

In reaching this conclusion, the Court considers the following factors. First, the Court recognizes that Pershing Square did play an active role from the beginning in helping Valeant craft its acquisition strategy. It is likely that the tender offer could not have been launched without Pershing Square's assistance in strategizing the bid, financing it by acquiring a

toehold through PS Fund 1, agreeing to accept Valeant shares if the Allergan-Valeant transaction included an offer for cash and shares to Allergan's shareholders, and agreeing to buy $400 million of Valeant shares at Valeant's request. The Court also recognizes that, technically, PS Fund 1 was a creature of both Valeant and Pershing Square at the time that it crossed the 5% threshold and triggered Schedule 13D disclosure obligations because, **[*41]** pursuant to the February 25 Relationship Agreement, Valeant was added as a member of the LLC and made a small $75.9 million contribution shortly before that point. (Prior to that point, PS Fund 1's only members and funders were Pershing Square entities.) Additionally, Pershing Square was listed as an "offeror" on the Schedule TO at the SEC's request, Defs.' App'x Ex. 37 at 1, and thus may be jointly and severally liable if Valeant fails to pay the consideration offered to Allergan's shareholders. *See Rule 14e-1(c)*; *17 C.F.R. § 240.14e-1(c)*.

However, although Pershing Square was active as a strategist and financier to Valeant and even listed itself as an "offeror," the Court is doubtful that Congress and the SEC meant for these factors to be sufficient to exempt an entity like Pershing Square from the "disclose or abstain" rule of *Rule 14e-3*. While the February 25 Relationship Agreement required Pershing Square to give its consent before a tender offer could be formally launched, Pershing Square had no control over the price to be offered to Allergan's shareholders, whether the tender offer would involve cash and/or an exchange of stock, or even whether to call off the tender offer at some point. Pershing Square is helping to finance **[*42]** the tender offer; however, there is no evidence that it will actually acquire any Allergan stock through the tender offer. In fact, Defendants' Form S-4 Registration Statement states the opposite:

> Q: WHO IS OFFERING TO ACQUIRE MY SHARES OF ALLERGAN COMMON STOCK?
>
> A: This offer is being made by Valeant through [AGMS], a wholly owned subsidiary of Valeant . . . .
>
> Q: WHAT DOES IT MEAN THAT PERSHING SQUARE AND PS FUND 1, A PERSHING SQUARE AFFILIATE, ARE CO-BIDDERS?
>
> A: . . . . [N]one of Pershing Square, PS Fund 1 or any of Pershing Square's affiliates is offering to acquire any shares of Allergan common stock in the offer. . . .[8]

In addition, there is no evidence that Pershing Square has

---

[8]   Valeant's Form S-4, Registration No. 333-196856, and subsequent amendments are available on EDGAR, https://www.sec.gov/edgar/searchedgar/companysearch.html.

2014 U.S. Dist. LEXIS 156227, *42

any interest or involvement with AGMS, Inc., the wholly-owned subsidiary of Valeant listed as the "Purchaser" on the Schedule TO. There is also no requirement that Pershing Square be involved in the surviving entity beyond the requirement that Pershing Square hold an equity interest in the surviving entity for at least one year. *See supra* note 8; Feb. 25 Relationship Agreement § 2(c). Given that Defendants took care to explain in their tender offer materials that Pershing Square and PS Fund 1 were "co-bidder[s]" only "for SEC purposes," [*43] Defs. App'x Ex. 44, it appears that even Defendants do not really see Pershing Square and PS Fund 1 as the persons actually making an offer to pay Allergan shareholders consideration in exchange for their shares.

Based on these considerations, the Court finds that Plaintiffs have, at minimum, raised serious questions regarding whether Pershing Square is an "offering person" or "co-offering person" exempt from *Rule 14e-3*'s "disclose or abstain" rule.

### e. Conclusion

In conclusion, the Court finds that Plaintiffs have raised serious questions going to the merits of their Rule 14e-3 claim.

### 2. Section 14(a) and Rule 14a-9 Claim

The Court next turns to Plaintiffs' Section 14(a) and Section 14a-9 claim. As a current shareholder, Ms. Parschauer has

standing to bring a Section 14(a) and Rule 14a-9 claim. *See United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198 (2d Cir. 1993)*. Although the Court has not found any legal authority on an issuer's standing under *Section 14(a)* and *Rule 14a-9*, case law regarding an issuer's standing to seek corrective disclosures on its shareholders' behalf for disclosure violations under *Section 13(d)* and *Section 14(d)* support the proposition that Allergan has standing to bring Section 14(a) and Rule 14a-9 claims. *See supra* note 3. But see *7547 Corp. v. Parker & Parsley Dev. Partners, L.P., 38 F.3d 211, 230 (5th Cir. 1994)* (shareholders not entitled to vote do not have standing under [*44] *Section 14(a)*).

*Section 14(a)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78n(a)*, and Rule 14a-9, *17 C.F.R. 240.14a-9*, prohibit the use of false or misleading statements or omissions in soliciting proxies. *Section 14(a)* and *Rule 14a-9* are violated when (1) the proxy solicitation contains either a false or misleading statement of fact or omits a material fact; (2) the misstatement or omission was made with the requisite level of culpability and (3) the solicitation was an essential link in accomplishing the proposed transaction. *Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000)*. Defendants do not dispute factors (2) and (3), so the Court addresses only the first factor.

Plaintiffs allege that Defendants' September 24, 2014 proxy solicitation[9] and Form S-4 Registration Statement fail to fully disclose that Valeant and Pershing Square had begun planning a tender offer to Allergan's shareholders in early

---

[9]  The operative complaint focuses on Defendants' proxy solicitation materials related to calling the special meeting, while Plaintiffs' Motion focuses on Defendants' September 24, 2014 proxy solicitation, which was filed after the December 18, 2014 special shareholders' meeting was called and solicits proxy votes for the proposals to be voted on at the December 18 meeting. Defendants argue that any claim about the former special meeting proxy materials is moot now that Allergan has called the special meeting. Defendants argue that Plaintiffs cannot obtain an injunction based on inadequate disclosures in September 24, 2014 proxy solicitation because Plaintiffs have not amended their complaint (filed on August 1, 2014) to include a claim based on that document. The Court rejects this argument, as the operative complaint alleges that Defendants "have made repeated misstatements and omissions regarding their relationship and intentions regarding Allergan — in their Special Meeting proxy materials, *and subsequent presentations and statements regarding the proposed takeover.*" Compl. ¶ 135 (emphasis added). The complaint also alleges that "[t]hese misstatements and omission [*46] are critical to stockholders considering whether to deliver proxies in favor of the Special Meeting, and perhaps *even more important to those considering whether to tender their shares to Valeant in an exchange offer.*" Compl. ¶ 143 (emphasis added). The complaint seeks "an order requiring that Defendants correct by public means their material misstatements and omissions and to file with the Commission accurate disclosures required by *Sections 13(d)*, 14(a), and 14(e) of the Exchange Act" and "preliminary and/or permanent injunctive relief," including preventing the Pershing Square Defendants "from enjoying any rights or benefits from Allergan securities that were acquired in violation of law." Compl. ¶¶ E-F. These allegations are sufficient to articulate a Section 14(a) and Rule 14a-9 claim for statements made by Defendants after the filing of the complaint and to give notice to Defendants of their potential liability for those statements, particularly in this situation where the challenged statements in the Special Meeting proxy solicitations and in the September 24, 2014 proxy solicitation are substantially the same, and Plaintiffs are alleging the same harm and seeking the same relief. *Compare* Defs.' Schedule 14A, July 11, 2014, [*47] at 4-12, (available on EDGAR, https://www.sec.gov/edgar/searchedgar/companysearch.html), *with* Smith Decl. Ex. 138 at 4-13. *See also Bly-Magee v. California, 236 F.3d 1014, 1019 (9th Cir. 2001)* ("To comply with *Rule 9(b)*, allegations of fraud must be 'specific enough to give defendants notice of the particular misconduct which is

February 2014 before PS Fund 1 began purchasing Allergan shares. Plaintiffs also allege that Defendants failed to disclose specifics about Pershing Square's involvement in Valeant's acquisition plans and that Defendants' conduct could make each Defendant liable under *Rule 14e-3*. *See* Compl. ¶¶ 135-143. Defendants argue that they have satisfied their disclosure obligations by disclosing that Allergan filed this lawsuit. Opp'n at 38. The **[*45]** Court agrees with Plaintiffs.

Although Defendants have disclosed many details about their early discussions in February 2014, they failed to disclose several key facts. First, they did not disclose that the February 25 Relationship Agreement includes a provision whereby Valeant, Pershing Square, and the Co-Bidder Entity agreed to be listed as "co-bidders" if the acquisition proceeded by way of tender offer. Second, they failed to disclose that they were cognizant of potential liability under *Rule 14e-3* when structuring the Relationship Agreement. *See* Smith Decl. Ex. 83. Finally, although Defendants did disclose that Plaintiffs had filed this lawsuit, they did not disclose that the lawsuit involved their potential liability under *Rule 14e-3*. The cases that Defendants cite for the proposition that the soliciting party need only disclose the existence of a dispute are unavailing. In *Taro Pharm.* **[*48]** *Indus., Ltd. v. Sun Pharm. Indus., Ltd.*, the tender offeror annexed the target company's detailed complaint to its tender offer. *09 CIV. 8262 (PGG), 2010 U.S. Dist. LEXIS 84163, 2010 WL 2835548, at *9 (S.D.N.Y. July 13, 2010)*. The tender offeror in *City Capital Associates Ltd. P'ship v. Interco, Inc*., provided a detailed summary of the allegations against it and disclosed that its ability to obtain tender offer financing could be adversely affected if it lost that lawsuit. *696 F. Supp. 1551, 1557 (D. Del. 1988)* aff'd, *860 F.2d 60 (3d Cir. 1988)*.

A reasonable shareholder would consider facts regarding Defendants' potential Rule 14e-3 liability important in deciding whether to vote for proposals advocated by Defendants, which are part of Defendants' plan for Valeant to acquire Allergan. *See SEC v. Fehn, 97 F.3d 1276, 1291 (9th Cir. 1996)* (requiring disclosure of contingent liability). Even if it was true that a shareholder would have to be "living under a rock" not to know about Plaintiffs' insider trading claims from the news or from Allergan's own disclosures, *see* Defs.' App'x Ex. 14 (Pyott Dep.) 184:12, that does not change Defendants' obligation to make their own required disclosures. *E.g., Kohn v. Am. Metal Climax, Inc., 458 F.2d 255, 265 (3d Cir. 1972)*.

Accordingly, the Court finds that Plaintiffs have raised serious questions going to the merits of their Section 14(a) and Rule 14a-9 claims.

**B. Irreparable Harm, Balance of the Equities, and Public Interest**

In **[*49]** order to obtain a preliminary injunction, the plaintiff must show that he or she is likely to suffer irreparable harm in the absence of an injunction. *Winter, 555 U.S. at 20*. If a plaintiff has demonstrated a likelihood of success on the merits, he or she must show that the balance of the equities or hardships tips in his or her favor, *id.*, or if a plaintiff has only shown that he or she raised serious questions as to the merits, then he or she must show that the balance of equities tips "sharply" in his or her favor, *Alliance for the Wild Rockies, 632 F.3d at 1135*. Additionally, a preliminary injunction must be in the public interest. *Winter, 555 U.S. at 20*.

Here, Plaintiffs seek a court order that would: (1) enjoin Defendant PS Fund 1 "from exercising any of the privileges of ownership attaching to its 9.7 percent stake in Allergan, including voting or acting" at the December 18, 2014 Allergan shareholder meeting; and (2) enjoin Defendants from voting any proxies solicited by them in violation of *Section 14(a)* or *Rule 14a-9* until corrective disclosures are made. Mot. at 37.

The Court addresses the second part of the proposal first. In the absence of a preliminary injunction requiring corrective disclosures, Allergan's shareholders would face the threat of an uninformed vote on proposals to make **[*50]** significant changes to Allergan's corporate governance. An uninformed shareholder vote is often considered an irreparable harm, particularly because the raison d'etre of many of the securities laws is to ensure that shareholders make informed decisions. *See, e.g., Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 97 (1st Cir. 1977)*; *St. Louis Police Ret. Sys. v. Severson, No. 12-CV-5086 YGR, 2012 U.S. Dist. LEXIS 152392, 2012 WL 5270125, at *6 (N.D. Cal. Oct. 23, 2012)*. In any event, preventing an uninformed shareholder vote through corrective disclosures once the inadequate disclosure is discovered is preferable to sorting out post-vote remedies for uninformed shareholders. *See St. Louis Police Ret. Sys., 2012 U.S. Dist. LEXIS 152392, 2012 WL 5270125, at *6*. Here, the information that Plaintiffs claims Allergan's shareholders are missing are the fact that Defendants potentially face liability under *Rule 14e-3* and the facts that gave rise to that potential liability. Given the publicity

alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong.'").

surrounding the Allergan-Valeant takeover, Allergan's shareholders likely are at least generally aware of this lawsuit. In fact, Allergan attached its motion for preliminary injunction to Amendment No. 23 to its Schedule 14D-9, filed on October 7.[10] However, the law requires Defendants to make material disclosure themselves. To the extent that shareholders discounted Allergan's allegations because Defendants did not address them in their proxy [*51] solicitation materials, requiring Defendants to disclose their potential liability under *Rule 14e-3* and the factual basis for it would ensure that shareholders are able to make an informed choice on December 18. If the Court orders corrective disclosures, Defendants would only incur the expense of making those disclosures. An injunction ordering corrective disclosures is also in the public interest, as it prevents an uninformed shareholder vote. Thus, the Court finds that the potential threat of an uninformed vote in this case presents an irreparable harm, that the balance of equities tips in Plaintiffs' favor, and that the proposed injunction to make corrective disclosures is in the public interest.

The first part of Plaintiffs' proposal—to enjoin PS Fund 1 from voting its shares on December 18, 2014 altogether, even if Defendants make corrective disclosures—is more difficult to assess. First, the Court notes that this proposal appears to be targeted at the Rule 14e-3 violation. Only Ms. Parschauer, not Allergan, has a private right of action under *Rule 14e-3* because only she is a contemporaneous trader. The harm that she suffered in late February and March can be remedied [*52] through damages. Plaintiffs who have adequate remedies of law, typically money damages, are precluded from seeking injunctive relief. See *Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 60, 95 S. Ct. 2069, 45 L. Ed. 2d 12 (1975)*.

Plaintiffs argue, however, that if PS Fund 1 is allowed to vote its shares at the December 18, 2014 meeting, Ms. Parschauer and other Allergan shareholders will be harmed because their votes will be diluted by PS Fund 1's ill-gotten votes. At the meeting, Allergan's shareholders will vote on eight proposals. Proposal 1 and 2 are the most relevant to this case.[11] Proposal 1 would remove six of Allergan's nine current board members. Proposal 2 is a non-binding shareholder recommendation for six replacement board members. Under Allergan's current bylaws, when board seats become vacant, Allergan's remaining board members select replacement directors. Defendants have informed shareholders via their proxy solicitation form that, in the event that Allergan's remaining three board members do not select the six board members nominated by the shareholders, Pershing Square intends to file a lawsuit in Delaware Court of Chancery to force an election to allow shareholders to fill the vacancies.[12] Smith Decl. Ex. 138 at 14-16, 30. Ultimately, Plaintiffs argue, PS [*53] Fund 1's votes may harm Allergan's shareholders because the current board of directors may be replaced by directors who support the tender offer, which could lead to Allergan to cease existing as a company. The harm is irreparable because it is difficult to "unscramble the eggs" after a tender offer is consummated. *Ronson Corp. v. Liquifin Aktiengesellschaft, 483 F.2d 846, 851 (3d Cir. 1973)*.

Although there is something [*54] inherently appealing about preventing someone who may have violated the securities laws from using their allegedly wrongfully-acquired shares to carry out their ultimate plan, and such an injunction is undoubtedly within the courts' broad equitable powers, the Court does not believe such an injunction is appropriate at this time and in this case. Although the Court has determined that Plaintiffs have raised serious questions as to their Rule 14e-3 claims, no jury has made a final determination as to whether substantial steps were taken toward a tender offer by the time PS Fund 1 began trading on confidential information. See *Ginsburg, 362 F.3d at 1302-03* (jury deciding "substantial steps"

---

[10]   Allergan's Amendment No. 23 to Schedule 14D-9 is available on EDGAR, https://www.sec.gov/edgar/searchedgar/companysearch.html.

[11]   Proposals 3 through 7 propose amendments to Allergan's bylaws to make it easier for shareholders to call a special meeting. Proposal 8 is a non-binding resolution calling for Allergan to engage in discussions with Valeant. Smith Decl. Ex. 138 at 16-20.

[12]   Under Del. Code Ann. tit. 8, § 223(c),

> If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the whole board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least 10 percent of the voting stock at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorships, or to replace the directors chosen by the directors then in office as aforesaid . . . .

2014 U.S. Dist. LEXIS 156227, *54

issue). This case also involves the novel legal issue of whether an entity that is a "co-bidder" for disclosure purposes is necessarily a "co-offering person" exempt from Rule 14e-3's "disclose or abstain" rule. The SEC has yet to provide guidance on this point.

Also, at base, the harm that Allergan and its shareholders face is the possibility that, on December 18, 2014, PS Fund 1's vote *may* tip the scales and lead to six of Allergan's nine board members being removed and six replacement directors being nominated. *If* those two proposals pass and [*55] *if* Allergan's remaining board members refuse to appoint those six nominees, then Pershing Square intends to sue in Delaware Court of Chancery to force an election. *If* the Delaware court orders an election and *if* the shareholders then elects directors friendly to Valeant, then the tender offer will be consummated. The consummation *may* then threaten Allergan's existence as a company and threaten harm to Allergan's employees, products, and customers. Or it may not. The nature of the harm that Plaintiffs fear—the end of a large company's existence—is great and irreparable. However, Plaintiffs have not demonstrated a "likelihood" of that harm, as there are too many "ifs" between PS Fund's ability to vote and the ultimately threatened harm to characterize the harm as certain or imminent. *See Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988)* ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction. A plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief.") (internal citations omitted). Accordingly, Plaintiffs also have not demonstrated that [*56] the equities tip sharply in Ms. Parschauer's favor.

Throughout this litigation, the Court has been unable to predict what Allergan, its shareholders, Valeant, Pershing Square, or other parties will do next out in the dynamic market. Because the parties' moves change the market landscape every day, there is no good way for the Court to fairly evaluate whether and how Allergan's shareholders and other investors will be harmed or benefited by an injunction enjoining PS Fund 1 from voting. It is in situations like these that courts should be mindful that Congress designed the Williams Act to be neutral and to leave decisions regarding a company's future and a company's management in the hands of shareholders, so long as shareholders have adequate information to make those decisions. *Rondeau, 422 U.S. at 58-59* ("[Drafters of the Williams Act] 'extreme care' . . . 'to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.").

## IV. Disposition

For the reasons discussed above, the Court GRANTS IN PART Plaintiffs' Motion for Preliminary Injunction. The Court hereby ORDERS as follows:

(1) Defendants must make corrective disclosures to their September 24, 2014 [*57] proxy solicitation statement in compliance with *Section 14(a)* of the Securities Exchange Act and *Rule 14a-9* promulgated thereunder, including disclosure of the facts underlying Defendants' exposure to liability under *Section 14(e)* of the Securities Exchange Act and *Rule 14e-3* promulgated thereunder. Specifically, Defendants must disclose that:

a. Pershing Square and Valeant's February 25 Relationship Agreement included an agreement that Pershing Square and Valeant agreed to be called "co-bidders" if the Allergan-Valeant transaction occurred by way of tender offer.

b. Allergan and Karah M. Parschauer's federal lawsuit against Pershing Square, Valeant, and PS Fund 1 alleged that they violated *Rule 14e-3* by causing PS Fund 1 to acquire Allergan shares between February and April 2014 without publicly disclosing information about Valeant's plans for a tender offer.

c. The Court found that Plaintiff Parschauer raised serious questions as to whether Defendants' conduct between February and April 2014 violated *Rule 14e-3*.

(2) Defendants and all of their officers, agents, representatives, employees, assigns, and/or anyone acting on their behalf or in concert with them are preliminarily enjoined from voting any proxies solicited by Defendants on the basis of their [*58] September 24, 2014 proxy solicitation and are enjoined from soliciting any further proxies until corrective disclosures are made.

(3) Defendants shall file their proposed corrective disclosures for the Court's review on or before **November 7, 2014**.

(4) Plaintiffs shall file their objections, if any, to Defendants' proposed corrective disclosures on or before **November 11, 2014**. Plaintiffs' objections shall be no more than 10 pages. If any objections are filed, Plaintiffs shall also file their own proposal for corrective disclosures.

IT IS SO ORDERED.

2014 U.S. Dist. LEXIS 156227, *58

/s/ David O. Carter                                    Dated: November 4, 2014

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE

⚠️  Caution

As of: August 12, 2015 12:05 PM EDT

## *St. Louis Police Ret. Sys. v. Severson*

United States District Court for the Northern District of California

October 23, 2012, Decided; October 23, 2012, Filed

Case No.: 12-CV-5086 YGR

**Reporter**

2012 U.S. Dist. LEXIS 152392; 2012 WL 5270125

ST. LOUIS POLICE RETIREMENT SYSTEM, on behalf of itself and All Others Similarly Situated and Derivatively on behalf of Nominal Defendant ABAXIS, INC., Plaintiff, vs. CLINTON H. SEVERSON, et al., Defendants, ABAXIS, INC., Nominal Defendant.

**Subsequent History:** Costs and fees proceeding at, Motion granted by, in part *St. Louis Police Ret. Sys. v. Severson, 2014 U.S. Dist. LEXIS 110984 (N.D. Cal., Aug. 11, 2014)*

**Counsel:** [*1] For St. Louis Police Retirement Systems, on behalf of itself and all others similarly situated and derivatively on behalf of nominal defendant Abaxis Inc, Plaintiff: Eric L. Zagar, James Hunter Miller, Jr, PRO HAC VICE, Matthew Alec Goldstein, PRO HAC VICE, Kessler Topaz Meltzer and Check, LLP, Radnor, PA; Ramzi Abadou, Erik David Peterson, Kessler Topaz Meltzer & Check, LLP, San Francisco, CA; Lester Rene Hooker, Saxena White P.A., Boca Raton, FL; Robin Winchester, Barroway Topaz Kessler Meltzer & Check LLP, Radnor, PA.

For Clinton H. Severson, Alberto R. Santa Ines, Kenneth P. Aron, Vladimir E. Ostoich, Donald P. Wood, Martin V. Mulroy, Richard J. Bastiani, Michael D. Casey, Henk J. Evenhuis, Prithipal Singh, Vernon E. Altman, Ernest S. Tucker, Defendants: Jessica Valenzuela Santamaria, LEAD ATTORNEY, Adam Christopher Trigg, John C. Dwyer, Cooley LLP, Palo Alto, CA.

**Judges:** YVONNE GONZALEZ ROGERS, UNITED STATES DISTRICT COURT JUDGE.

**Opinion by:** YVONNE GONZALEZ ROGERS

## Opinion

### Order Granting In Part Motion of Plaintiff St. Louis Police Retirement System for Preliminary Injunction

Plaintiff St. Louis Police Retirement System ("Plaintiff") brings this shareholder class action and derivative action against Defendants [*2] Clinton H. Severson, Alberto R. Santa Ines, Kenneth P. Aron, Vladimir E. Ostoich, Donald P. Wood, Martin V. Mulroy, Richard J. Bastiani, Michael D. Casey, Henk J. Evenhuis, Prithipal Singh, Vernon E. Altman, and Ernest S. Tucker ("Defendants") and Abaxis, Inc. ("Abaxis" or "the Company") as nominal defendant. Plaintiffs allege claims for violation of section 14(a) of the Securities Exchange Act, breach of fiduciary duty, and unjust enrichment.

Plaintiff has filed a Motion for Preliminary Injunction as to the section 14(a) claim seeking to enjoin the October 24, 2012 Annual Shareholders Meeting on the grounds that the Company's proxy statement issued in advance of its 2012 annual meeting was misleading because it failed to disclose material information to shareholders related to their request to approve a modification to an equity incentive plan issued in 2005 and thereafter modified.

Having carefully considered the papers submitted, the parties' evidence and arguments, as well as the pleadings in this action, and for the reasons set forth below, the Court hereby **Grants In Part** the Motion for Preliminary Injunction.

### SUMMARY OF FACTS

The facts essential to the motion are not in dispute. [*3] Abaxis is a California corporation located in Union City, California. Abaxis develops, manufactures, markets and sells portable blood analysis systems for use in human and veterinary patient care to provide clinicians with rapid blood constituent measurements. (Verified Complaint, Dkt. No. 1, ¶ 15.)

In 2005, Abaxis adopted and shareholders approved an equity incentive plan ("the Plan"). Under the 2005 Plan as originally approved, the maximum aggregate number of shares of common stock that could be issued was 4,886,000 shares. (Declaration of Alberto E. Santa Ines ["Santa Ines Decl."], Dkt. No. 28, Ex. B at 14.) The 2005 Plan states, "in

2012 U.S. Dist. LEXIS 152392, *4

no event shall more than five hundred thousand (500,000) shares in the aggregate be issued under the Plan pursuant to the exercise or settlement of . . . Restricted Stock Unit Awards" and some other specified forms of awards ("Full Value Awards")." (Santa Ines Decl. Ex. A at 12.) This provision (the "Full Value Award Limit") thus restricts the Company from issuing more than 500,000 shares of stock upon the settlement of any restricted stock units ("RSUs") and other Full Value Awards under the Plan. (Id.) "Settlement" refers to the issuance of shares [*4] upon the vesting of an RSU. RSUs are an obligation of the Company to issue a fixed number of shares of common stock on a given date in the future, subject to the RSU holder's continued service with the Company through a prescribed vesting date or other vesting criteria. Shares are not issued unless the RSU holder remains in the service of the Company through a vesting date. (Santa Ines Decl. Exh. E at 17-18.)

On October 28, 2008, the Company's shareholders approved an amendment to the Plan to increase the aggregate number of shares of common stock reserved for issuance under the Plan by 500,000 shares to 5,386,000. (Santa Ines Decl., Ex. D.) On October 27, 2010, the Company's shareholders approved a second amendment to the Plan to increase the aggregate number of shares of common stock reserved for issuance under the Plan by another 500,000 shares to 5,886,000. (Id.) However, the Full Value Award Limit of 500,000 shares was never increased in connection with these amendments or otherwise.

Since 2007, the Company has issued only RSUs under the Plan. (Verified Complaint Ex. B at 42.) As of August 28, 2012, the Company had issued 870,179 shares of common stock upon settlement of RSUs granted [*5] under the Plan since October 2005, i.e., 370,179 shares in excess of the 500,000 Full Value Award Limit.

Around August of 2012, the Company realized it had issued more shares in settlement of RSUs than allowable under the Plan's Full Value Award Limit. (Verified Complaint Ex. A; Santa Ines Decl. ¶ D.) The Company promptly reported both the information to NASDAQ's Listing and Qualifications Department, and that the assessment that it potentially had violated NASDAQ Listing Rule 5635(c), requiring listed companies to obtain shareholder approval for equity compensation plans and material amendments to an equity compensation plan. (Santa Ines Decl. ¶ D.) The Company proposed to remedy the situation by amending the Plan to remove the Full Value Award Limit. (Id.) NASDAQ

consented to the Company's proposed compliance plan. (Id.) On August 28, 2012, the Company filed a Form 8-K with the SEC setting forth the following:

> On August 28, 2012, Abaxis, Inc. (the "Company") received a letter from the staff of the Listing Qualifications Office of the NASDAQ Stock Market determining that the Company failed to comply with Listing Rule 5635(c) that listed companies obtain stockholder approval for material [*6] amendments to an equity compensation plan.
>
> The Company maintains its 2005 Equity Incentive Plan, originally approved by shareholders in October 2005 and subsequently amended by the Company and approved by shareholders in October 2008 and October 2010 (the "Plan"), under which it may make awards of restricted stock units and other equity-based awards. The Plan contains a provision that no more than 500,000 shares may be granted under the plan upon exercise or settlement of "full value awards," which include [RSUs]. In connection with the preparation of the proxy statement for the Company's 2012 annual meeting of shareholders, the Company determined that it issued more shares in settlement of [RSUs] than are currently permitted under the full value award limit. As of August 28, 2012, the Company had issued 870,179 shares of Common Stock upon settlement of [RSUs] granted under the Plan since October 2005, and thereby exceeded the full value award limit in the 2005 Plan.
>
> The Company reported the foregoing to the Listing Qualifications Office of the NASDAQ Stock Market and submitted its proposed plan to regain compliance with Listing Rule 5635(c) to the Listing Qualifications Office of NASDAQ [*7] on August 22, 2012. On August 28, 2012, the Listing Qualification Officer provided a letter to the Company indicating that the Company's issuance of shares in settlement of [RSUs] had failed to satisfy the shareholder approval requirement of Listing Rule 5635(c), and agreed to the Company's proposed remediation plan of amending the Plan to eliminate the full value award limit upon approval of its shareholders at its 2012 annual shareholders meeting.

(Verified Complaint Ex. A "Form 8-K".) [1]

On September 17, 2012, the Company filed with the SEC and distributed to shareholders its 2012 Proxy Statement for the Annual Meeting. (Verified Complaint Ex. B.) The 2012

---

[1]   There is no evidence to suggest that Defendants transmitted the Form 8-K directly to shareholders, by mail or otherwise.

2012 U.S. Dist. LEXIS 152392, *7

Proxy Statement includes four proposals on which shareholders will vote at the Annual Meeting: (1) the election of directors; (2) an amendment to the Plan, which would, among other things, remove the Full Value Award Limit and increase the total number of shares available under the Plan by 900,000 shares ["the Proposed Amendment"]; (3) an advisory vote on executive compensation; and (4) the ratification of the **[*8]** Company's independent registered public accounting firm. (*Id.*)

With respect to Item 2, the 2012 Proxy Statement summarizes the nature of the item as follows:

> To (i) approve an amendment to the Company's 2005 Equity Incentive Plan (the "2005 Plan") to, among other things, increase the aggregate number of shares of common stock authorized for issuance under the 2005 Plan by 900,000 shares and increase the maximum number of shares that may be issued pursuant to incentive stock options and (ii) reapprove the *Internal Revenue Code Section 162(m)* performance criteria and award limits of the 2005 Plan to permit the Company to continue to grant awards to our key officers that qualify as performance based compensation under Rule *162(m) of the Internal Revenue Code*..

(*Id.*) In the section entitled "What Am I Voting On?," Item 2 is summarized as:

> Approval of an amendment to the Company's 2005 Equity Incentive Plan (the "2005 Plan") to, among other things, increase the aggregate number of shares of common stock authorized for issuance under the 2005 Plan by 900,000 shares and increase the maximum number of shares that may be issued pursuant to incentive stock options and reapproval of the *Internal Revenue Code Section 162(m)* **[*9]** performance criteria and award limits of the 2005 Plan.

(*Id.* at 1.)

The 2012 Proxy Statement includes a thirteen-page discussion of the Proposed Amendment and the 2005 Plan (*id.* at 15-27) and attaches the proposed 2005 Plan as Appendix A.) The 2012 Proxy Statement explains that the proposed amendment would "eliminate the limitation on the number of shares that may be issued pursuant to restricted stock awards, restricted stock units and performance share awards granted under the 2005 plan." (*Id.*) While the 2012 Proxy Statement includes a description of the 2005 Plan as amended, it does not: (1) incorporate or refer to the Form 8-K; (2) indicate that RSUs

have been settled in excess of the Full Value Award Limit; or (3) state that the amendment is necessary to regain compliance with Listing Rule 5635(c) with NASDAQ. It generally explains the reasons for the need for re-approval of the Plan, and the potential consequences of a failure to reapprove the existing provisions of the plan such as tax consequences for the Company. (*Id.* at p. 15). However, it does not explain the reasons for or consequences of failure to approve the Proposed Amendment. (*Id.*) The 870,179 figure **[*10]** disclosed in the Form 8-K does not appear in the 2012 Proxy Statement.

## DISCUSSION

A plaintiff seeking a preliminary injunction must establish: "(1) likely success on the merits; (2) likely irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the plaintiffs favor; and (4) that an injunction is in the public interest." *Pimentel v. Dreyfus, 670 F.3d 1096, 1105 (9th Cir. 2012)* (citing *Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008))*.

### A. Likelihood of Success on the Merits

With respect to likelihood of success on the merits, the Court must decide whether Plaintiffs have offered sufficient evidence to suggest that they can prevail, by a preponderance of the evidence, on their claim that Defendants have failed to disclose all material facts bearing on the decision before the shareholders in the proxy vote. "Directors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders." *Hill v. State Farm Mut. Auto. Ins. Co., 166 Cal. App. 4th 1438, 1490, 83 Cal. Rptr. 3d 651 (Cal. Ct. App. 2008)* (quoting *Kelly v. Bell, 254 A.2d 62, 71 (Del. Ch. 1969))*. The "obligation [to disclose] attaches to proxy **[*11]** statements and any other disclosures in contemplation of stockholder action." *Arnold v. Soc'y or Sav. Bancorp, Inc., 650 A.2d 1270, 1277 (Del. 1994)*.

Section 14(a) of the Securities Exchange Act makes it unlawful for directors to provide information that is false or misleading with respect to any material fact in a proxy statement. *See Charming Shoppes Inc. v. Crescendo Partners II, L.P., 557 F. Supp. 2d 621, 627-29 (E.D. Pa. 2008)* (citing *15 U.S.C. § 78n(a)* and *17 C.F.R. § 240.14a-9*). "The question of materiality. . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976)*. Thus, a fact is material "if there is a substantial likelihood

that a reasonable shareholder would consider it important in deciding how to vote." *Id. at 449*. An omission is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.*; *see also Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 889 (9th Cir. 2008) (same).

"Material not included in the **[*12]** proxy statement is generally not charged to the knowledge of the stockholder." *Shaev v. Saper, 320 F.3d 373, 381 (3d Cir. 2003)*. "A proxy statement should inform, not challenge the reader's critical wits." *Id. at 379* (citing *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1097, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991))*. "That an investor could hypothetically conduct research to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under *Rule 240.14a-9*." *Id.* Shareholders are entitled to a candid disclosure of all material facts and should not be required to "ask a series of detailed questions to elicit the material fact." *Turner v. Bernstein, 776 A.2d 530, 544-45 (Del. Ch. 2000)*.

In *Shaev*, the Third Circuit held that a proxy statement seeking shareholder approval of a year-2000 amendment to the company's management incentive plan was misleading. *Shaev, 320 F.3d at 381*. The proxy statement solicited shareholder approval of the 2000 amendment to the plan, but did not include the material features of the 1997 plan or its 1999 supplement. *Id.* The court there rejected the company's argument that a proxy statement was sufficient if it contained enough information for **[*13]** a shareholder to deduce that a separate, predecessor plan existed and to contact the company to obtain past SEC filings regarding that plan. *Id.* Simply providing "cryptic references" from which a shareholder might infer that other material information existed was not sufficient to comply with the company's disclosure obligations. *Id.*

Similarly, in *United Paperworkers Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1198-200 (2d Cir. 1993)*, the Second Circuit held that information appearing in a company's 10-K Report to the SEC, but not distributed to shareholders, was not "part of the reasonably available mix" for purposes of the directors' duty of disclosure. Much like the 2012 Proxy Statement here, the proxy statement in *United Paperworkers* did not mention the SEC filing, much less suggest that there was any information relevant to the proxy vote therein. *Id.* As the court held, "a reasonable shareholder who was interested in [the subject of the vote] and had read both the Proxy Statement and the annual report would have received no indication that additional information pertinent to the [vote] was available in the 10-K Report." *Id. at 1200*.

Moreover, a proxy statement that fails to "accurately **[*14]** depict the purposes or effects" of the matters before the shareholders for a vote may be misleading. *ODS Technologies, L.P. v. Marshall, 832 A.2d 1254, 1260-61 (Del. Ch. 2003)*. In *ODS Technologies, L.P.*, the court found that failure to include the reasons for certain amendments deprived shareholders of information material to their vote. The court held that the board was required to provide a "full and fair explanation of the rationale for a proposal that directors are recommending stockholders to approve [. . . and] to disclose its motivations candidly." *Id.*

Defendants argue that they are not required to repeat information that was contained in the Form 8-K, since such information was readily available to shareholders. However, Defendants authorities for that proposition do not support it. For instance, in *Seibert v. Sperry Rand Corp., 586 F.2d 949 (2d Cir. 1978)*, the court easily concluded that information need not be disclosed in a proxy statement where it was not material and, in addition, was widely known through countrywide press coverage and "a nationwide consumer boycott . . . accompanied by massive media advertising." *Id. at 952*. Likewise, in *Indiana Elec. Workers Pension Trust Fund, IBEW v. Dunn, C-06-01711 RMW, 2007 U.S. Dist. LEXIS 20513, 2007 WL 1223220 (N.D. Cal. Mar. 1, 2007)*, **[*15]** the trial court found that plaintiffs there had not shown that any of the matters omitted from the statements were material to the matters upon which shareholders were voting. In *Newman v. Warren, 684 A.2d 1239 (Del. Ch. 1996)*, the court held that a proxy statement was not misleading where it did not disclose dissenting director's reasons for not supporting a proposition. Finally, in *Brinckerohoff*, the district court refused to accept the argument that one part of the proxy materials should be considered standing alone and apart from other proxy materials sent to shareholders on that same vote for purposes of determining whether the materials were misleading. *Brinckerhoff v. Texas Eastern Products Pipeline Co., LLC, 2008 Del. Ch. LEXIS 174, 2008 WL 4991281 (Del. Chanc. Ct., November 25, 2008)*. None of these cases support the notion that information in a Form 8-K that is not referenced or incorporated into the proxy statement should nevertheless be considered to establish that directors carried out their affirmative duties to disclose all material information related to a shareholder vote.

Here, the 2012 Proxy Statement does not incorporate **[*16]** the Form 8-K by reference or mention it at all, much less include the information contained therein. The 2012 Proxy Statement does not "accurately depict the purposes or effects" of the Proposed Amendment to the 2005 Plan. This information is material to the shareholders' vote. As a result,

the evidence before the Court establishes that Plaintiff is likely to succeed on its claim that Defendants have failed to disclose material information in violation of their duties under Section 14(a) of the Securities Exchange Act.

## B. Likelihood of Irreparable Injury

"The threat of an uninformed stockholder vote constitutes irreparable harm." *ODS Techs., 832 A.2d at 1262; see also In re Pure Res., Inc., Shareholders Litig., 808 A.2d 421, 452 (Del. Ch. 2002)* ("This court has recognized that irreparable injury is threatened when a stockholder might make a tender or voting decision on the basis of materially misleading or inadequate information.") Generally, disclosure deficiencies cannot be remedied effectively by an "after-the-fact damages" case. *In re Staples, Inc. Shareholders Litig., 792 A.2d 934, 960 (Del. Ch. 2001)*. Thus, "[i]t is appropriate for the court to address material disclosure problems [*17] through the issuance of a preliminary injunction that persists until the problems are corrected." *Id.*

Here, the alternative of invalidating the election at a later date, and unwinding any transactions that might be made in reliance on the results of a tainted election, all point to the conclusion that a *post hoc* remedy is inadequate. Plaintiff would be irreparably injured if the election were to go forward under these circumstances.

## C. Balance of Hardships and Public Policy Considerations

The balance of hardships favors enjoining a vote in which shareholders were not provided material information. Defendants argue that the Company could be delisted by NASDAQ if the proposed amendments to the 2005 Plan are not approved at the Annual Meeting on October 24, 2012. However, they offer no evidence to suggest that this is anything more than speculation, or that a brief postponement would otherwise jeopardize the Company. A fully informed shareholder vote in compliance with Section 14(a) of the Securities Exchange Act Again is in the best interests of shareholders and the shareholding public generally. *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Adams, 148 F. Supp. 2d 1141, 1150 (D. Kan. 2001)* [*18] ("assuming the existence of materially misleading information, a full disclosure of such information, prior to any vote based thereon, will best serve the shareholding public").

## D. Bond

*Rule 65(c) of the Federal Rules of Civil Procedure* requires that the party seeking an injunction must post security "in an

amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Fed. Rules Civ. Proc. 65(c)*. Defendants seek a bond in the amount of $100,000 based upon the costs of postponing the Annual Meeting, amending the proxy statement, and mailing to shareholders. (Santa Inez Decl. ¶11.) The Court finds this amount reasonable in light of the actions that Defendants will be required to undertake.

## CONCLUSION

In light of the foregoing, and pending further Order of the Court:

The vote on the Proposed Amendment (Item 2 in the 2012 Proxy Statement) at the Abaxis Annual Meeting, presently scheduled to be held on October 24, 2012, is enjoined in order for the Board Defendants to supplement the 2012 Proxy Statement to disclose:

a. that the Company issued common stock upon settlement of RSUs in excess of the Full Value Limit [*19] in the 2005 Plan. As of August 29, 2012, the Company had issued 870,179, or 370,179 shares of common stock in excess of the Restricted Stock Limit;

b. that the Proposed Amendment is being recommended by the Company and presented for a vote of the shareholders because the settlement of RSUs in excess of the limit without shareholder approval meant that the Company was out of compliance with Listing Rule 5635(c) of NASDAQ and the Proposed Amendment would put the Company back in compliance with that rule;

c. whether and how the stockholders' approval or disapproval of the Proposed Amendment will affect the 370,179 shares of common stock issued in excess of the Full Value Award Limit;

d. whether and how the stockholders' approval or disapproval of the Proposed Amendment will affect the settlement of the outstanding RSUs.

The vote on the Proposed Amendment (Item 2) shall not take place unless and until the 2012 Proxy Statement has been supplemented and such supplemented proxy statement has been mailed to shareholders. The supplemental proxy statement shall be in substantially the form attached hereto as **Exhibit A,** and the reconvened meeting shall occur in no fewer than seven (7) calendar days [*20] after mailing, as agreed upon by the parties.

Only the vote on Item 2 is enjoined. All other business at the Abaxis Annual Meeting may go forward.

Issuance of this preliminary injunction is contingent upon Plaintiff filing proof of issuance of a bond in the amount of $100,000.00 no later than **9:00 a.m. on October 24, 2012.** Should Plaintiff fail to file proof of such undertaking by that time, this Order is and shall be dissolved without further order of the Court.

IT IS SO ORDERED.

**October 23, 2012**

/s/ Yvonne Gonzalez Rogers

**YVONNE GONZALEZ ROGERS**

**UNITED STATES DISTRICT COURT JUDGE**

EXHIBIT A

October __, 2012

Dear Shareholder:

This letter is being mailed to our shareholders as of August 31, 2012, the record date for our 2012 annual meeting of shareholders. As you know, this year's annual meeting was held on Wednesday, October 24, 2012, at 10:00 a.m. Pacific time, at our offices, located at 3240 Whipple Road, Union City, California. The annual meeting was called to order for voting on all proposals other than Proposal 2 and was partially adjourned. We intend to reconvene the meeting on __, 2012 for voting on Proposal 2.

The proxy statement and form of proxy card for the annual meeting were filed **[*21]** with the Securities and Exchange Commission ("SEC") and mailed to all record shareholders on September 17, 2012. The proxy statement and our annual report to shareholders are available at *http:// investor.abaxis.com*. When the meeting is reconvened, we are requesting that our shareholders approve amendments to our 2005 Equity Incentive Plan (the "2005 Plan") as set forth in Proposal 2 of the proxy statement. This letter includes additional information concerning this proposal. **We encourage you to review the information in this letter, as well as all of the other information in the proxy statement, in connection with your decision whether or not to vote in favor of this proposal.**

On October 1, 2012, St. Louis Police Retirement System, a purported shareholder of Abaxis, ("plaintiff"), filed a lawsuit against certain officers and each of our directors in the United States District Court for the Northern District of California alleging, among other things, that the directors breached their fiduciary duty by failing to disclose in the 2012 proxy statement (1) the events leading up to the proposal to amend the 2005 Equity Incentive Plan to eliminate the limit on the number of shares that may **[*22]** be issued pursuant to restricted stock units, and (2) the effects of the proposed amendment on certain settled and outstanding restricted stock units. Plaintiff sought, and on October 23 the court issued, an order preliminarily enjoining the shareholder vote on Proposal 2 until such time as additional disclosures could be made. This letter contains the additional disclosures required by the Court.

Under our 2005 Plan, we may make awards of restricted stock units and other equity-based awards to our employees, directors and consultants. In October 2005, when the 2005 Plan was originally approved by shareholders, it contained an overall limit of 4,886,000 shares of common stock that may be issued under the 2005 Plan. In October 2008 and October 2010, we amended the 2005 Plan to increase this overall limit by 500,000 shares each time, and obtained shareholder approval for such amendments. However, the 2005 Plan also contains a provision that no more than 500,000 shares of common stock may be granted under the plan upon exercise or settlement of "full value awards," a defined term that includes restricted stock units. In connection with the preparation of the proxy statement for our 2012 **[*23]** annual meeting of shareholders, we determined that we inadvertently have issued more shares in settlement of restricted stock units than are currently permitted under the full value award limit. We incorrectly believed that the full value award limit was increased by an amount corresponding to the overall share reserve increase approved by shareholders. As of the date of this letter, we have issued 870,179 shares of Common Stock upon settlement of restricted stock units granted under the 2005 Plan since October 2005. We have not, however, issued restricted stock units and other equity awards or shares issuable upon exercise or settlement thereof in excess of the overall share reserve approved by shareholders for the 2005 Plan.

We determined that the issuance of such shares of common stock in excess of the full value award limit violated the Nasdaq Stock Market's Listing Rule 5635(c), which requires that listed companies obtain stockholder approval for equity compensation plans and material amendments to an equity compensation plan. We promptly reported the violation and our proposed remediation plan to regain compliance with Listing Rule 5635(c) to the Listing Qualifications Office

 [**24**] of Nasdaq on August 22, 2012. On August 28, 2012, the Listing Qualification Officer provided a letter to us (a) concurring in our view that the issuance of shares in settlement of restricted stock units in excess of the full value award limit caused us to fail to satisfy the shareholder approval requirement of Listing Rule 5635(c) and (b) agreeing to our proposed remediation plan of amending the Plan to eliminate the full value award limit (the "Amendment") and seeking shareholder approval for such Amendment at our 2012 annual meeting.

The information contained in the preceding two paragraphs was publicly disclosed in a Current Report on Form 8-K filed with the SEC on August 28, 2012.

We  [**25**] first exceeded the 500,000-share full value award limit in May 2011. We have issued a total of 370,179 shares of common stock in excess of such limit, representing less than 1.7% of our outstanding shares of common stock. The approval or disapproval of the Amendment will have no effect on these 370,179 shares of common stock, the issuance of which our Board of Directors and compensation committee intend to ratify, as we believe is permitted by California law and our articles of incorporation and bylaws.

We have ceased the issuance of shares under our 2005 Plan upon settlement of restricted stock units until the Amendment in Proposal 2 is approved. As of the date of this letter, we have granted 2,168,701 restricted stock units under the 2005 Plan since April 2006, of which 1,119,270 units remain unvested and outstanding. If the Amendment is approved, we will be able to issue shares of common stock upon settlement of these unvested and outstanding restricted stock units in compliance with the 2005 Plan. If the Amendment is not approved, we will not be able to issue shares of Common Stock upon settlement of these unvested and outstanding restricted stock units.

We believe that failure to  [**26**] eliminate the full value award limit would result in continued noncompliance with Listing Rule 5635(c). We cannot offer any assurance as to what, if any, measures the Listing Qualifications Office of Nasdaq will take in such an event. However, the Listing Qualifications Office of Nasdaq has a number of remedies available to it, including the potential "de-listing" of Abaxis' common stock from the Nasdaq Stock Market. The Board of Directors believes that a potential "delisting" of Abaxis' common stock would be detrimental to the Company, its employees, and stockholders, among others. Accordingly, the Board of Directors recommends that you vote **FOR** Proposal 2 of the proxy statement.

**Your participation at the annual meeting is important. Whether or not you expect to attend the meeting, please complete, date, sign and return the proxy card enclosed with your proxy statement, or vote over the telephone or the Internet as instructed in the proxy statement, as promptly as possible in order to ensure your representation at the meeting or any postponement or adjournment thereof. A return envelope (which is postage prepaid if mailed in the United States) was enclosed with the proxy statement  [**27**] for your convenience.**

Sincerely yours,

/s/ Clinton H. Severson

CLINTON H. SEVERSON

*Chairman of the Board, President and*

*Chief Executive Officer*

◆ Positive

As of: August 12, 2015 12:02 PM EDT

### *David P. Simonetti Rollover IRA v. Margolis*

Court of Chancery of Delaware, Kent

June 23, 2008, Submitted; June 27, 2008, Decided; June 27, 2008, EFiled

C.A. No. 3694-VCN

**Reporter**

2008 Del. Ch. LEXIS 78; 2008 WL 2588577

DAVID P. SIMONETTI ROLLOVER IRA, Individually and On Behalf of All Others Similarly Situated, Plaintiff, v. JEFFREY H. MARGOLIS, DONALD J. LOTHROP, PAUL F. LEFORT, JERRY P. WIDMAN, NANCY H. HANDEL, L. WILLIAM KRAUSE, APAX PARTNERS, L.P., TZ HOLDINGS, L.P., TZ MERGER SUB, INC., and THE TRIZETTO GROUP, INC., Defendants.

## Case Summary

### Procedural Posture

Plaintiff stockholder brought a purported class action against defendants, the company, the individual members of the company's board of directors, the limited partnership, and the affiliated entities, for a preliminary injunction to prevent the proposed acquisition of the company by the limited partnership.

### Overview

The stockholder contended that an order preliminarily enjoining a proposed merger between the company and the limited partnership was to issue because the parties involved in the merger violated their duty of disclosure and because the board of directors failed to maximize shareholder value. The court found that the selection process used by the directors for the selection of the partnership to acquire the company was reasonable. Regarding the proxy statement, the court found the disclosures were adequate as to the engagement of a financial advisor and an investment bank, and the fact that the previously rejected bidders were not reengaged. Disclosure of lower-probability financial projections and the partnership being an alleged favored bidder was not required. However, additional disclosures as to the financial advisor's potential financial benefits from the merger was warranted. As irreparable harm could have resulted from a vote by the stockholders, the equities favored the interim relief to allow the stockholders the opportunity to be an informed voter, aided by an understanding of the financial advisor's possible separate incentives to support the transaction.

### Outcome

The motion for a preliminary injunction was granted in part, and the vote of the stockholders was enjoined preliminarily, pending either a final hearing on the merits of the stockholder's disclosure claim or an appropriate, curative disclosure to the stockholders regarding the potential benefits of the transaction to the financial advisor. Otherwise, the motion for a preliminary injunction was denied.

## LexisNexis® Headnotes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Evidence > Burdens of Proof > Allocation

*HN1* To obtain the extraordinary remedy of a preliminary injunction, a plaintiff must establish: (1) that it has a reasonable probability of success on the merits of its claims at trial; (2) that it will suffer imminent, irreparable harm if its application is denied; and (3) that the harm to the plaintiff and the class it purports to represent, if the preliminary injunction is not granted, will outweigh the harm to the defendants and the class if the relief is granted. There are also instances in which consideration of the public interest may also be necessary.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN2* A corporation's board of directors, in order to satisfy their fiduciary duties, are obligated, in a sale of control context, to secure the transaction offering the best value

reasonably available for the stockholders. A court is thus called upon to assess the adequacy of the auction process employed by the board under an enhanced scrutiny standard. Ultimately, the board's actions, if they are to be sustained, must fall within a range of reasonableness. The court, in assessing the conduct of the board, must also recognize that there is no single blueprint for the directors to follow.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN3* When the directors of a Delaware corporation seek shareholder action, they are bound by their fiduciary duties of due care and loyalty to disclose fully and fairly all material information within the board's control. The information disclosed must not be misleading. The critical inquiry in resolving disclosure issues frequently is whether the alleged omission or misrepresentation is material.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN4* An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Evidence > Burdens of Proof > Allocation

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN5* A plaintiff is not required to demonstrate that a challenged omission would change a stockholder's vote if it were disclosed; instead, a plaintiff must show that when considered in light of the circumstances, the omitted information would have been significant to a reasonable shareholder's decision. Omitted facts, however, are not rendered material simply because they might be helpful. Materiality is a mixed question of law and fact determined from the perspective of the reasonable shareholder, and the plaintiff bears the burden of demonstrating materiality.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN6* Stockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board of directors as to how to vote rely. This is because the real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

Securities Law > Postoffering & Secondary Distributions > Proxies > Minimum Disclosure Standards

*HN7* A proxy statement should give the stockholders the best estimate of a company's future cash flows as of the time the board of directors approved a transaction. In that regard, Delaware law places a premium on management's predictions of future performance.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Care

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > Duty of Loyalty

2008 Del. Ch. LEXIS 78, *78

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN8* Delaware law requires that corporate directors disclose the substance of an investment banker's work, which usually depends in part upon management's best estimates.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN9* Delaware law is clear that when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with an accurate, full, and fair characterization of those historic events. This does not mean, however, that a board of directors must give a play-by-play recitation of the events leading up a transaction. In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN10* Stockholders approving the sale of a company are entitled to full and complete disclosure of material facts before they vote on a proposed transaction. Indeed, Delaware has an indisputable preference for a fully informed stockholder vote on such matters, and the Court of Chancery of Delaware has not hesitated to enjoin transactions pending disclosure of additional material facts. The reason for this is clear: an appropriate post hoc monetary remedy for what amounts to an informational injury is not only difficult to calculate with any meaningful precision, but also it completely undermines the purpose of requiring full disclosure of material facts in the first instance. Although it is theoretically possible to fashion monetary relief in some

cases, a breach of the disclosure duty actually results in irreparable harm to the stockholders that is better addressed through an injunctive remedy.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN11* The corporate directors' disclosure duty is premised upon the stockholders' right to be informed of all material facts when casting a vote on a proposed transaction, and the standard for determining the materiality of an undisclosed fact turns on whether it would have altered the total mix of information available to the stockholders in considering how to vote on the proposed transaction. It necessarily follows, then, that a previously undisclosed material fact only assumes meaningful significance when, in fact, it can be considered before the vote; money damages after-the-fact constitute, at best, an inadequate consolation prize. In light of this reality, the Court of Chancery of Delaware's stated preference is to avoid the damages issue altogether through an injunctive remedy requiring additional disclosures in advance of the stockholder vote whenever possible.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN12* Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. Therefore, Delaware cases recognize that it is appropriate for a court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.

2008 Del. Ch. LEXIS 78, *78

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN13* A board of directors is only required to disclose information within its control.

Business & Corporate Law > ... > Management Duties & Liabilities > Fiduciary Duties > General Overview

Business & Corporate Law > ... > Meetings & Voting > Special Meetings > Fundamental Changes

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Mergers & Acquisitions Law > Mergers > Duties & Liabilities of Directors & Officers

Mergers & Acquisitions Law > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers

*HN14* The touchstone of irreparable injury is the absence of any adequate recompense. Because of the shortcomings inherent in any effort to ascribe monetary value to a failure to fully inform stockholders, adequate recompense to compensate shareholders for a disclosure violation is an elusive goal.

**Counsel:** [*1] Seth D. Rigrodsky, Esquire and Brian D. Long, Esquire of Rigrodsky & Long, P.A., Wilmington, Delaware, and Judith L. Spanier, Esquire and Karin E. Fisch, Esquire of Abbey Spanier Rodd & Abrams, LLP, New York, New York, Attorneys for Plaintiff.

Donald J. Wolfe, Jr., Esquire, Arthur L. Dent, Esquire, and Berton W. Ashman, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware, and Wayne W. Smith, Esquire, Meryl L. Young, Esquire, T. Kevin Roosevelt, Esquire, and Linda D. Lam, Esquire of Gibson, Dunn & Crutcher LLP, Irvine California, Attorneys for Defendants Jeffrey H. Margolis, Donald J. Lothrop, Paul F. LeFort, Jerry P. Widman, Nancy H. Handel, L. William Krause, and The TriZetto Group Inc.

Martin P. Tully, Esquire, Jon E. Abramczyk, Esquire, and John P. DiTomo, Esquire of Morris, Nichols, Arsht &

Tunnell LLP, Wilmington, Delaware, and Yosef J. Riemer, Esquire, Mark W. Rasmussen, Esquire, and David S. Flugman, Esquire of Kirkland & Ellis LLP, New York, New York, Attorneys for Defendants Apax Partners, L.P., TZ Holdings, L.P., and TZ Merger Sub, Inc.

**Judges:** John W. Noble, Vice Chancellor.

**Opinion by:** John W. Noble

# Opinion

**MEMORANDUM OPINION**

NOBLE, Vice Chancellor

**I. BACKGROUND**

Plaintiff David P. Simonetti  [*2] Rollover IRA brought this purported class action individually and on behalf of all other public holders of the common stock of Defendant The TriZetto Group, Inc. ("TriZetto" or the "Company") and has moved for a preliminary injunction to prevent the Company and Defendant Apax Partners, L.P., and affiliated entities [1] (collectively, "Apax"), from consummating Apax's proposed acquisition of TriZetto by merger (the "Merger"). The Individual Defendants, Jeffrey H. Margolis, Donald J. Lothrop, Paul F. LeFort, Jerry P. Widman, Nancy H. Handel, and L. William Krause, constitute TriZetto's board of directors (the "Board").

TriZetto, a publicly traded Delaware corporation headquartered in Newport Beach, California, is in the business of developing, licensing, and supporting proprietary and third-party software products for the healthcare industry. Its products allow payers and others to improve the coordination of benefits and care for healthcare consumers. Its clients include national and regional health insurance plans and benefits administrators.

Defendant Margolis, TriZetto's chief executive officer and co-founder,  [*3] also serves as chairman of the Board. Margolis stands to receive over $ 43.5 million in cash from the Merger; approximately three-quarters of the proceeds may be attributable to his individual holdings of TriZetto stock; the balance is based on in-the-money options, restricted stock, and change in control payments. Additionally, Margolis, along with other insiders, stands to receive certain performance-based payments that would not

---

[1]   The affiliated entities are Defendants TZ Holdings, L.P. and TZ Merger Sub, Inc.

2008 Del. Ch. LEXIS 78, *3

otherwise be payable until 2010. The remaining five Individual Defendants are independent and disinterested outside directors. The Company's directors and executive officers and their affiliates had the right to vote approximately 9.1% of TriZetto's 43,123,786 outstanding shares as of May 19, 2008.

Apax is a private equity firm. Apax's acquisition is supported by two regional health insurance companies, [2] which are also major customers of TriZetto.

In the months leading up to November 2007, TriZetto was considering a potential acquisition that would have required financing. To that [*4] end, TriZetto considered a private investment in a public entity, or PIPE, financing (the "PIPE Transaction"). Apax was one of the private equity firms interested in the PIPE Transaction and, in that capacity, it received certain nonpublic information about TriZetto, including management projections. Deutsche Bank represented TriZetto in connection with the contemplated PIPE project; UBS Investment Bank ("UBS"), part of UBS Securities, LLC, advised Apax. The proposed acquisition and the PIPE Transaction were never consummated. [3]

Afterwards, several of the private equity firms involved in the abortive PIPE Transaction orally indicated an interest in acquiring TriZetto. One of these firms was Apax, which orally expressed some interest in an acquisition with a price range of $ 24.50 to $ 26 per share. On November 26, 2007, Margolis relayed these expressions of interest to the Board. At that meeting, the Board authorized Margolis to meet with interested parties to discuss a potential transaction preliminarily, but it directed that any serious interest should be submitted to the Board in writing [*5] for its review. The Board also instructed Margolis to contact UBS for its advice on any potential transaction. UBS had served as TriZetto's investment banker in the past and was viewed as having special expertise and experience in TriZetto's business sector. Eventually, Apax would retain Deutsche Bank as its financial advisor in connection with the Merger.

In early December 2007, TriZetto sent more nonpublic information to Apax. It also provided similar information to Deutsche Bank, UBS, and another potential financial bidder. [4] Apax submitted a non-binding indication of interest in a possible acquisition of TriZetto in a range of $ 21 to $ 23 per share on December 7, 2007. On December 11, the other financial firm submitted an indication of interest for $ 20 to $ 23 per share. A third financial firm expressed its interest orally. Margolis reported these indications of interest to the Board in a meeting on December 17. Margolis also informed the Board that there might be other financial or strategic parties that would be interested. On December 18, 2007, a third financial firm submitted a written indication of interest at $ 21 to $ 23 per share. [5] This submission was considered by the [*6] Board on December 19, 2007. The Board then agreed to meet the next day to discuss the process for soliciting and evaluating potential acquirers.

At that meeting, Margolis informed the Board that he had received an expression of interest from a potential strategic buyer earlier in the day. This buyer is referred to in TriZetto's proxy statement (the "Proxy Statement") as "Bidder A." The Board discussed TriZetto's prospects and concluded that it was unlikely that its shares would trade at prices substantially above then-current levels. As a result, the Board decided that it should explore a possible sale. Margolis told the Board that, in conjunction with UBS, he would attempt to identify potential strategic buyers.

On December 28, 2007, at the Board's direction, each financial firm that had submitted a written indication of interest was sent a letter stating that the Board was reviewing its proposal and considering a response. On January 10, 2008, TriZetto's management and UBS developed a list of potential [*7] strategic buyers. That day, Margolis provided the Board with a written update including a list of twelve potential strategic buyers. It was about this time that Margolis began to anticipate that TriZetto's first quarter financial results might be weak. For this reason, the Board believed that an expedited sale would be advantageous.

By January 22, 2008, nineteen potential buyers, including Apax and Bidder A, had been contacted to assess their interest. This group included seven financial buyers and twelve strategic buyers. TriZetto entered into confidentiality agreements with twelve of these potential buyers and gave them access to an online data room with nonpublic information about the Company. This information included updated versions of the nonpublic information sent to Apax

---

[2]   The regional health insurance companies are BlueCross BlueShield of Tennessee ("BCBST") and The Regence Group ("Regence"), a consortium of several BlueCross BlueShield ventures.

[3]   It was not clear until the end of November 2007 that the PIPE Transaction would not go forward.

[4]   The names of the other potential bidders are not disclosed because of confidentiality concerns.

[5]   It is unclear whether this third firm was the same firm that expressed its interest orally.

2008 Del. Ch. LEXIS 78, *7

and others in early December 2007. These so-called "First Round participants" were requested to submit written non-binding indications of interest by February 4, 2008 (the "First Round"). These were to include price, structure, financing, and other details. Written indications of interest were received from seven of the First Round participants, including both financial and strategic firms. Prices ranged from **[*8]** $ 21 to $ 26 per share; Apax and BCBST submitted a joint proposal in the range of $ 23 to $ 25 per share; Bidder A submitted a proposal in the range of $ 24 to $ 24.50 per share. Additionally, UBS had received a written communication from a First Round participant strategic buyer that had failed to meet the bidding deadline (the "Non-conforming Bidder"). This bidder failed to provide pricing information, but, apparently because of its market strength and recognition, was asked to submit a formal indication of interest including pricing and other information.

The Board met on February 8, 2008, to discuss the seven conforming indications of interest and the communication received from the Non-conforming Bidder. Before the meeting, Margolis had provided the Board with a memorandum recommending that Apax, [6] Bidder A and another strategic bidder, Bidder B, be invited to a second round (the "Second Round"). At the meeting, however, the Board unanimously determined that the Non-conforming Bidder and another financial bidder ("Bidder Z") should be involved in the Second Round. The Board had decided that including more than five bidders in the Second Round would be overly cumbersome.

According to the Proxy Statement, "[b]ased on the price and other terms reflected in the bids," the Board agreed to invite two strategic and two financial buyers that had submitted conforming bids to the Second Round, as well as the Non-conforming Bidder. The three firms not invited to participate in the Second Round were financial firms that, according to the Proxy Statement, were eliminated because of their "proposed prices and perceived inabilities to consummate a transaction."

From February 8 until March 7, the remaining five bidders were given increased access to due diligence materials and afforded opportunities to meet with TriZetto's management. Second Round participants were notified to submit final bids in writing by March 7, 2008, providing final price, financing, and other information, as well as a markup of a draft merger agreement.

Between February 8 and March 7, the bidders continued to conduct due diligence. Between February 15 and February

22, all five bidders met with TriZetto's management and received formal management presentations. On February 28, 2008, one of the strategic bidders withdrew. On March 7, Bidder **[*10]** A submitted a written bid at $ 24.50 to $ 26 per share; the following day, Apax submitted a bid at $ 23 per share. The two remaining bidders, the Non-conforming Bidder and Bidder Z, expressed continuing interest, but failed to comply with the requirement to submit a definitive proposal.

On March 11, 2008, the Board met and decided to pursue a transaction with Bidder A while also encouraging Apax to increase its price. On March 14, the Board met again and learned from Margolis that progress had been made toward finalizing a merger agreement with Bidder A and that Bidder A's board was scheduled to consider approving the transaction at a meeting on March 17. Around this time, Apax sent TriZetto a revised offer, again at $ 23 per share.

Margolis informed the Board on March 17 that Bidder A had decided not to pursue an acquisition of TriZetto. The Board met the following day to discuss its strategy going forward in light of Bidder A's withdrawal. The Company determined to encourage Apax, which by this point also had the support of Regence, to increase its offer price. Negotiations ensued between March 20 and March 25. On March 22, 2008, Apax informed TriZetto that it was working to extend **[*11]** its bank financing commitment. Apax also indicated that its bid would likely fall below its most recent $ 23 bid.

On March 25, Margolis apprised the Board of the ongoing negotiations, including Apax's intention to reduce its bid, and informed the Board of Apax's financing prospects. On March 28, Apax sent the Board a revised proposal for the purchase price of $ 21 per share. The Board found this proposal, which also limited its ability to consider superior proposals from other participants, unacceptable during a meeting on March 28. The following day, Margolis had contact with an Apax representative, and they agreed to meet on March 30. At the meeting, Margolis told the Apax representative that Apax would have to increase its offer price. Apax indicated its $ 21 price was firm. Margolis also exchanged several emails with an Apax representative on March 30; his purpose was to attain a higher price.

That evening, the Board met and was updated with Margolis's progress, including Apax's willingness to eliminate limitations on the Board's ability to consider superior proposals. The Board scheduled a meeting for the next day to consider any potential price increase from Apax.

---

[6]   References **[*9]** to Apax may include BCBST and Regence as appropriate.

2008 Del. Ch. LEXIS 78, *11

When the Board **[*12]** met on March 31, 2008, it was informed that Apax's price remained unchanged at $ 21 per share. The Board decided to reject Apax's offer and to cease negotiations. TriZetto requested Apax to return or destroy all materials connected to the proposed transaction on April 3.

Two days later, on April 5, Apax sent the Board a revised bid of $ 22 per share. The Board met on April 8, 2008, and authorized management and its outside counsel to negotiate a definitive merger agreement with Apax. On April 10, 2007, the Board considered the merger agreement (the "Merger Agreement") and UBS's analysis that $ 22 was a fair price. [7] The Board unanimously approved the Merger Agreement with the six directors present voting in favor; a seventh director had excused himself before the vote but indicated his support. The agreement was executed the following day.

The merger price of $ 22 per share represents a 29% premium over TriZetto's market price immediately before announcement of the transaction. Despite the Board's prerogative **[*13]** to consider a "superior offer," none has emerged. TriZetto's shareholders are scheduled to meet on June 30, 2008, to consider the Merger.

## II. CONTENTIONS

As described more fully below, the Plaintiff contends that an order preliminarily enjoining the merger should issue because the Defendants have violated their duty of disclosure and because the Board failed to maximize shareholder value. The Plaintiffs also assert that irreparable harm will occur without interim injunctive relief and that the equities favor the issuance of an injunction.

The Defendants disagree and answer that the Plaintiff has failed to demonstrate a reasonable probability of success on the merits of any of its claims and that the Plaintiff has not shown that irreparable harm will occur in the absence of interim relief. The Defendants also argue that an interim injunction might interfere with the transaction and deny the TriZetto stockholders the benefit of merger consideration reflecting a significant premium to previous market pricing and, also, that delay might even jeopardize the favorable reverse termination fee that TriZetto would receive if Apax is unable to complete the financing for its acquisition.

## III. **[*14]** ANALYSIS

### A. *Preliminary Injunction Standard*

**HN1** In order to obtain the "extraordinary remedy" of a preliminary injunction, the Plaintiff must establish: (1) that it has a reasonable probability of success on the merits of its claims at trial; (2) that it will suffer imminent, irreparable harm if its application is denied; and (3) that the harm to the Plaintiff and the class it purports to represent, if the preliminary injunction is not granted, will outweigh the harm to the Defendants and the class if the relief is granted. [8]

### B. *Probability of Success*

#### 1. *"Revlon"* Claims

**HN2** TriZetto's directors, in order to satisfy their fiduciary duties, were obligated, in this sale of control context, "to secure the transaction offering the best value reasonably available for the stockholders." [9] The Court is thus called upon by *Revlon* [10] and its progeny to assess the adequacy of the auction process employed by the Board under an enhanced **[*15]** scrutiny standard. Ultimately, the Board's actions, if they are to be sustained, must fall within a "range of reasonableness." [11] The Court, in assessing the conduct of the Board, must also recognize that there is "no single blueprint" for the directors to follow. [12]

The Plaintiff has failed to demonstrate any reasonable probability of success on the merits of its *Revlon* claims.

---

[7]   UBS stands to receive a fee in excess of $ 11 million if the Merger closes. In addition, it holds other interests in TriZetto which are to be cashed out if the transaction is consummated.

[8]   *See, e.g., Concord Steel v. Wilmington Steel Processing Co., Inc., 2008 Del. Ch. LEXIS 44, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008); Cox v. Crawford-Emery, 2007 Del. Ch. LEXIS 167, 2007 WL 433775, at *3 (Del. Ch. Nov. 30, 2007).* There are also instances in which consideration of the public interest may also be necessary.

[9]   *Paramount Commc'ns, Inc. v. QVC Network, Inc., 637 A.2d 34, 44 (Del. 1994); see also In re Netsmart Techs., Inc. S'holders Litig., 924 A.2d 171, 192 (Del. Ch. 2007).*

[10]   *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1985).*

[11]   *See In re Toys "R" Us S'holder Litig., 877 A.2d 975, 1001 (Del. Ch. 2005).*

[12]   *Barkan v. Amsted Indus., Inc., 567 A.2d 1279, 1286 (Del. 1989).*

2008 Del. Ch. LEXIS 78, *15

The record reflects that TriZetto attempted to elicit the interest of nineteen potential acquirers, including strategic and financial entities; the auction process spanned several months and featured multiple rounds of bidding with five potential suitors invited to the Second Round; moreover, the Board was actively engaged, holding at least fifteen meetings to discuss the process and being regularly informed by its management, investment **[*16]** advisor, and outside legal counsel throughout.

In particular, the Plaintiff challenges management's, and especially Margolis's, alleged favoritism for Apax. As directed by the Board, Margolis did meet early on with Apax; he also met with other interested parties. It is reasonably apparent that Apax, before the First Round, had an informational advantage in the earliest stages of the sale process, but that advantage dissipated by January 2008 because of the Board's decision to share certain nonpublic information broadly with all interested bidders who were willing to sign an appropriate confidentiality agreement. Thus, by the time of the First Round, Apax had no informational edge.

Moreover, any lingering favoritism to Apax is belied by two key events during the course of the process. First, the Board allowed more parties, including the Non-conforming Bidder, which was thought to be especially capable financially to complete any acquisition, into the Second Round of the negotiation process, even though Margolis did not initially recommend inclusion of that potential bidder and one other which also was invited to participate. Second, the Board initially chose Bidder A, not Apax, as its **[*17]** preferred acquirer. Apax was only able to negotiate the Merger Agreement because Bidder A, for its own reasons in no way attributable to Margolis, chose to drop out of the process. [13] In sum, the selection process was fair: it was comprehensive, it was sophisticated, and it was open. Nothing about the process, as developed in the record, would allow a court to second-guess the conduct of the Board or to conclude in any way that the Board's conduct, even when measured under an enhanced judicial scrutiny standard, was anything other than reasonable.

2. <u>Disclosure Claims</u>

Although the Plaintiff has alleged a sizeable number of individual disclosure claims, the Court, as did the Plaintiff and the Defendants at argument, will focus its attention on two broad categories of challenged omissions from the Proxy Statement: (i) its treatment of information concerning the Merger's financial advisors; and (ii) its description of certain aspects of the sale process.

a. *The Disclosure Framework*

**HN3** When the directors of a Delaware corporation seek shareholder action, they are bound by their **[*18]** fiduciary duties of due care and loyalty to "disclose fully and fairly all material information within the board's control." [14] The information disclosed must not be misleading. The critical inquiry in resolving disclosure issues frequently whether the alleged omission or misrepresentation is material.

Materiality is determined in accordance with the standard announced by the United States Supreme Court in *TSC Industries, Inc v. Northway, Inc.:* [15]

> **HN4** An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available. [16]

**HN5** A plaintiff is not required to demonstrate that a challenged **[*19]** omission would change a stockholder's vote if it were disclosed; instead, a plaintiff must show that when considered in light of the circumstances, the omitted information would have been significant to a reasonable shareholder's decision. [17] Omitted facts, however, are not rendered "material simply because they might be helpful."

---

[13]   For a discussion of a string of emails involving Margolis and quoted by the Plaintiff, see *infra* Part III(B)(2)(c)(ii).

[14]   *Gantler v. Stephens,* 2008 Del. Ch. LEXIS 20, 2008 WL 401124, at *19 (Del. Ch. Feb. 14, 2008). *See also Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998). For a detailed discussion of the fiduciary foundations of directors' disclosure obligations, see *In re Transkaryotic Therapies, Inc.* 954 A.2d 346, 2008 Del. Ch. LEXIS 76, 2008 WL 2462767, at *8-9 (Del. Ch. June 19, 2008).

[15]   426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976); *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944 (Del. 1985) (adopting the *TSC Industries* standard).

[16]   *Gantler,* 2008 Del. Ch. LEXIS 20, 2008 WL 401124, at *19 (quoting *TSC Industries*) (omission in original).

[17]   *E.g., Zirn v. VLI Corp.,* 621 A.2d 773, 779 (Del. 1993).

2008 Del. Ch. LEXIS 78, *19

[18] Materiality is a mixed question of law and fact determined from the perspective of the reasonable shareholder, and the plaintiff bears the burden of demonstrating materiality. [19]

b. *The Financial Advisors*

The first group of challenged omission concerns TriZetto's disclosures regarding its financial advisor, UBS, and its previous financial advisor, Deutsche Bank. Specifically, the Plaintiff questions (i) the Proxy Statement's treatment of TriZetto's [*20] retention of UBS and Apax's retention of Deutsche Bank in connection with the Merger; (ii) the Proxy Statement's failure to quantify certain facets of UBS's interest in the transaction; and (iii) the Proxy Statement's failure to disclose that UBS chose to use the Company's most conservative projections, as the basis for the fairness opinion, instead of the more favorable projections established by management before any sale of the Company was anticipated. The Court finds merit in the second challenge.

(i) Retention of Financial Advisors

The Plaintiff complains that the Proxy Statement does not adequately convey that UBS, shortly before being retained by TriZetto to act as its financial advisor on the Merger, had worked for Apax in connection with the abandoned PIPE Transaction and that Deutsche Bank, which had recently advised TriZetto on the PIPE Transaction, was now advising Apax in connection with the Merger.

In regard to the Board's decision to retain UBS, the Court finds little that the Proxy Statement could have added for the shareholders' benefit. The Proxy Statement reports that the Board "instructed Mr. Margolis to contact TriZetto's financial advisor, [UBS], to request UBS's [*21] assistance." [20] The Proxy Statement also notes that UBS and its affiliates had "acted as joint bookrunner in connection with a convertible notes offering by TriZetto in April 2007," "acted as a counterparty in connection with the related bond hedge and warrant transactions entered into by TriZetto (referred to as the BHW Transaction)," "provided certain cash

management services to TriZetto," and acted as "a participant in a credit facility of TriZetto." [21] It explains that the Board selected UBS as its financial advisor "because UBS is an internationally recognized investment banking firm with substantial experience in similar transactions and because of UBS's familiarity with TriZetto and its business." [22] These disclosures were sufficient to describe

Apax's retention of Deutsche Bank is a more vigorously argued claim. The Plaintiff submits that the Proxy Statement lacks critical contextual disclosures, including that the team of bankers that advised Apax on the Merger was substantially the same as the team that had advised the Company on the PIPE Transaction and that Deutsche Bank had access to certain nonpublic information, including insight [*22] into TriZetto's business and operations.

Although the Proxy Statement perhaps does not provide as much information as a shareholder would think optimal, the Court concludes that its disclosures regarding Deutsche Bank are adequate. The Proxy Statement discloses that TriZetto was considering the PIPE Transaction in November of 2007 and that Deutsche Bank had acted as its financial advisor. [23] It also discloses that Deutsche Bank advised Apax on the Merger. [24] Thus, the stockholders are made aware that the same investment bank that had represented TriZetto in November 2007 was representing its potential acquirer through the Merger. No further disclosures on this point would have altered the total mix of information available, *viz.,* that the same investment bank had represented parties with opposed interests in the Merger in temporal proximity.

With respect to Apax's access to certain nonpublic information, the record indicates that any such information provided to Deutsche Bank in connection with the PIPE Transaction was likely revealed to all bidders eventually [*23] through similar or updated information included in the

---

[18]   *Skeen v. Jo-Ann Stores, Inc.,* 750 A.2d 1170, 1174 (Del. 2000).

[19]   *In re CheckFree Corp. S'holders Litig.,* 2007 Del. Ch. LEXIS 148, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007).

[20]   Proxy Statement at 21.

[21]   *Id.* at 36.

[22]   *Id.*

[23]   *Id.* at 20.

[24]   *Id.* at 24. It is unclear who, if anyone, consented on behalf of TriZetto to Apax's engagement of Deutsche Bank.

2008 Del. Ch. LEXIS 78, *23

due diligence data room. [25] Although the Court has some reservation that Deutsche Bank may have acquired some insight into TriZetto's institutional temperament and mood through its interactions with TriZetto's management, such a speculative inference is not substantiated in the record and does not support a holding of materiality. [26]

Consequently, the Court concludes that TriZetto was not obligated to provide additional disclosures in the Proxy Statement concerning UBS's and Deutsche Bank's engagement in the Merger.

(ii) UBS's Interest in the Merger

The Plaintiff's next challenge to the adequacy of TriZetto's disclosures arises out of UBS's separate financial interest in the Merger. The Proxy Statement provides that under the terms of UBS's engagement, TriZetto agreed to pay UBS a fee of approximately $ 11.3 million, "a significant portion" of which is contingent upon the Merger's closing. [27] The Plaintiff does not dispute the adequacy [*24] of this disclosure. The Proxy Statement also declares, "As of the date of UBS's opinion, UBS and its affiliates held (i) warrants to acquire TriZetto common stock that were issued by TriZetto as a part of the BHW Transaction and (ii) convertible notes of TriZetto . . . , and would be entitled to receive, upon consummation of the merger, cancellation payments relating to such warrants and the conversation value and certain make-whole payments relating to such notes." [28] The Plaintiff does dispute the sufficiency of this disclosure, but contends that the value of these notes and warrants should have been quantified either in the form of a specific value or range of values. At argument, the Defendants indicated, presumably because TriZetto would not survive the Merger, that holders of the notes and warrants would be entitled to receive cash payments upon, or at some point shortly after, consummation of the Merger. The Defendants rejoin that UBS's interest is clearly set forth in the proxy and that the value of UBS's notes and warrants is not currently quantifiable because their value is dependent

upon several factors that can only be determined after the Merger.

In resolving this issue, the Court is tasked with two inquiries: determining whether the extent of UBS's interest in the transaction is material and, if so, whether that interest is quantifiable. The financial advisor's opinion of financial fairness for a proposed transaction is one of the most important process-based underpinnings of a board's recommendation of a transaction to its stockholders and, in turn, for the stockholders' decisions on the appropriateness of the transaction. Thus, it is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts. In this instance, if the Merger occurs, UBS not only would receive a substantial fee if the Merger is consummated, but also it would receive certain benefits as the holder of various TriZetto obligations. It appears that its debt holdings will be cashed out and the complex hedge/warrant arrangement will be unwound. Turning debt into [*26] cash, perhaps at something of a premium, confers a significant benefit, especially in the current economic environment. It is not simply the magnitude of UBS's holdings, but how those obligations will be treated as a result of the Merger. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered in assessing how much credence to give its analysis. For that reason, the peculiar benefits of the Merger to UBS, beyond its expected fee, must also be disclosed to TriZetto's stockholders. [29]

In this instance, full and complete disclosure requires quantification. The Court is satisfied that the value of UBS's note holdings can be quantified, at least in the form of a range of values. From the record, it appears the note holdings are amenable to mathematical valuation by reference to the number of notes held by UBS and the amount of make-whole payments, which are dependent [*27] on the transaction price and the date of the closing. [30] Similarly, although the record indicates that quantifying the value of the warrants will not be an easy undertaking, the

---

[25]   For more discussion of Apax's access to nonpublic information, see *infra* Part III(B)(2)(c)(ii).

[26]   *See In re Transkaryotic Therapies*, 2008 Del. Ch. LEXIS 76, 2008 WL 2462767, at *1 ("[T]heories alone cannot lead to liability.").

[27]   Proxy Statement at 35.

[28]   *Id.* at 36. [*25] The Plaintiff has objected to the inclusion of these disclosures under a subheading of "Miscellaneous" in the Proxy Statement's "Opinion of TriZetto's Financial Advisor" section. The Court finds no fault requiring remedy on this basis.

[29]   Of course, the extent of UBS's holdings will only prove to be material if they are of sufficient magnitude. The Court is satisfied that the Plaintiff has met its burden of demonstrating that there is a reasonable probability UBS's holdings will surpass that threshold.

[30]   *See* Deposition of Ali Satvat at 165-69. Ali Satvat is a senior associate at Apax who focuses on the healthcare sector; he worked on both the PIPE Transaction [*28] and the Merger.

2008 Del. Ch. LEXIS 78, *27

Court is satisfied that their value may be quantified, again at least in the form of a range. At oral argument, TriZetto's counsel asserted that "it's not possible to put a range on [the warrants]." [31] The record, however, belies this assertion. James Brennan, a UBS managing director who has worked in finance since 1984, stated in deposition:

> At a number of points in the process, we attempted to describe to potential buyers of TriZetto the consequences to the buyer of buying the company arising from these convertible notes, both strips of convertible notes and the bond hedge and warrant transaction, at various theoretical transaction prices in order to help them assess the liabilities of the company they would acquire. . . . It was a range of numbers. . . . We shared [the numbers] with potential bidders and put [the information] into the data room. [32]

Undoubtedly, some negotiation will be required; all uncertainty at this point--whether because of market fluctuation or bargaining success--cannot be eliminated.

Because the Plaintiff has demonstrated a reasonable probability of success in proving UBS's holdings material and susceptible to quantification, the Plaintiff has shown that additional disclosures as to UBS's potential financial benefits from the Merger are warranted. [33]

(iii) <u>TriZetto's Projections</u>

Finally, [*29] the Plaintiff argues that the Proxy Statement fails to disclose that the financial forecasts TriZetto directed UBS to use in formulating its fairness opinion were the most conservative of management's available projections. TriZetto's management prepared three sets of projections:

Cases, 1, 2, and 3. Case 1 was a relatively pessimistic forecast; Case 2 was an intermediate forecast, and Case 3 was a more optimistic forecast. [34] The Plaintiff argues the Proxy Statement's failure to disclose the existence of more optimistic projections, especially Case 2, was a material omission. In reply, the TriZetto Defendants argue that the projections used by UBS were management's best estimates; that the Case 1 projections were consistent with the revenue guidance provided to Wall Street in February 2008; and that in April, when UBS rendered its opinion, management expected to miss its first quarter expectations.

As discussed above, a financial advisor's opinion regarding the fairness of a potential transaction figures prominently in a shareholder's decision where she would receive cash in exchange for her shares. This Court has said that *HN6* "stockholders [*30] are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote . . . rely." [35] This is because "[t]he real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result." [36] Accordingly, in *In re Pure Resources, Inc.* this Court held a proxy statement deficient that did not disclose "*any* substantive portions" of the bankers' work. [37]

The key assumptions made by a banker in formulating his opinion are of paramount importance to the stockholders because any valuation analysis is heavily dependent upon the projections utilized. *HN7* A proxy statement should "give the stockholders the best estimate of the company's future cash flows as of the time the board approved the [transaction]." [38] In that regard, Delaware law places a premium on management's predictions of future performance. [39] Thus, in *In re Netsmart Technologies, Inc.,*

---

[31]   Oral Argument Tr. at 72, June 23, 2008.

[32]   Deposition of James Brennan at 47-48. Thus, the "quantification" has already occurred.

[33]   Although disclosure of speculative information is not required, *see* <u>Arnold v. Soc'y for Sav. Bancorp, Inc., 650 A.2d 1270, 1280 (Del.1994)</u> ("[A]s an abstraction, Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information."), in this case the Court concludes that additional disclosure is warranted because the range of value will provide stockholders with an understanding of the relative significance of UBS's holdings and any possible Merger-related incentives that may result.

[34]   *See* Long Aff., Ex. 44 (the projection case scenarios).

[35]   <u>In re Pure Res., Inc. S'holders Litig., 808 A.2d 421, 449 (Del. Ch. 2002)</u>.

[36]   <u>Id. at 449</u>.

[37]   <u>Id. at 448-50</u>.

[38]   <u>In re Netsmart Techs., 924 A.2d at 203</u>.

[39]   *See, e.g., id.*

2008 Del. Ch. LEXIS 78, *33

this Court held it a material omission where a proxy statement did not disclose the actual **[*31]** updated projections that a banker utilized in assessing a transaction's fairness, disclosure of an earlier set of projections was not required where the disclosed projections were deemed more current and more accurate by management. [40]

In the instant case, the Proxy Statement supplies the projections given to UBS, the Case 1 projections, and recites that "management believed the [the projections provided to UBS] were reasonable at the time." [41] UBS's fairness opinion, appended to the Proxy Statement as Annex B, also states that UBS prepared its fairness opinion assuming at TriZetto's direction that the projections reflected management's best estimates as to TriZetto's future performance. [42] In his deposition, UBS banker Brennan agreed. [43] As the Defendants argue, TriZetto's management foresaw a disappointing first quarter in 2008. [44] According to Margolis, TriZetto began to predict weak first quarter results sometime in January of 2008. [45] The numbers set forth in the Proxy Statement closely correspond to a Form 8-K filed shortly thereafter in early February 2008, stating that TriZetto expected revenues between **[*32]** $ 480 to $ 500 million for the full year of 2008. [46] The Proxy Statement sets forth projections estimating full year 2008 revenues at $ 495.8 million; by way of comparison, Case 2 estimates 2008 revenues at $ 507.5 million.

Although including the more optimistic projections in the Proxy Statement and then explaining why they were not relied upon may have been somewhat helpful to stockholders, it is doubtful that any such additional disclosures would have materially altered the total mix of information provided. Under *In re Pure Resources* and *In re Netsmart Technologies*, *HN8* Delaware law requires that directors disclose the substance of the investment banker's work, which usually depends in part upon management's best estimates. The

Proxy Statement meets that standard. The record indicates that the projections used by UBS reflected management's **[*33]** best estimates at the time. Given this, the Plaintiff has failed to meet its burden of showing how disclosing lower-probability projections would have been considered material by the reasonable stockholder. [47]

c. *The Sale Process*

The second set of challenged disclosures concerns the sale process, including Apax's alleged favored status. In this vein, the Plaintiff questions the Proxy Statement's sufficiency chiefly based on two omissions. First, the Plaintiff challenges the Proxy Statement's failure to disclose TriZetto's justification for rejecting bids--especially that there was an asserted "breaking point" of $ 23 per share for a bidder to continue on to the Second Round--and the Company's failure to reengage previously rejected bidders, particularly the Non-conforming Bidder and Bidder Z (a major private equity firm), after Apax's bid fell to $ 21 a share in late March 2008. Second, the Plaintiff contends that TriZetto favored Apax during the sale process, pointing to management's contact with Apax and that entity's unique access to nonpublic information. For the following reasons, the Court determines that the Plaintiff has no **[*34]** reasonable probability of success with respect to these claims.

(i) The "Breaking Point" and TriZetto's Decision Not to Reengage Rejected Bidders

Although TriZetto concedes that the Board decided that it would only invite bidders proposing price ranges including $ 23 or higher to the Second Round, [48] the Proxy Statement is silent regarding any breaking point. Instead, it provides that of the seven conforming bidders, the Board selected three to continue onto the Second Round based on price and

---

[40]  *See* *id.* at 200-04.

[41]  Proxy Statement at 30. The projections were prepared during the first quarter of 2008.

[42]  *See* Proxy Statement, Annex B, at 2.

[43]  Brennan Dep. at 60.

[44]  Deposition of Jeffrey Margolis at 102-03 ("I saw a looming weakness in our potential Q1 results. Q1 '08 results.").

[45]  *See* *In re Netsmart Techs.,* 924 A.2d at 203.

[46]  *See* Ashman Aff., Ex. 59 (the Form 8-K).

[47]  *Cf.* *In re CheckFree Corp.,* 2007 Del. Ch. LEXIS 148, 2007 WL 3262188, at *2-3.

[48]  *See* TriZetto Defs.' Answering Br. at 17-18.

2008 Del. Ch. LEXIS 78, *34

other bid terms. [49] The Proxy Statement also states that the three dismissed bidders were not invited to the Second Round because of "their proposed prices and perceived inabilities to consummate a transaction." [50] Additionally, the Proxy Statement reveals that the Non-conforming Bidder was asked to participate in the Second Round because of its size, reputation, and ability to close a potential transaction. The Proxy Statement reports that bids ranged from $ 21 to $ 26 per share, including bids from Bidder A at a price range of $ 24 to $ 24.50 per share and from Apax at $ 23 to $ 25 per share.

Distilled, the Plaintiff [*35] contends that because the Board chose to reject bids below $ 23 on February 8, 2008, and Apax's bid ultimately fell below that price point, TriZetto should have disclosed its decision not to invite bidders submitting offers below $ 23 to the Second Round. Although revealing the breaking point may have been desirable, the Plaintiff has failed to show that disclosing it would alter the total mix of information available to the stockholders. By disclosing that there was some initial interest as high as $ 26, the Proxy Statement made shareholders aware that some potential bidders--at least in February, 2008--may have been willing to pay more than the Transaction Price.

The Plaintiff also contends that the Proxy Statement should have revealed that TriZetto failed to reengage previously rejected bidders and that it even turned some of these bidders away after expressions of interest continued. The Proxy Statement provides that three of the seven conforming bidders were rejected on February 8, 2008, leaving four conforming bidders and the Non-conforming bidder. [51] The Proxy Statement relates that one of the Second Round participants withdrew on February 28 and that two other bidders, the Non-conforming [*36] Bidder and Bidder Z, failed to submit definitive proposals by the March 7 deadline. [52] Thus, at this point along the Proxy Statement's chronology, only Bidder A and Apax remained. The Proxy Statement does not discuss the Non-conforming Bidder or Bidder Z, again in connection with the sale process.

Likewise, after its description of the Board's determination as to which bidders to invite to the Second Round, the Proxy Statement does not mention the rejected First Round bidders again. Consequently, a fair reading of the Proxy Statement reveals that after March 11, 2008, only Bidder A and Apax were considered.

Therefore, the Proxy Statement makes the following information available: some bidders initially expressed interest as high as $ 26 per share; Bidder A was selected partly based on its bid of $ 24.50 to $ 26 per share in early March; after March 11, only Bidder A and Apax were considered; Bidder A withdrew its offer on March 17; Apax's bid was $ 21 on March 28; and as of April 11, the Transaction Price was $ 22. This information is sufficient to inform shareholders that even after Apax's bid was lowered to $ 21 per share, other offers were not seriously [*37] considered. Accordingly, the Proxy Statement satisfactorily discloses that previously rejected bidders were not reengaged.

As to the continued interest of previous bidders, *HN9* our law is clear that when fiduciaries choose to provide the history of a transaction, they have an obligation to provide shareholders with "an accurate, full, and fair characterization of those historic events." [53] This does not mean, however, that a board must give a "play-by-play" recitation of the events leading up to a transaction. [54] In the usual case, where a board has not received a firm offer or has declined to continue negotiations with a potential acquirer because it has not received an offer worth pursuing, disclosure is not required. [55] The Plaintiff has failed to demonstrate that any previously rejected bidder put forward what could be characterized as approaching a firm offer in March 2008 (or thereafter). The record shows that although the Non-conforming Bidder and Bidder Z continued to express interest in TriZetto, Bidder Z had requested approximately four more weeks to conduct due diligence and the Non-conforming Bidder had requested three to four more weeks of due diligence and an exclusivity agreement.

---

49   *See* Proxy Statement at 22.

50   *Id.*

51   *Id.* at 22-23.

52   *Id.* at 23.

53   *Globis Partners, L.P. v. Plumtree Software, Inc.,* 2007 Del. Ch. LEXIS 169, 2007-WL 4292024, at *14 (Del. Ch. Nov. 30, 2007).

54   *Id.*

55   *See Skeen v. Jo-Ann Stores, Inc.,* 1999 Del. Ch. LEXIS 193, 1999 WL 803974, at *8 (Del. Ch. Sept. 27, 1999), *aff'd,* 750 A.2d 1170 (Del. 2000); *see also Alessi v. Beracha* 849 A.2d 939, 948 (Del. Ch. 2004) ("Casual inquiries or mere expressions of interest need not be disclosed.").

2008 Del. Ch. LEXIS 78, *38

[*38] No one had put forth a firm offer and there is no reason to believe that any firm offer would be forthcoming. The potential interest of others is mere speculation and, thus, not material.

Accordingly, the Plaintiff has failed to show that the breaking point or TriZetto's failure to reengage previously rejected bidders are material omissions.

(ii) Apax's Status in the Sale Process

A central theme in the Plaintiff's moving papers is that Apax was a favored bidder in the sale process. Although perhaps better presented as a substantive claim, the Plaintiff has brought disclosure challenges related to this issue that, as with the substantive claim, the Court finds unavailing.

The Plaintiff argues that the Proxy Statement's failure to disclose that Apax was given access to important nonpublic information about the Company before the initiation [*39] of the bidding process is a material omission. The Court disagrees. In connection with the PIPE Transaction, Apax received certain nonpublic financial, market, and business information regarding TriZetto. [56] Specifically, certain budgets and forecasts were shared with Apax in November of 2007 in connection with the PIPE Transaction. After that date, TriZetto sent Apax--as well as Deutsche Bank, UBS, and another potential acquirer--nonpublic information in early December 2008, unrelated to the PIPE Transaction. [57] The Plaintiff argues that this information gave Apax an advantage over other potential suitors and implies that Apax used this information to TriZetto's disadvantage by lowering its initial oral indication of interest of $ 24.50 to $ 26 a share to $ 21 to $ 23 in its first written indication on December 7, 2007. [58] Apax's Satvat could not recall if Apax had used nonpublic information in formulating its initial written expression of interest.

The parties do not dispute, however, that substantially similar information was made available to the other potential bidders before First Round bidding had closed. In actuality, the bidders were provided with better information through the online data room, including updated projections for 2008 and the actual results of calendar 2007's fourth quarter. Because all potential bidders were provided with similar or better information by the First Round bid submission deadline, a reasonable shareholder would not find disclosures along these lines important, especially where the Plaintiff has not argued that potential acquirers were turned away before First Round bidding.

The Plaintiff also submits that TriZetto's management, especially Margolis, favored Apax, and material circumstances surrounding this favored relationship are not disclosed in the Proxy Statement. In addition to the nonpublic information that TriZetto provided to Apax early in the process, [*41] which the Court has already found immaterial, the Plaintiff has quoted various email exchanges between Margolis and an Apax representative on March 30, 2008, in support of its claim in fairness. Although the quoted excerpts do give the impression that Margolis was weighting the sale process toward Apax, when read in their entirety, the emails read as having been authored by a chief executive officer engaged in earnest negotiation. The Plaintiff also points to evidence indicating that Margolis would likely be offered employment with any resulting Apax controlled entity. There is no evidence of actual negotiation regarding post-merger employment. Even so, the Proxy Statement states, "[Apax] has previously indicated its belief that the continued involvement of [the] management team is integral . . . ." [59] Furthermore, given the substantial cash proceeds Margolis is to receive in the event a cash-out transaction is consummated with any suitor--proceeds largely due to his stockholdings--the Court is doubtful that he would be significantly motivated by the prospect of continued employment at the expense of a reduced per-share price. [60]

Therefore, because the Plaintiff has not made an adequate showing that these circumstances indicate that Apax was a favored bidder, the Court rejects his contention that the Proxy Statement should be required to include additional information along those lines.

---

[56]   Satvat Aff. at 54-55.

[57]   Additionally, TriZetto's Senior Vice President of Corporate Development asked Apax, instead of TriZetto's financial advisor, for information regarding premiums paid in comparable transactions.

[58]   The Plaintiff has [*40] argued that Apax suspiciously raised its bid to $ 23 to $ 25 per share in order to participate in the Second Round, but then quickly reduced it to $ 23 and then $ 21 per share. No evidence in the record supports malfeasance on this account.

[59]   Proxy Statement at 39.

[60]   The Plaintiff also offers that [*42] Margolis's assistance in recruiting Regence to join with Apax and BCBST indicates favoritism. A more pragmatic concern may have motivated this action: the desire to close a sale transaction.

2008 Del. Ch. LEXIS 78, *41

## C. Irreparable Harm

As discussed above, **HN10** stockholders approving the sale of a company, as TriZetto's stockholders are now being asked to do, are entitled to full and complete disclosure of material facts *before* they vote on a proposed transaction. Indeed, Delaware has an indisputable preference for a fully informed stockholder vote on such matters, and this Court has not hesitated to enjoin transactions pending disclosure of additional material facts. [61] The reason for this is clear: an appropriate post hoc monetary remedy for what amounts to an informational injury is not only difficult to calculate with any meaningful precision, but also it completely undermines the purpose of requiring full disclosure of material facts in the first instance. [*43] Although it is theoretically possible to fashion monetary relief in some cases, [62] a breach of the disclosure duty actually results in irreparable harm to the stockholders that is better addressed through an injunctive remedy. [63]

**HN11** The directors' disclosure duty is premised upon the stockholders' right to be informed of all material facts when casting a vote on a proposed transaction, and the standard for determining the materiality of an undisclosed fact turns on whether it would have altered the total mix of information available to the stockholders in considering [*44] how to vote on the proposed transaction. It necessarily follows, then, that a previously undisclosed material fact only assumes meaningful significance when, in fact, it can be considered before the vote; money damages after-the-fact constitute, at best, an inadequate consolation prize. [64] In light of this reality, this Court's stated preference is to avoid the damages issue altogether through an injunctive remedy requiring additional disclosures in advance of the stockholder vote whenever possible. [65]

Again, the role of the financial advisor, including its authorship [*45] of the fairness opinion in the sale scenario, is critical and, oftentimes, as it is here, an important underpinning of the directors' recommendation of support for a particular transaction. Perhaps it is unavoidable that financial advisors regularly seem to suffer from conflicts of one degree or another, but, if that is the likely state of affairs, then the stockholders are entitled to know what material factors, if any, may be motivating the financial advisor. The Company is asking its stockholders to have faith in UBS and to rely upon its expertise; UBS may well be deserving of that confidence, but the stockholders have every right to expect the Company to share with them any extraneous, substantial reasons UBS may have for seeing that the transaction is consummated. [66] In this instance, the Company has failed to achieve that objective and the denial of the stockholders' right to full and complete disclosure as

---

61   *E.g.*, In re Lear Corp. S'holder Litig., 926 A.2d 94 (Del. Ch. 2007); In re Netsmart Techs., 924 A.2d 171; In re MONY Group, Inc. S'holder Litig., 852 A.2d 9 (Del. Ch. 2004).

62   *See generally* In re J.P. Morgan Chase & Co. S'holder Litig., 906 A.2d 766 (Del. 2006).

63   In re Transkaryotic, 2008 Del. Ch. LEXIS 76, 2008 WL 2462767, at *10 (citing Berger v. Pubco Corp., 2008 Del. Ch. LEXIS 63, 2008 WL 2224107, at *4 (Del. Ch. May 30, 2008); In re Netsmart Techs., 924 A.2d at 207; Allen v. News Corp., 2005 Del. Ch. LEXIS 27, 2005 WL 415095, at *1 (Del. Ch. Feb. 3, 2005); In re MONY Group, 852 A.2d at 18; ODS Techs., Inc. v. Marshall, 832 A.2d 1254, 1262 (Del. Ch. 2003); and In re Pure Res., 808 A.2d at 452).

64   *See* 2008 Del. Ch. LEXIS 76, [WL] at *7-10 (discussing the evolution of Delaware's jurisprudence with respect to damages for disclosure violations).

65   2008 Del. Ch. LEXIS 76, [WL] at *10; Globis Partners, L.P., 2007 Del. Ch. LEXIS 169, 2007 WL 4292024, at *10; *see also* In re Staples, Inc. S'holders Litig., 792 A.2d 934, 960 (Del. Ch. 2001) (**HN12** "Delaware case law recognizes that an after-the-fact damages case is not a precise or efficient method by which to remedy disclosure deficiencies. . . .Therefore, our cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.").

66   The TriZetto Defendants have suggested that they are limited in their ability to make these disclosures because UBS is unwilling to share the necessary information regarding [*46] its holdings. *See* Gantler, 2008 Del. Ch. LEXIS 20, 2008 WL 401124, at *19 (**HN13** a board is only required to disclose information within its control). There are two possible answers to this predicament. First, perhaps the Board should reconsider its choice of financial advisor. One wonders how a board should expect its stockholders to rely upon the sponsor of a fairness opinion who is unwilling to disclose the nature and scope of its potential conflicts. Second, perhaps (and the Court need not express a view at this time) disclosure of the financial advisor's unwillingness to provide the appropriate information should be shared with the stockholders and then they would be able to consider that recalcitrance in their own assessment of whether to rely upon the fairness opinion and to approve the proposed transaction. It also should be repeated that the record supports the inference that the interests of UBS at stake in this matter are material. After all, the fact that there are such holdings was disclosed in the Proxy

to the peculiar interests of the financial advisor in the Merger constitutes irreparable harm. [67]

D. *Balancing of the Equities*

Ordinarily, balancing the equities between (a) ordering full and complete disclosure to enable stockholders to make an informed decision and (b) a short delay required to allow additional disclosure is a fairly simple task. TriZetto, however, has spoken of quasi-catastrophic consequences that might befall it and its stockholders if even a short delay results. It speculates that the transaction might fall apart and the stockholders would lose the benefit of the $ 22 per share bargain which they likely want to receive and, even more ominously, that it might fall apart in such a way that Apax could escape its obligation to pay the reverse termination fee of $ 65 million.

The Court, of course, cannot guarantee that the transaction, assuming it is approved by the **[*48]** stockholders, will not fall apart or that Apax will not take advantage of the circumstances and seek to avoid the reverse termination fee. Those outcomes, if either should occur, are not likely to be attributable to any interim injunctive relief prescribed to assure proper disclosure to the stockholders. The list of unfortunate events posited by TriZetto is, at most, speculative, and does not outweigh the value to be placed upon an informed stockholder vote.

In sum, the equities clearly favor the interim relief necessary to allow the stockholders the opportunity to be an informed voter, aided by an understanding of the financial advisor's possible separate incentives to support the transaction. [68]

**IV. CONCLUSION**

For the reasons set forth above, the Court concludes, after balancing the various factors guiding the exercise of its discretion, that the **[*49]** vote of the stockholders of TriZetto should be enjoined preliminarily, pending either final hearing on the merits of the Plaintiff's disclosure claim or an appropriate, curative disclosure to the stockholders regarding

the potential benefits of the transaction to UBS because of its holdings of various instruments issued by TriZetto. Otherwise, because the Plaintiff has failed to demonstrate a reasonable probability of success on its other claims and because no other equitable considerations call out for interim relief, the Plaintiff's motion for a preliminary injunction is denied.

An implementing order will be entered.

**ORDER**

**AND NOW,** this 27th day of June, 2008, for the reasons set forth in the Court's Memorandum Opinion of even date,

**IT IS HEREBY ORDERED:**

1. Plaintiff's Motion for a Preliminary Injunction is granted part;

2. Defendant The TriZetto Group, Inc. ("TriZetto") and Defendants Jeffrey H. Margolis, Donald J. Lothrop, Paul E. LeFort, Jerry P. Widman, Nancy H. Handel, and L. William Krause, and their agents and all persons acting under, in concert with, or for them are preliminarily enjoined from conducting or allowing any vote by the stockholders of The TriZetto Group, Inc. upon **[*50]** a proposal to approve and adopt the agreement and plan of merger, dated as of April 11, 2008 (the "Merger Agreement"), by and among TZ Holdings, L.P. ("TZ Holdings"), TZ Merger Sub, Inc. ("Merger Sub"), and TriZetto, and to approve TZ Holdings' acquisition of TriZetto through a merger of Merger Sub, a wholly-owned subsidiary of TZ Holdings, with and into TriZetto, as contemplated by the Merger Agreement;

3. This Order, upon application, may be vacated upon demonstration that Defendant The TriZetto Group, Inc. has provided its stockholders with appropriate curative disclosures as identified in Part III(B)(2)(b)(ii) of the Court's Memorandum Opinion of even date;

4. The preliminary injunction imposed by this Order shall be effective upon Plaintiff's posting of an unsecured bond in the sum of $ 10,000.

---

Statement, and post-merger negotiations over these holdings are anticipated. There is no reason to believe that only incidental or immaterial holdings are in play.

[67]  **HN14** The touchstone of irreparable injury **[*47]** is the absence of any "adequate recompense." Because of the shortcomings inherent in any effort to ascribe monetary value to a failure to fully inform stockholders, "adequate recompense" to compensate shareholders for disclosure violation is an elusive goal. *See* DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12.02[e], at 12-27 (2008).

[68]   In a similar vein, TriZetto has argued that the Plaintiff should be required to post a $ 65 million bond to secure any preliminary injunction in the event that any failure of the transaction is attributable to the interim relief. Such a bond, in these circumstances, would be unprecedented and, for the reasons set forth above, unwarranted.

2008 Del. Ch. LEXIS 78, *50

5. Otherwise, Plaintiff's Motion for a Preliminary Injunction is denied.

Vice Chancellor

*/s/ John W. Noble*